# Exhibit C

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| NATIONWIDE MUTUAL INSURANCE COMPANY, NATIONWIDE MUTUAL FIRE INSURANCE COMPANY, NATIONWIDE LIFE INSURANCE COMPANY, NATIONWIDE GENERAL INSURANCE COMPANY, NATIONWIDE VARIABLE LIFE COMPANY, COLONIAL INSURANCE COMPANY OF CALIFORNIA later known as COLONIAL INSURANCE COMPANY OF WISCONSIN and still later known as NATIONWIDE ASSURANCE COMPANY, and NATIONWIDE PROPERTY AND CASUALTY COMPANY, | : : : : : : : : : : : : : : | CIVIL NO. 301CV02 (AHN) |
| Plaintiffs, | : : | |
| v. | : : | |
| RONALD P. MORIN, SR., d/b/a BUCKLAND HILLS INSURANCE AGENCY, TRI-TOWN AGENCY, ENFIELD SQUARE AGENCY, CHET W. KOELSCH, d/b/a ENFIELD SQUARE AGENCY and RONALD MORIN, JR., | : : : : : : | |
| Defendants. | : | APRIL 2, 2001 |

**ANSWER, AFFIRMATIVE DEFENSES AND COUNTERCLAIM TO PLAINTIFFS'**
**COMPLAINT AND DEMAND FOR TRIAL BY JURY**

The Defendants, Ronald P. Morin, Sr., d/b/a Buckland Hills Insurance Agency, Tri-Town

Agency, Enfield Square Agency, Chet W. Koelsch, d/b/a Enfield Square Agency and Ronald

Morin , Jr., hereby answer the Plaintiffs' complaint, and make demand respectively for trial by

jury.

HART1-925160-1

## I.     PRELIMINARY STATEMENT.

With respect to the preliminary statement, Defendant Morin, Sr., d/b/a Buckland Hills Insurance Agency, Tri-Town Agency, Enfield Square Agency, ("Morin") admits that he had a contractual relationship with Nationwide but denies the remaining allegations to the extent they are addressed to him. Each of the remaining Defendants deny the allegations of the preliminary statement to the extent they are addressed to him. To the extent that the allegations of the preliminary statement are addressed to one of the Defendants, each of the remaining Defendants lacks sufficient knowledge or information upon which to base a reply, and therefore the allegations are denied and the Plaintiffs are left to their proof.

## II.     JURISDICTION.

1.     With respect to paragraph 1, each of the Defendants lacks sufficient knowledge or information upon which to base a reply, and therefore the allegations are denied and the Plaintiffs are left to their proof.

2.     With respect to paragraph 2, each of the Defendants lacks sufficient knowledge or information upon which to base a reply, and therefore the allegations are denied and the Plaintiffs are left to their proof.

3.     With respect to paragraph 3, each of the Defendants lacks sufficient knowledge or information upon which to base a reply, and therefore the allegations are denied and the Plaintiffs are left to their proof.

## III.     PARTIES.

4.     With respect to paragraph 4, each of the Defendants lacks sufficient knowledge or information upon which to base a reply, and therefore the allegations are denied and the Plaintiffs are left to their proof.

5.     Each of the Defendants admits paragraph 5

6.     Each of the Defendants admits paragraph 6.

7.     Each of the Defendants admits paragraph 7

8.     Each of the Defendants admits paragraph 8 except that Morin no longer does business as the Enfield Square Agency.

9.     Each of the Defendants denies paragraph 9.

10.     Each of the Defendants admits paragraph 10.

11.     Each of the Defendants admits paragraph 11.

12.     Each of the Defendants admits the first and second sentences of paragraph 12. Each of the Defendants denies the third sentence of paragraph 12. With respect to the fourth sentence of paragraph 12, the Defendants lack sufficient knowledge or information upon which to base a reply, and therefore the allegations are denied and the Plaintiffs are left to their proof.

13.     Each of the Defendants denies paragraph 13 except that with respect to the third sentence, the Defendants lack sufficient knowledge or information upon which to base a reply, and therefore the allegations are denied and the Plaintiffs are left to their proof.

## IV.     FACTS.

14.     Each of the Defendants admits the allegations of paragraph 14.

15.    Defendant, Morin admits that he signed Exhibit A but denies the remaining allegations of paragraph 15. Each of the remaining Defendants lacks sufficient knowledge or information upon which to base a reply, and therefore the allegations are denied and the Plaintiffs are left to their proof.

16.    Defendant, Morin denies the allegations of paragraph 16 as pled and refers to Exhibit A for a true and complete statement of the terms and conditions of his contract. Each of the remaining Defendants lacks sufficient knowledge or information upon which to base a reply, and therefore the allegations are denied and the Plaintiffs are left to their proof.

17.    Defendant, Koelsch admits that he was an associate agent of Morin and that he signed Exhibit C. Defendant, Koelsch denies the remaining allegations of paragraph 17 and refers to Exhibit C for a true and complete statement of the terms and conditions of the associate agent agreement. Defendant, Morin, Jr., admits that he was an associate agent of Morin and that he signed Exhibit D. Defendant, Morin, Jr. denies the remaining allegations of paragraph 17 and refers to Exhibit D for a true and complete statement of the terms and conditions of the associate agent agreement.

18.    Each of the Defendants denies the first sentence of paragraph 18. Defendants admit that a true and complete copy of the AOA Lease is attached to plaintiff's complaint as Exhibit B.

19.    Each of the Defendants denies the allegations of paragraph 19 as pled and refers to Exhibit B for a true and complete statement of the terms and conditions of the AOA Lease.

20.    Defendant, Koelsch admits that he signed Exhibit C. Defendant, Morin, Jr. admits that he signed Exhibit D. To the extent that the allegations of paragraph 20 are addressed

-4-

to one of the Defendants, each of the remaining Defendants lacks sufficient knowledge or information upon which to base a reply, and therefore, the allegations are denied and the Plaintiffs are left to their proof.

21.    Each of the Defendants denies the allegations of paragraph 21.

22.    Each of the Defendants denies the allegations of paragraph 22.

23.    Each of the Defendants denies the allegations of paragraph 23.

24.    Each of the Defendants admits the allegations of the first sentence of paragraph

24.  Each of the Defendants denies the allegations of the second sentence of paragraph 24.

25.    Each of the Defendants denies the allegations of paragraph 25.

26.    With respect to paragraph 26, each of the defendants admits that Nationwide made demand upon Morin for return of certain information and property, including policyholder files, but denies that said demand was legally accurate or justifiable

27.    Each of the Defendants denies the allegations of paragraph 27.

28.    Each of the Defendants denies the allegations of paragraph 28.

## COUNT ONE

29.    Each of the Defendants' responses to paragraphs 1 through 28 above are incorporated herein by reference as if fully set forth and repeated herein.

30.    Each of the Defendants denies the allegations of paragraph 30.

31.    Each of the Defendants denies the allegations of paragraph 31.

32.    Each of the Defendants denies the allegations of paragraph 32.

33.    Each of the Defendants denies the allegations of paragraph 33.

34.    Each of the Defendants denies the allegations of paragraph 34.

35.    Each of the Defendants denies the allegations of paragraph 35.

36.    Each of the Defendants denies the allegations of paragraph 36.

### COUNT TWO

37.    Each of the Defendants' responses to paragraphs 1 through 36 above are incorporated herein by reference as if fully set forth and repeated herein.

