UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| RONALD P. MORIN, SR., ET AL., | : | CIVIL ACTION NO. |
|     Plaintiffs, | : | |
| | : | 3:03 CV 277 (CFD) |
| v. | : | |
| | : | |
| NATIONWIDE FEDERAL CREDIT UNION, | : | |
| ET AL., | : | |
|     Defendants. | : | April 11 2007 |

**DEFENDANTS' LOCAL RULE 56(a)(1) STATEMENT**

Pursuant to the Federal Rules of Civil Procedure 56 and Local Rule 56(a)(1), the Defendants Nationwide Federal Credit Union, et al. (collectively "NFCU"), hereby respectfully submit this Local Rule 56(a)(1) Statement in support of their motion for summary judgment.

**BACKGROUND**

1. Plaintiffs Ronald P. Morin and Denise Morin are husband and wife. Compl., Count 1, ¶ 2.

2. Mr. Morin became an independent contractor exclusive agent for the sale of Nationwide's insurance products, pursuant to an "Agent's Agreement." Transmittal Affidavit of Michael D. Blanchard ("Blanchard Aff."), Ex. 1.

3. Pursuant to his Agent's Agreement, Mr. Morin was entitled to payment of commissions and following termination of his relationship with Nationwide, "Deferred Compensation Incentive Credits" ("DCIC") and "Extended Earnings" (together with DCIC,

"Agency Security Compensation" or "ASC"), as provided in and subject to the terms of the Agent's Agreement. Blanchard Aff., Ex. 1.

    4.    Paragraph 11(f) of the Agent's Agreement provides in pertinent part:

> All liability of the Companies for Agency Security Compensation provided for in paragraph 11 and its subparagraphs shall cease and terminate in the event any one or more of the following shall occur:
>
> (1) You either directly or indirectly, by and for yourself or as an agent for another, or through others as their agent, <u>engage in or be licensed as an agent</u>, solicitor, representative, or broker or in anyway be connected with the fire, casualty, health, or life insurance business, <u>within one year following cancellation within a 25 mile radius of your business location at that time</u> . . . .

See Blanchard Aff., Ex. 1, at p. 6 (emphasis added).

**NFCU Loans**

    **A.**    **Business Loan**

    5.    On January 5, 1994, pursuant to a "Loanliner Advance Request Voucher And Security Agreement" Mr. Morin applied for and received a loan, account number 907119006, from NFCU. See Affidavit of Kathleen M. Brisendine, ("Brisendine Aff."), Ex. 1, ("1/5/94 Loanliner Agreement"), at p. 1. The loan amount was $85,000. Id., at p. 1.

    6.    Pursuant to the 1/5/94 Loanliner Agreement, the "security offered" for the loan was comprised of "commissions, extended earnings, and deferred compensation incentive credits." Id., at p. 2. The "Security Agreement" accompanying the Business Loan provided further, in part, as follows:

2

**What The Security Interest Covers**

> The security interest secures the advance and any extensions, renewals or refinancings of the advance.  <u>It also secures any other advance you now have or receive in the future under the LOANLINER Credit Agreement and any other amounts you owe the credit union for any reason now or in the future</u>. . . .

<u>Id.</u> (emphasis added) ("Security Agreement").

7.  Mr. Morin also executed an Assignment dated January 5, 1994.  <u>See</u> Brisendine Aff., Ex. 2 ("1/55/94 Assignment").  Pursuant to the 1/5/94 Assignment, in pertinent part:

> For value received, <u>I hereby transfer, set over, and assign to Nationwide Federal Credit Union any and all payments due me</u>, including <u>commissions, extended earnings, deferred compensation incentive credits, bonuses, and any other compensation due me</u> under my Agent's Agreement or any Agent's Agreement executed hereafter, <u>for all outstanding loans from the Credit Union which are now or hereafter made, and deposit said payments to the account of Nationwide Federal Credit Union</u>.
>
> This assignment shall include all commission, extended earning, deferred compensation incentive credit, bonuses, and any other compensation becoming due upon me, or any time hereafter, and <u>at the termination of my Agent's Agreement, such amounts due me shall be applied in their entirety to my indebtedness to Nationwide Federal Credit Union</u>.

<u>Id.</u>, at N/W RM 00571 (emphasis added).

