**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| RONALD P. MORIN, SR., ET AL, | : | CIVIL ACTION NO. |
| | : | 3:03CV277 (CFD) |
| Plaintiffs, | : | |
| | : | |
| VS. | : | |
| | : | |
| NATIONWIDE FEDERAL CREDIT UNION, | : | JUNE 19, 2007 |
| ET AL, | : | |
| | : | |
| Defendants. | : | |

**PLAINTIFFS' MEMORANDUM OF LAW
IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

The plaintiffs in the above-entitled matter hereby oppose the defendants' Motion for Summary Judgment dated April 11, 2007.  In moving for summary judgment, the defendants rely, in large part, on factual claims that are disputed and legal positions that cannot be sustained. Under such circumstances, the defendants are not entitled to a summary judgment in their favor, except with respect to Count 11 as to which the plaintiffs agree that a summary judgment may enter.

## I.    THE SUMMARY JUDGMENT STANDARD

The standard to be applied by the Court in regard to a claim for summary judgment is well established:  A summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed.R.Civ.P. 56(c).  "A dispute regarding a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the non moving

1

party. . . .  Therefore, if, as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper."  McCarthy v American International Group Inc., 283 F.3d 121, 124 (2d Cir. 2002) (internal quotation marks omitted; citations omitted). Moreover, because "the burden is upon the moving party to demonstrate that no genuine issue respecting any material fact exists . . . , all ambiguities must be resolved and all inferences drawn in favor of the party against whom summary judgment is sought."  Gallo v. Prudential Residential Services, Ltd. Partnership, 22 F.3d 1219, 1223 (2d Cir. 1994) (citations omitted). Consequently, "the trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them.  Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution."  Id. at 1224.

## II.    PERTINENT FACTS

The following facts are set forth in the accompanying Affidavit of Ronald P. Morin, Sr. ("Morin Affidavit").

For many years prior to 2000, plaintiff Ron Morin ("Mr. Morin") had been an employee of the defendant Nationwide Mutual Insurance Company and its defendant affiliates (hereinafter "Nationwide"), and then, commencing in approximately 1989, he became an independent contractor agent for the sale of insurance products that were offered by Nationwide.  With respect to those insurance products (e.g., investments, and home, automobile, business and life insurance), Mr. Morin sold exclusively for Nationwide.  However, with respect to other insurance products (e.g., group health insurance), he was authorized by Nationwide to represent other companies. (Morin Affidavit, ¶ 3.)

2

As part of Mr. Morin's employment with Nationwide, Nationwide had established an Agency Security Compensation Plan similar to a profit sharing or pension plan wherein the contributions were a deferred part of the agent's earnings and are credited to the agent's account to be available to the agent upon retirement. The details of that Plan are set forth in Section 11 of the Agent's Agreement between Mr. Morin and Nationwide, a copy of which is attached as Exhibit 1 to the Affidavit of Michael D. Blanchard In Support of Defendants' Motion for Summary Judgment (dated April 11, 2007). (Morin Affidavit, ¶ 4.)

In the late 1990's, Nationwide placed more and more pressure on Nationwide agents, including Mr. Morin, through the imposition of quotas, pressure to sell multiple products to customers at reduced commissions, and Nationwide began its own direct solicitation of customers, competing with its agents in regard to the consumer base. (Morin Affidavit, ¶ 5.) The strain between Nationwide and its agents lead to Nationwide developing a strategy to deal with its agents who quit or threaten to quit, including retaliatory termination by Nationwide. (Morin Affidavit, ¶ 6.) As a result of the Nationwide strategy to maximize financial pressure on agents who terminated with Nationwide, Nationwide established a so-called "reflex unit" with the stated intention of putting the departing agents out of business, by among other things trying to wrongfully confiscate agents' retirement accounts and otherwise creating substantial difficulties in terms of the agents' ability to continue to do insurance business. (Morin Affidavit, ¶ 6.)[1] Creating financial difficulties with respect to an insurance agent's credit and credit rating is particularly significant, beyond the obvious problems that poor credit has for all individuals. (Morin Affidavit, ¶ 6.) When an independent insurance agent seeks to obtain an appointment from an insurance company to act as its authorized agent, the insurance company will require

_____

[1] Nationwide's reflex unit activities are referenced in the recent decision in Nationwide Mutual Ins. Co. v. Fleming, 2007 WL 1463357 (Pa. Superior Ct. 5/21/07) (copy attached).

that the agent have a good credit rating or provide a satisfactory explanation of any blemishes on the prospective agent's credit record. (Morin Affidavit, ¶ 6.)  Therefore, an adverse credit history will have a substantial and detrimental impact on a former Nationwide agent's ability to make a living as an insurance agent and to compete with Nationwide after his or her departure from Nationwide. (Morin Affidavit, ¶ 6.)

At all times relevant to this litigation, defendant Nationwide Federal Credit Union (hereinafter "NFCU") was a federally chartered credit union which solicits business from Nationwide employees, agents and their families.  Nationwide had a special program to encourage its agents to utilize NFCU for agency development loans.  In fact, all applications for business loans from NFCU had to be, and were, submitted to and approved by Nationwide prior to any disbursement of loan funds by NFCU. (Morin Affidavit, ¶ 7.)

During the time that Mr. Morin was a Nationwide agent, he maintained several accounts with NFCU, including a savings account and a checking account, under account number 907119006.  In addition, during the time that he was a Nationwide agent, Mr. Morin had obtained several loans from NFCU.  As of February 6, 2000, Mr. Morin had five (5) loans outstanding with Nationwide, plus a Visa credit card account.  Those loans were: (1) a business loan, referred to as a Partnership Plus loan, which was given the account number 907119006-1; (2) an automobile loan for the auto used by his daughter Nicole, which was given the account number 907119006-2; (3) a loan for a recreational vehicle, which was given the account number 907119006-3; (4) a motor vehicle loan for a Dodge Durango, which was given the account number 907119006-4, and (5) an automobile loan for the auto used by his

4

daughter Jennifer, which was given the account number 907119006-6.[2]   Except for the Partnership Plus business loan, each of these outstanding loans was for items purchased for personal use by Mr. Morin or his family members. (Morin Affidavit, ¶ 8.)

By letter dated February 6, 2000, Mr. Morin gave notice to Nationwide that he was retiring from Nationwide. (A copy of that letter is attached as Exhibit 2 to the Affidavit of Michael D. Blanchard In Support of Defendants' Motion for Summary Judgment.) The reasons for Mr. Morin's decision to retire from Nationwide and terminate his relationship with Nationwide are set forth in that letter. At the time that he terminated his relationship with Nationwide, Mr. Morin had no intention to compete against Nationwide or otherwise continue to sell insurance near his former Nationwide office location. In fact, prior to his termination, he had become licensed to sell insurance in Vermont, and he had made arrangements to move from Connecticut and begin work, later in February, as an independent insurance agent in Vermont. (Morin Affidavit, ¶ 9.)

