# Connecticut General Statutes (Rev. to 2001) §§ 42a-9-501 to 507

# THE GENERAL STATUTES OF CONNECTICUT

## REVISION OF 1958

*Revised to January 1, 2001*

## VOLUME 11

*Published by Authority of the State*

(2) In addition to other requirements of this part, a continuation statement, amendment, termination statement, statement of assignment or statement of release which is filed in the office of a town clerk must refer to the record of the original financing statement by book and page. The town clerk shall enter upon the margin of the record of the original financing statement a notation of the record of the subsequent statement or amendment.

(3) Provision for a security interest in goods which are or are to become fixtures may be included in a mortgage or other like instrument transferring an interest in the real estate concerned. If such instrument complies with the requirements for a financing statement of section 42a-9-402, except the signature of the secured party, is recorded as an instrument affecting real estate, and has the appropriate recording fee paid therefor, such recording or registering and payment of fee shall be an effective filing under this part in the office of the town clerk without the necessity of any separate filing or payment of any separate fee to the town clerk under this part.

(4) If a person filing any financing statement, continuation statement, amendment, termination statement, statement of assignment or statement of release furnishes the town clerk a copy thereof at the time of filing, the town clerk shall upon request note upon such copy the date and hour of the filing of the original and promptly deliver or send the copy to such person.

(1961, P.A. 116, S. 15; 1963, P.A. 528, S. 4.)

History: 1963 act substituted reference to Sec. 7-34a for reference to Sec. 7-34, repealed by same act.

## PART 5*

## DEFAULT

*Uniform commercial code, Art. 9 part 5 cited. 221 C. 530, 539. Sec. 42a-9-501 et seq. cited. 241 C. 24.

**Sec. 42a-9-501. Default; procedure when security agreement covers both real and personal property.** (1) When a debtor is in default under a security agreement, a secured party has the rights and remedies provided in this part and except as limited by subsection (3) those provided in the security agreement. He may reduce his claim to judgment, foreclose or otherwise enforce the security interest by any available judicial procedure. If the collateral is documents the secured party may proceed either as to the documents or as to the goods covered thereby. A secured party in possession has the rights, remedies and duties provided in section 42a-9-207. The rights and remedies referred to in this subsection are cumulative.

(2) After default, the debtor has the rights and remedies provided in this part, those provided in the security agreement and those provided in section 42a-9-207.

(3) To the extent that they give rights to the debtor and impose duties on the secured party, the rules stated in the subsections referred to below may not be waived or varied except as provided with respect to compulsory disposition of collateral by subsection (3) of section 42a-9-504 and section 42a-9-505 and with respect to redemption of collateral by section 42a-9-506 but the parties may by agreement determine the standards by which the fulfillment of these rights and duties is to be measured if such standards are not manifestly unreasonable: (a) Subsection (2) of section 42a-9-502 and subsection (2) of section 42a-9-504 insofar as they require accounting for surplus proceeds of collateral; (b) subsection (3) of section 42a-9-504 and subsection (1) of section 42a-9-505 which

deal with disposition of collateral; (c) subsection (2) of section 42a-9-505 which deals with acceptance of collateral as discharge of obligation; (d) section 42a-9-506 which deals with redemption of collateral; and (e) subsection (1) of section 42a-9-507 which deals with the secured party's liability for failure to comply with this part.

(4) If the security agreement covers both real and personal property, the secured party may proceed under this part as to the personal property or he may proceed as to both the real and the personal property in accordance with his rights and remedies in respect of the real property in which case the provisions of this part do not apply.

(5) When a secured party has reduced his claim to judgment the lien of any levy which may be made upon his collateral by virtue of any execution based upon the judgment shall relate back to the date of the perfection of the security interest in such collateral. A judicial sale, pursuant to such execution, is a foreclosure of the security interest by judicial procedure within the meaning of this section, and the secured party may purchase at the sale and thereafter hold the collateral free of any other requirements of this article.

(1959, P.A. 133, S. 9-501; P.A. 76-369, S. 36.)

History: P.A. 76-369 added reference to Sec. 42a-9-504(3).

Cited. 221 C. 530, 539, 540.
Cited. 35 CA 81, 92.
Subsec. (1):
Cited. 35 CA 81, 92.
Subsec. (3):
Cited. 221 C. 530, 546, 547.
Cited. 34 CS 632, 635.

**Sec. 42a-9-502. Collection rights of secured party.** (1) When so agreed and in any event on default the secured party is entitled to notify an account debtor or the obligor on an instrument to make payment to him whether or not the assignor was theretofore making collections on the collateral, and also to take control of any proceeds to which he is entitled under section 42a-9-306.

(2) A secured party who by agreement is entitled to charge back uncollected collateral or otherwise to full or limited recourse against the debtor and who undertakes to collect from the account debtors or obligors must proceed in a commercially reasonable manner and may deduct his reasonable expenses of realization from the collections. If the security agreement secures an indebtedness, the secured party must account to the debtor for any surplus and, unless otherwise agreed, the debtor is liable for any deficiency; but, if the underlying transaction was a sale of accounts or chattel paper, the debtor is entitled to any surplus or is liable for any deficiency only if the security agreement so provides.

(1959, P.A. 133, S. 9-502; P.A. 76-369, S. 37.)

History: P.A. 76-369 deleted reference to sale of contract rights in Subsec. (2).

**Sec. 42a-9-503. Secured party's right to take possession after default.** Unless otherwise agreed a secured party has on default the right to take possession of the collateral. In taking possession a secured party may proceed without judicial process if this can be done without breach of the peace or may proceed by action. If the security agreement so provides the secured party may require the debtor to assemble the collateral and make it available to the secured party at a place to be designated by the secured

party which is reasonably convenient to both parties. Without removal a secured party may render equipment unusable, and may dispose of collateral on the debtor's premises under section 42a-9-504.

(1959, P.A. 133, S. 9-503.)

Cited. 207 C. 15, 21. Cited. 221 C. 530, 540.
Cited. 18 CA 265, 270. Cited. 29 CA 283, 286, 292; judgment reversed, see 228 C. 795 et seq. Cited. 46 CA 573.
Cited. 40 CS 475, 480.

**Sec. 42a-9-504. Secured party's right to dispose of collateral after default; effect of disposition.** (1) A secured party after default may sell, lease or otherwise dispose of any or all of the collateral in its then condition or following any commercially reasonable preparation or processing. Any sale of goods is subject to article 2. The proceeds of disposition shall be applied in the order following to (a) the reasonable expenses of retaking, holding, preparing for sale or lease, selling, leasing and the like and, to the extent provided for in the agreement and not prohibited by law, the reasonable attorneys' fees and legal expenses incurred by the secured party; (b) the satisfaction of indebtedness secured by the security interest under which the disposition is made; (c) the satisfaction of indebtedness secured by any subordinate security interest in the collateral if written notification of demand therefor is received before distribution of the proceeds is completed. If requested by the secured party, the holder of a subordinate security interest must seasonably furnish reasonable proof of his interest, and unless he does so, the secured party need not comply with his demand.

