**EXHIBIT A**

**STATEMENTS IN MORIN AFFIDAVIT TO BE STRICKEN**

| Morin Aff. ¶ | TESTIMONY TO BE STRICKEN | LEGAL BASIS FOR STRIKING |
|---|---|---|
| 5 | "In the late 1990's, Nationwide placed more and more pressure on Nationwide agents, including me, through the imposition of quotas, pressure to sell multiple products to customers at reduced commissions, and Nationwide began its own direct solicitation of customers, competing with its agents in regard to the consumer base." | • No personal knowledge - *See* Defendants Memorandum of Law in Support of Motion to Strike ("Brief"), § II<br><br>• Nationwide's interactions with other agents and/or its general business strategies are wholly irrelevant - *See* Fed. R. Civ. P. 56(e) (requiring that opposing affidavits "shall set forth such facts as would be admissible in evidence") |
| 6 | "The strain between Nationwide and its agents lead [sic] to Nationwide developing a strategy to deal with its agents who quit or threaten to quit, including retaliatory termination by Nationwide. As a result of the Nationwide strategy to maximize financial pressure on agents who terminated with Nationwide, Nationwide established a so-called 'reflex unit' with the stated intention of putting the departing agents out of business, by among other things trying to wrongfully confiscate agents' retirement accounts and otherwise creating substantial difficulties in terms of the agents' ability to continue to do insurance business. Creating financial difficulties with respect to an insurance agent's credit and credit rating is particularly significant, beyond the obvious problems that poor credit has for all individuals. When an independent insurance agent seeks to obtain an appointment from an insurance company to act as its authorized agent, the insurance company will require that | • No personal knowledge - *See* Brief, § II<br><br>• Irrelevant - *See* Fed. R. Civ. P. 56(e)<br><br>• Hearsay (as to "stated intention") - *See* Brief, § II.<br><br>• Mr. Morin's hypothetical and conclusory assertions about the predicted impact of "creating financial difficulties" when an agent "seeks to obtain an appointment from an insurance company," including what such hypothetical company "will require" and the impact that an adverse credit history "will have" on a hypothetical "former Nationwide agent's ability to make a living," are not adequate to support a summary judgment opposition. *See* Brief, § II. |

| Morin Aff. ¶ | TESTIMONY TO BE STRICKEN | LEGAL BASIS FOR STRIKING |
|---|---|---|
| | the agent have a good credit rating or provide a satisfactory explanation of any blemishes on the prospective agent's credit record. Therefore, an adverse credit history will have a substantial and detrimental impact on a former Nationwide agent's ability to make a living as an insurance agent and to compete with Nationwide after his or her departure from Nationwide." | |
| 7 | "The defendant Nationwide Federal Credit Union (hereinafter 'NFCU') was, at all relevant times, a federally chartered credit union which solicits business from Nationwide employees, agents and their families. Nationwide had a special program to encourage its agents to utilize NFCU for agency development loans. In fact, all applications for business loans from NFCU had to be, and were, submitted to and approved by Nationwide prior to any disbursement of loan funds by NFCU." | • No personal knowledge - *See* Brief, § II<br><br>• To the extent that Mr. Morin purports to base at least part of this testimony on his own personal experience but fails to explain any basis for such personal knowledge, the testimony is still deficient. *See Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 643 (2d Cir. 1988) (finding affidavit insufficient under Rule 56 where there was "no way to ascertain which portions of [the] affidavit were based on personal knowledge, as opposed to information and belief"). |
| 10 | "The voluntary termination of my relationship with Nationwide constituted a 'qualified cancellation' of my Agent's Agreement under Section 11e of the Agent's Agreement, which entitled me to the payment of 'extended earnings' under the other terms of Section 11 of the Agent's Agreement." | • The Agent's Agreement speaks for itself.<br><br>• Legal conclusions (re: his purported rights under the agreement) - *See* Brief, § III. |
| 12 | "The letter incorrectly stated that my loan had been in default since February 7, 2000. The letter also incorrectly stated that my Extended Earnings and Deferred Compensation Incentive Credits (DCIC) had been 'forfeited upon the termination | • The referenced letter speaks for itself.<br><br>• Conclusory allegations based on legal conclusions (that the letter is |