38.    Each of the Defendants denies the allegations of paragraph 38.

39.    Each of the Defendants denies the allegations of paragraph 39.

### COUNT THREE

40.    Each of the Defendants' responses to paragraphs 1 through 39 above are incorporated herein by reference as if fully set forth and repeated herein.

41.    Each of the Defendants denies the allegations of paragraph 41.

42.    Each of the Defendants denies the allegations of paragraph 42.

43.    Each of the Defendants denies the allegations of paragraph 43.

### COUNT FOUR

44.    Each of the Defendants' responses to paragraph 1 through 43 above are incorporated herein by reference as if fully set forth and repeated herein.

45.    Each of the Defendants denies the allegations of paragraph 45.

46.    Each of the Defendants denies the allegations of paragraph 46.

47.    Each of the Defendants denies the allegations of paragraph 47.

48.    Each of the Defendants denies the allegations of paragraph 48.

49.    Each of the Defendants denies the allegations of paragraph 49.

## COUNT FIVE

50.    Each of the Defendants responses to paragraphs 1 through 49 above are incorporated herein by reference as if fully set forth and repeated herein.

51.    Each of the Defendants denies the allegations of paragraph 51.

52.    Each of the Defendants denies the allegations of paragraph 52.

53.    Each of the Defendants denies the allegations of paragraph 53.

54.    Each of the Defendants denies the allegations of paragraph 54.

55.    Each of the Defendants denies the allegations of paragraph 55.

## COUNT SIX

56.    Each of the Defendants' responses to paragraphs 1 through 55 above are incorporated herein by reference as if fully set forth and repeated herein.

57.    Each of the Defendants denies the allegations of paragraph 57.

58.    Each of the Defendants denies the allegations of paragraph 58.

59.    Each of the Defendants denies the allegations of paragraph 59.

60.    Each of the Defendants denies the allegations of paragraph 60.

61.    Each of the Defendants denies the allegations of paragraph 61.

## COUNT SEVEN

62.    Each of the Defendants' responses to paragraphs 1 through 61 above are incorporated herein by reference as if fully set forth and repeated herein.

63.    Each of the Defendants denies the allegations of paragraph 63.

64.    Each of the Defendants denies the allegations of paragraph 64.

65.    Each of the Defendants denies the allegations of paragraph 65.

66.    Each of the Defendants denies the allegations of paragraph 66.

67.    Each of the Defendants denies the allegations of paragraph 67.

68.    Each of the Defendants denies the allegations of paragraph 68.

69.    Each of the Defendants denies the allegations of paragraph 69.

70.    Each of the Defendants denies the allegations of paragraph 70.

71.    Each of the Defendants denies the allegations of paragraph 71.

72.    Each of the Defendants denies the allegations of paragraph 72.

73.    Each of the Defendants denies the allegations of paragraph 73.

### COUNT EIGHT

74.    Each of the Defendants' responses to paragraphs 1 through 73 above are incorporated herein by reference as if fully set forth and repeated herein.

75.    Each of the Defendants denies the allegations of paragraph 75.

76.    Each of the Defendants denies the allegations of paragraph 76.

77.    Each of the Defendants denies the allegations of paragraph 77.

78.    Each of the Defendants denies the allegations of paragraph 78.

### COUNT NINE

79.    Each of the Defendants' responses to paragraphs 1 through 78 above are incorporated herein by reference as if fully set forth and repeated herein.

80.    Each of the Defendants denies the allegations of paragraph 80.

81.    Each of the Defendants denies the allegations of paragraph 81.

82.    Each of the Defendants denies the allegations of paragraph 82.

83.    Each of the Defendants denies the allegations of paragraph 83.

84.    Each of the Defendants denies the allegations of paragraph 84.

## COUNT TEN

85.    Each of the Defendants' responses to paragraphs 1 through 84 above are incorporated herein by reference as if fully set forth and repeated herein.

86.    Each of the Defendants denies the allegations of paragraph 86.

87.    Each of the Defendants denies the allegations of paragraph 87.

## AFFIRMATIVE DEFENSES

### FIRST AFFIRMATIVE DEFENSE

The Plaintiffs' claims for equitable relief in this action are barred by laches.

### SECOND AFFIRMATIVE DEFENSE

Had Nationwide acted in good faith compliance with the contracts between it and the Defendant, Morin it would at most have been entitled to keep substantial earnings of the Defendant, Morin as potential liquidated damages, but it forfeited such by its wrongful treatment of Defendants, including the institution of this lawsuit.

### THIRD AFFIRMATIVE DEFENSE

The Plaintiffs are precluded from obtaining equitable relief because of their own unclean hands and inequitable conduct.

### FOURTH AFFIRMATIVE DEFENSE

The Plaintiffs had an adequate remedy at law, which they elected to forfeit.

## FIFTH AFFIRMATIVE DEFENSE

The Plaintiffs actions are in violation of public policies in that they are illegal attempts to suppress competition and/or to deprive the Defendants of rights and privileges protected by the United States and Connecticut Constitutions.

## SIXTH AFFIRMATIVE DEFENSE (As to Counts One, Two, Three, Four, Eight and Ten)

These counts each fail to state a claim upon which relief may be granted.

## SEVENTH AFFIRMATIVE DEFENSE (As to Count Eight)

If any of the Defendants interfered as alleged, which interference is denied, then such Defendant was privileged to do so.

### COUNTERCLAIM

## FIRST COUNT

1.      Ronald P. Morin, Sr., ("Morin") is a citizen of the State of Connecticut.

2.      Nationwide Mutual Insurance Company, Nationwide Mutual Fire Insurance Company, Nationwide Variable Life Insurance Company, Nationwide Property and Casualty Insurance Company, Nationwide General Insurance Company and Nationwide Life Insurance Company, are corporations incorporated in the State of Ohio and each has its principal place of business in Ohio. Colonial Insurance Company of California is a corporation incorporated in the State of Wisconsin with its principal place of business in Ohio. The several corporations are hereinafter collectively referred to as "Nationwide".

3.     The matter in controversy exceeds the sum of $75,000.00, exclusive of interest and costs.

4.     Jurisdiction is based on 29 U.S.C. § 1132 (e) and (f) and/or on 28 U.S.C. § 1332 and § 1367.

5.     Commencing in 1990, Morin became affiliated with Nationwide in the sale of insurance policies issued by Nationwide.

6.     On or about December 1, 1990, Morin signed a contract drafted by Nationwide. (A copy of the standard contract form signed by Mr. Morin is attached hereto as Exhibit A and is made a part of this paragraph).

7.     Other individuals who contracted with Nationwide to sell its products during the period when Morin was under contract with Nationwide, had signed similar contracts containing language substantially identical to that found in Exhibit A.

8.     In particular, each contract contained language substantially identical to paragraph 11 in Exhibit A.

9.     Among the contractees who was working pursuant to such a substantially identical contract was Robert Darden.

10.     Commencing in or around November 8, 1983, Mr. Darden and others who also had substantially identical contracts began legal proceedings in the United States District Courts, the goal of which was to establish that they were under the control of Nationwide and, therefore, the benefits accrued pursuant to their contracts' provisions, which contracts included provisions that were the same as or substantially the same as paragraph 11 of Exhibit A were protected by 29 U.S.C. § 1001, *et seq.* (hereinafter collectively referred to as "ERISA").