8.  Mr. Morin also executed a "Commission Disbursement/Term Authorization Form" ("1/5/94 CDTAF") on January 5, 1994 directed to Nationwide Mutual Insurance Company and its affiliates which provided, in pertinent part:

> I hereby authorize you to make deductions from my COMMISSIONS and any other amounts due me as specified below, and to transfer to NATIONWIDE FEDERAL CREDIT UNION any and all payments for outstanding loans due me to the Credit Union which are due now or hereafter, and deposit the same to the account of NATIONWIDE FEDERAL CREDIT UNION.

3

> This authorization shall include all commissions and any other compensation becoming due upon me, or any time hereafter, at the termination of my AGENT'S AGREEMENT, such amounts due me shall be applied in their entirely to my indebtedness to NATIONWIDE FEDERAL CREDIT UNION.

See Brisendine Aff., Ex. 3, at N/W RM 00570.

9.      Mr. Morin also executed a document on January 5, 1994 that stated in pertinent part as follows:

> Agent/Borrower acknowledges that any Agency Security Compensation payable to Agent/Borrower pursuant to any Agent's Agreement between the Agent and the Nationwide Insurance Companies (Nationwide) will be reduced by any sums paid by Nationwide to the Nationwide Federal Credit Union (Credit Union) for the satisfaction of debts due the Credit Union from Agent, plus interest from the date such debt is satisfied by Nationwide. The interest rate to be applied is the interest rate stated in the promissory note executed by Agent/Borrower, which was by Nationwide, or the highest interest rate permitted by law, whichever is lower.

See Brisendine Aff., Ex. 4 ("1/5/94 Acknowledgement Form"), at N/W RM 00572.

10.     On October 31, 1996, Mr. Morin executed a Loanliner Advance Request Voucher And Security Agreement (including a Security Agreement), and on October 30, 1996 he executed an Assignment, an acknowledgement form and a Commission/Disbursement/Term Authorization Form pursuant to which Mr. Morin received from NFCU an advance of $32,339.04, creating a then present balance owed to NFCU of $100,000.   See Brisendine Aff., Ex. 5 (the "10/31/96 Loan Documents"), at p. 1.

11.     The 10/31/96 Loan Documents respectively contained the same terms quoted above in paragraphs 6-8. Id., at p. 2.

CTDOCS/1685147.2

12.     The 10/31/96 Loan Documents included a "Loanliner Application And Credit Agreement" which provided, among other things:

> Security Interest ¶:  You agree that <u>all advances under this Plan will be secured by the shares and deposits in all joint and individual accounts you have with the credit union now and in the future</u>.  Additional security will be required depending on the subaccount under which an advance is requested.  For example, a subaccount called "New Car Advances" means the security will be a new car.  Shares and deposits in an Individual Retirement Account or any other account that would lose special tax treatment under state or federal law if given as security are not subject to the security interest you have given in your shares and deposits.
>
> <u>Property given as security under this Plan or for any other loan will secure all amounts you owe the credit union now and in the future</u>.  However, the credit union specifically waives any security interest it may have in you dwellings given through any other mortgages or security agreements."
>
> <u>Default</u> :  <u>You will be in default if you do not make a payment of the amount required when it is due</u>.  You will be in default if you break any promise you made under this Plan or if anyone is in default under any security agreement made in connection with an advance under this Plan.  <u>You will be in default</u> if you die, file for bankruptcy, become insolvent, if you make any false or misleading statements in any credit application or update of credit information, <u>or if something happens which the credit union believes may substantially reduce your ability to repay what you owe</u>.
>
> When you are in default the credit union can demand immediate repayment of the entire unpaid balance under the Plan without giving you advance notice.  If immediate repayment is demanded, you will continue to pay interest, at the applicable interest rates in effect under this Plan, until what you owe has been repaid.  If a demand for immediate payment has been made, the shares and deposits given as security for this Plan can be applied towards what you owe.  The credit union can also exercise any other rights given by law when you are in default.

<u>See</u> Brisendine Aff.,  Ex. 6, at N/W RM 00548 (under "Security Interest") (emphasis added).

13.     On April 17, 1997, Mr. Morin executed a Loanliner Advance Request Voucher And Security Agreement (including a Security Agreement) and a Commission / Disbursement / Term Authorization Form pursuant to which Mr. Morin received from NFCU an advance of

5

$15,000, creating a then present balance owed to NFCU of $113,410.19.  See Brisendine Aff., Ex. 7 (the "4/17/97 Loan Documents"), at N/W RM 00535.