As of February 6, 2000, all payments on Mr. Morin loans with NFCU were current. (Morin Affidavit, ¶ 11.) His voluntary termination of his relationship with Nationwide constituted a "qualified cancellation" of his Agent's Agreement under Section 11e of the Agent's Agreement, which entitled Mr. Morin to the payment of "extended earnings" under the other terms of Section 11 of the Agent's Agreement. (Morin Affidavit, ¶ 10.) Notwithstanding that, on February 9, 2000, NFCU notified Mr. Morin that he was in default on his Partnership Plus

---

[2]   These loans were often referred to by the parties by their last digit. Thus, for example, the business loan was referred to as loan #1. However, in or around November of 2000, NFCU changed the number assigned to the various loans. The Durango loan became loan #1; the recreational vehicle loan became loan #5; and the Partnership Plus business loan became loan #6. This change in loan number designation created additional confusion with respect to the proper application of payments and accounting for the same by NFCU. (Morin Affidavit, ¶ 8.)

(business) loan.  (Morin Affidavit, ¶ 12, and Exhibit A attached thereto.)  The letter incorrectly stated that Mr. Morin's loan had been in default since February 7, 2000.  The letter also incorrectly stated that his Extended Earnings and Deferred Compensation Incentive Credits (DCIC) had been "forfeited upon the termination of your relationship with Nationwide Insurance."  As noted above, because Mr. Morin had retired by way of a voluntary termination under circumstances that constituted a "qualified cancellation" under Section 11e of the Agent's Agreement, there had been no forfeiture of his Extended Earnings or DCIC.  (Morin Affidavit, ¶ 12.)  The position taken by NFCU concerning the purported default and the purported forfeiture was part of the "reflex unit" response to his retirement which was intended to wrongfully exert financial pressure on Mr. Morin because he had terminated his relationship with Nationwide.  (Morin Affidavit, ¶ 12.)  In fact, it was only because Nationwide had, by February 9, apparently taken the position that Mr. Morin's Extended Earnings benefits had been forfeited, and consequently those monies would not be available to him to allow him to move to Vermont and establish a new insurance business there, that Mr. Morin then modified his plans and instead focused his business plan on his Connecticut insurance agency as an independent agent.  (Morin Affidavit, ¶12.)

Prior to his retirement from Nationwide, all of Mr. Morin's loans had been paid on a current basis by way of deductions from his agent's commissions.  During February of 2000, those loans continued to be paid via payroll deductions on the 15th and 25th of the month.  (Morin Affidavit, ¶ 13.)  In fact, an internal NFCU e-mail dated March 3, 2000, which was disclosed by NFCU during discovery, lists Mr. Morin's loans as "either in repayment or promising repayment and **not in default**" (emphasis in original).  (Morin Affidavit, ¶ 13, and Exhibit B attached thereto.)  Since his loans continued to be paid and since this subsequently-

6

disclosed internal NFCU e-mail confirms that his loans were not regarded as being in default, it appears that NFCU's February 9 letter (Exhibit A) was part of a coordinated effort between NFCU and Nationwide, though the Reflex Unit, to use false and misleading information to harass Mr. Morin and to exert improper financial pressure on him because he had made the decision to leave Nationwide and was contemplating the possibility of continuing to sell insurance. (Morin Affidavit, ¶ 13.) Furthermore, that NFCU was part of Nationwide's "reflex unit" actions with respect to former Nationwide agents like Mr. Morin is confirmed by the series of e-mails that are reprinted in Exhibit B, all of which refer to NFCU's actions with respect to "reflex agents."

Mr. Morin's commission payments from Nationwide continued into March of 2000, and during that month the loans were paid via deductions from his NFCU account on March 14 or 15 and on March 29. (Morin Affidavit, ¶ 14.) However, during that month, he became aware that his commission payments from Nationwide would end soon. (Morin Affidavit, ¶ 15.) Because of that, a written payment plan was initiated by Mr. Morin, as a member in good standing at NFCU, under which he was to deposit $2300 into his savings account at NFCU twice a month, and NFCU was to then disperse the $2300 that he had deposited to each of his outstanding loans in the amount that was due on each loan at the time that each loan payment was due. (Morin Affidavit, ¶ 15.) A copy of that directive (ACH authorization), with hand-written notations by NFCU at the top regarding the loans to which the funds were to be dispersed, is attached as Exhibit C-1 to the Morin Affidavit. That method of payment worked for several months, until NFCU violated the terms of the agreement between Mr. Morin and NFCU by failing to apply the deposited funds as directed to each of his loan accounts, which actions by NFCU disrupted the orderly payment of the loan accounts. When Mr. Morin called

7

NFCU to inquire why the funds were not disbursed in accordance with our agreement, he was told by NFCU that it could do whatever it wanted to do with the funds in that savings account. (Morin Affidavit, ¶ 15.)

As a result of NCFU's actions in misapplying the account funds in payment of the loans, and the fact that it would be impossible to make the aforementioned agreement work if the funds that Mr. Morin was depositing to his account were not applied by NFCU to each loan for the full amount due as the parties had agreed, Mr. Morin initiated and entered into a new arrangement with NFCU under which NFCU was to make an electronic withdrawal for specified loan payments from Mr. Morin's account at the Savings Bank of Rockville (hereinafter "Rockville Bank"). Under that new ACH authorization, which was signed on July 4, 2000, NFCU was to withdraw $900 from Mr. Morin's Rockville Bank account twice monthly, which amounts were to be applied to the loan ending in #4 (the Dodge Durango), to the loan ending #3 (the recreational vehicle), and to the loan ending in #6 (Jennifer's car) and to the Visa account. Around that time, Mr. Morin paid off the loan ending #2, and the loan ending #1 (the business loan) was to be paid directly by personal check. Although this new ACH authorization was dated July 4, 2000, and returned to NFCU immediately thereafter for use by NFCU per the agreement between Mr. Morin and NFCU, it was not processed by NFCU until August 11, 2000. Because of this delay by NFCU, NFCU did not take payments under the new ACH authorization as instructed, causing the loans to be delinquent. (Morin Affidavit, ¶ 16 and Exhibit C-2 attached thereto.)

Even though there would have been no delinquencies in regard to Mr. Morin's personal loans had NFCU followed the aforementioned agreements, instructions and authorizations with respect to the payment of those loans, all of Mr. Morin's loans with NFCU were brought current

8

on or about September 27, 2000, through payment by checks. A check payable to NFCU for $6,775.00 was made to bring the Partnership (business) loan (#907119006-1) current. A check payable to NFCU for $1,028 was made to bring loan #907119006-4 current. A check payable to NFCU for $4,320 was made to pay off loan #907119006-6 in full. These payments corrected the problems that had been brought about by NFCU's failure to deduct and apply payments properly under the aforementioned agreements. (Morin Affidavit, ¶ 17.)