(2) If the security interest secures an indebtedness, the secured party must account to the debtor for any surplus and, unless otherwise agreed, the debtor is liable for any deficiency; but if the underlying transaction was a sale of accounts or chattel paper, the debtor is entitled to any surplus or is liable for any deficiency only if the security agreement so provides.

(3) Disposition of the collateral may be by public or private proceedings and may be made by way of one or more contracts. Sale or other disposition may be as a unit or in parcels and at any time and place and on any terms but every aspect of the disposition including the method, manner, time, place and terms must be commercially reasonable. Unless collateral is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market, reasonable notification of the time and place of any public sale or reasonable notification of the time after which any private sale or other intended disposition is to be made shall be sent by the secured party to the debtor, if he has not signed after default a statement renouncing or modifying his right to notification of sale. In the case of consumer goods no other notification need be sent. In other cases notification shall be sent to any other secured party from whom the secured party has received, before sending his notification to the debtor or before the debtor's renunciation of his rights, written notice of a claim of an interest in the collateral. The secured party may buy at any public sale and if the collateral is of a type customarily sold in a recognized market or is of a type which is the subject of widely distributed standard price quotations he may buy at private sale.

(4) When collateral is disposed of by a secured party after default, the disposition transfers to a purchaser for value all of the debtor's rights therein, discharges the security interest under which it is made and any security interest or lien subordinate thereto. The purchaser takes free of all such rights and interests even though the secured party fails to comply with the requirements of this part or of any judicial proceedings (a) in the case of a public sale, if the purchaser has no knowledge of any defects in the sale and if he does not buy in collusion with the secured party, other bidders or the person conducting the sale; or (b) in any other case, if the purchaser acts in good faith.

removal a secured party
on the debtor's premises

795 et seq. Cited. 46 CA 573.

**ateral after default; ef-**
ase or otherwise dispose
y commercially reason-
article 2. The proceeds
reasonable expenses of
and the like and, to the
e reasonable attorneys'
sfaction of indebtedness
ade; (c) the satisfaction
the collateral if written
of the proceeds is com-
dinate security interest
unless he does so, the

red party must account
debtor is liable for any
nts or chattel paper, the
cy only if the security

e proceedings and may
ion may be as a unit or
spect of the disposition
nmercially reasonable.
in value or is of a type
n of the time and place
ich any private sale or
red party to the debtor,
ing his right to notifica-
need be sent. In other
hom the secured party
the debtor's renuncia-
collateral. The secured
customarily sold in a
y distributed standard

lefault, the disposition
discharges the security
bordinate thereto. The
the secured party fails
proceedings (a) in the
defects in the sale and
or the person conduct-
d faith.

(5) A person who is liable to a secured party under a guaranty, endorsement, repurchase agreement or the like and who receives a transfer of collateral from the secured party or is subrogated to his rights has thereafter the rights and duties of the secured party. Such a transfer of collateral is not a sale or disposition of the collateral under this article.

(1959, P.A. 133, S. 9-504; P.A. 76-369, S. 38.)

History: P.A. 76-369 added references to leasing in Subsec. (1), deleted reference to sale of contract rights in Subsec. (2), revised notice provisions in Subsec. (3) to state when debtor need not be notified, and to restate provisions re notice to other secured parties and notice in cases involving consumer goods.

Cited. 153 C. 181. Cited. 203 C. 407, 412, 419. Cited. 216 C. 458, 462, 472, 477. Cited. 221 C. 530, 540. Cited. 227 C. 270, 281. Cited. 231 C. 707, 710, 711, 717, 718.
Cited. 24 CA 455, 465. Cited. 41 CA 324, 328.
Cited. 34 CS 632, 634, 635. Cited. 37 CS 7, 9. Cited. 38 CS 455, 456. Cited. 40 CS 475, 480.
Subsec. (1):
Cited. 207 C. 15, 21. Cited. 227 C. 270, 281.
Subsec. (2):
Cited. 227 C. 270, 281.
Subsec. (3):
Cited. 207 C. 15, 16, 20–24, 26–28, 30. Cited. 209 C. 163, 165, 166. Cited. 216 C. 458, 472, 477.
Cited. 18 CA 265, 271. Cited. 24 CA 455, 466.
Cited. 34 CS 632, 635. Cited. 38 CS 455–457. Cited. 40 CS 475, 479, 482.
Subsec. (5):
Cited. 18 CA 265, 272. Cited. 24 CA 455, 465, 466.

**Sec. 42a-9-505. Compulsory disposition of collateral; acceptance of the collateral as discharge of obligation.** (1) If the debtor has paid sixty per cent of the cash price in the case of a purchase money security interest in consumer goods or sixty per cent of the loan in the case of another security interest in consumer goods, and has not signed after default a statement renouncing or modifying his rights under this part a secured party who has taken possession of collateral must dispose of it under section 42a-9-504 and if he fails to do so within ninety days after he takes possession the debtor at his option may recover in conversion or under section 42a-9-507 (1) on secured party's liability.

(2) In any other case involving consumer goods or any other collateral a secured party in possession may, after default, propose to retain the collateral in satisfaction of the obligation. Written notice of such proposal shall be sent to the debtor if he has not signed after default a statement renouncing or modifying his rights under this subsection. In the case of consumer goods no other notice need be given. In other cases notice shall be sent to any other secured party from whom the secured party has received, before sending his notice to the debtor or before the debtor's renunciation of his rights, written notice of a claim of an interest in the collateral. If the secured party receives objection in writing from a person entitled to receive notification within twenty-one days after the notice was sent, the secured party must dispose of the collateral under section 42a-9-504. In the absence of such written objection the secured party may retain the collateral in satisfaction of the debtor's obligation.

(1959, P.A. 133, S. 9-505; P.A. 76-369, S. 39.)

History: P.A. 76-369 revised notice provisions in Subsec. (2) to state when debtor need not be notified and to restate provisions re cases involving consumer goods and re notice to other secured parties, changing deadline for objection from thirty to twenty-one days after notice sent.

Cited. 221 C. 530, 540, 541.
Subsec. (2):
Cited. 40 CA 616, 617, 623. Cited. 41 CA 324, 328, 329.

**Sec. 42a-9-506. Debtor's right to redeem collateral.** At any time before the secured party has disposed of collateral or entered into a contract for its disposition under

section 42a-9-504 or before the obligation has been discharged under section 42a-9-505(2) the debtor or any other secured party may unless otherwise agreed in writing after default redeem the collateral by tendering fulfillment of all obligations secured by the collateral as well as the expenses reasonably incurred by the secured party in retaking, holding and preparing the collateral for disposition, in arranging for the sale, and to the extent provided in the agreement and not prohibited by law, his reasonable attorney's fees and legal expenses.