| Morin Aff. ¶ | TESTIMONY TO BE STRICKEN | LEGAL BASIS FOR STRIKING |
|---|---|---|
| | of your relationship with Nationwide Insurance.' As noted above, because I had retired by way of a voluntary termination under circumstances that constituted a 'qualified cancellation' under Section 11e of the Agent's Agreement, there had been no forfeiture of my Extended Earnings or DCIC. The position taken by NFCU concerning the purported default and the purported forfeiture was part of the 'reflex unit' response to my retirement which was intended to wrongfully exert financial pressure on me because I had terminated my relationship with Nationwide." (third through sixth sentences) | incorrect) - *See* Brief, §§ II, III.<br><br>• No personal knowledge and no concrete particulars (re: Nationwide's purported "reflex unit response") - *See* Brief, § II |
| 13 | "Since my loans continued to be paid and since this subsequently-disclosed internal NFCU e-mail confirms that my loans were not regarded as being in default, I believe that NFCU's February 9 letter (<u>Exhibit A</u>) was part of a coordinated effort between NFCU and Nationwide, through the Reflex Unit, to use false and misleading information to harass me and to exert improper financial pressure on me because I had made the decision to leave Nationwide and was contemplating the possibility of continuing to sell insurance. That NFCU was part of Nationwide's Reflex Unit actions is demonstrated in the series of e-mails that are reprinted in <u>Exhibit B</u> hereto." (fifth and sixth sentences) | • Conclusory assertion (re: assertion that "loans continued to be paid") - *See* Brief, § II<br><br>• Mr. Morin's accusations regarding false and misleading information are unsubstantiated and Mr. Morin's <u>belief</u> regarding an allegedly coordinated effort among NFCU and Nationwide to harass him and put pressure on him is unbridled speculation and conjecture. *See* Brief, § II.<br><br>• Mr. Morin's conclusions as to the import of the email are not proper as it is up to the Court to determine whether a March 9 email stating that the loan was in repayment has any bearing on Mr. Morin's defaults in July, August, October and onward. |
| 15 | "That method of payment worked for several months, until NFCU violated the terms of our agreement by failing to apply the deposited funds as directed and/or applying all of the monies in the | • Legal conclusion (that "NFCU violated the terms of our agreement" (i.e., that there was such an agreement and that NFCU violated |

| Morin Aff. ¶ | TESTIMONY TO BE STRICKEN | LEGAL BASIS FOR STRIKING |
|---|---|---|
| | account to just one loan account, which actions by NFCU disrupted the orderly payment of the loan accounts. When I called NFCU to inquire why the funds were not disbursed in accordance with our agreement, I was told by NFCU that it could do whatever it wanted to do with the funds in that savings account." (fourth and fifth sentences) | it)) - *See* Brief, § III<br><br>• Mr. Morin proffers no substantiation whatsoever for his bald assertions that NFCU failed to apply funds in accordance with such purported agreement. *See* Brief, § II.<br><br>• Hearsay (re: statements purportedly made by some unidentified representative of NFCU) - *See* Brief, § II |
| 16 | "As a result of NCFU's actions in misapplying the account funds in payment of the loans, and the fact that it would be impossible to make the aforementioned agreement work if the funds that I was depositing to my account were not applied by NFCU to each loan for the full amount due as we had agreed…." (first sentence) | • Mr. Morin's allegation that NFCU misapplied account funds is a bald assertion and his hypothetical statement (what "would be impossible" <u>if</u> funds "were not applied) is not fact. *See* Brief, § II.<br><br>• Legal conclusion (re: the "aforementioned agreement" and its purported terms) - *See* Brief, § III |
| 16 | "Although this new ACH authorization was dated July 4, 2000, and returned to NFCU immediately thereafter for use by NFCU per the agreement between myself and NFCU, it was not processed by NFCU until August 11, 2000. Because of this delay by NFCU, NFCU did not take payments under the new ACH authorization as instructed, causing the loans to be delinquent." (fifth and sixth sentences) | • Legal conclusion (re: reference to the "agreement between myself and NFCU" and what NFCU was purportedly "instructed" to do under such alleged agreement) - *See* Brief, § III<br><br>• No personal knowledge (re: when NFCU processed the ACH authorization or took payments thereunder) - *See* Brief, § II |
| 17 | "Even though there would have been no delinquencies in regard to my personal loans had NFCU followed the aforementioned agreements, instructions and authorizations with respect to the payment of those loans…." (first sentence) | • Legal conclusions - *See* Brief, § III<br><br>• Mr. Morin's hypothetical statement is not fact. |