11.     Throughout legal proceedings instituted by Mr. Darden and others, the goals of which were to obtain ERISA protection, Nationwide took the position that contractees such as Mr. Darden were not subject to its control, were free to terminate their relationships with Nationwide at any time and were thereafter free to submit information concerning their customers who owned policies with Nationwide to other companies, to solicit both their customers and such other companies, to offer replacement policies to customers who owned Nationwide policies and to use their files and other information obtained by them during their period of contractual relationship with Nationwide in order to compete with Nationwide.

12.     Throughout the proceedings instituted by Mr. Darden and others, Nationwide never claimed or contended that it owned or retained the exclusive right to the possession and use of the files of or information contained in the files of contractees such as Mr. Darden, nor that contractees such as Mr. Darden were prohibited by their contracts from retaining and using such information or from providing same to competitors of Nationwide in order to obtain quotes for the issuance of policies to the customers of such contractees following their terminations.

13.     To the contrary it contended throughout those proceedings that contractees were free to terminate, subject only to forfeiture of their Agency Security Compensation, and that after termination such former contractees had the right to retain their files, to solicit competing quotes, to provide customer names and insurance information to competitors and to compete with Nationwide for the sale of non-Nationwide insurance products to third parties, including customers of such contractees who were insured by Nationwide during such contract period.

14.    In addition, it contended that the only proscription on such activities of such

contractees after termination was the forfeiture provisions in their contracts, which provisions

were substantially similar if not identical to the provisions found in paragraph 11 of Exhibit A.

15.    In support of such contention Nationwide filed pleadings with the United States

Supreme Court, which included the following representation:

> Darden asserts that Nationwide "owned" his agency's policy
> expirations (Respondent's Brief at 43), as if Nationwide had an
> exclusive right to solicit future business from Darden's clientele
> when their policies came due for renewal or expiration. That
> assertion is false. Under the agreement between Darden and
> Nationwide, neither party held such an exclusive right:
> Nationwide retained the right to solicit its policyholders and thus
> to compete with Darden for their future business (JA 11, P10), just
> as Darden could (and did) compete with Nationwide for that
> business if he considered it more valuable than the compensation
> Nationwide agreed to pay if he refrained from so doing. (See JA
> 11-18, P11; JA 51).[4]
>
>> Fn.[4]    Darden's assertion that Nationwide could
>> prevent him from competing by enforcing a
>> restrictive covenant in state court (Respondent's
>> Brief at 38) is false. By its terms, the restrictive
>> covenant in Darden's agreement ceased to apply
>> after his fifth year as a Nationwide agent (JA 18-19,
>> P12), and Darden was a Nationwide agent for
>> eighteen years. (See Pet. App. 33a). After the fifth
>> year, the contract permitted Darden to solicit
>> Nationwide policyholders but offered him
>> compensation (including the Deferred
>> Compensation Incentive Credits in issue here) if he
>> refrained from doing so. (JA 17, P11). At trial,
>> Darden expressly acknowledged that this
>> compensation was offered as a "surrogate" for
>> policy expirations and was of "rough[ly] equivalent
>> . . . value." (Tr. 70).

16.     The United States Supreme Court accepted the contentions of Nationwide and ruled in Nationwide Mut. Ins. Co. v. Darden, 503 U.S. 318, 112 S.Ct. 1344, 117 L.Ed. 2d 581 (1992), that the facts offered by Nationwide in support of its claim that it did not control contractees sufficiently to make them "employees" for the purpose of ERISA protection raised issues requiring the lower court to reconsider the finding that Mr. Darden was an "employee." The case was, therefore, reversed and remanded.

17.     Following its success in the United States Supreme Court, Nationwide began to develop and implement new policies and practices the goals of which were to impose the type of control that it had denied exercising in the legal proceedings pursued by contractees such as Mr. Darden.

18.     One such practice involved the imposition of the requirement that all contractees lease computers and software from Nationwide at their own expense.

19.     While the stated purpose of such leasing was to replace the paper files maintained by the contractees with a paperless file system, Nationwide configured such computer system so that it had access to all the information inputted by the contractees and could review and retrieve such information at any time, without the contractees' knowledge or consent.

20.     In addition, Nationwide adopted the practice of claiming that the information obtained and inputted by the contractees somehow became materials or supplies provided to them by Nationwide, that such information constituted the sole property of Nationwide, and that such information was not available for use by the contractees upon termination notwithstanding the provisions found in paragraphs 1 and 11f(2) of Exhibit A.

-14-

21.    In order to bolster its new post-Darden position Nationwide unilaterally adopted self-serving codes of ethics, rules and regulations, policies and procedures and mandatory training, the purposes of which were to assert control over its contractees, and to claim exclusive ownership of and control over the particular information that it had denied controlling in the proceedings instituted by its contractees, including Mr. Darden.

22.    In adopting such positions Nationwide ignored the terms of its contracts, and in particular, ignored the express provisions of paragraphs 1, 11 and 17 of such contracts.

23.    On or about February 6, 2000, Morin terminated his contract with Nationwide.

24.    Morin then commenced to sell insurance products provided by other carriers.

25.    As a result, Nationwide has taken the position that Morin has forfeited all of his rights to those retirement and deferred compensation benefits, that had accrued over the years, and which exceeds $ 791,500.00.

26.    Commencing in or about January of 1998 and continuing into 2001, a significant number of contractees have exercised their right to terminate their contracts and to compete with Nationwide.

27.    In each such instance, Nationwide claimed that said contractees had forfeited their right to the accrued retirement and compensation benefits.

28.    Nevertheless, Nationwide undertook a policy of suing selected contractees in order to deprive them of their contractual rights to solicit, to compete and to retain the possession and use of all information obtained during their period as contractees.

29.    Nationwide targeted Morin for such a lawsuit.

-15-

30.    The actions against Morin and the actions filed against other contractees had and have the additional goal of intimidating the remaining present or former contractees, in order to further control the nonterminated contractees into staying under contract to Nationwide and in order to cause the non-terminated contractees to fear retribution if they support those who have been sued.

31.    In pleadings filed by Nationwide in such other lawsuits, which pleadings were and are subject to Federal Rules of Civil Procedure (hereinafter "FRCP"), Rule 11, in oral representations made on behalf of Nationwide and in sworn testimony by Nationwide representatives during proceedings in certain federal and state court actions, Nationwide has claimed in words or substance that one, some or all of the following is or are true, when in fact they are not true:

    a.    the positions being taken in presently pending lawsuits are the same positions held by Nationwide prior to and during the Darden litigation;

    b.    the contracts clearly and unambiguously provide that any information with respect to existing or potential customers cannot be used in order to compete with Nationwide following termination;

    c.    the contracts clearly and unambiguously prohibit the transmission by a contractee, following termination, of the contents of any files, whether paper or computer stored to any competitors of Nationwide;

    d.    Nationwide has always held the position that the provisions of their contracts, and prior versions thereof, clearly and unambiguously provide that any files, whether paper or computer-generated, which were created and maintained by contractees

-16-

during their period of relationship with Nationwide, are the sole and exclusive property of Nationwide and can only be used, after termination, by Nationwide;

    e.    any attempt by terminated contractees to use the paper or paperless files or any other materials created by them constitutes civil theft subject to penal sanctions and any attempt to use the computer stored files, which they created, is a crime;

    f.    contractees of Nationwide are the captives of Nationwide;

    g.    the businesses of terminated contractees, except for real estate or personal property owned by them, belong exclusively to Nationwide;

    h.    terminated contractees owe continuing fiduciary duties to Nationwide not to solicit policyholders of, not to submit customer information to competitors of, and not to compete with Nationwide through the use of the contents of any paper or computer-generated files created and maintained by such contractees prior to their terminations;

    i.    terminated contractees owe continuing duties of loyalty to Nationwide not to solicit policyholders of, not to submit customer information to competitors of and not to compete with Nationwide through the use of the contents of any paper or computer generated files created and maintained by them prior to their terminations.