14.    The 4/17/97 Loan Documents respectively contained the same terms quoted above in paragraphs 6 and 8.  Id., at p. 3.

15.    On May 27, 1997, Mr. Morin executed a Loanliner Advance Request Voucher And Security Agreement (including a Security Agreement) and a Commission / Disbursement / Term Authorization Form pursuant to which Mr. Morin received from NFCU an advance of $791.55, creating a then present balance owed to NFCU of $133,410.19.  See Brisendine Aff., Ex. 8 (the "5/27/97 Loan Documents"), at p. 3.

16.    The 5/27/97 Loan Documents respectively contained the same terms quoted above in paragraphs 6 and 8.  Id.

17.    On July 7, 1997, Mr. Morin executed a Loanliner Advance Request Voucher And Security Agreement (including a Security Agreement), an an acknowledgement form and a Commission/Disbursement/Term Authorization Form pursuant to which Mr. Morin received from NFCU an advance of , creating a then present balance owed to NFCU of $153,369.70.  See Brisendine Aff., Ex. 9 (the "7/7/97 Loan Documents"), at p. 1.

18.    The 7/7/97 Loan Documents respectively contained the same terms quoted above in paragraphs 6 and 8.  Id., at p. 3.

19.    On July 30, 1998, Mr. Morin executed a Loanliner Advance Request Voucher And Security Agreement (including a Security Agreement), an an acknowledgement form and a Commission / Disbursement / Term Authorization Form pursuant to which Mr. Morin received

6

from NFCU an advance of $44,523.00, creating a then present balance owed to NFCU of $190,438.46. See Brisendine Aff., Ex. 10 (the "7/30/98 Loan Documents"), at N/W 23787.

20. The 7/30/98 Loan Documents respectively contained the same terms quoted above in paragraphs 6 and 8. Id., at N/W 23789.

21. As of February 7, 2000 Mr. Morin owed to NFCU a total of $173,245.86 pursuant to the foregoing agreements and transactions (collectively referred to as the "Business Loan"). See Brisendine Aff., ¶ 20.

**B.  Durango Loan**

22. On October 11, 1999, Mr. Morin executed a Loanliner Advance Request Voucher and Security Agreement, pursuant to which Mr. Morin received a loan for the purchase of a 2000 Dodge Durango (the "Durango") in the principal amount of $35,488.82, at an interest rate of 7.5% for a 60 month term, payable in semi-monthly installments of $355.67, with the first payment due November 15, 1999 and a Security Agreement. See Brisendine Aff., Ex. 11, at N/W RM 00146.

23. Pursuant to the agreement, Mr. Morin granted NFCU a security interest in the Durango, which secured all of Mr. Morin's loans with NFCU. As provided in the agreement:

> **What The Security Interest Covers**
> The security interest secures the advance and any extensions, renewals or refinancings of the advance. <u>It also secures any other advances you now have or receive in the future under the LOANLINER Credit Agreement, any loans you have with the credit union, including any credit card loan, and any other amounts you owe the credit union for any reasons now or in the future</u> . . . .

Id., at N/W RM 00147 (emphasis added).  Further, the default provisions in the agreement expressly provided:  "when you are in default, the Credit Union can, without advance notice to you, require immediate payment of the loan balance under the Loanliner Credit Agreement, and take possession of the property.  You agree the credit union has the right to take possession of the property without going to Court."  See id.

24. On the same day, Mr. Morin executed a "Payroll/Disbursement/Term Authorization Form, directed to Nationwide Mutual Insurance Company and its affiliates which provided, in pertinent part:

> I hereby authorize you to make deductions from my . . . COMMISSIONS and any other amounts due me as specified below, and to transfer to NATIONWIDE FEDERAL CREDIT UNION any and all payments for outstanding loans due me to the Credit Union which are due now or hereafter, and deposit the same to the account of NATIONWIDE FEDERAL CREDIT UNION.
>
> This authorization shall include all wages, commissions and any other compensation becoming due upon me, or any time hereafter, at the termination of my . . . AGENT'S AGREEMENT, such amounts due me shall be applied in their entirely to my indebtedness to NATIONWIDE FEDERAL CREDIT UNION.

See id., at N/W RM 00148.