At the time of his retirement from Nationwide in February of 2000, Nationwide owed Mr. Morin a substantial amount of money for compensation that had been earned as of December 31, 1999. Those monies should have been paid to Mr. Morin by Nationwide at or before the time of his retirement. However, it was not until October 17, 2000, soon after his three remaining loans with NFCU (including the Partnership Plus (business) loan) were brought current at the end of September of 2000, that Nationwide finally released Mr. Morin's earned compensation in the amount of $31,578.99 which Nationwide had wrongfully withheld since February of 2000. However, that money was not sent to Mr. Morin; instead, the $31,578.99 was sent by Nationwide to NFCU. It further appears that that amount was sent by Nationwide to NFCU electronically on October 17, 2000, because, not long thereafter, Mr. Morin had asked NFCU to provide him with a copy of any payment that Nationwide had made by check and none was provided to him. The entire $31,578.99 was applied by NFCU to Mr. Morin's Partnership Plus (business) loan. When he learned that the $31,578.99 had gone to NFCU, Mr. Morin contacted NFCU by telephone to discuss the matter with a representative of NFCU. In that conversation, Mr. Morin indicated that since the $31,578.99 represented more than 13 months of payments on the Partnership Plus (business) loan, that payment would constitute monthly payments for each of the months through November of 2001, which would then keep

9

the business loan current until November of 2001 and consequently no payment would be due on that loan until November of 2001.  The NFCU representative voiced no objection to or concern with that manner of proceeding, and Mr. Morin did not receive any communication from NFCU that this arrangement was not acceptable.  Therefore, based on Mr. Morin's agreement with NFCU in October or November of 2000, the monthly payments on his Partnership Plus (business) loan were current through November of 2001.  (Morin Affidavit, ¶ 18.)

Because of the problems that Mr. Morin had encountered with NFCU's application of the $900 (twice monthly) ACH withdrawals from his Rockville Bank account to the other outstanding loans, another change was made in the ACH authorization.  Effective October 30, 2000, NFCU was provided with authorization to debit Mr. Morin's Rockville Bank account for $355.67 twice monthly to satisfy the amount due on the Durango loan (#907119006-4) and $168.14 twice monthly to satisfy the amount due on the recreational vehicle loan (#907119006-3), which were Mr. Morin's only NFCU loans that remained outstanding, with the exception of the business loan which had been paid current to November of 2001.  Because this new ACH authorization was provided to NFCU at the end of October of 2000, Mr. Morin made payments on both loans by check in November of 2000.  Thereafter, all scheduled payments of loans #3 and #4 were to be taken from his Rockville Bank account through this ACH withdrawal authorization.  (Morin Affidavit, ¶ 19 and Exhibit C-3 attached thereto.)[3]

---

[3] However, no loan payments were due, and no ACH withdrawal was made by NFCU, in December of 2000 because Mr. Morin participated in NFCU's "holiday skip-a-payment" program, as he had done in each of the preceding years. In that program, NFCU permitted credit union members to skip the December payments on their loans in order to have more money available for other holiday season expenses.  (Morin Affidavit, ¶ 19.)

Soon after the newest ACH authorization was in place, NFCU began a confusing pattern of activity with respect to the ACH withdrawals that Mr. Morin had authorized whereby NFCU either failed to withdraw payments or reversed the withdrawal of payments, and then claimed that the loans were delinquent because no payment had been made. (Morin Affidavit, ¶ 21.) In fact, in a letter to Mr. Morin dated March 30, 2001, Regina M. Lewie, the Chief Financial Officer of NFCU, explained to Mr. Morin that, with respect to the Durango loan and the recreational vehicle loan (referred to therein as loan # 1 and loan # 5) that were to be paid by ACH debit:

> On February 16, 2001 NFCU sent you a letter because we did not pull your loan payments as scheduled from Savings Bank of Rockville in January or early February. Unfortunately, you were not the only member affected by this error. In our efforts to try to notify members as quickly as possible, the February 16th letter was sent to the affected members.
>
> Your loans were credited as scheduled at the credit union. The funds due the credit union for the January and February payments were pulled on February 21.

(Morin Affidavit, ¶ 21, and Exhibit D attached thereto.)

In fact, in 2001, ACH payments of $355.67 were taken from Mr. Morin's Rockville Bank account by NFCU for the Durango loan twice on February 22, on March 13, on March 28, on April 12, on April 27 and on May 11. (Morin Affidavit, ¶ 22.) Because the Durango was repossessed on May 15, 2001, Mr. Morin terminated the ACH authorization, and NFCU's attempt to make further ACH debit from his Rockville Bank account on May 25, 2001 for the Durango loan was rejected. (Morin Affidavit, ¶ 22.) Likewise, in 2001, ACH payments of $168.14 were taken from Mr. Morin's Rockville Bank account by NFCU for the recreational vehicle loan on February 16, on February 22, on March 1, on March 16, April 3, on April 13, on April 30, and on May 15. (Morin Affidavit, ¶ 23.) Significantly, notwithstanding that these payments were being taken electronically by NFCU, on or about March 26, 2001, NFCU sent

Mr. Morin a "Due Notice" indicating that the recreational vehicle loan (account #907119006 sub 5) was past due.  (Morin Affidavit, ¶ 23.)  Immediately upon receiving that Due Notice, Mr. Morin notified NFCU that this notice was another example of its failure to properly collect and/or process the ACH payments on his loans.  (Morin Affidavit, ¶ 23, and Exhibit E attached thereto.)  By letter dated April 18, 2001, NFCU acknowledged its error and confirmed that the recreational vehicle loan was, in fact, current. (Morin Affidavit, ¶ 23, and Exhibit F attached thereto.)  NFCU sent Mr. Morin no other notice regarding any then-existing default on any of his loans, and Rockville Bank did not notified him of any failed ACH withdrawals regarding either of his loans that were being paid by ACH withdrawal.    (Morin Affidavit, ¶ 23.)[4] Ultimately, because the Durango had been repossessed on May 15, 2001, notwithstanding that Mr. Morin was then current on all of his loan payments, and because it was (again) clear to Mr. Morin that NFCU had no interest in proceeding in good faith in regard to his loans and the electronic ACH withdrawals that he had authorized NFCU to make in order to pay the loans, Mr. Morin terminated the ACH authorization with respect to the recreational vehicle loan as well, and NFCU's attempt to make further ACH debit from his Rockville Bank account on May 31, 2001 for the recreational vehicle loan was rejected. (Morin Affidavit, ¶ 23.)  Instead, on or about June 26, 2001, I paid the $336.28 due on the recreational vehicle loan by check.  (Morin Affidavit, ¶ 23.)  Furthermore, at or about that time, NFCU "wrote off" the recreational vehicle loan despite it being current and reported the same as a "charged off" loan to the several credit reporting agencies. (Morin Affidavit, ¶23.)

_____

[4]    If there were ever insufficient funds in Mr. Morin's Rockville Bank account when a third party attempted to withdraw funds by way of an ACH authorization, then he would have been notified of that fact, and charged a fee, by Rockville Bank.  However, at no time did he receive any notice from Rockville Bank that the funds in his Rockville Bank account were insufficient to pay any attempt by NFCU to withdraw funds by way of an ACH authorization. (Morin Affidavit, ¶ 20.)