(1959, P.A. 133, S. 9-506.)

Cited. 216 C. 458, 462, 472.
Cited. 24 CA 455, 462, 463.

**Sec. 42a-9-507. Secured party's liability for failure to comply with this part.** (1) If it is established that the secured party is not proceeding in accordance with the provisions of this part disposition may be ordered or restrained on appropriate terms and conditions. If the disposition has occurred the debtor or any person entitled to notification or whose security interest has been made known to the secured party prior to the disposition has a right to recover from the secured party any loss caused by a failure to comply with the provisions of this part. If the collateral is consumer goods, the debtor has a right to recover in any event an amount not less than the credit service charge plus ten per cent of the principal amount of the debt or the time price differential plus ten per cent of the cash price.

(2) The fact that a better price could have been obtained by a sale at a different time or in a different method from that selected by the secured party is not of itself sufficient to establish that the sale was not made in a commercially reasonable manner. If the secured party either sells the collateral in the usual manner in any recognized market therefor or if he sells at the price current in such market at the time of his sale or if he has otherwise sold in conformity with reasonable commercial practices among dealers in the type of property sold he has sold in a commercially reasonable manner. The principles stated in the two preceding sentences with respect to sales also apply as may be appropriate to other types of disposition. A disposition which has been approved in any judicial proceeding or by any bona fide creditors' committee or representative of creditors shall conclusively be deemed to be commercially reasonable, but this sentence does not indicate that any such approval must be obtained in any case nor does it indicate that any disposition not so approved is not commercially reasonable.

(1959, P.A. 133, S. 9-507.)

Cited. 221 C. 530, 540. Cited. 227 C. 270, 281.
Cited. 24 CA 455, 457.
Subsec. (1):
Cited. 207 C. 15, 24, 25. Cited. 221 C. 530, 535. Cited. 231 C. 707, 719, 722.
Cited. 34 CS 632, 635. Cited. 40 CS 475, 480, 482.
Subsec. (2):
Cited. 207 C. 15, 25, 29, 30. Cited. 216 C. 458, 478.

## ARTICLE 10

## EFFECTIVE DATE. TRANSITION

**Sec. 42a-10-101. Effective date.** This title shall apply to transactions entered into and events occurring on and after October 1, 1961.

(1959, P.A. 133, S. 10-101.)

# UNREPORTED DECISIONS CITED IN MEMORANDUM OF LAW

## (Arranged Alphabetically)



Not Reported in F.Supp.2d Page 1

Not Reported in F.Supp.2d, 2005 WL 1353612 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

C
Agogbua v. Abington Memorial Hosp.
E.D.Pa.,2005.
Only the Westlaw citation is currently available.
United States District Court,E.D. Pennsylvania.
Edward AGOGBUA
v.
ABINGTON MEMORIAL HOSPITAL
**No. Civ.A. 03-6897.**

May 31, 2005.

Edward Agogbua, El Paso, TX, pro se.
Susan M. O'Neill, Christopher J. Moran, Simon Moran, PC, Philadelphia, PA, for Abington Memorial Hospital.

*MEMORANDUM*

PADOVA, J.
*1 Plaintiff, Edward Agogbua, brings this *pro se* action against Abington Memorial Hospital ("AMH" ) for race, gender, and national origin discrimination pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. §§ 2000e-2000e-17. Presently before the Court is AMH's Motion for Summary Judgment.[FN1] For the reasons that follow, the Motion is granted in part and denied in part.

FN1. On or about May 19, 2005, Plaintiff submitted a document styled as "Motion for Summary Judgment." In the accompanying certificate of service, however, Plaintiff refers to his submission as an "opposition" to AMH's Motion for Summary Judgment. Because the dispositive motion deadline passed in April 2005, the Court will treat Plaintiff's May 19, 2005 submission solely as a response to AMH's Motion for Summary Judgment. In any event, for the reasons discussed below, genuine issues of material fact would preclude the entry of summary judgment in Plaintiff's favor.

I. BACKGROUND

Plaintiff, an African-American who was born and raised in Nigeria, applied for and was admitted to the Nurse Externship Program at AMH in May 2001. (Def.'s Statement of Undisputed Material Facts ¶ 1; Pl.'s Ex. B.) At the time of his admission to the Nurse Externship Program, Plaintiff was enrolled as a nursing student at Villanova University. (Agogbua Dep. at 394.) Participants in the Nurse Externship Program, which runs for approximately ten weeks each summer, are given classroom lecture instruction and assigned to observe practicing registered nurses in the performance of their duties. (McDade Decl. ¶ 2.) Plaintiff began employment as an Nurse Extern at AMH on or about June 11, 2001, and successfully completed the Nurse Externship Program on August 14, 2001. (Pl.'s Exs. B, D.) Following his completion of the Nurse Externship Program, Plaintiff continued to work at AMH as a Clinical Associate ("CA"). (Agogbua Dep. at 412-13.) On or about October 7, 2001, Plaintiff received a satisfactory performance appraisal evaluation from AMH for the period running from June 2001 to September 2001. (Pl.'s Ex. E.) In late October 2001, Plaintiff quit his position as a CA at AMH to concentrate on his nursing studies at Villanova. (Agogbua Dep. at 20-21.)

In or about July 2002, Plaintiff applied for Job Reference No. N21800, a CA position in AMH's Progressive Care Department. (Def.'s Mem. at 22 n. 5.; Pl.'s Ex. J.) On July 30, 2002, AMH sent Plaintiff a postcard acknowledging that it had " received [his] application/resume." (Pl.'s Ex. J.) On or about August 5, 2002, Plaintiff received a letter from Christine M. Tierney, Employment Manager for AMH's Personnel Department, notifying him that he had not been selected for "the [CA] position" despite his "impressive" background. (Pl.'s Ex. J;

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?prft=HTMLE&destination=atp&sv=Full... 6/14/2007

Not Reported in F.Supp.2d Page 2

Not Reported in F.Supp.2d, 2005 WL 1353612 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

Def.'s Ex. G.) On April 19, 2004, AMH hired Tarik Khan, a Hispanic male, to fill Job Reference No. N21800. (Pl.'s Ex. H.)

On July 20, 2002, Plaintiff sent a letter to AMH's Personnel Department enclosing a job application for Job Reference No. N21911, a CA position in AMH's Emergency Trauma Center ("ETC"). (Def.'s Ex. F.; Pl.'s Ex. J.) The resume which accompanied Plaintiff's July 20, 2002 application indicated that he was "present[ly]" attending Villanova University School of Nursing. (*Id.*) On August 17, 2002, AMH sent Plaintiff a postcard acknowledging that it had " received [his] application/resume." (Pl.'s Ex. K.) On August 27, 2002, AMH hired Dawn DiIanni, a Caucasian female, to fill Job Reference No. N21911. (Tierney Decl. ¶ 11; Pl.'s Ex H.)