| Morin Aff. ¶ | TESTIMONY TO BE STRICKEN | LEGAL BASIS FOR STRIKING |
|---|---|---|
| 17 | "These payments corrected the problems that had been brought about by NFCU's failure to deduct and apply payments properly under the aforementioned agreements." (fifth sentence) | • Conclusory allegations - *See* Brief, § II |
| 18 | "Those monies should have been paid to me by the time of my retirement." (second sentence) | • Conclusory allegation - *See* Brief, § II<br><br>• Legal conclusion - *See* Brief, § III |
| 18 | "… the three remaining loans (including the Partnership Plus (business) loan) were brought current at the end of September of 2000…" (third sentence) | • Conclusory allegation (that the "three remaining loans…were brought current") - *See* Brief, § II |
| 18 | "…Nationwide had wrongfully withheld [\$31,578.99] since February 2000." (third sentence) | • Legal conclusion - *See* Brief, § III |
| 18 | "I believe that that amount was sent by Nationwide to NFCU electronically on October 17, 2000…." (fourth sentence) | • Speculative belief (i.e., no records or testimony) - *See* Brief, § II |
| 18 | "The NFCU representative voiced no objection to or concern with that manner of proceeding." (eighth sentence) | • The statement concerning what an unidentified speaker during a phone call said fails to proffer the requisite "specific facts" and therefore should be stricken. *See* Brief, § I.<br><br>• To the extent it is offered to show an assertion of assent, what an unidentified NFCU representative purportedly said or omitted to say improperly offers inadmissible hearsay. *See* Brief, §§ I, II. |
| 18 | "Therefore, based on my agreement with NFCU in October or November of 2000, the monthly payments on my Partnership Plus (business) loan were current through November of 2001." (tenth sentence) | • Legal conclusion (re: the "agreement", which is itself based on vague assertion of a phone call insufficient for Rule56(e), and inadmissible hearsay) - *See* Brief, §§ I, III |

| Morin Aff. ¶ | TESTIMONY TO BE STRICKEN | LEGAL BASIS FOR STRIKING |
|---|---|---|
| 19 | "…which were the only NFCU loans of mine that remained outstanding, with the exception of the business loan that was paid current to November of 2001." (second sentence) | • Legal conclusion (which is itself based on inadmissible hearsay) - *See* Brief, §§ I, II |
| 20 | "If there were insufficient funds in my Rockville Bank account when a third party attempted to withdraw funds by way of an ACH authorization, then I would have been notified of that fact, and charged a fee, by Rockville Bank." (first sentence) | • Mr. Morin's hypothetical statement is not fact.<br><br>• No personal knowledge (re: policies and procedures of Rockville Bank) - *See* Brief, § II |
| 21 | "Soon after the newest ACH authorization was in place, NFCU began a confusing pattern of activity with respect to the ACH withdrawals that I had authorized whereby NFCU either failed to withdraw payments or reversed the withdrawal of payments, and then claimed that the loans were delinquent because no payment had been made." (first sentence) | • Conclusory allegations - *See* Brief, § II |
| 23 | "…I was then current on all of my loan payments, and because it was (again) clear to me that NFCU had no interest in proceeding in good faith in regard to my loans and the electronic ACH withdrawals that I had authorized NFCU to make in order to pay the loans…" (eighth sentence) | • Conclusory allegations - *See* Brief, § II<br><br>• No personal knowledge (re: NFCU's intentions) - *See* Brief, § II |
| 23 | "At or about this time, NFCU 'wrote off' the recreational vehicle loan despite it being current and reported the same as a 'charged off' loan to the several credit reporting agencies." (tenth sentence) | • No personal knowledge (re: NFCU's handling of Mr. Morin's recreational vehicle loan) - *See* Brief, § II<br><br>• Conclusory allegation (that he was current on all of his loan payments) - *See* Brief, § II |
| 24 | "At that time, I was current on all of my loans with NFCU." (second sentence) | • Conclusory allegation - *See* Brief, § II |