32.    Further, notwithstanding Nationwides more recently contrived claims of pre-and post-termination control over the abilities of Morin and others to engage in the business of selling insurance, it continues to take the position that it can forfeit its obligations with respect to their retirement benefits and deferred earnings.

33.    By virtue of the actions taken by Nationwide with respect to Morin and others in its assertions of control over both existing and terminating contractees, Nationwide has in a legal

-17-

sense made such contractees, including Morin, its "employees" within the meaning of ERISA and, therefore, Morin is entitled to the ERISA protections applicable to his accrued and vested pension benefits and deferred earnings.

34.     Notwithstanding such protection, Nationwide has violated and continues to violate the mandates of ERISA in one or more of the following respects:

a.     it has failed to protect the nonforfeitable benefits accrued by Morin in violation of 29 U.S.C. § 1053;

b.     it has failed to set up a plan containing the features required by 29 U.S.C. § 1102, which features are for the protection of Morin;

c.     it has failed to create a trust for the protection and benefit of Morin as required by 29 U.S.C. § 1103;

d.     it has illegally used benefits of Morin for its own benefit, in violation of 29 U.S.C. § 1103;

e.     it has engaged in prohibited transactions in violation of 29 U.S.C. § 1106;

f.     it has breached the fiduciary duties it owes to Morin in violation of 29 U.S.C. § 1109;

g.     it has imposed illegal forfeiture provisions in violation of 29 U.S.C. § 1110;

h.     it has failed to obtain the bond required for the protection of Morin in violation of 29 U.S.C. § 1112;

i.     it has failed to provide Morin with the notice required by 29 U.S.C. § 1133;

-18-

j.      it has in all respects failed to protect the benefits accrued by Morin in

violation of the requirements of and the public policy established by ERISA.

35.     In addition, or alternatively, Nationwide is barred from denying that the

terminated contractees, including Morin is an "employee" whose accrued benefits are therefore

subject to ERISA protection, because it either committed fraud upon the United States courts in

their prior litigation with contractees, such as Mr. Darden, or it is currently committing a fraud

on the United States courts by taking positions directly contrary to those taken in such prior

litigation.

36.     In addition, or alternatively, Nationwide is estopped from denying control over

the terminated employees, including Morin, sufficient to make him an "employee" for purposes

of ERISA protection because of the pleadings filed, statements made and testimony given by

Nationwide's representatives in suits presently pending or previously disposed of in various state

and federal courts.

**SECOND COUNT**

1.-36.   Paragraphs 1 through 36 of the First Count are made corresponding paragraphs 1

through 36 of the Second Count.

37.     The benefits accrued by Morin pursuant to paragraph 11 of his contract are

benefits contributed by him as an "employee", within the meaning of ERISA.

38.     Such contributions resulted from Nationwide's control of commissions earned by

contractees, which commissions have been kept below rates provided by competitors with the

differentials constituting contributions to the retirement and compensation benefits accruing in favor of Morin.

39.    Nationwide's attempt to retain such benefits is illegal and contravenes the express protections mandated by ERISA.

40.    Nationwide's actions have been the result of its intentional, willful, wanton or reckless plan to subvert the public policy of and the protections provided by ERISA.

## THIRD COUNT

1.-6.    Paragraphs 1 through 6 of the First Count are made corresponding paragraphs 1 through 6 of the Third Count.

7.    Exhibit A further contains an implied duty of good faith and fair dealing running from Nationwide to Morin.

8.    On February 6, 2000, Morin terminated his contract with Nationwide.

9.    Following his termination, Nationwide converted Morin's deferred retirement and compensation benefits, then amounting to over $ 791,500.00, to its own use and benefit.

10.    Notwithstanding its claim of forfeiture pursuant to paragraph 11 of Exhibit A, Nationwide refused to afford and continues to interfere with Morin's exercise of the post-termination rights afforded to him by said paragraph 11 of Exhibit A.

11.    As part of such ongoing interference, Nationwide has sued Morin in an effort to stop him from exercising his contractual rights.

12.    As a result of Nationwide's efforts to interfere with Morin's exercise of his contractual rights, Nationwide has breached its contract with Morin in one or more of the following respects:

-20-

a.  it has interfered and continues to try and interfere with his right to compete freely with Nationwide;

b.  it has interfered and continues to try and interfere with his right to keep materials, records and supplies, which Nationwide claims that it furnished to him;

c.  it has interfered and continues to try and interfere with his right to induce policyholders of Nationwide to lapse, cancel or replace policies in force with Nationwide;

d.  it has interfered and continues to try and interfere with his right to furnish other persons or organizations with the names of Nationwide policyholders so as to facilitate the solicitation of such policyholders for the purchase of insurance or any other purpose;

e.  it has interfered and continues to try and interfere with his right to compete freely by falsely claiming that materials, records or supplies created by Morin or obtained by Morin from sources other than Nationwide are nonetheless the exclusive property of Nationwide, notwithstanding the absence of any such provision in Exhibit A;

f.  it has interfered and continues to try and interfere with Morin's right to compete freely by falsely accusing Morin of breach of a duty of loyalty and/or breach of contract and/or conversion and/or civil theft and/or contract interference and/or interference with business relations and/or violation of the Connecticut Unfair Trade Practices Act and/or violation of the Connecticut Uniform Trade Secrets Act and/or breach of a fiduciary duty and/or unjust enrichment.

13.     One, more or all of the claims set forth in the previous paragraph constitute breaches of Nationwide's duty of good faith and fair dealing either on their face or for one or more of the following reasons:

a.      it or they are not made in good faith and fairly because Nationwide knows that the contract it drafted does not say what it claims it says;

b.      it or they are not made in good faith and fairly because Nationwide knows that it has made contrary claims on prior occasions when its pecuniary interests were better served by espousing such contrary views;

c.      it or they are not made in good faith or fairly because Nationwide is using court proceedings against Morin in order to frighten former contractees into silence or submission;

d.      it or they are not made in good faith and fairly because Nationwide is using the lawsuit against Morin in order to hold present contractees captive by suppressing their right to consider exercising or exercising their contract rights to terminate their relationship with and compete with Nationwide.

14.     By reason of each, some or all of the foregoing breaches, Morin has been deprived of his retirement and deferred compensation benefits, has been required to incur legal fees, and has had his rights to work and to earn interfered with.


## FOURTH COUNT

1.      On or about February 6, 2000, Morin terminated his contract with Nationwide.

2.    Immediately upon Morin's resignation, Nationwide declared that Morin had forfeited all right to his retirement and deferred compensation benefits, which benefits exceed $791,500.00.

3.    Notwithstanding this forfeiture, on or about March 8, 2000, Nationwide threatened to sue Morin unless he submitted to interrogation by Nationwide's lawyers and agreed to several other improper and unlawful demands.

4.    Although Morin refused to accede to Nationwide's threats and demands, he was not sued by Nationwide at the time.

5.    Between July 2000 and December 2000, Morin wrote several letters to the Nationwide Federal Credit Union ("NFCU") questioning the propriety of certain of its activities.