**Ski-Doo Loan**

25. On October 22, 1997 Mr. Morin executed a Loanliner Advance Request Voucher and Security Agreement, pursuant to which Mr. Morin received a loan for the purchase of Ski-Doo vehicles ("Ski-Doo")  in the principal amount of $12,720.00, at an interest rate of 12% payable in semi-monthly installments of $168.14, with the first payment due November 24, 1997 and a Security Agreement.  See Brisendine Aff., Ex. 12, at p. 1.

26.     On the same day, Mr. Morin executed a "Payroll/Disbursement/Term Authorization Form, directed to Nationwide Mutual Insurance Company and its affiliates which provided, in pertinent part:

> I hereby authorize you to make deductions from my . . . COMMISSIONS and any other amounts due me as specified below, and to transfer to NATIONWIDE FEDERAL CREDIT UNION any and all payments for outstanding loans due me to the Credit Union which are due now or hereafter, and deposit the same to the account of NATIONWIDE FEDERAL CREDIT UNION.
>
> This authorization shall include all wages, commissions and any other compensation becoming due upon me, or any time hereafter, at the termination of my . . . AGENT'S AGREEMENT, such amounts due me shall be applied in their entirely to my indebtedness to NATIONWIDE FEDERAL CREDIT UNION.

See id., at p. 2.

**VISA Credit Card**

27.     On January 2, 1996 Mr. Morin and Mrs. Morin executed a "VISA Credit Card Application." See Brisendine Aff., Ex. 13. The VISA card was issued by NFCU. See Brisendine Aff., ¶ 25.

28.     Mr. and Mrs. Morin were joint on the credit card. See Brisendine Aff., Ex. 13.

**Termination Of Agency Relationship**

29.     Mr. Morin terminated his relationship with Nationwide by letter of resignation dated February 6, 2000. See Blanchard Aff., Ex. 2; Blanchard Aff., Ex. 3 (Morin Dep., at 48). He also admits that he spoke with someone at Nationwide on February 6 or 7 concerning his termination. Blanchard Aff., Ex. 3 (Morin Dep., at 49).

30. Mr. Morin admits that "[f]or the time period from the date of the termination of [his] agent relationship with Nationwide until one year after, [he] directly or indirectly engage[d] in business activity as an agent, solicitor, representative or broker relating to the fire, casualty, health or life insurance business within a 25 mile radius of the business location he last maintained as an agent with Nationwide."  See Blanchard Aff., Ex. 4 (Answer to Int. No. 1); Blanchard Aff., Ex. 3 (Morin Dep., at 53-55).

31. On February 8, 2000 Nationwide notified Mr. Morin that his agent's agreement had been terminated (see Blanchard Aff., Ex. 5) and informed NFCU that Mr. Morin was no longer an agent and had forfeited his ASC.  See Brisendine Aff., ¶ 27.

**Course Of Events Under the LoanLiner Agreements**

32. By letter dated February 9, 2000, NFCU advised Mr. Morin that he was in default of his loans.  See Brisendine Aff., Ex. 14, at N/W RM 00345.  The letter stated in pertinent part: "The loan was secured by Extended Earnings and DCIC, which were forfeited upon the termination of your agency relationship with Nationwide Insurance."  See id.  The letter requested that Mr. Morin contact NFCU to "state your intentions as to repayment of the loan."  See id.

33. NFCU did not indicate in its Feb. 9, 2000 letter that it was seizing security.  Id. NFCU did not seize the security for any loans at that time.  See id.

34. As of February 9, 2000, Mr. Morin was obligated to pay $4,076.42 per month to satisfy his total debt obligations under the LoanLiner Agreement (i.e. for all his outstanding loans at that time), payable $2,038.21 semi-monthly.  See Brisendine Aff., ¶ 29.

10

35. Mr. Morin, by a letter dated March 13, 2000, confirmed a February 21, 2000 conversation with a Bob G. Collins by which it was agreed that Mr. Morin would make payments on his loans by way of semi-monthly automated transfers from his NFCU savings account for payments on the loans. Mr. Morin enclosed a $2300 check for deposit into his NFCU savings account to cover loan payments becoming due. See Brisendine Aff., Ex. 15, at N/W RM 00791.

36. Mr. Morin executed an "ACH Debit" form, permitting semi-monthly automated transfers of $2,300 (twice per month), commencing on March 30, 2000, into his NFCU savings account for payments on, among other loans, his Visa account and loans 1 (the Durango), 3 (the Ski-Doo), and 6 (the Business Loan). The ACH Debits state that they are to remain in full force and effect until a reasonable time after written revocation. See Brisendine Aff., Ex. 16, at N/W RM 00030.