On May 15, 2001, NFCU repossessed Mr. Morin's Dodge Durango, notwithstanding that, at that time, he was current on all of his loans with NFCU. (Morin Affidavit, ¶ 24.) Furthermore, it appears that Mr. Morin's Dodge Durango was sold by NFCU (through Southern Auto Sales, Inc. in East Windsor, Connecticut) to a Massachusetts automobile dealer on June 20, 2001. (Morin Affidavit, ¶ 25, and Exhibit G attached thereto.)   Mr. Morin was never informed of that sale. (Morin Affidavit, ¶ 25.)  In fact, notwithstanding that his Durango had been sold on June 20, 2001, NFCU thereafter informed him by way of a letter dated July 2, 2001, that he needed to pay $145,153.80 within 20 days in order to "redeem your vehicle." (Morin Affidavit, ¶ 25, and Exhibit H attached thereto.)  Soon thereafter, by letter dated July 7, 2001, NFCU indicated that Mr. Morin should disregard the July 2, 2001 letter, and instead informed him that he needed to pay $2614.53 within 20 days in order to "redeem your vehicle." (Morin Affidavit, ¶ 25, and Exhibit I attached thereto.)  As can be seen from a comparison of the two letters (Exhibits H & I), the difference between the amounts listed in the two letters is that the July 7 letter does not include any claim of delinquency on the business (Partnership Plus) loan, as that loan had already been paid current through November of 2001. (Morin Affidavit, ¶ 25; see also ¶ 18.)  Instead, the loan payment and past due amounts claimed in the July 7 letter pertain exclusively to the Durango loan, as each figure is divisible by the semi-monthly amount of $355.67 that Mr. Morin had been paying on that loan until the date of its repossession on May 15, 2001. (Morin Affidavit, ¶ 25.)

Additional misleading statements regarding the sale date and the opportunity to redeem the repossessed vehicle appear in a letter to Mr. Morin dated June 20, 2001 from Attorney Randall May of NFCU's Office of General Counsel.  (Morin Affidavit, ¶ 26.)   That letter purported to inform Mr. Morin that "[u]nless you promptly return all of your NFCU accounts to

13

current status, the repossessed automobile will be sold at auction." (Morin Affidavit, ¶ 26, and Exhibit J attached thereto.) However, as noted above, Mr. Morin's Durango had already been sold by NFCU on that very day. (Morin Affidavit, ¶ 25, 26.)

It further appears that NFCU's communications with Nationwide were not limited to information regarding the Partnership Plus (business) loan. In December of 2000, Mr. Morin received an undated letter from Randall May, Esq., who is in-house legal counsel for NFCU, which letter was postmarked December 19, 2000. (Morin Affidavit, ¶ 27, and Exhibit K attached thereto.) That letter includes information regarding not only Mr. Morin's business loan with NFCU, but also includes information about his personal loans (Dodge Durango and Ski Doo) with NFCU. (Morin Affidavit, ¶ 27, and Exhibit K attached thereto.) The letter that was sent to Mr. Morin included a third page with a "Bcc" notation indicating that a "blind copy" of the letter had been sent to Randy Orr and Gregg Bachmann, who are attorneys who represent the Nationwide insurance companies. (Morin Affidavit, ¶ 27, and Exhibit K attached thereto.) Therefore, it appears that NFCU was sharing account information with Nationwide regarding Mr. Morin's personal loans. (Morin Affidavit, ¶ 27.)

As a result of NFCU misapplying payments to Mr. Morin's loans; failing to debit accounts established for automatic payments to be made to his loans; wrongfully claiming defaults when Mr. Morin's loans were current; sending false reports to credit reporting agencies regarding the status of his loans, including reflecting his wife, co-plaintiff Denise M Morin (hereinafter "Mrs. Morin"), as a co-maker on one or more those loans when she was never a co-maker on any of the loans; wrongfully repossessing his Dodge Durango; and refusing his repeated requests for information and clarification by way of an accounting on the various loans; Mr. Morin's credit rating and that of his wife were negatively impacted, and Mr.

14

Morin's ability to do business has been substantially impaired, and Mr. Morin's ability to enjoy normal social pleasures through the use of credit has been negatively impacted. (Morin Affidavit, ¶ 28.) In addition, because of the false payment status information that NFCU had supplied to credit reporting agencies, Rockville Bank declined to provide Mr. Morin with a loan in 2002. (Morin Affidavit, ¶ 29.) It was only after Mr. Morin provided additional information to Rockville Bank to demonstrate that he had kept current with his obligations to NFCU that Rockville Bank went forward with the loan; however, the loan that was eventually extended to Mr. Morin by Rockville Bank was for a shorter term and at a higher rate of interest than it otherwise would have been had there not been credit report issues because of the loan information from NFCU. (Morin Affidavit, ¶ 29.) Furthermore, on or about March 1, 2002, Mrs. Morin was notified by Chase Manhattan Bank, N.A. that her request for an increase in the limit on her personal Chase Visa credit card had been denied. (Morin Affidavit, ¶ 30.) The reason for that denial of credit was because of false information in her credit report that had been supplied by NFCU. (Morin Affidavit, ¶ 30.) The false credit report information was that Mrs. Morin was obligated, with Mr. Morin, on the Partnership Plus (business) loan when, in fact, Mrs. Morin was never obligated on that loan. (Morin Affidavit, ¶ 30.) Finally, soon after Mr. Morin's retirement from Nationwide, NFCU shut off the available credit on the NFCU Visa credit card account that was held jointly by Mr. and Mrs. Morin. (Morin Affidavit, ¶ 31.) Specifically, at some point between March and September of 2000, NFCU refused to provide Mr. and Mrs. Morin with otherwise available credit under the NFCU Visa credit card notwithstanding that the account continued to be below its credit limit. (Morin Affidavit, ¶ 31.)

### III.    LEGAL ARGUMENT IN OPPOSITION TO SUMMARY JUDGMENT

### A.    Because Genuine Issues of Material Fact Exist Concerning the Conduct of the Defendants In Regard to the Administration of the Subject Loans, and in Particular Regarding the Payment Status of the Loans, Defendant NFCU Is Not Entitled To A Summary Judgment on Counts 1 and 2

The Morin Affidavit, which is relied on by the plaintiffs in opposing the motion for summary judgment, demonstrates that NFCU repeatedly failed to act in accordance with the instructions given by Mr. Morin in regard to the source and method of loan repayment, and NFCU's agreements to same, and that NFCU thereafter claimed defaults on the underlying loans when none existed. First, NFCU claimed an immediate default on the loans by virtue of the fact that Mr. Morin had resigned as a Nationwide agent when that act, and the surrounding circumstances, created no default (or even any forfeiture of Mr. Morin's Extended Earnings benefits, as asserted by NFCU and Nationwide). Second, notwithstanding explicit instructions given by Mr. Morin to NFCU regarding the source and method of paying the loans, which instructions NFCU agreed to follow, NFCU failed, on numerous occasions, to take available funds that were to be applied to the loans and NFCU took funds, on other occasions, but failed to properly apply them to all of the loans, in each instance creating difficulties for Mr. Morin in keeping his loans current. Ultimately, notwithstanding that Mr. Morin was current on his loans in May of 2001, NFCU repossessed his Dodge Durango. NFCU's bad faith conduct and breach of contract in the administration of the loans is evidenced in NFCU's determined efforts to make Mr. Morin's orderly payment of the loans an impossibility, which conduct began the day after Mr. Morin retired as a Nationwide agent and continued through the unauthorized repossession of his vehicle and beyond.