***2** In December 2002, Plaintiff failed out of nursing school. (Agogbua Dep. at 20-21.) On or about December 30, 2002, Plaintiff attempted to submit an online job application to AMH for two CA positions, Job Reference Nos. N331188 and N331190.[FN2] (*Id.* at 193-94.) No such application was ever entered into AMH's Internet job application system, (Tierney Decl. ¶ 9), and Plaintiff did not receive a postcard from AMH acknowledging that it had received his application. (Pl.'s Mem. at 10.) Because AMH's Personnel Department was unaware that Plaintiff intended to apply for Job Reference Nos. N331188 and N331190, it did not consider him for these positions. (Tierney Decl. ¶ 9.) Sometime in 2003, AMH hired Emily Auxter, a Caucasian female, to fill Job Reference No. N331188. (Tierney Decl. ¶ 13; Pl.'s Ex. L.) The CA position for Job Reference No. N331190 was cancelled and never filled by AMH. (Tierney Decl. ¶ 6.)

FN2. In general, enrollment in a nursing school program is not a prerequisite qualification for a CA position at AMH. (Pl.'s Ex. H.)

On January 8, 2003, Plaintiff submitted an online job application to AMH for three CA positions, Job Reference Nos. N331167, N331169, and N331224. (Def.'s Ex. I; Pl.'s Ex. M.) In the section of the job application which requested educational information, Plaintiff wrote "Villanova University College of Nursing, Villanova, PA, 1999-Graduating 2003," (*Id.*) The CA position for Job Reference No. N331167 was cancelled and never filled by AMH. (Tierney Decl. ¶ 6.) On February 10, 2003, AMH hired Somini Joseph, a female of Asian/Pacific Islander descent, to fill Job Reference No. N331169. (Tierney Decl. ¶ 12; Pl.'s Ex. H.) On April 15, 2003, AMH hired Valerie Miller, a Caucasian female, to fill Job Reference No. N331224. (Tierney Decl. ¶ 10; Pl.'s Ex.H.)

On January 21, 2003, Plaintiff sent a letter to Denise Williams, a supervisor in AMH's Nurse Recruiting Department, inquiring about six CA positions, Job Reference Nos. N330908, N331224, N330928, N330933, N331140, and N330920. (Def.'s Ex. J; Pl.'s Ex. M.) The resume which accompanied Plaintiff's January 21, 2003 application indicated that he was "present[ly]" attending Villanova University School of Nursing. ( *Id.*) The CA positions referenced in Plaintiff's January 21, 2003 letter were all positions in the hospital's ETC. (Tierney Decl. ¶ 7; Agogbua Dep. at 201.) When Plaintiff called the Nurse Recruiting Department to follow up on his January 21, 2003 letter, he was advised that AMH's Personnel Department, rather than the Nurse Recruiting Department, is responsible for hiring CAs in the ETC. (Agogbua Dep. at 123, 204.) Although Tierney maintains that AMH's Personnel Department never received an application from Plaintiff for Job Reference Nos. N330908, N331224, N330928, N330933, N331140, and N330920, (Tierney Decl. ¶ 7), on January 25, 2003, AMH's Personnel Department sent Plaintiff a postcard acknowledging that it had "received [his] application/resume." (Pl.'s Ex. M.) The CA position for Job Reference No. N330908 was cancelled and never filled by AMH. (Tierney Decl. ¶ 6.) On January 22, 2003, AMH hired Patti Donofrio, a Caucasian female, to fill Job Reference No. N330933. (Tierney Decl. ¶ 8; Pl.'s Ex. H.) On January 30, 2003, AMH hired Guerdy Cadet, an African-American male, to fill Job Reference No. N331140. (Tierney Decl. ¶ 8; Pl.'s Ex. H.) On January 31, 2003, AMH hired Jennifer West, a Caucasian female, to fill Job Reference No.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?prft=HTMLE&destination=atp&sv=Full... 6/14/2007

Not Reported in F.Supp.2d Page 3

Not Reported in F.Supp.2d, 2005 WL 1353612 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

N330928. (Tierney Decl. ¶ 8; Pl.'s Ex. H.) On April 1, 2003, AMH hired Stacey Nisbet, a Caucasian female, to fill Job Reference No. 330920. Tierney Decl. ¶ 8; Pl.'s Ex. H.) On April 15, 2003, AMH hired Valerie Miller, a Caucasian female, to fill Job Reference No. N331224.

***3** In late January 2003, Plaintiff contacted AMH's Nurse Recruiting Department to inquire about available CA positions. (Agogbua Dep. at 130-31.) The Nurse Recruiting Department advised Plaintiff of three open CA positions, including a position in AMH's Telemetry Unit, for which he could interview. (*Id.*) Plaintiff chose to interview for the position in the Telemetry Unit. (*Id.*) On or about February 4, 2003, Plaintiff was interviewed by Terry Reilly, the Nurse Manager of the Telemetry Unit. (Reilly Decl. ¶ 4.) Before interviewing Plaintiff, Reilly was under the impression that he was currently enrolled in a nursing program. (*Id.* ¶ 6.) During the interview, however, Plaintiff admitted to Reilly that he had failed out of Villanova and was not currently enrolled in a nursing program. (*Id.* ¶ 7.) On February 10, 2003, Denise Williams sent Plaintiff a letter advising him that he had not been selected for the CA position. (Def.'s Ex. L; Pl.'s Ex. M.) The next three CAs hired in the Telemetry Unit were Caucasian females. (Reilly Decl. ¶ 13; Pl.'s Ex. H.)

On March 21, 2003, Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), challenging AMH's failure to hire him on the basis of race, national origin, and gender discrimination. (Def.'s Ex. M; Pl.'s Ex. P.) On September 29, 2003, the EEOC dismissed Plaintiff's charge and sent him a right-to-sue letter. (Def.'s Ex. N; Pl.'s Ex. P.) On December 26, 2003, Plaintiff timely filed the instant action.[FN3]

FN3. Although it appears that the discrimination charge which Plaintiff filed with the EEOC only challenged AMH's rejection of his candidacy for two of the positions discussed above, AMH has not asserted, much less proven, an exhaustion defense. *See Williams v. Runyon,* 130 F.3d 568, 573 (3d Cir.1997) ("Because failure to exhaust administrative remedies is an affirmative defense, the defendant bears the burden of pleading and proving that the plaintiff had failed to exhaust administrative remedies" in a Title VII action.).