| Morin Aff. ¶ | TESTIMONY TO BE STRICKEN | LEGAL BASIS FOR STRIKING |
|---|---|---|
| 25 | Included in Exhibit 22 to the Affidavit of Kathleen M. Brisendine (dated April 11, 2007), which affidavit has been submitted by the defendants in support of their motion for summary judgment, are documents showing that my Dodge Durango was sold by NFCU (through Southern Auto Sales, Inc. in East Windsor, Connecticut) to a Massachusetts automobile dealer on June 20, 2001. Those documents, which include what appears to be a bill of sale and a check dated June 21, 2001 for the proceeds of that sale, are attached hereto as Exhibit G. I was never informed of that sale. In fact, notwithstanding that my Durango had been sold on June 20, 2001...." (first through fourth sentences) | • Exhibit 22 to the Affidavit of Kathleen M. Brisendine speaks for itself and Mr. Morin's subjective characterization of what that document shows and what an exhibit to it "appears to be" is not fact testimony and does not satisfy Rule 56(e). *See* Brief, § II.<br><br>• Moreover, as explained more fully in Defendants' Memorandum in Support of Motion to Strike Scandalous (and Demonstrably False) Accusations, submitted herewith, NFCU did not, in fact, sell the Durango on June 20, 2001, which fact is aptly demonstrated by the very series of exhibits to which Morin refers. |
| 25 | "As can be seen from a comparison of the two letters (Exhibits H & I), the difference between the amounts listed in the two letters is that the July 7 letter does not list any claim of delinquency on the business (Partnership Plus) loan. Instead, the loan payment and past due amounts claimed in the July 7 letter pertain exclusively to the Durango loan, as each figure is divisible by the semi-monthly amount of $355.67 that I had been paying on that loan until the date of its repossession on May 15, 2001." (seventh and eighth sentences) | • The referenced letters speak for themselves and Mr. Morin's subjective characterization as to what the difference between amounts represents is unsupported speculation about which he lacks personal knowledge. *See* Brief, § II. |
| 26 | "...as noted above, my Durango was sold by NFCU on that very day." (second sentence) | • NFCU did not sell the Durango on June 20, 2001, which fact is plainly demonstrated by the very series of exhibits to which Morin refers, and is, therefore, undisputed. *See* Def. Memo. in Support of Motion to Strike Scandalous (and Demonstrably False) Accusations. |

| Morin Aff. ¶ | TESTIMONY TO BE STRICKEN | LEGAL BASIS FOR STRIKING |
|---|---|---|
| 27 | "Therefore, it appears that NFCU was sharing account information with Nationwide regarding my personal loans." (sixth sentence) | • The letter speaks for itself and Mr. Morin's speculative conclusion about what "it appears" NFCU was doing is not fact. *See* Brief, § II. |
| 28 | "As a result of NFCU misapplying payments to my loans; failing to debit accounts established for automatic payments to be made to my loans; wrongfully claiming defaults when my loans were current; sending false reports to credit reporting agencies regarding the status of my loans, including reflecting my wife, Denise M. Morin, as a co-maker on one or more those loans when she was never a co-maker on any of the loans; wrongfully repossessing my Dodge Durango; and refusing my repeated requests for information and clarification by way of an accounting on the various loans…." | • Conclusory allegations - *See* Brief, § II<br><br>• Legal conclusion (re: wrongfully repossessing Durango) - *See* Brief, § III. |
| 29 | "Because of the false payment status information that NFCU had supplied to credit reporting agencies, Rockville Bank declined to provide me with a loan…." (first sentence) | • Conclusory allegation - *See* Brief, § II<br><br>• Hearsay (re: the reasons for Rockville Bank's declination and any knowledge) - *See* Brief, § II |
| 30 | "On or about March 1, 2002, my wife, Denise Morin, was notified by Chase Manhattan Bank, N.A. that her request for an increase in the limit on her personal Chase Visa credit card was being denied. The reason for that denial of credit was because of false information in her credit report that had been supplied by NFCU. The false credit report information was that Denise was obligated, with me, on the Partnership Plus (business) loan. In fact, Denise was never obligated on that loan." | • Hearsay (re: communications between Denise Morin and Chase Manhattan Bank ) - *See* Brief, § II<br><br>• No personal knowledge (re: reasons for credit denial) - *See* Brief, § II<br><br>• Conclusory allegations (that NFCU supplied "false information" and that Denise Mr. Morin was never obligated on the Partnership Plus loan) - *See* Brief, § II |

| Morin Aff. ¶ | TESTIMONY TO BE STRICKEN | LEGAL BASIS FOR STRIKING |
|---|---|---|
| 31 | "Soon after my retirement from Nationwide, NFCU shut off the available credit of the NFCU visa credit card account that was held jointly by my wife and myself.  Specifically, at some point between March and September of 2000, NFCU refused to provide us with otherwise available credit under the NFCU Visa credit card.  Although the credit card balance at that time was less than the account's $5,000 credit limit, NFCU informed us that we had no 'available credit' on that credit card.  Although I continued to make payments on that credit card until the entire account balance was paid in full some time in early 2004, and even though those monthly payments resulted in a decreasing account balance and a resulting increase in the difference between the balance due and the credit limit, that account continued to have no available credit." | • Conclusory allegations (that NFCU "shut off the available credit" and "refused to provide [the Morins] with otherwise available credit",  and that they "continued to have no available credit") - *See* Brief, § II<br><br>• Hearsay (re: what some unidentified representative of NFCU purportedly "informed" the Morins) -  *See* Brief, § II |