6.    On or about December 2, 2000, Morin wrote to the National Credit Union Administration questioning the propriety of the NFCU's activities.

7.    On or about December 19, 2000, Morin received a letter purportedly from an attorney for the NFCU, which letter was blind carbon copied to Randy Orr and Gregg Backmann, the attorneys for Nationwide who are responsible for coordinating suits against former agents under Nationwide's agency defection plans.

8.    On January 1, 2001, Nationwide mailed the complaint in the present suit to Morin.

9.    This suit was brought against Morin in retaliation for his lawful exercise of his right of free speech as guaranteed by the Connecticut Constitution.

10.    Nationwide's actions also constitute a violation of Connecticut General Statute § 31-51q. By reason of the foregoing conduct, Morin has suffered damages.

-23-

## FIFTH COUNT

1.-15.  Paragraphs 1 through 13 of the Third Count and paragraphs 7 and 8 of the First Count are made corresponding paragraphs 1 through 15 of the Fifth Count.

16.     During most of the years when Morin was under contract with Nationwide, Nationwide took the position that contractees such as Morin were not subject to its control, were free to terminate their relationships with Nationwide at any time and were thereafter free to submit information concerning their customers who had policies issued by Nationwide to other companies, to solicit both their customers and such other companies, to offer replacement policies to customers who had policies issued by Nationwide and to use their files and other information obtained by them during their period of contractual relationship with Nationwide in order to compete with Nationwide.

17.     However, commencing in the 1990's Nationwide began to develop and implement new policies and practices the goals of which were to impose controls on its contractees, which controls were inconsistent with and contrary to the provisions of its contracts, including Exhibit A.

18-20.  Paragraphs 18 through 20 of the First Count are made corresponding paragraphs 18 through 20 of the Fifth Count.

21.     In order to bolster its efforts to control its contractees Nationwide unilaterally adopted self-serving codes of ethics, rules and regulations, policies and procedures and mandatory training requirements, the purposes of which were not only to assert such control over its contractees, but also to claim exclusive ownership of and control over the client information that its contractees accumulated during the course of their contract engagements.

-24-

22-30. Paragraphs 22 through 30 of the First Count are made corresponding paragraphs 22 through 30 of the Fifth Count.

31.     In pleadings filed by Nationwide and in oral representations made on behalf of Nationwide and in sworn testimony by Nationwide representatives during proceedings in a state court action and in other actions, Nationwide has claimed in words or substance that one, some or all of the following is or are true, when in fact it is or they are not true:

a.      the positions being taken in such lawsuits are the same positions taken in earlier lawsuits and are consistent with the views held by Nationwide during most of the years when Morin was under contract;

b.      the contracts clearly and unambiguously provide that any information with respect to existing or potential customers cannot be used in order to compete with Nationwide following termination;

c.      the contracts clearly and unambiguously prohibit the transmission by a contractee, following termination, of the contents of any files whether paper or computer-stored to any competitors of Nationwide;

d.      Nationwide has always held the position that the provisions of their contracts, and prior versions thereof, clearly and unambiguously provide that any files, whether paper or computer-generated, which were created and maintained by contractees during their period of relationship with Nationwide, are the sole and exclusive property of Nationwide and can only be used, after termination, by Nationwide;

-25-

e.       any attempt by terminated contractees to use the paper or paperless files or any other materials created by them constitutes civil theft subject to penal sanctions and any attempt to use the computer-stored files, which they created, is a crime;

f.       contractees of Nationwide are the captives of Nationwide;

g.       the businesses of terminated contractees, except for real estate or personal property owned by them, belong exclusively to Nationwide;

h.       terminated contractees owe continuing fiduciary duties to Nationwide not to solicit policyholders of, not to submit customer information to competitors of, and not to compete with Nationwide through the use of the contents of any paper or computer-generated files created and maintained by such contractees prior to their terminations;

i.       terminated contractees owe continuing duties of loyalty to Nationwide not to solicit policyholders of, not to submit customer information to competitors of and not to compete with Nationwide through the use of the contents of any paper or computer-generated files created and maintained by them prior to their terminations.

32.     Paragraph 32 of the First Count is made paragraph 32 of the Fifth Count.

33-40.  Paragraphs 3-10 of the Fourth Count are hereby made paragraphs 33-40 of the Fifth Count.

41.     The conduct described in the aforesaid paragraphs separately or collectively constituted and continues to constitute unfair methods of competition and/or unfair or deceptive acts or practices in the conduct of Nationwide's trade or commerce.

42.     As a consequence of such unfair competition or unfair or deceptive acts or practices, Morin has suffered ascertainable losses of money, including the loss of his

-26-

accumulated retirement and deferred compensation benefits, the cost of defending himself in this lawsuit, and the effects of Nationwide's interferences with his right to work and earn, which losses are subject to recovery pursuant to Conn. Gen. Stat. § 42-110g(a).

43.     In addition, Morin has incurred and continues to incur costs and attorneys' fees in the prosecution of this action, which costs and fees are subject to recovery pursuant to Conn. Gen. Stat. § 42-110g(d).

## SIXTH COUNT

1-43.     Paragraphs 1 through 43 of the Fifth Count are made corresponding paragraphs 1 through 43 of the Sixth Count.

44.     One, more or all of Nationwide's acts of unfair competition or unfair or deceptive acts or practices were undertaken in reckless, willful or wanton disregard of the rights of Morin, and, therefore, warrant an award of punitive damages pursuant to Conn. Gen. Stat. § 42-110g(a).

## SEVENTH COUNT

1.-13.     Paragraphs 1 through 13 of the Third Count are made corresponding paragraphs 1 through 13 of the Seventh Count.

14.     The actions of Nationwide in interfering with and refusing to honor his contract rights were done in reckless, willful or wanton disregard for the rights of Morin.

15.     Under such circumstances, the actions of Nationwide in keeping Morin's money constituted the unlawful conversion of funds held for the benefit of Morin, and Nationwide was, therefore, stealing his retirement and deferred compensation benefits, in violation of Conn. Gen. Stat. § 52-564, which benefits, at the time of such theft, exceeded $ 791,500.00.

WHEREFORE, Morin claims:

-27-

1.      an accounting for and payment of all sums accumulated by Morin as retirement and deferred compensation benefits;

2.      an accounting for and payment of all earnings or benefits obtained by Nationwide through the use of Morin's retirement and deferred compensation benefits;

3.      interest on all amounts accounted for;

4.      attorneys' fees and costs;

5.      exemplary or penal damages to the extent allowed by ERISA;

6.      compensatory damages;

7.      statutory damages pursuant to Conn. Gen. Stat. § 42-110g(a);

8.      punitive damages pursuant to Conn. Gen. Stat. § 42-110g(a);

9.      attorneys' fees and costs pursuant to Conn. Gen. Stat. § 42-110g(d);

10.     treble damages pursuant to Conn. Gen. Stat. § 52-564.

DEFENDANTS,

By: _____

Frank F. Coulom, Jr. (ct05230)
fcoulom@rc.com
Edward F. Hennessey (ct04222)
ehennessey@rc.com
Maria T. Ackley (ct18118)
mackley@rc.com
Robinson & Cole LLP
280 Trumbull Street
Hartford, CT 06103-3597
Telephone: (860) 275-8200
Fax: (860) 275-8299

-28-

## **CERTIFICATION**

This is to certify that a copy of the foregoing was mailed, postage prepaid, to the

following counsel of record on this 2nd day of April, 2001:

Deborah S. Freeman, Esq.
Nicole J. Anker, Esq.
Bingham Dana LLP
One State Street
Hartford, CT  06103-3178

Frank F. Coulom, Jr.