37. By forms dated July 4, 2000, received by NFCU on August 1, 2000 and processed on August 11, 2000 Mr. Morin revoked the ACH debit authorization for the semi-monthly $2300 transfers and executed new ACH debit authorization forms for debit in the amount of only $900 semi-monthly. See Brisendine Aff., Ex. 17, at N/W RM 00043. The new authorization form indicated that the $900 semi-monthly transfer was "to be applied to the following NFCU account: See id. Account # 907119006 Suffix # 1." "Account # 907119006 Suffix # 1" was Mr. Morin's Durango Loan. See Brisendine Aff., ¶ 32. Accordingly, Mr. Morin had ceased authorization for automatic transfer payments on his Business Loan. See Brisendine Aff., Ex. 17, at N/W RM 00044.

38. Mr. Morin made no payments on the Business Loan from July 15, 2000 through August 31, 2000. See Brisendine Aff., ¶ 33. The loan was thereby delinquent. See id.

39. Because the July 4 ACH forms were not received and processed by NFCU until mid-August, 2000, and additionally because Mr. Morin had transferred $1,517.49 from his savings account (which would have been available for the ACH transfers) to his checking account on July 6, 2000, two transfers for $2,300 and one transfer for $900 (after the ACH revocation and authorization forms were processed) were returned for insufficient funds. See Brisendine Aff., ¶ 34. This was explained in a letter to Mr. Morin dated September 22, 2000. See Brisendine Aff., Ex. 18, at N/W RM 00311-00312.

40. By letter of September 26, 2000, NFCU made demand upon Mr. Morin to bring all loans, including the Business Loan, current by October 6, 2000. See Brisendine Aff., Ex. 19, at N/W RM 00054. The letter indicated that Mr. Morin's "entire member relationship with NFCU [is] secured by any collateral on all loans and deposits you may hold with the credit union." See id.

41. By letter dated September 27, 2000, Mr. Morin forwarded to NFCU various payments to make his loans current, including $6,775 for the Business Loan. See Brisendine Aff., Ex. 20, at N/W RM 00055. Mr. Morin's loans were, as a result of these payments, made current. See Brisendine Aff., ¶ 36.

42. Mr. Morin's September 27, 2000 letter also indicated, however:

I hope this will bring this entire account to a current status and we can start a discussion with Nationwide management on the Partnership loan and their

CTDOCS/1685147.2

<u>responsibilities to provide the collateral payments</u> based on the fact that I retired on February [sic] of this year.

<u>See</u> Brisendine Aff., Ex. 20, at N/W RM 00055 (emphasis added).

    43.    Mr. Morin made no payment on the Business Loan on October 15, 2000. <u>See</u> Brisendine Aff., ¶ 38. He did make payments on that date for the Durango and Ski-Doo loans. <u>See id.</u>

    44.    By forms dated October 26, 2000, Mr. Morin revoked his July 2000 $900 ACH debit authorization. <u>See</u> Brisendine Aff., Ex. 21, at N/W RM 00058-0060. Mr. Morin submitted new authorization forms to permit automatic payments in the amount of $355.67 semi-monthly for Loan 4 (the Durango Loan) and $168.14 semi-monthly for Loan 3 (the Ski-Doo Loan). <u>See id.</u> Mr. Morin did not submit any forms for authorization of payments to the Business Loan. <u>See</u> Brisendine Aff., ¶ 39.

    45.    Mr. Morin made no payments by ACH transfer or otherwise on his Business Loan following October 31, 2000 or thereafter. <u>See</u> Brisendine Aff., ¶ 40.

    46.    NFCU received from Nationwide a check for $31,578.99 to be applied to Mr. Morin's loans on November 16, 2000. <u>See</u> Brisendine Aff., ¶ 41. On October 17, 2000, Nationwide issued a bonus payment for Mr. Morin in the amount of $31,578.99. <u>See id.</u>; Blanchard Aff., Ex. 6. The payment was made to and accepted by NFCU, however, as it comprised a portion of the security for Mr. Morin's loans, and Mr. Morin had instructed NFCU pursuant to the 1/5/94 loan documents to make such payments directly to NFCU. <u>See</u> Brisendine Aff., ¶ 41; <u>see also supra</u>, ¶ 7 ("For value received, I <u>hereby</u> transfer, set over, and assign to

Nationwide Federal Credit Union <u>any and all payments due me</u>, including commissions, extended earnings, deferred compensation incentive credits, <u>bonuses</u>, and any other compensation due me under my Agent's Agreement.")  The payment of the bonus was not received by NFCU until November 16, 2000.  Brisendine Aff., ¶ 41.