NFCU first claims that there was a default simply because Mr. Morin left Nationwide. But, that position, first asserted by NFCU in a letter dated February 9, 2000, only days after Mr. Morin retired from Nationwide, was without legal or factual basis. It is clear from the Agent's Agreement

16

that an agent is entitled to the payment of ASC benefits (Extended Earnings and DCIC) upon his retirement (voluntary termination) from Nationwide. That is what should have occurred here. On February 6, 2000, Ron Morin retired from Nationwide after many years of service. (Morin Affidavit, ¶ 3, 9.) That event entitled him to the payment of the ASC benefits under the terms of his contract with Nationwide (the Agent's Agreement). (Morin Affidavit, ¶ 4, 9, 10.) Therefore, any default claimed because of his retirement was unjustified.

NFCU also claims that Mr. Morin's purported "forfeiture" of his ASC benefits also created a default. In fact, in its February 9, 2000 to Mr. Morin, NFCU asserted that "[y]our Partnership Plus loan, in the amount of $173,245.86, has been in default since February 7, 2000. . . . The loan was secured by Extended Earnings and DCIC, which were forfeited upon the termination of your relationship with Nationwide Insurance." (Exhibit A to the Morin Affidavit.) Yet, as noted above, under the Agent's Agreement, Mr. Morin's retirement did not cause any forfeiture of his ASC benefits. (Morin Affidavit, ¶ 9, 10.) In fact, quite the opposite, that retirement is the event that created Mr. Morin's entitlement to the payment of his ASC benefits under Section 11e of the Agent's Agreement. (Morin Affidavit, ¶ 10.) In addition, as of February 9, 2000, Mr. Morin had not engaged in any competition with Nationwide, nor had he engaged in the business of selling insurance in Connecticut after his February 6 retirement. (Morin Affidavit, ¶ 12.) Instead, he had closed his insurance agency in Connecticut in order to move to Vermont to sell insurance there. (Morin Affidavit, ¶ 9.) Consequently, there was no legal or factual basis for NFCU (or Nationwide) to claim a forfeiture of ASC benefits when NFCU declared that Mr. Morin's "Partnership Plus loan . . . has been in default since February 7, 2000."

In fact, as part of its coordinated efforts with Nationwide's "Reflex Unit," NFCU had declared that supposed "default" as an improper means of placing significant adverse financial

17

pressure on Nationwide agents, like Mr. Morin, who have decided to leave Nationwide. (Morin Affidavit, ¶ 6, 7, 12, 13.) By declaring defaults without basis in order to harm the agent's credit rating, and by improperly depriving agents of needed cash payments to which they are otherwise entitled by way of the ASC benefits, NFCU and Nationwide sought to unlawfully suppress business competition by discouraging agents, like Mr. Morin, who have left Nationwide from continuing to make a living in anywhere the insurance business. (Morin Affidavit, ¶ 13.) Certainly, these facts support the conclusion that NFCU acted in bad faith in its administration of the loans.

Ultimately, it was only after Mr. Morin received NFCU's February 9 letter and realized that Nationwide was not going to honor its contractual obligation to pay the ASC benefits, which he needed in order to pursue his plan to move his insurance business to Vermont, and that NFCU was part of a coordinated effort to squeeze him financially, that Mr. Morin decided to re-open his insurance agency in Connecticut and compete against Nationwide. (Morin Affidavit, ¶ 12.) While NFCU attempts to point to such competition as causing the forfeiture of the ASC benefits and justifying the claim of default, that view is neither factually accurate nor legally sound. The lack of any factual foundation for the claim of default on February 7, 2000 is evident in the fact that there had been no competition by Mr. Morin as of that date. (Morin Affidavit, ¶ 12.) Without competition, there was no basis to claim a "forfeiture" of ASC benefits. But, of course, NFCU's motivation was not truth or accuracy; instead, NFCU sought to declare a default, even for a nonexistent reason, in order to exert additional financial pressure against Mr. Morin as part of NFCU's and Nationwide's coordinated and retaliatory response to Mr. Morin's departure. (Morin Affidavit, ¶ 6, 7, 10, 12, 13.) Not only was the declaration of a forfeiture of ASC benefits, and the purported default in the loans based thereon, without factual

basis, but it was also of dubious legal validity because the "forfeiture for competition" provision in the Agent's Agreement is unenforceable. Under very similar facts, the Connecticut Supreme Court determined that Nationwide's failure to pay ASC benefits to several agents who began competing after the termination of their relationship with Nationwide can amount to an actionable breach of contract and CUTPA violation. See Deming v. Nationwide Mut. Ins. Co., 279 Conn. 745, 757-69, 784 (2006). Therefore, what we have here is a purported default that is based entirely on a claim of forfeiture that is legally unsound and unenforceable, which forfeiture had not even occurred at the time that it was declared by the defendants.

In addition, although NFCU has decided to re-assert the purported February 7, 2000 default to support its position in this litigation, an internal NFCU e-mail from March of 2000 demonstrates that NFCU itself did not actually believe that the circumstances of Mr. Morin's voluntary termination had caused a default in the Partnership Plus loan. (Morin Affidavit, ¶ 13.) Specifically, that NFCU e-mail, which was disclosed to the plaintiffs by NFCU during discovery (but which is not referenced in the defendants' summary judgment materials) lists Mr. Morin's loan as "either in repayment or promising repayment and **not in default**." (Morin Affidavit, ¶ 13 and Exhibit B attached thereto (emphasis added).) Since NFCU itself, at least internally, apparently did not believe that the loan was in default because of the circumstances of Mr. Morin's departure from Nationwide, it is reasonable to conclude that its assertion of a default as of February 7, 2000, based on Mr. Morin's retirement was not made in good faith, and was simply part of its coordinated effort with Nationwide to exert financial pressure upon former Nationwide agents and wreck havoc with such agent's attempts to secure credit and continue in the insurance business.

But, there is more. NFCU takes the preposterous position that because the loan

19

documents state that Mr. Morin would be in default if he broke "any promise" made therein, and

because he promised, in the loan documents signed long before his termination, that he owned

the property that secured the loan (which "property" included his "commissions, extended

earnings, and deferred compensation incentive credits"), Mr. Morin somehow went into default

under the loan documents when Nationwide wrongfully forfeited Mr. Morin's ASC benefits upon

his retirement from Nationwide, or when Morin later competed against Nationwide. Yet, at the

time that he signed the loan documents, Mr. Morin promised only that he owned the property

securing the loans, and there is no dispute that he did then own the property. In fact, Mr. Morin

was entitled to the payment of his ASC benefits upon his retirement because his retirement

constituted a "qualified cancellation" of his Agent's Agreement. (Morin Affidavit, ¶ 10.) More

importantly, the Security Agreements relied on by NFCU do not contain any promise that Mr.