II. LEGAL STANDARD

Summary Judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c) ( " Rule 56(c)"). An issue is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A factual dispute is "material" if it might affect the outcome of the case under governing law. *Id.*

A party seeking summary judgment always bears the initial responsibility for informing the district court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Where the non-moving party bears the burden of proof on a particular issue at trial, the movant's initial *Celotex* burden can be met simply by " pointing out to the district court that there is an absence of evidence to support the non-moving party's case." *Id.* at 325. After the moving party has met its initial burden, "the adverse party's response, by affidavits or otherwise as provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). That is, summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing " sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322. Under Rule 56, the Court must view the evidence presented on the motion in the light most favorable to the opposing party. *Anderson,*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?prft=HTMLE&destination=atp&sv=Full... 6/14/2007

Not Reported in F.Supp.2d Page 4

Not Reported in F.Supp.2d, 2005 WL 1353612 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

477 U.S. at 255. "If the opponent [of summary judgment] has exceeded the 'mere scintilla' [of evidence] threshold and has offered a genuine issue of material fact, then the court cannot credit the movant's version of events against the opponent, even if the quantity of the movant's evidence far outweighs that of its opponent. *Big Apple BMW, Inc. v. BMW of North America, Inc.*, 974 F.2d 1358, 1363 (3d Cir.1992). "Although the same standards for summary judgment apply to *pro se* litigants, courts read the [submissions] of a *pro se* plaintiff liberally and interpret them 'to raise the strongest arguments that they suggest." ' *United States v. Asken*, Civ. A. No. 01-0026, 2002 WL 32175416, at *1 n. 11 (E.D.Pa. Oct.28, 2002) (quoting *McPherson v. Coombe*, 174 F.3d 276, 279 (2d Cir.1999)).

III. DISCUSSION

***4** In evaluating Title VII discrimination claims based on indirect evidence,[FN4] courts apply the three-step burden shifting analysis developed by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 797 (3d Cir.2003). The plaintiff bears the initial burden of establishing a prima facie case of discrimination. *Id.* If the plaintiff establishes a prima facie case of discrimination, the burden of production shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." *Id.* (quoting *McDonnell Douglas*, 411 U.S. at 802). If the defendant meets its burden, "the burden of production rebounds to the plaintiff, who must now show, by a preponderance of the evidence, that the employer's explanation is pretextual." *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir.1994).

FN4. There is no direct evidence of discrimination in the summary judgment record.

A. *Step One: Prima Face Case*

To establish a prima facie case of discrimination in a failure to hire case, the plaintiff must establish by a preponderance of the evidence that he: (1) belongs to a protected class; (2) was qualified for the position; (3) was rejected for the position; and (4) that after his rejection, the position remained open and the employer continued to seek applications from persons with qualifications similar to the plaintiff's to fill the position. *Sarullo*, 352 F.3d at 797; *Bray v. Marriott Hotels*, 110 F.3d 986, 990 (3d Cir.1997). In general, the existence of a prima facie case of discrimination is a question of law for the court. *Pivirotto v. Innovative Sys., Inc.*, 191 F.3d 344, 347 n. 1 (3d Cir.1999).

AMH does not dispute that Plaintiff has established the first three elements of his prima facie case. AMH instead argues that, because the other candidates who were chosen for the positions at issue were better qualified than Plaintiff, Plaintiff cannot prove the fourth element, i.e., that AMH continued to seek applicants with "similar" qualifications to fill the positions for which Plaintiff had been rejected.[FN5] AMH's contention rests on a misperception of the role that the prima facie case plays in the *McDonnell Douglas* burden-shifting analysis. As the United States Court of Appeals for the Third Circuit ("Third Circuit") has recognized, the "major purpose of the prima face case is to eliminate the most obvious, lawful reasons for the defendant's action (i.e., the position that the applicant sought was not filled for economic reasons, the applicant was not qualified, no adverse action such as failure to hire or firing was actually taken, etc.)." *Pivirotto*, 191 F.3d at 352. In contrast to proof that the plaintiff was qualified for the position relative to the entire pool from which applications were welcome, proof that the plaintiff is as well (or better) qualified than the applicant eventually selected for the position does not eliminate any obvious, lawful reasons for the defendant's adverse action. Indeed, "[t]he fact that a rejected applicant was the 'least' qualified does not assure that the employer's motive was not discriminatory; nor does the employer's refusal to hire the 'best' qualified applicant necessarily indicate discriminatory intent." *Gafford v. Gen. Elec. Co.*, 997 F.2d 150, 167 n. 9 (6th Cir.1993) (citation omitted); *cf. Pivirotto*, 191 F.3d at 353 (concluding that plaintiff in Title VII gender

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?prft=HTMLE&destination=atp&sv=Full... 6/14/2007

Not Reported in F.Supp.2d Page 5

Not Reported in F.Supp.2d, 2005 WL 1353612 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

discrimination case is not required to prove that she was replaced by a man because such a requirement " eliminates no common, lawful reasons for the discharge"). For this reason, numerous courts have concluded that a Title VII litigant need not establish that his qualifications are sufficiently similar to those of the successful applicant in order to satisfy the fourth element of a prima facie case. *See, e.g., Walker v. Mortham,* 158 F.3d 1177, 1193 (11th Cir.1998) ("Although a plaintiff may be forced to address relative qualifications if the defendant presents them to rebut the plaintiff's presumption of discrimination, the plaintiff need not introduce evidence regarding relative qualifications before then; she need only prove that she herself was qualified to perform the coveted job."); *Mitchell v. Baldrige,* 759 F.2d 80, 85 (D.C.Cir.1985) (Ginsburg, J.) (noting that Supreme Court "has reiterated the *McDonnell Douglas* standards-without adding a requirement that plaintiff take the initiative in comparing himself to those selected" in several cases). The record evidence shows that Job Reference Nos. N21800, N21911, N330920, N330928, N331140, N331169, N331224, and the Telemetry Unit position remained open and AMH continued to seek qualified applicants after Plaintiff's rejection.[FN6] No more is required of Plaintiff to establish the fourth element of his prima facie case of discrimination with respect to these positions. *See McDonnell Douglas,* 411 U.S. at 802.[FN7] As Plaintiff has adequately made a prima face showing with respect to Job Reference Nos. N21800, N21911, N330920, N330928, N331140, N331169, N331224, and the Telemetry Unit position, the burden shifts to AMH to produce a legitimate, non-discriminatory reason for rejecting Plaintiff's applications for these positions, as discussed below. As to Job Reference Nos. N330900, N330908, N331167, and N331190, however, it is undisputed that these positions were cancelled and never filled by AMH. There is no evidence in the record that these positions were cancelled under circumstances which raise an inference of discriminatory action. Furthermore, there is no record evidence from which the jury could reasonably infer that Plaintiff even applied for Job Reference No. N331188, [FN8] or that Job Reference No. N330933 was still available on the date on the which the Personnel Department received his application.[FN9] Accordin @gly, AMH's Motion is granted with respect to Plaintiff's Title VII claims which are based on Job Reference Nos. N330900, N330908, N330933, N331167, N331188, and N331190.