-29-

A



# AGENT'S
# AGREEMENT

MARCH 15. 1987

# AGENT'S AGREEMENT

## PREFACE

It is the intent of this Agreement to define the conditions governing the business relationship between the parties involved. Only if both parties understand their duties and responsibilities can a mutually satisfactory relationship be established and maintained. The overall objectives of this Agreement are:

1. To provide a relationship which will result in the best possible service to the customer.
2. To assist the Agent in establishing and maintaining a growing agency which is profitable to both the Agent and the Companies.
3. To maintain the Companies' financial strength at the level necessary to protect the policyholders' interest.

## AGENCY APPOINTMENT

Nationwide Mutual Insurance Company, Nationwide Mutual Fire Insurance Company, Nationwide Life Insurance Company, Nationwide General Insurance Company, Nationwide Property and Casualty Insurance Company, Nationwide Variable Life Insurance Company, and Colonial Insurance Company of California, collectively referred to in this Agreement as "we," "us," "Nationwide" or the "Companies," insurance corporations organized and existing under the laws of the States of Ohio and California with their principal offices located at Columbus, Ohio, and Anaheim, California appoint, for those Companies which are authorized in the State listed below,

RONALD P. MORIN
Name

referred to in this Agreement as "you" or the "Agent" of

497 Buckland Road, Brandywine Building, South Windsor, CT          Hartford
Street-Route                          City                          State          County

as an agent to represent the Companies in  Connecticut  , while properly licensed so to act in accordance with the
State

provisions of this Agreement. This Agreement is to become effective   December 1  , 1990

1. **Independent Contractor.** The parties agree that the purpose of this Agreement will be best served by your acting as an independent contractor. Therefore, it is agreed that you are an independent contractor for all purposes. In accordance with the provisions of the Tax Equity and Fiscal Reponsibility Act of 1982, this is to remind you that, since you are an independent contractor and not an employee, you are solely responsible for paying all federal, state, and local estimated income and self-employment taxes as well as the timely and correct reporting and paying of all taxes. As an independent contractor, you have the right to exercise independent judgment as to time, place, and manner of soliciting insurance, servicing policyholders, and otherwise carrying out provisions of the Agreement. Insurance being a closely regulated business, it is understood that it will be necessary for us to provide you with certain manuals, forms, records, and such other materials and supplies as are necessary in the conduct of an insurance business. All such property furnished to you by the Companies or on behalf of the Companies shall remain the property of the Companies and be returned to them in good condition upon any cancellation of this Agreement. We may offer to you, from time to time, training, counsel, and guidance based upon our accumulated experience in the sale and servicing of business. However, it is understood that you may reject or accept such offers at your discretion.

2. **Expenses.** As an independent contractor, you will pay all expenses in connection with your Nationwide insurance agency. You will not incur any indebtedness on behalf of us in connection with expenses resulting from your Nationwide agency.

3. **Licenses.** As an independent contractor, you will be responsible for securing and keeping in effect any required license to represent us as an agent. You agree not to solicit any lines of insurance unless you have the required license authorizing you to do so.

Set forth below are the types of licenses you hold and the date acquired:

| | | |
|---|---|---|
| Casualty | October 14 | , 19 83 |
| Health and Accident | October 9 | , 19 81 |
| Fire and Inland Marine | October 9 | , 19 81 |
| Life | October 9 | , 19 81 |
| Variable Life | October 31 | , 19 88 |

4. **Exclusive Representation.** It is agreed and understood that you will represent us exclusively in the sale and service of insurance. Such exclusive representation shall mean that you will not solicit or write policies of insurance in companies other than those parties to this Agreement, either directly or indirectly, without the written consent of these Companies. It is not intended that the incidental use of voluntary or statutory state or federal insurance plans, or other similar agreements, shall be a violation of this clause.

5. **General Conduct and Representation.** You will maintain a good reputation in the community which you serve and will direct your efforts in the field of insurance toward advancing the business and interest of the Companies to the best of your ability. In the conduct of your business, you will comply with all applicable insurance laws and regulations.

6. **Company Funds.** All funds coming into your possession from customers as premiums or considerations for insurance policies issued by the Companies are funds of the Companies received by you in a fiduciary capacity and shall be immediately remitted to us. If any such funds are not remitted to us, we shall have a first lien on all compensation due or which may become due you to the extent of such funds. Each of the Companies is authorized to deduct the entire amount of such funds due, either before or after the cancellation of this Agreement, from any compensation due you.

7. **Compensation.** Any compensation due you under this Agreement from any of the Companies, may be paid, to you, on their behalf, by any of the other Companies. For all services rendered under this Agreement by you, you shall be compensated solely in accordance with the General Conditions and the Schedules of each Company, attached hereto and made a part hereof except for such additional compensation payable to you under paragraph 11.

   It is agreed that we will pay you any and all original and renewal commissions earned by you, but not credited to your account at the time of entering into this Agreement, on business written by you while employed by us under our Agent's Employment Agreement. It is understood, however, that we may deduct from any compensation due you under this Agreement any commissions previously credited to your account while an employee agent, which subsequently become unearned as a result of the termination or lapse of any policy or coverage.

   Should any Company desire to amend its General Conditions or Schedules, notification in writing of such amendment shall be given to you prior to its effective date, and shall become a part of this contract on its effective date.

8. **Overpayment of Compensation.** Any compensation paid to you for premiums later returned or credited to the customer or any other overpayment of compensation shall be a debt due us from you. In addition to all other rights available to us as a creditor, we shall have the right to deduct such compensation or overpayment from any future compensation due you.

9. **Cancellation.** This Agreement shall be in force until cancelled by either party.

   This Agreement shall automatically cancel upon the date your license to act as an agent for the Companies is revoked or cancelled, or upon death. Further, due to the personal nature of our relationship you or the Companies have the right to cancel this Agreement at any time after written notice has been delivered to the other or mailed to the other's last known address. It is understood that the Agent shall have access to the Agents Administrative Review Board, and its procedures, as it may exist from time to time.

10. **Service to Customer Upon Cancellation.** Upon cancellation of this Agreement, it is understood that the Companies retain the right to continue to provide insurance services to any and all customers and to continue to solicit such customers for additional business.

11. **Agency Security Compensation.**

    a.   Computation of Deferred Compensation Incentive Credits.

For each full calendar year you act as an agent for the Companies, beginning in the first year your annual DCIC Class Earnings equal or exceed the Threshold Amount, until you are age sixty-five (65), the Companies will credit to your account as Deferred Compensation Incentive Credits the percentage set forth below of your DCIC Class Earnings. The Threshold Amount is four times the minimum amount of earnings for which Deferred Compensation Incentive Credits will be credited as set forth in the table below and as further adjusted from time to time in accordance with this paragraph 11-a. DCIC Class Earnings are identified as your annual original and renewal service fee earnings, including earnings from Nationwide Financial Services, Inc., but excluding earnings from joint underwriting associations, reinsurance facilities, auto insurance plans, the variable life policy known as "Investment Life," and line 19 auto business, and limiting earnings from Colonial Insurance Company business to 25% of such earnings. If you entered into an Agent's Agreement providing for an Agents Security Compensation Plan for the first time prior to January 1, 1987, qualification for Deferred Compensation Incentive Credits will occur on the earlier of the satisfaction of the requirement set forth above or the completion of your fifth year of service as an agent with the Companies, crediting all years of service under an Agent's Employment Agreement, Agency Representative Agreement, or Agent's Agreement.