      47.      By letter dated February 12, 2001, NFCU informed Mr. Morin as follows:

> You will note that you agreed to give us security when you opened the loan and all future loans.  This means the 2000 Dodge Durango is collateral on the other loan(s).  We are within our rights to repossess/foreclose the collateral should we decide to, in order to secure the other loan(s).
>
> I am sure that you do not wish for us to take such action on the loan on which you are making payments, therefore, we suggest you bring the other loan(s) up to date <u>by 2/22/01</u>

<u>See</u> Brisendine Aff., Ex. 22, at N/W RM 00069  (emphasis added).

      48.      Mr. Morin made no payments on the Business Loan following the February 12, 2001 letter or thereafter.  <u>See</u> Brisendine Aff., ¶ 43.

      49.      Mr. Morin's ACH payments on the Durango Loan from February 9 and 26, 2001 were returned due to non-sufficient funds or February 27 and 28, 2001, respectively.  <u>See</u> Brisendine Aff., ¶ 44.  Mr. Morin thereafter made payments on the Durango Loan, but never made up the February 9 and 26, 2001 payments.  <u>See id.</u>  Accordingly, his Durango loan became delinquent and remained so from February onward.  <u>See id.</u>

      50.      Because Mr. Morin was not current on his NFCU loans, including the Durango Loan, the NFCU repossessed the Durango on or about May 15, 2001.  <u>See</u> Brisendine Aff., ¶ 45.  NFCU did not receive any report or notice that the repossession involved a breach of the peace.

See id. By letter dated July 7, 2001, the NFCU advised Mr. Morin of the sums required to redeem the Durango and demanded payment within 20 days. See id. With no payment forthcoming, Mr. Morin was advised on August 31, 2001 that the Durango had been sold at auction on August 6, 2001 for $16,785.00 and that the deficiency due to the NFCU was $16,155.99. See Brisendine Aff., Ex. 23, at N/W RM 00974; Blanchard Aff., Ex. 7 (NFCU Interrogatory Resp. No. 11). Mr. Morin never paid the deficiency. See Brisendine Aff., ¶ 45.

51. Following June 26, 2001, Mr. Morin made no payments on the Ski-Doo loan (except for a transfer from his NFCU account of less than $1). See Brisendine Aff., ¶ 46.

52. On September 21, 2001 NFCU wrote off the Durango Loan at a loss of $10,207.08. On September 21, 2001 NFCU wrote off the Ski-Doo Loan at a loss of $2,483.49. See Brisendine Aff., ¶ 47. On September 29, 2001 NFCU wrote off the Business Loan at a loss of $133,902.54. See id. On June 29, 2001 Nationwide, as a guarantor of the Business Loan, paid to NFCU $133,902.54. See id.

**NFCU/Nationwide Communications**

53. Throughout the time when Mr. Morin had loans with NFCU, all communications between NFCU and Nationwide concerned the Partnership Plus loan, not the Durango or Ski-Doo loans. See Brisendine Aff., ¶ 48; Blanchard Aff., Ex. 7 (Int. Resp. No. 8).

**NFCU Interactions With Credit Reporting Agencies**

54. In the ordinary course of business, NFCU does not receive inquiries from credit reporting agencies or creditors concerning NFCU members, including Mr. and Mrs. Morin's creditors. See Brisendine Aff., ¶ 49. Rather, the credit reporting process is an automated system

whereby NFCU submits on a monthly basis to the credit reporting agencies (Trans Union, Equifax, and Experian,) a monthly tape which provides payment status on outstanding loans. See id. NFCU submitted such tapes during the period Mr. Morin and Mrs. Morin had loans with NFCU. NFCU's information provided to the credit reporting agencies via these tapes does not include default information for defaults arising from events other than non-payment. See id. Accordingly, all of NFCU's interactions with credit reporting agencies consisted of providing information about Mr. and Mrs. Morin's loan payment history only. See id. At no time did NFCU report any default on any of Plaintiffs' loans except for defaults resulting from non-payment. See id.; Blanchard Aff., Ex. 7 (Int. Resp. No. 1)

55. To the extent any of the Plaintiffs' creditors made direct inquiry regarding the status of any of the Plaintiffs' accounts with NFCU, NFCU in the ordinary course would have directed such inquiry to national credit reporting agencies. See Brisendine Aff., ¶ 50; Blanchard Aff. Ex. 7 (Int. Resp. No. 1). NFCU is not aware of any such direct inquiries being made concerning the Plaintiffs. See Brisendine Aff., ¶ 50.