Morin will continue to own the property. In fact, since "the property" under the Security

Agreements included "commissions," it would mean that Mr. Morin could never spend any of his

commissions (or at least spend them for anything but payment of the loan) without somehow

causing a default on his loans because, once spent, he would no longer "own" those amounts.

Thus, the purported broken "promise" upon which defendants rely to make out their claim of a

"default" is not supported by words of the parties' agreement. Moreover, given the fact that the

language actually supports a conclusion that is the opposite of the defendants' contention, at

most the interpretation of the "promise that you own the property" language that is urged by the

defendants would point to a contractual ambiguity, which presents a question of fact that cannot

be addressed in the context the defendants' motion for summary judgment. See, e.g., Niehaus v.

Cowles Business Media, Inc., 263 Conn. 178, 190 (2003) (where the meaning of contractual

language is not "clear and unambiguous," the interpretation and application of that language

20

presents a question of fact that cannot be resolved by dispositive motion). Therefore, as far as ownership of the retirement accounts is concerned, nothing in the defendants' papers establishes that Mr. Morin did not own the retirement accounts when the loan documents were signed or when he terminated his agency status and NFCU declared him to be in default.

In fact, other than in the February 9, 2000 letter, which was intended purely as a means of putting financial pressure on Mr. Morin as a retired Nationwide agent, and then again in this litigation, NFCU did not stand by its claim that the loans have been in default since February of 2000 because of the forfeiture of the ASC benefits, notwithstanding the frequent communication between NFCU and Morin during the 15 months between the termination of his relationship with Nationwide and the repossession of his vehicle. Not only did NFCU acknowledge that there was no default in the aforementioned internal e-mail of March 3, 2000; see Exhibit B to the Morin Affidavit; but it is undisputed that NFCU regarded all loans as being current as of the end of September of 2000; see Affidavit of Kathleen M. Brisendine, ¶ 36 (submitted by defendants in support of motion for summary judgment); and, later, in its explanation for the repossession of Mr. Morin's vehicle in May of 2001, NFCU did not mention any purported default based on forfeiture of the ASC benefits, but only asserted an alleged default in timely loan payments. See Exhibit J to the Morin Affidavit. It is therefore apparent that the supposed default because of the (wrongful) forfeiture of Mr. Morin's ASC benefits is a position that NFCU has never really pursued, except as an immediate response to Mr. Morin's termination of his relationship with Nationwide and in the course of this litigation, both of which appear to be strategic decisions to maximize the pressure on a departing Nationwide agent like Mr. Morin and serve notice on other Nationwide agents that leaving their employment with Nationwide will not be without personal and financial cost, if not ruin, without regard to factual or legal constraint.

Furthermore, after he ended his relationship with Nationwide, Mr. Morin worked with NFCU to keep his loans current, notwithstanding repeated instances in which NFCU either failed to take payments that it was authorized and instructed to take and apply to the loans, or took payments but misapplied the amounts among the several outstanding loans. (Morin Affidavit, ¶ 11, 14-24.) When Mr. Morin authorized NFCU to take a large lump sum amount ($2300) twice monthly from his bank account at the Savings Bank of Rockville to be distributed in payment of all of his outstanding loans, NFCU took the money but did not always apply it to the loans as instructed. (Morin Affidavit, ¶ 15.) Later, during the summer of 2000, when Mr. Morin then changed the ACH authorization by permitting NFCU to take a smaller lump sum amount of money from his bank account at the Savings Bank of Rockville for the consumer loans, NFCU again failed to follow those instructions, this time by not even taking money as instructed. (Morin Affidavit, ¶ 16, 19-23.) By its conduct, NFCU so confused the payment of the loans that clear analysis of the payment status is difficult, at best. But, what appears to be undisputed is that all loan payments were brought current, to the satisfaction of NFCU, by the end of September of 2000. See Affidavit of Kathleen M. Brisendine, ¶ 36 (submitted by defendants in support of motion for summary judgment). In fact, by that time, two of the automobile loans that had been outstanding at the time of Mr. Morin's departure from Nationwide had been paid in full, and NFCU's liens on those vehicles were released. (Morin Affidavit, ¶ 16, 17.) Thereafter, the parties agreed that the $31,578.99 in Mr. Morin's earnings that Nationwide finally paid over to NFCU in October of 2000 would be used to keep the payments on the business loan current *until November of 2001*. (Morin Affidavit, ¶ 18.) Further, Mr. Morin instructed and authorized NFCU to take the payments for each of the two remaining loans (for the Dodge Durango and for the recreational vehicle) from his bank account at the Savings Bank of Rockville by electronic

22

transfers in the exact amount due on each loan twice each month. (Morin Affidavit, ¶ 19.) This arrangement appears to have worked until NFCU failed to take the money from Mr. Morin's bank account as instructed. (Morin Affidavit, ¶ 21.) In fact, the Brisendine Affidavit that is relied on by the defendants to support their claim for summary judgment is misleading, to the say the least, because it fails to explain that NFCU did not take the required payments as instructed in January and/or February of 2001, notwithstanding that NFCU's Chief Financial Officer had acknowledged that failure in a letter to Mr. Morin dated March 30, 2001. (Morin Affidavit, ¶ 21 and Exhibit D attached thereto.) Thereafter, NFCU took the missed payments, and the only default of which it notified Mr. Morin was later admitted to be erroneous. (Morin Affidavit, ¶ 22, 23 and Exhibits E and F attached thereto.) Nonetheless, on May 15, 2001, NFCU repossessed the Dodge Durango notwithstanding that all loans were then current. (Morin Affidavit, ¶ 24.)

The foregoing facts demonstrate that NFCU failed to honor its contractual obligations with Mr. Morin, and in particular the several agreements that the parties had entered into after Mr. Morin's departure from Nationwide in which he gave explicit instructions that NFCU agreed it would follow regarding the manner and method for the repayment of the loans. Furthermore, these facts demonstrate bad faith on the part of NFCU in the administration of the loans. It is well settled, in Connecticut, that the duty of good faith and fair dealing is a covenant implied into every contract or contractual relationship. Hoskins v. Titan Value Equities Group, Inc., 252 Conn. 789, 793 (2000); Magnan v. Anaconda Industries, Inc., 193 Conn. 558, 566 (1984). "Good faith performance or enforcement of a contract emphasizes faithfulness to an agreed common purpose and consistency with justified expectations of the other party. Good faith and fair dealing mean an attitude or state of mind denoting honesty of purpose and freedom from intention to defraud. It means being faithful to one's duty and obligation under the contract.

Good faith is defined as the opposite of bad faith. . . . Bad faith generally implies a design to mislead or to deceive another or neglect or refusal to fulfill some duty or some contractual obligation not prompted by an honest mistake as to one's right or duties. Bad faith is simply not bad judgment or negligence, but it implies the conscious doing of a wrong because of dishonest purpose." PSE Consulting, Inc. v. Frank Mercede and Sons, Inc., 267 Conn. 279, 325 (2004). Here, NFCU, in coordination with Nationwide, sought to harass Mr. Morin and caused repeated confusion in regard to the status of the loan payments in order to create the supposed defaults as a means of exerting financial pressure on a former Nationwide agent (Mr. Morin) who had dared to leave the company and continue to make a living selling insurance. Under such circumstances, NFCU breached the covenant of good faith and fair dealing through its bad faith administration of the loan agreement, which included the subsequent repayment instructions and agreements between the parties regarding same.