FN5. In some instances, the positions at issue did not remain open after Plaintiff was rejected because the positions were filled when another candidate was chosen over Plaintiff. The Third Circuit has noted that "this variance from the letter of the *McDonnell Douglas Corp.* formula" does not affect a Title VII litigant's ability to establish a *prima facie* case. *Bray,* 110 F.3d at 990 n. 5. For ease of reference, however, the Court will refer to such positions as "remaining open" after Plaintiff's rejection.

FN6. AMH contends that Plaintiff was not considered for Job Reference Nos. N330908, N330920, N330928, N330933, N331140, and N331224, each of which involved CA positions in the ETC, because he submitted his January 21, 2003 application to the Nurse Recruiting Department, rather than to the Personnel Department. It is undisputed that the Personnel Department is exclusively responsible for hiring CAs in the ETC. (Agogbua Dep. at 123, 204.) According to Tierney, the Personnel Department "never received any application for [these six positions] from [Plaintiff]." (Tierney Decl. ¶ 7.) In response, Plaintiff has produced evidence that, on January 25, 2003, the Personnel Department sent him a postcard acknowledging that it had "received [his] application/resume." (Pl.'s Ex. M.) Viewing the evidence in the light most favorable to Plaintiff, there is a genuine issue of material fact as to whether the Personnel Department received Plaintiff's January 21, 2003 application. As discussed below, however, Plaintiff has failed to establish a prima facie case with respect Job Reference Nos. N330908 and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?prft=HTMLE&destination=atp&sv=Full... 6/14/2007

Not Reported in F.Supp.2d Page 6

Not Reported in F.Supp.2d, 2005 WL 1353612 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

N330933 for other reasons.

FN7. Although a Title VII plaintiff is not required to prove that the employer hired a person who was not a member of his protected class, he may rely on such evidence to establish a prima facie case. *Bullock v. Children's Hosp. of Philadelphia,* 71 F.Supp.2d 482, 487 (E.D.Pa.1999). The Court notes that Plaintiff has submitted evidence that AMH filled the positions for which he applied with candidates who were not members of his protected class(es).

FN8. AMH has no record that Plaintiff attempted to apply for Job Reference No. 331188, (Tierney Decl. ¶ 9), and Plaintiff did not receive an acknowledgment card from AMH with respect to this position. (Pl.'s Mem. at 10.)

FN9. Viewing the evidence in the light most favorable to Plaintiff, AMH received his application for Job Reference No. 330933 three days after the hospital had hired Ms. Donofrio to fill the position. (Pl.'s Exs. H, M.)

B. *Step Two: Nondiscriminatory Reasons*

***5** Under the *McDonnell Douglas* paradigm, the burden of production now shifts to AMH to " articulate some legitimate, nondiscriminatory reason " for its rejection of Plaintiff's candidacy with respect to Job Reference Nos. N21800, N21911, N330920, N330928, N331140, N331169, N331224, and the Telemetry Unit position. *McDonnell Douglas,* 411 U.S. at 802. The employer may satisfy this "relatively light burden" by introducing evidence "which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision." *Fuentes,* 32 F.3d at 763.

AMH has introduced evidence that it believed that the candidates selected for the positions at issue were better qualified than Plaintiff. According to Tierney, "the Personnel Department primarily seeks a candidate who is actively enrolled as a nursing student or who is certified as an Emergency Medical Technician/Paramedic." Tierney testified that the Personnel Department prefers nursing students because they "tend[ ] to remain employed at [AMH] as registered nurses after graduating from nursing school." (Tierney Decl. ¶ 4.) With respect to the specific qualifications of the candidates hired, Tierney testified as follows:

[1.] Job Reference # N331140 was filled by Guerdy Cadet, a black male. Mr. Cadet was better qualified than [Plaintiff] because Mr. Cadet had several years of prior healthcare experience, including paramedic training in the military;

[2.] Job Reference # N330920 was filled by Stacey Nisbet. Ms. Nisbet was better qualified than [Plaintiff] because she was a nursing student with prior experience as a medical assistant and who expressed a desire to remain in the employ of [AMH] after graduating from nursing school;

[3.] Job Reference # N330928 was filled by Jennifer West. Ms. West was better qualified than [Plaintiff] because she was a nursing student with previous experience at [AMH] as a CA and who expressed a desire to remain in the employ of [AMH] after graduating from nursing school;

[4.] In accordance with Policy III [pursuant to which internal job candidates are generally given preference in hiring over external job applicants], ... Job Reference # N331224 was filled by Valerie Miller, who was a nursing student who expressed a desire to remain in the employ of [AMH] after she graduated from nursing school and who was already employed in [AMH's] ETC. [Based on those qualifications], Ms. Miller was better qualified than [Plaintiff] for that position;

[5.] Dawn DiIanni was selected to fill [Job Reference # N21911]. Unlike [Plaintiff], Ms. DiIanni's qualifications included that she was a current nursing student, she was already working in a hospital emergency trauma center, and she had five (5) years of health care experience. Based on her qualifications, Ms. DiIanni was better qualified than [Plaintiff];

[6.] Somini Joseph, a female Asian/Pacific Islander, was selected to fill [Job Reference # N331169]. Unlike [Plaintiff], Ms. Joseph's qualifications included that she was a current nursing student, she had prior nursing aid experience, and she expressed

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?prft=HTMLE&destination=atp&sv=Full... 6/14/2007

interest in working as [a] CA and remaining in the employ of [AMH] as an RN. Based on her qualifications, Ms. Joseph was better qualified than [Plaintiff];

***6** [7.] Tarik Khan, an Hispanic male, was selected to fill [Job Reference # N21800]. Unlike [Plaintiff], Mr. Kahn was a current nursing student at the time he applied for this position. Based on his qualifications, Mr. Kahn was better qualified than [Plaintiff].

(*Id.* ¶¶ 8, 10-14.) Terry Reilly, the Nurse Manager who interviewed Plaintiff for a CA position in the Telemetry Unit, testified that she " strongly preferred hiring candidates who were currently enrolled in nursing school because those individuals tended to remain employed at [AMH] as registered nurses after graduation from nursing school." (Reilly Decl. ¶ 5.) Reilly further testified as follows:[D]uring the interview, [Plaintiff] was slow to answer questions, he lacked assertiveness, and I had serious doubts about his ability to handle a very busy Telemetry Unit. After interviewing [Plaintiff], I also spoke to Kathy McDade, the Coordinator of the 2001 Nurse Externship Program, in which [Plaintiff] was a participant. Ms. McDade informed me that [Plaintiff] was a kind and caring individual, but that she also believed he might lack the assertiveness needed for the busy Telemetry Unit .... I concluded that [Plaintiff] was only a marginal candidate for the Telemetry Unit and that there were other individuals better qualified than [Plaintiff] to work in the Unit. The primary reason I decided not to hire [Plaintiff] was because he was not currently enrolled in nursing school.

(*Id.* ¶¶ 8-10, 12.) In light of the documentation provided by AMH, the Court concludes that AMH has satisfied its burden of articulating legitimate, non-discriminatory reasons for not hiring Plaintiff. *See Fuentes,* 32 F.3d at 765.