        0% of such earnings under $13,100.00.
        3% of such earnings from $13,100.00 to $19,599.99.
        6% of such earnings from $19,600.00 to $26,299.99.
      10% of such earnings from $26,300.00 to $32,799.99.
      15% of such earnings from $32,800.00 to $462,100.00.
        0% of such earnings in excess of $462,100.00.

It is understood that the Deferred Compensation Incentive Credit formula set out above is applicable to credits calculated for the calendar years of 1987 and 1988 only. For each succeeding two (2) year period, the formula ranges shall be adjusted based on fifty (50) percent of the percentage change that has occurred in the Consumer Price Index (CPI) for all Urban Consumers, U.S., City Average, All Items during the preceding two (2) year period. (The change in the CPI will be measured over a two year period based on the month of June, with formula changes, if any, effective the following January 1.) These changes will be communicated prior to their effective date and shall supersede the previous formula.

    b.   Extended Earnings Payable Upon Qualified Cancellation of this Agreement.

When you qualify for the Deferred Compensation Incentive Credits, you will also qualify for extended earnings payable upon qualified cancellation of this Agreement. Upon qualified cancellation of this Agreement an amount equal to the renewal service fees paid to you by each Company for the last full twelve (12) calendar months immediately proceeding such cancellation subject to the following exceptions:

    (1)   Renewal service fees earned from joint underwriting associations and state automobile insurance plans shall be excluded.

    (2)   For purposes of extended earnings renewal services shall be reduced by 50% on reinsurance facility and line 19 auto business.

    (3)   Extended Earnings on Nationwide General business shall be calculated at 70% of the last 12 months total compensation paid to you on such business.

    (4)   Extended Earnings on Colonial business shall be calculated at 25% of the last 12 months total compensation paid to the Agent.

    (5)   Extended Earnings will be retroactively reduced by the amount of renewal commissions originally included in the extended earnings calculation on any commercial policy or account which does not renew in the 12 months following cancellation of this agreement on which policy or account you were paid $20,000 or more in renewal commissions during the preceding 12 month period. This chargeback will not apply if cancellation of this agreement occurs due to your death, permanent and total disability, or attainment of age 65.

c.   Amounts Payable Upon Qualified Cancellation.

   (1)   **If you live until retirement,** you will receive your Extended Earnings, provided you have completed five years of service with the Companies as an agent. In addition, you will receive Deferred Compensation Incentive Credits in accordance with the provisions outlined in paragraph 11-c(3) and 11-d(2).

   (2)   **If you die or become totally and permanently disabled** which results in the cancellation of this Agreement, provided that you have completed five years of service with the Companies as an agent, you or your beneficiary, or the estate of your beneficiary will receive your Extended Earnings and 100% of your accumulated Deferred Compensation Incentive Credits.

   (3)   **If at the time this Agreement is cancelled** for reasons other than death or total and permanent disability you have completed at least five years of service with the Companies as an agent, you will receive the Extended Earnings. Deferred Compensation Incentive Credits will be paid to you in accordance with the following schedule and the provisions of paragraph 11-d(2):

       (a)   50% of Benefit Payable — When age plus length of service as agent equals the sum of 45.

       (b)   10% Additional Benefit Payable for each year of service after the sum of 45 as defined in paragraph (a) above is attained, subject to a maximum under (a) and (b), of 100% of such benefit.

d.   Provisions for Payment

   After deducting any amount paid to you under this paragraph for cancellation or termination of any prior Agreement, or as extended renewal service fees under any former agreement, or any amounts due the Companies from you, the Companies will pay to you, or should you not survive, your beneficiary or the estate of your beneficiary:

   (1)   Your Extended Earnings divided into ten (10) equal parts as follows:

       Commencing within sixty (60) days following qualified cancellation of this Agreement:

       The first part shall be payable in twelve (12) equal monthly installments, each monthly installment after the first on the first day of subsequent consecutive months.

       The remaining parts shall be paid in equal annual installments, the first annual installment payable thirty (30) days after payment of the last monthly installment and each other annual installment thereafter on the anniversary of that date until paid. At your election prior to your cancellation, such annual installments may be made in equal monthly payments.

(2)   The amount of Deferred Compensation Incentive Credits to which you are entitled payable in ten (10) equal parts as follows:

Commencing sixty (60) days after your death or total and permanent disability which results in the cancellation of this Agreement, or sixty (60) days after other qualified cancellation of this Agreement.

It is understood that in the event such payments would commence prior to age 60, for reasons other than death or total and permanent disability, such payments shall be reduced to the percentages shown in the following table:

| Age At Which Benefit Payments Commence | Percent of Accrued Benefits To be Paid |
|---|---|
| 60 | 100.00% |
| 59 | 94.34% |
| 58 | 89.00% |
| 57 | 83.96% |
| 56 | 79.21% |
| 55 | 74.73% |
| 54 | 70.50% |
| 53 | 66.51% |
| 52 | 62.74% |
| 51 | 59.19% |
| 50 | 55.84% |
| Under 50 | None |

*These sums shall be payable as outlined in d-(1) above.*

(3)   Election for Different Payment.

At your written election, received by the Companies prior to the time of cancellation of this Agreement, the Companies will agree to make payments of Extended Earnings and/or Deferred Compensation Incentive Credits under one of the following methods. Amounts payable as Deferred Compensation Incentive Credits, regardless of election, are not payable prior to your reaching age fifty (50) except in the case of death or total and permanent disability.

(a)   To make payments in not less than three (3) nor more than ten (10) equal parts.

Commencing within sixty (60) days after qualified cancellation or such other later date as provided by the election and the terms of this Agreement, and the parts shall be payable as in d-(1) above.

(b)   To pay to you the amounts payable in accordance with paragraph 11, under one of the following three forms of annuity benefits. Such benefits to be determined as actuarial equivalent amounts in accordance with such interest rates and mortality tables as adopted by the Companies for this purpose.

1.   Life Annuity — No Death Benefit
2.   Life Annuity — Installment Refund, or
3.   Life Annuity — Joint and Survivorship

Payments shall commence within sixty (60) days after qualified cancellation or such other later date as provided by the election and the terms of this Agreement.

(c)  To divide the amounts payable to you as you elect, paying part in equal annual installments, not less than three (3) nor more than ten (10), with the balance payable under subparagraph (b) above.

The amount payable as equal annual installments shall be paid as provided in subparagraph (a) and the balance as in subparagraph (b).

(4)  Payment in Event of Employment.

If this Agreement is cancelled as a result of your employment by the Companies, payments to you shall be deferred until your separation from the Companies, death or total and permanent disability. At that time, payment shall commence as provided by this paragraph 11 as if employment had not intervened.

e.  Qualified Cancellation.

Unless you have induced or attempted to induce, either directly or indirectly, policyholders to lapse, cancel, or replace any insurance contract in force with the Companies, the cancellation of this Agreement shall be a qualified cancellation for the purpose of this Agreement.

f.  Cessation of Agency Security Compensation.