56. At no time did NFCU deny to the Plaintiffs any credit for personal, family, or household purposes or increase the charge for such credit because of information obtained from a person other than a consumer reporting agency. See Brisendine Aff., ¶ 51.

57. At no time did NFCU disclose the Plaintiffs' financial information to any person other than as authorized by Conn. General Stat. § 36a-41. See Brisendine Aff., ¶ 52.

58. At no time did NFCU intend to cause Plaintiffs emotional harm or distress or act recklessly in handling Plaintiffs' loans. See Brisendine Aff., ¶ 55.

59. Mr. Morin made several complaints to NCUA and to NFCU regarding NFCU's alleged handling of his loans. For each complaint, NFCU conducted a reasonable investigation, responded to those complaints, and concluded in good faith that it had acted properly. See Brisendine Aff., ¶ 53.

60. At no time did the National Credit Union Administration ("NCUA") make a final determination, communicated to NFCU, that NFCU was in violation of any federal law concerning the Plaintiffs loans. See Brisendine Aff., ¶ 54.

61. At no time did NFCU act in bad faith. At all times, NFCU acted in the honest and good faith belief that its actions were authorized by the loan agreements Mr. and Mrs. Morin executed. See Brisendine Aff., ¶ 56.

62. Nationwide is currently the owner and holder of the loan documents concerning Mr. Morin's Business Loan, upon which there is currently due and owing principal, interest, late charges, reasonable attorneys' fees and costs of collection, along with any and all other amounts as provided for under the loan documents. See Brisendine Aff., ¶ 57.

63. In March 2002, Mrs. Morin received a credit report from Experian. See Blanchard Aff., Ex. B8, at p. 1. The report indicated that she was co-signer on a loan with Mr. Morin from Nationwide that was past due. See id., at p. 2.

64. By April 2002, Mrs. Morin received a credit report from Experian indicating that the entry regarding the co-signed loan with Mr. Morin from Nationwide was deleted. See id., at p. 3.

65. By July 2003, Mrs. Morin's credit report contained no negative information with respect to any late payments, defaults or charge-offs. See Blanchard Aff., Ex. 9. In fact, the report indicated: "You have a good score and a wide array of loans and credit products will likely be available to you. Most lenders will consider offering you very competitive rates and terms on loan products." See id. The report also indicated "You have 0 accounts that show evidence of missed payments in the past." See id., at p. 2. The report indicated that the negative factors affecting her credit included the "proportion of balances to credit limits on your charge accounts is too high" and "you have too many bank card accounts." See id., at p. 3.

**State Court Action**

66. On January 27, 2003, Mr. Morin and Mrs. Morin caused a complaint to be served upon NFCU, which was filed in the Connecticut Superior Court at Hartford and which was eventually removed to this Court. See Blanchard Aff., Ex. 10.

                            **THE DEFENDANTS,**
                            **NATIONWIDE FEDERAL CREDIT UNION, ET AL**

                            By: /s/ Michael D. Blanchard
                            Deborah S. Freeman (ct05257)
                            Michael D. Blanchard (ct25891)
                            BINGHAM McCUTCHEN LLP
                            One State Street
                            Hartford, CT  06103-3178
                            (860) 240-2700
                            (860) 240-2818 (fax)
                            Their Attorneys
                            deborah.freeman@bingham.com
                            michael.blanchard@bingham.com

## CERTIFICATION

I hereby certify that on this 11th day of April, 2007, a copy of the foregoing was sent via the Court's electronic notification system or by first class U.S. mail to:

Richard P. Weinstein, Esq.
Nathan A. Schatz, Esq.
Weinstein & Wisser, P.C.
29 South Main Street, Ste. 207
West Hartford, CT 06107
*Counsel for Plaintiff*

                                     /s/ Michael D. Blanchard
                                         Michael D. Blanchard