Based on the foregoing, there are, at the very least, genuine issues of material fact in regard to plaintiff's claims, in Counts 1 and 2, that NFCU failed to properly abide by and implement the contractual relationship between itself and Mr. Morin.   Consequently, the defendants are not entitled to judgment as a matter of law on the contract claims set forth in Counts 1 and 2 of the Complaint.

## B.   Because the Repossession of the Dodge Durango by NFCU and the Circumstances Surrounding its Disposition by NFCU Were In Violation of Law, Defendant NFCU Is Not Entitled To A Summary Judgment on Counts 3 and 9

Count 3 of the Complaint alleges that NFCU's repossession of Mr. Morin's Dodge Durango was not authorized by law and therefore constituted a conversion of his property. Count 9 of the Complaint alleges that NFCU's repossession of Mr. Morin's Dodge Durango violated Connecticut

General Statutes (Rev. to 2001) §§ 42a-9-501 to 507, inclusive.[5]

The defendants correctly point out that, under Connecticut law, conversion is an unauthorized assumption and exercise of the right of ownership over goods belonging to another, to the exclusion of the owner's rights.  See e.g., Devitt v. Manulik, 176 Conn. 657, 660 (1979). Furthermore, under § 42a-9-503, a secured party has the right to take possession of collateral only "on default."  Where there has been no default, and therefore repossession is not authorized, the debtor whose collateral has been taken without authorization has a right to recover for any loss caused by the secured party's wrongful repossession.  See Conn. Gen. Stat. § 42a-9-507(1). While there is no dispute here that NFCU was a secured party, there is a dispute as to the status of the loan payments.  As argued in Part III.A above, Mr. Morin was not in default on May 15, 2001, when NFCU repossessed his vehicle.  (Morin Affidavit, ¶ 11, 13-24.)  At the very least, the question of whether the plaintiff was in default with respect to the outstanding loans on May 15, 2001, which is the prerequisite to a legally authorized repossession, presents a genuine issue of material fact that will preclude the entry of a summary judgment in favor of the defendants on Counts 3 and 9 of the Complaint.[6]

---

[5] Because all of the events pertinent to the repossession of the Dodge Durango occurred prior to October 1, 2001, when revisions to Article 9 of the UCC became effective in Connecticut, the plaintiff's claims under Conn. Gen. Stat. §§ 42a-9-501 to 507 are governed by the former version of Article 9.  Accordingly, all references to Conn. Gen. Stat. §§ 42a-9-501 to 507 herein are to the 2001 Revision to the Connecticut General Statutes, which was in effect prior to October 1, 2001.  For the convenience of the Court, a copy of Conn. Gen. Stat. (Rev. to 2001) §§ 42a-9-501 to 507 is attached to this Brief.

[6] In Count 3, the plaintiff also seeks treble damages for theft pursuant to Conn. Gen. Stat. § 52-564.  While a common law claim for conversion merely requires an intent to exercise dominion or control over the item of property that has been wrongfully taken; Plikus v. Plikus, 26 Conn. App. 174, 180 (1991); a claim for treble damages for theft under § 52-564 requires additional proof of an intent to deprive another person of his property.  Suarez-Negrete v. Trotta, 47 Conn. App. 517, 521 (1998).  Because issues of intent are peculiarly within the province of the trier of fact, they are not properly resolved by way of a motion for summary judgment.  See, e.g., United States v. Cello-Foil Prods., 100 F.3d 1227, 1233-34 (6th Cir. 1996).  Therefore, whether

Furthermore, the violations of Article 9 at issue in Count 9 are not limited to the repossession of the vehicle, but also include NFCU's disposition of the vehicle after it was repossessed. See Complaint, Ninth Count, ¶ 19. Thus, even if the repossession itself was authorized because of the default claimed by the defendants, NFCU's conduct thereafter in regard to the disposition of the collateral constituted a separate violation of Article 9. Most significantly, while NFCU asserts that, after its repossession, the Durango was not sold by NFCU until August of 2001, *the documentary evidence (attached to NFCU's own summary judgment affidavit) demonstrates that the vehicle was actually sold by NFCU on June 20, 2001*, notwithstanding NFCU's later representations to Mr. Morin, in July of 2001, that he could "redeem your vehicle" by paying a specified amount on the vehicle loan. (Morin Affidavit, ¶ 25, 26.)[7]

Conn. Gen. Stat. (Rev. to 2001) § 42a-9-504(1) provides that, after default and repossession, a secured party may sell, lease or otherwise dispose of collateral, but § 42a-9-504(3) further provides that "every aspect of the disposition including the method, manner, time, place and terms must be commercially reasonable" and that "reasonable notification of the time and place of any public sale or reasonable notification of the time after which any private sale or other intended disposition is to be made shall be sent by the secured party to the debtor, if he has not signed

---

the defendant's unlawful seizure of the plaintiff's vehicle also amounted to actionable theft cannot be resolved by way of the motion for summary judgment.

[7] The fact that Kathleen Brisendine testifies falsely in her affidavit that the Durango was not sold until August of 2001 when the documentary evidence demonstrates that the sale actually occurred on June 20, 2001, is a sufficient basis for the trier of fact to reject *all* of her affidavit testimony, which would preclude the defendants from relying on the same to support any of their claims for summary judgment. The maxim of *falsus in uno, falsus in omnibus* is a sufficient ground to deny summary judgment where, as here, it has been shown that a moving party's witness has not testified truthfully about a material issue of fact. See, e.g., Peckham v. Ronrico Corp., 171 F.2d 653, 658 (1st Cir. 1949); Agogbua v. Abington Memorial Hospital, 2005 WL 1353612 at * 6 n. 11 (E.D. Pa. 5/31/05) (copy attached). This conclusion is consistent with the well-settled requirement that the evidence must be viewed in the light most favorable to the party opposing the claim for summary judgment.

26

after default a statement renouncing or modifying his right to notification of sale." Here, the Morin Affidavit demonstrates that, even though the vehicle had <u>already</u> been sold by NFCU <u>without advance notice to Mr. Morin</u>, NFCU sent Mr. Morin letters setting forth the amount he would need to pay in order to "redeem your vehicle," that is, to have the vehicle returned to him. (Morin Affidavit, ¶ 25, 26.) Under such circumstances, NFCU cannot demonstrate its compliance with the requirements of § 42a-9-504(3) regarding the notification of any sale or that the method, manner, time, place and terms were commercially reasonable. In addition, Connecticut General Statutes (Rev. to 2001) § 42a-9-506 provides that "[a]t any time before the secured party has disposed of collateral or entered into a contract for its disposition under section 42a-9-504 . . . the debtor . . . may unless otherwise agreed in writing after default redeem the collateral by tendering fulfillment of all obligations secured by the collateral [plus other expenses]." Here, it is obvious that NFCU violated that provision when it purported to allow Mr. Morin to redeem his motor vehicle *at a time when NFCU had <u>already</u> sold the vehicle to a third party*. Finally, § 42a-9-507(1) provides a debtor with a right to recover from the secured party any loss caused by the secured party's failure to comply with the foregoing provisions. Under these circumstances, independent of whether its initial repossession of the Durango was unlawful, because NFCU failed to comply with the provisions of §§ 42a-9-504 and 42a-9-506 in regard to the disposition of the collateral, it is not entitled to a summary judgment in its favor on Count 9 for that additional reason.