C. *Step Three: Pretext*

To survive summary judgment where the employer has met its burden of production under the *McDonnell Douglas* analysis, a plaintiff must either "present sufficient evidence to meaningfully throw into question, i.e., to cast substantial doubt upon, the [employer's] proffered reasons for not hiring him (e.g., by painting them as weak, implausible, contradictory, or incoherent) or ... come forward with sufficient evidence from which a factfinder could reasonably conclude that an illegitimate factor more likely than not was a motivating or determinative cause of the adverse employment decision...." *Id.*

The Court concludes that Plaintiff has presented sufficient evidence to raise a genuine issue of material fact as to whether AMH's proffered reasons for not hiring him for Job Reference Nos. N21800, N21911, N330920, N330928, N331169, and N331224 were pretexts for discrimination. With respect to Job Reference No. N21800, AMH produced evidence that Mr. Kahn, the selected applicant, was more qualified than Plaintiff only because he was actively enrolled in nursing school at the time he applied for the position. At the time that Plaintiff applied for Job Reference No. N21800 in or about July 2002, however, he was still actively enrolled in nursing school at Villanova. Similarly, AMH relies in part on Ms. DiIanni's status as a nursing student in support of its contention that she was better qualified for Job Reference No. 21911, yet Plaintiff was still actively enrolled at Villanova when he applied for this position on or about July 20, 2002, as reflected by the information contained in the resume which he submitted with his application. Although Plaintiff was no longer enrolled in nursing school when he applied for Job Reference Nos. N330920, N330928, N331169, and N331224 in January 2003, there is a genuine issue of material fact as to whether Tierney was aware of this fact at the time she hired other candidates to fill these positions. Indeed, the resumes which accompanied his January 2003 applications indicated that he was "present[ly]" attending nursing school.[FN10] Whereas Reilly learned that Plaintiff had failed out of nursing school during his interview for the Telemetry Unit position, Tierney rejected Plaintiff's candidacy for the positions at issue without holding an interview. There is no evidence in the record which suggests that Tierney learned, from Reilly or otherwise, that Plaintiff had failed out of nursing school *before* she rejected his applications for Job Reference Nos. N330920,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d Page 8

Not Reported in F.Supp.2d, 2005 WL 1353612 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

N330928, N331169, and N331224. Given Tierney's state of knowledge at the time she filled Job Reference Nos. N330920, N330928, N331169, and N331224, a reasonable factfinder could infer that her explanation that the selected candidates were better qualified than Plaintiff because they were presently enrolled in nursing school was a *"post hoc* fabrication." FN11 *Fuentes,* 32 F.3d at 764. Viewed in the light most favorable to Plaintiff, the Court concludes that the record evidence demonstrates such weaknesses, inconsistencies, and contradictions in AMH's proffered reasons for its challenged hiring decisions that "a reasonable factfinder *could* rationally find them unworthy of credence, and hence infer that the employer did not act for the asserted non-discriminatory reasons" in rejecting Plaintiff's applications for Job Reference Nos. N21800, N21911, N330920, N330928, N331169, and N331224.FN12 *Fuentes,* 32 F.3d at 765 (internal quotation and citations omitted). Accordingly, AMH's Motion is denied with respect Plaintiff's Title VII claims which are based on Job Reference Nos. N21800, N21911, N330920, N330928, N331169, and N331224.

FN10. The Supreme Court has made clear that after-acquired evidence of wrongdoing by the plaintiff is not a defense to Title VII liability. *See McKennon v. Nashville Banner Publishing Co.,* 513 U.S. 352, 359, 115 S.Ct. 879, 130 L.Ed.2d 852 (1995) (noting that "the employer could not have been motivated by knowledge it did not have" at the time of the adverse action). If Plaintiff successfully proves at trial that AMH is liable under Title VII, however, his alleged "resume fraud" may be relevant to the factfinder's remedial determination. *Id.* at 360-63.

FN11. Although Plaintiff has failed to produce evidence which casts substantial doubt on some of the other proffered reasons for Tierney's decision not to hire him for Job Reference Nos. N330920, N330928, N331169, and N331224, the Third Circuit has emphasized that, in certain circumstances, a Title VII plaintiff is not obligated to discredit all of the employer's proffered reasons in order to survive summary judgment. *Fuentes,* 32 F.3d at 764 n. 7. Indeed, the factfinder's rejection of certain proffered reasons "may impede the employer's credibility seriously enough so that a factfinder may rationally disbelieve the remaining proffered reasons, even if no evidence undermining those remaining rationales in particular is available." *Id.; see also Logue v. Int'l Rehab. Assoc., Inc.,* 683 F.Supp. 518, 518 (W.D.Pa.1988) (noting that courts may " follow the ancient legal maxim *falsus in uno, falsus in omnibus"* in considering multiple reasons for employment action offered by same witness), *aff'd,* 866 F.2d 1410 (3d Cir.1988) (unpublished opinion). The Court concludes that the factfinder's rejection of Tierney's explanation that she preferred candidates who were presently enrolled in nursing school over Plaintiff could impede her credibility seriously enough to permit the factfinder to rationally disbelieve the remaining proffered reasons.

FN12. A prima facie case of discrimination, coupled with the production of evidence from which a reasonable factfinder could infer that the employer's proffered reasons for the adverse action were pretextual, is typically sufficient to defeat a motion for summary judgment. *See St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 511, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). The Supreme Court has recognized, however, that "there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory." *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 148, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). For example, "the employer would be entitled to judgment as a matter of law if the record conclusively revealed some

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?prft=HTMLE&destination=atp&sv=Full... 6/14/2007

Page 9 of 11

Not Reported in F.Supp.2d Page 9

Not Reported in F.Supp.2d, 2005 WL 1353612 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination occurred." *Id.* In assessing whether judgment as a matter of law is appropriate where the plaintiff has proven a prima facie case and raised a genuine issue of fact with respect to pretext, the court should consider "the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that may be properly considered" on a motion for summary judgment. Although the Third Circuit has not yet squarely addressed the issue, several courts have read *Reeves'* pronouncements narrowly, confining the entry of judgment as a matter of law to situations involving " *unusual circumstances* that would *prevent* a rational fact-finder from concluding that the employer's reasons for failing to [hire the plaintiff] were discriminatory and in violation of Title VII." *Blow v. City of San Antonio,* 236 F.3d 293, 298 (5th Cir.2001) (emphasis added); *see also Reeves,* 530 U.S. at 154 (Ginsburg, J., concurring) (anticipating that circumstances which require proof beyond the prima facie case and rejection of employer's proffered reasons "will be uncommon"); *Rowe v. Marley Co.,* 233 F.3d 825, 830 (4th Cir.2000) (holding that claim must go to jury if plaintiff proves prima facie case plus pretext unless "there is evidence that *precludes* a finding of discrimination") (emphasis added).