All liability of the Companies for Agency Security Compensation provided for in paragraph 11 and its subparagraphs shall cease and terminate in the event any one or more of the following shall occur:

(1)  You either directly or indirectly, by and for yourself or as an agent for another, or through others as their agent, engage in or be licensed as an agent, solicitor, representative, or broker or in anyway be connected with the fire, casualty, health, or life insurance business, within one year following cancellation within a 25 mile radius of your business location at that time; or

(2)  You fail to return in good condition, within ten days, all materials, records, and supplies furnished to you by the Companies during the course of this Agreement, together with any copies thereof; or

(3)  After cancellation of this Agreement, you directly or indirecty induce, attempt to induce, or assist anyone else in inducing or attempting to induce policyholders to lapse, cancel, or replace any insurance contract in force with the Companies; furnish any other person or organization with the name of any policyholder of the Companies so as to facilitate the solicitation by others of any policyholder for insurance or for any other purpose.

g.  The Agency Security Compensation is intended to be in lieu of the compensation and/or benefits awarded by any state statute or regulation. If you elect any benefits of any such statute or regulation then the amount of such benefits so received shall be deducted from the benefits due you under paragraph 11. If the exact amounts of any such statutory or regulatory benefits are known at the time of the cancellation of this Agreement, then this deduction shall be immediately made and the balance of such benefits under paragraph 11 shall commence as provided for under the provision of paragraph 11. If the exact amount of such statutory or regulatory benefits are not known at the time of the cancellation of this Agreement, then the payment of any benefits under paragraph 11 shall be deferred until such time as the amount of such statutory or regulatory benefits becomes known.

h.  Amendments and Termination.

The Companies hope and expect to continue the Agency Security Compensation Plan indefinitely, and every effort has been made to meet future conditions. In order to protect you and the Companies against unforeseen conditions however, the right to amend or terminate this plan is necessarily reserved by the Companies. The Companies may terminate this plan by notification, at least sixty (60) days prior to such termination, in writing. No change in the Plan or termination however can alter or modify rights or benefits received or granted prior to such change or termination.

12. **Agent's Activities After Cancellation.** (Applicable only to agents entering an independent contractor's agreement for the first time on and after July 1, 1969.)

You agree that if the Agreement is cancelled within a period of five years from the date of your first contract as an agent with the Company, you will not, either directly or indirectly, by and for yourself or as agent for another or through others as their agent, engage in or be licensed as an agent, solicitor, representative, or broker or in any way be connected with the fire, casualty, health, or life insurance business, within a 25 mile radius of your last business location for a period of one year from the date of the voluntary or involuntary cancellation of this Agreement or, should we find it necessary by legal action to enjoin you from competing with us, one year after the date such injunction is obtained.

In any jurisdiction where a covenant similar to that appearing above is held to be invalid either by statute or by judicial decision, you agree upon cancellation of this Agreement you shall thereafter refrain from further solicitation or servicing of policyholders of the Companies and from interfering in any way for a period of one year with existing policies and policyholders in the geographical area described above.

In the event that we are successful in any suit or proceeding brought or instituted by us to enforce any of the provisions of this Agreement or on account of any damages sustained by us by reason of the violation by you of the terms and/or provisions of this Agreement, you agree to pay to us such reasonable attorneys' fees as are permitted by statute and fixed by the court.

13. **Agent Number.** For the benefit of the Companies and the agent, a number is assigned to each agent to facilitate more efficient use of the Companies computer system. This number is the property of the Companies and may be reassigned for identification within that system. Your name will be printed for your benefit on billings and materials received by our policyholders. If this agreement is cancelled, your name will be removed as soon as possible, but you acknowledge that occasional error may cause it to continue to be printed.

14. **Pricing, Products, Rules, and Regulations.** The insurance business being subject to changing laws, regulations, and conditions, it is understood and agreed that each Company will prescribe rules, regulations, prices, and terms under which it will insure risks, and each Company retains the right to change, alter or amend such rules, regulations, prices, and terms, including the right to limit, restrict, or discontinue entirely the acceptance or writing of any policies, coverages, lines or kinds of insurance, at any time it deems it advisable to do so, and without notice to or consent of the Agent, and any such change, alteration, amendment or limitation shall become effective on the date specified by the Company.

In order to maximize productivity and lower operating expenses to the benefit of the customer, agent and Companies, the Companies are investing in a computerized transaction and record-keeping system with our agency force. Agents Office Automation (AOA) is designed to assist the agent and ultimately reduce expenses. During the transitional period, the Company will utilize and accept transmittal of both hardcopy and electronic transactions. This dual system will not continue indefinitely. On the date that total policies in force of agents using the AOA system represent 70% of the Company's personal lines policies in force, the Company will notify you that the dual system (hardcopy and electronic transactions) will continue to operate for only one year after that date. Six months after notification, the Company reserves the right to require all transactions to be through the AOA system.

15. **Authorization to Direct Bill.** The agent and the Companies agree that it is to their mutual benefit for the Companies to bill the policyholders directly. The agent hereby gives the Companies permission to use his name on those billings and for use of his name for a reasonable period following the cancellation of his Agreement.

16. **Extent of Authority.** You will obligate us only to the extent authorized by the rules and regulations set forth by us from time to time, or as may be authorized in writing by an officer of the Companies.

17. **Amendments or Modifications.** Except as otherwise provided herein, this Agreement may be changed, altered, or modified only in writing signed by you and an officer of the Companies.

18. **Assignment of Agreement.** The Companies rely upon your particular personal abilities in carrying out your obligations under this Agreement, therefore, no assignment of your rights, responsibilities, or any sums due you under this Agreement shall be made without prior written consent signed by an officer of the Companies.

19. **Agreement Defined, Prior Agreements Superseded.** Whenever used in this Agreement, the term "Agreement" shall mean any contract in writing captioned "Standard Agent's Agreement," "Master Agent's Agreement," "Agent's Employment Agreement," "Corporate Agency Agreement" or "Agent's Agreement" between you and the Companies executing this Agreement. The execution and delivery of this Agreement shall supersede and take the place of any prior Agreement, provided that the execution and delivery of this Agreement shall not affect your obligation to pay any money due the Companies from you under the provisions of any other agreement, written or oral, nor shall the execution of this Agreement nullify any negotiated compensation Agreement, differing from the schedules of compensation attached to former Agreements, entered into between you and the Companies on cases written prior to the execution of that Agreement.

20. **Severability.** If any clause or part of this Agreement shall be held invalid for any reason, then such invalidity shall not affect any part of this Agreement and the parts thereof not invalid shall remain in full force and effect.

21. **Legal Action Under This Agreement.** It is agreed that no action, suit, proceeding at law or in equity shall be brought under this contract unless it is commenced and process is served within three years after the cause of action for which suit is brought. If the limitations set forth in this paragraph are prohibited by the statutes of the state in which this Agreement is issued, then these limitations shall be deemed amended to agree with the minimum period of limitation permitted by such statutes.

IN WITNESS WHEREOF, the Agent has signed his name and the Companies have caused their corporate names to be affixed by their duly authorized representative to duplicate copies hereof.

> NATIONWIDE MUTUAL INSURANCE COMPANY
> NATIONWIDE MUTUAL FIRE INSURANCE COMPANY
> NATIONWIDE LIFE INSURANCE COMPANY
> NATIONWIDE GENERAL INSURANCE COMPANY
> NATIONWIDE PROPERTY AND CASUALTY INSURANCE COMPANY
> NATIONWIDE VARIABLE LIFE INSURANCE COMPANY
> COLONIAL INSURANCE COMPANY OF CALIFORNIA

By _____    5/1/91
          For the Companies                (Date)

_____    5/1/91
          Agent                            (Date)