## C.    The Plaintiffs' State Law Claims in Counts 4, 5, 6, 8 and 12 Are Not Preempted by Federal law

### 1.    Defendants' Preemption Claim Has Not Been Pleaded As an Affirmative Defense and Therefore Is Not A Proper Ground for Summary Judgment

Rule 8(c) of the Federal Rules of Civil Procedure requires that a responsive pleading must set forth certain enumerated affirmative defenses as well as "any other matter

constituting an avoidance or affirmative defense."  "[A] party's failure to plead an affirmative defense bars its invocation at later stages of the litigation."  Doubleday & Co., Inc. v. Curtis, 763 F.2d 495, 503 (2d Cir. 1985), citing Satchell v. Dilworth, 745 F.2d 781, 784 (2d Cir. 1984) ("Failure to plead an affirmative defense in the answer results in the waiver of that defense and its exclusion from the case.") (internal quotation marks omitted).

The federal preemption defense on which the defendants seek summary judgment in regard to Counts 4, 5, 6, 8 and 12 must be pleaded as an affirmative defense in order to be relied upon by the defendants in seeking judgment in their favor.  Where a defendant argues that a plaintiff's state law claims are preempted by a federal statute that regulates the underlying conduct, the defendant is presenting a choice of law question, and such federal preemption claims are matters of affirmative defense that are waived if not timely raised.  See, e.g., Saks v. Franklin Covey Co., 316 F.3d 337, 349-50 (2d Cir. 2003) (ERISA preemption). Therefore, the defendants are not permitted to rely on any preemption defense in this case, unless the defendants' belated assertion of this defense is excused by the Court.  While the defendants have sought leave to plead federal preemption as an affirmative defense, the plaintiffs have opposed that motion.  If the Court agrees with the plaintiffs that the defendants should not be permitted to belatedly assert this defense at this stage of the proceedings, then the defendants claim for summary judgment on preemption grounds must be rejected in its entirety on that basis alone.

2.    Even If Available, Preemption Does Not Apply to Many Aspects of the Defendants' Conduct at Issue in the Challenged Counts

In addition, the state law claims asserted by the plaintiffs are not affected, in whole or at least in part, by the federal statutes on which the defendants rely for their preemption defense. According to the defendants' brief, their preemption argument rests on the provisions of 15 U.S.C.

28

§ 1681t(b)(1)(F)[8] and the provisions of 15 U.S.C. § 1681h(e)[9].  However, neither provision is

applicable here for at least two reasons.  First, as can be seen from the text of both statutory

provisions, the preemption that they provide is limited to state law claims relating to *the furnishing*

*of information to a consumer credit reporting agency.*[10]  Therefore, neither provision will bar the

plaintiffs' state law claims in Counts 4, 5, 6, 8 or 12 to the extent that the plaintiffs base those

claims on actionable conduct by the defendants that do not involve the furnishing of information to

consumer reporting agencies.  Second, even where state law claims arise from the furnishing of

information to consumer reporting agencies, by its limited terms, the preemption that is provided

in § 1681t applies only to conflicting state consumer protection statutes and regulations ('the laws

of any State") that specifically "regulate[ ] . . . the responsibilities of persons who furnish

information to consumer reporting agencies"; see Footnote 8, supra; and therefore § 1681t does

---

[8]  15 U.S.C. § 1681t(b)(1)(F) provides, in pertinent part, that:
No requirement or prohibition may be imposed under the laws of any State  . . .
with respect to any subject matter regulated under . . . [15 U.S.C. § 1681s-2],
relating to the responsibilities of persons who furnish information to consumer
reporting agencies . . . .
Section 1681s-2 regulates the duties and responsibilities of those who furnish information
relating to a consumer to a consumer reporting agency.

[9]  15 U.S.C. § 1681h(e) provides, in pertinent part:
Except as provided in [15 U.S.C. § 1681n and 1681*o*], no consumer may bring any
action or proceeding in the nature of defamation, invasion of privacy, or negligence
with respect to the reporting of information against . . . any person who furnishes
information to a consumer reporting agency, based on information disclosed
pursuant to sections 1681g, 1681h, or 1681m of this title, or based on information
disclosed by a user of a consumer report to or for a consumer against whom the
user has taken adverse action, based in whole or in part on the report except as to
false information furnished with malice or willful intent to injure such consumer.

[10]  For purposes of the aforementioned statutes, a "consumer reporting agency" means "any
person which, for monetary fees, dues or on a cooperative nonprofit basis, regularly engages
in whole or in part in the practice of assembling or evaluating consumer credit information or
other information on consumers for the purpose of furnishing consumer reports to third parties,
and which uses any means or facility of interstate commerce for the purpose of preparing or
furnishing consumer reports." 15 U.S.C. § 1681a (f).

not apply generally to common law causes of action, such as those sounding in "defamation, invasion of privacy, or negligence" because any preemption with respect to those common law claims is instead expressly governed by § 1681h(e), which allows such claims against any person who furnishes information to a consumer reporting agency where the false information was furnished with malice or willful intent to injure the consumer. See Footnote 9, supra. Here, only Counts 8 and 12 are claims under "the laws of any State" referenced in § 1681t (although those counts do not pertain to the furnishing of information to consumer credit reporting agencies), while Counts 4, 5 and 6 are the types of common law claims expressly referenced in § 1681h(e) which are not preempted where, as here, the false information was furnished to the credit reporting agency with malice or willful intent to injure the plaintiffs.

Count 4 is not limited to actionable conduct involving the furnishing of information to consumer credit reporting agencies. Count 4 sounds in intentional infliction of emotional distress and the actionable aiding and abetting of such conduct. Specifically, the Complaint alleges facts demonstrating the strained relationship between the Nationwide companies and their agents which led to the development of business strategy to maximize the financial pressure on Nationwide agents who terminated with Nationwide by wrongfully taking over the agents' customers, by confiscating agents' retirement accounts, and by otherwise creating substantial difficulties in terms of the agents' ability to continue to do insurance business. (Complaint, Fourth Count ¶ 4-7, 13.) The Complaint further alleges that, upon Mr. Morin's termination of his agent relationship with the Nationwide companies, NFCU "was either directed by Nationwide to default plaintiff's loans or otherwise wrongfully did so on its own, but as part of the larger strategy between Nationwide and its affiliated credit union (NFCU) to pressure departing agents" (Complaint, Fourth Count, ¶ 14), and that, as a direct result of that