In this case, Plaintiff's prima facie case is relatively strong, as he has produced evidence that AMH filled the positions at issue with candidates who are not members of his protected class(es). Although Plaintiff's proof of pretext is perhaps less convincing, the record evidence does not present circumstances, such as those hypothesized in *Reeves,* that would preclude a rational factfinder from inferring discrimination from pretext.

*7 The Court further concludes that Plaintiff's attack on the proffered reasons for Reilly's decision not to hire him for the Telemetry Unit position fails to raise a genuine issue of material fact. Plaintiff argues that Reilly's explanation that she preferred candidates for CA positions who were actively enrolled as nursing students is unworthy of credence because enrollment in a nursing school program is not a prerequisite qualification for a CA position. ( *See* Pl.'s Ex. H.) There is no dispute, however, that enrollment in a nursing school program is not a prerequisite qualification for a CA position. AMH instead asserts, and the uncontroverted evidence demonstrates, that Reilly *preferred* to hire CA applicants for the Telemetry Unit who are actively attending nursing school. In the absence of evidence tending to demonstrate that AMH did not prefer nursing students in hiring CAs,[FN13] Plaintiff has failed to sufficiently rebut this legitimate reason for AMH's decision not to hire him.

FN13. In his Response brief, Plaintiff identifies seventeen individuals who he baldly alleges were employed as CAs by AMH in 2001, notwithstanding the fact that they were not enrolled in nursing school. (Pl.'s Resp. at 5-6.) Such unfounded assertions are insufficient to satisfy his Rule 56 burden.

Plaintiff also argues the following evidence supports a reasonable inference that Reilly's decision not to hire him for the Telemetry Unit position was more likely than not motivated by discriminatory animus: (1) Reilly's failure to note certain information about his educational and professional history on the Interview Assessment Form that she completed after the interview (Pl .'s Ex. M); (2) Reilly's comment in a written statement to AMH's legal director that "the work on the very busy telemetry floor required an individual that was better skilled and experienced than [Plaintiff]" (*id.*); and (3) a comment contained in AMH's position statement to the EEOC, which appears to be

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?prft=HTMLE&destination=atp&sv=Full... 6/14/2007

Page 10 of 11

Not Reported in F.Supp.2d Page 10

Not Reported in F.Supp.2d, 2005 WL 1353612 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

attributable to Kathy McDade, that Plaintiff's "very thick accent made communication very difficult" and his grammar and writing style were " inappropriate from a nursing student." (Pl.'s Ex. A.) The challenged omissions from the Interview Assessment Form and Reilly's comment in her written statement to AMH's legal director patently lack "the natural probative force" necessary to support an inference that discrimination was more likely than not a motivating or determinative cause of Reilly's adverse decision. *Keller v. Orix Credit Alliance, Inc.,* 130 F.3d 1101, 1111 (3d Cir.1997) (en banc). Furthermore, even assuming that McDade's alleged comment constitutes evidence from which a reasonable factfinder could draw an inference of discriminatory animus, *but see Ang v. Procter & Gamble Co.,* 932 F.2d 540, 549 (6th Cir.1991) (stating that "unlawful discrimination does not occur ... when a plaintiff's [communication skills] affect[ ] his ability to perform the job effectively"), the Court cannot conclude that this isolated comment, considered in the context of all the record evidence, could reasonably be viewed as sufficient to prove by a preponderance of the evidence that Plaintiff's national origin was a determinative cause of Reilly's adverse hiring decision. *See Fuentes,* 32 F.3d at 767 ("Stray remarks by non-decisionmakers ... unrelated to the decision process are rarely given great weight, particularly if they were made temporally remote from the date of the decision.") (quoting *Ezold v. Wolf, Block, Schorr & Solis-Cohen,* 983 F.2d 509, 545 (3d Cir.1992)). As Plaintiff has failed to present sufficient evidence from which a factfinder could reasonably either (1) disbelieve Reilly's proffered reasons for not hiring him for the Telemetry Unit position or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of Reilly's action, AMH's Motion is granted in this respect.[FN14]

FN14. Plaintiff also argues that AMH's proffered reasons for not hiring him to fill Job Reference No. N331140 were pretextual because, in his view, the selected candidate was less qualified for the position. The Court summarily rejects this contention. *See Fuentes,* 32 F.3d at 765 ("To discredit the employer's proffered reason, ... the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent."). Accordingly, AMH's Motion is granted in this respect.

## IV. CONCLUSION

***8** Based on the summary judgment record, the Court concludes that a reasonable factfinder would be *permitted,* but not *compelled,* to find AMH liable under Title VII with respect to Job Reference Nos. N21800, N21911, N330920, N330928, N331169, and N331224. *See Reeves,* 530 U.S. at 146-47 (" The ultimate question is whether the employer intentionally discriminated, and proof that 'the employer's proffered reason is unpersuasive, or even obviously contrived, does not necessarily establish that the plaintiff's proffered reason ... is correct.' In other words, '[i]t is not enough ... to *dis* believe the employer; the factfinder must *believe* the plaintiff's explanation of intentional discrimination.") (quoting *Hicks,* 509 U.S. at 519, 524). As there are genuine issues of material fact with respect to Plaintiff's Title VII claims which are based on these positions, AMH's Motion is denied in this respect. As to the remaining positions at issue, however, Plaintiff has failed either to establish a prima facie case of discrimination or to produce sufficient evidence of pretext to create a genuine issue of material fact. Accordingly, AMH's Motion is granted with respect to Job Reference Nos. N330900, N330908, N330933, N331140, N331167, N331188, N331190, and the Telemetry Unit position.

An appropriate Order follows.

## *ORDER*

AND NOW, this 31st day of May, 2005, upon consideration of Defendant's Motion for Summary Judgment (Doc. No. 37), Plaintiff's Response

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?prft=HTMLE&destination=atp&sv=Full... 6/14/2007

Page 11 of 11

Not Reported in F.Supp.2d Page 11

Not Reported in F.Supp.2d, 2005 WL 1353612 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

thereto, and all attendant and responsive briefing, IT IS HEREBY ORDERED that said Motion is GRANTED IN PART and DENIED IN PART as follows:

1. Defendant's Motion is GRANTED with respect to Plaintiff's Title VII claims which are based on Job Reference Nos. N330900, N330908, N330933, N331140, N331167, N331188, N331190, and the Telemetry Unit position, and these claims are DISMISSED.
2. Defendant's Motion is DENIED with respect to Plaintiff's Title VII claims which are based on Job Reference Nos. N21800, N21911, N330920, N330928, N331169, and N331224.

E.D.Pa.,2005.
Agogbua v. Abington Memorial Hosp.
Not Reported in F.Supp.2d, 2005 WL 1353612 (E.D.Pa.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?prft=HTMLE&destination=atp&sv=Full... 6/14/2007