# EXHIBIT C



Only the Westlaw citation is currently available.

NOTICE: FINAL PUBLICATION DECISION PENDING

Court of Appeals of Iowa.
DEBRUCE GRAIN, INC., Plaintiff,
v.
Maurice D. MITCHELL, Sr., Defendant-Appellant,
Cargill Incorporated, Defendant-Appellee,
Marvin Mitchell and Charles Smith, Bankruptcy
Trustees for the Estate of Marvin
Mitchell, Defendants.
**No. 05-1934.**

July 25, 2007.

Appeal from the Iowa District Court for Union County, Sherman W. Phipps, Judge.

Maurice D. Mitchell, Sr. appeals the district court's ruling finding Marvin Mitchell was the owner of a grain contract with DeBruce Grain, Inc. AFFIRMED.

David L. Leitner of Leitner Law Office, West Des Moines and Peter C. Riley of Tom Riley Law Firm, P.L.C., Cedar Rapids, for appellant.

Jacob D. Bylund of Faegre & Benson, L.L.P., Des Moines, for appellee.

Heard by ZIMMER, P.J., and MILLER and BAKER, JJ.

MILLER, J.

**\*1** Maurice D. Mitchell, Sr. (Maurice) appeals the district court's ruling finding Marvin Mitchell (Marvin) was the owner of a grain contract with DeBruce Grain, Inc. (DeBruce). He contends the court erred in failing to find he was the owner of the grain contract, failing to recognize that his changes to the contract confirmation modified the contract, and failing to find he was the owner of the grain. We affirm.

**I.  BACKGROUND  FACTS  AND PROCEEDINGS.**

The record reveals the following facts. DeBruce is a

Missouri corporation which operates a grain elevator in Creston, Iowa. The location manager at DeBruce, Dean Michaelson, oversees the grain portion of the facility and makes contracts to buy grain from sellers. DeBruce makes forward contracts in the spring to buy grain from farmers in the fall by offering them a quote based on the futures market value for the particular grain. These forward contracts are often made over the phone and are almost always oral contracts.

Maurice and Marvin, father and son, are both farmers and residents of West Des Moines, Iowa. Marlene Mitchell (Marlene) is Marvin's wife. Maurice has farmed all of his adult life and thus is experienced in buying and selling grain. Prior to and following a bankruptcy filing by Marvin and Marlene in 2002, Marvin and Marlene conducted business under names including "Mitchell Farms." In August 2003, Maurice opened a bank account at Liberty Bank which he called the "Mitchell Farms Clearing Account."

On April 12, 2004, Marvin contacted Michaelson at DeBruce by phone to obtain a bid for the sale of soybeans. Although Michaelson did not know Marvin personally, he had heard of him from the business Marvin had done with the fertilizer division of DeBruce. Marvin requested a bid for October delivery of 36,000 bushels of soybeans. Michaelson offered to pay Marvin $7.43 per bushel. Marvin accepted. Marvin did not have an account with DeBruce so he requested Michaelson set one up for him under the name "Mitchell Farms Clearing Account." Michaelson did so and assigned Marvin a customer account number. While Michaelson was on the telephone with Marvin he recorded information onto a written form. The form included Marvin's name, phone number, social security number, and an address given to him by Marvin which was actually Maurice's address. Michaelson testified he had never heard of Maurice at that time and thus could not have been aware the address given to him by Marvin was actually Maurice's address. During the conversation Marvin never mentioned he was in any way acting on behalf of Maurice.

After the information provided to DeBruce by Marvin was entered into the computer, DeBruce generated a confirmation entitled "Purchase Contract Confirmation" and mailed it to the address provided

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

by Marvin. The confirmation listed DeBruce as the "Buyer" and Marvin as the "Customer Representative" and "Seller ." It further provided that the soybeans were "Bought From: Mitchell Farms Clearing Acct" and listed the customer identification number Michaelson had assigned to Marvin.

**\*2** Upon receiving the confirmation sent by DeBruce, Maurice wrote "Mitchell Farms Clearing act" above the signature spaces, crossed out Marvin's first name, substituted his first name for Marvin's as "Seller", dated it April 16, 2004, and signed it as the "Seller" and person "accepting" the confirmation. At trial Maurice testified that he called DeBruce about correcting the confirmation because he was not sure if he needed to initial the change. He alleged someone at DeBruce told him to scratch out Marvin's name, insert the correct one, sign it and send it back. However, Maurice did not know the name of the person at DeBruce to whom he allegedly had spoken and did not mention this call until his testimony during trial. Maurice then mailed the confirmation back to DeBruce where a clerical employee at DeBruce logged it into the computer and initialed and dated it to indicate it had been so logged.

At the end of September DeBruce began to run lien searches on Marvin in anticipation of his delivery of soybeans on his contract because Marvin was the person DeBruce believed the contract to be with and the only person it knew to be connected with the account. Through these searches DeBruce learned of a judgment debt Marvin owed to Cargill, his bankruptcy, and the fact he might be selling grain under names other than his own.

In October 2004, soybeans were delivered to DeBruce pursuant to the April contract. There was an overrun of 115.66 bushels, so DeBruce drafted an overrun contract confirmation for that amount to "Mitchell Farms Clearing Account in care of Marvin R. Mitchell." Following delivery of the soybeans, and upon learning DeBruce was preparing to make payment to Marvin and his creditors, Maurice demanded DeBruce make payment on the contact to him. DeBruce refused to make payment to Maurice because it believed its contract to be with Marvin.

Maurice lodged a complaint with the Iowa Department of Agriculture against DeBruce for non-payment. Marvin also had his attorney send DeBruce a letter demanding the proceeds be paid to Maurice. DeBruce responded by filing the current interpleader petition on October 25, 2004, naming Marvin, Maurice, and Charles Smith, Marvin's bankruptcy

trustee, as defendants. [FN1] DeBruce deposited the proceeds of the April bean contract with the county clerk of court. The petition was later amended to add Cargill as a defendant and claimant to the proceeds. Cargill claimed the contract proceeds as a judgment creditor of Marvin while Maurice claimed the proceeds on the ground it was his contract and he owned the beans.

> FN1. Marvin and Marlene had filed a Chapter 7 bankruptcy petition in March 2002.

Affidavits of all three defendants were prepared and presented to the district court. Marvin and Smith both disclaimed any interest in the proceeds while Maurice claimed them. Based on these affidavits, the court ordered the clerk of court to issue a check for the full amount of the proceeds to Maurice. This order was later set aside on November 8, 2004. Marvin did not file an answer to DeBruce's interpleader petition, and DeBruce filed a motion for default against him which was granted by the district court. DeBruce then filed a motion for statutory discharge which was also granted as to the sums deposited with the clerk of court. The matter then proceeded to trial on June 13-15, 2005, with Cargill and Maurice as the only remaining parties.

**\*3** The district court noted that the parties had agreed the only issue before the court was with whom DeBruce contracted to purchase soybeans and thus to whom the court was required to remit the contract proceeds, Marvin or Maurice. The court noted that if the contract at issue was with Marvin, as pled by DeBruce, then Cargill as a lien creditor of Marvin with the senior interest in his agricultural products or their proceeds would be entitled to the contract proceeds.

The court concluded the contract was by and between Marvin and DeBruce and therefore ordered that contract proceeds be released to Cargill in an amount sufficient to satisfy its judgment against Marvin. More specifically, the court found (1) an oral contract was entered into between Marvin and DeBruce via their telephone conversation on April 12, 2004; (2) Maurice failed to meet his burden to prove the existence of an employment relationship between himself and Marvin and thus Marvin was not acting as Maurice's employee in entering into the oral contract with DeBruce; and (3) Maurice's act of removing Marvin's name on the contract confirmation, and then signing and returning the confirmation to DeBruce, did not create a written

contract with DeBruce or otherwise make Maurice a party to the contract.

Maurice filed motions to amend or enlarge the court's findings and conclusions, for new trial, and for a stay. The motions for new trial and stay were denied. His motion to amend or enlarge was granted and the court issued a corrected ruling adding specific findings that there was not sufficient credible evidence in the trial record to determine who owned the soybeans delivered to DeBruce, and there was not sufficient evidence that Marvin was acting as Maurice's agent in making the contract with DeBruce.

Maurice appeals contending the court erred in (1) failing to find the he was the owner of the grain contract because he was the owner of the "Mitchell Farms Clearing Account" and Marvin entered into the contract on Maurice's behalf as his agent, (2) failing to recognize Maurice's changes to the contract confirmation as a modification to the contract with DeBruce, and (3) failing to find he was the owner of the grain and therefore entitled to the proceeds.

### II. SCOPE AND STANDARDS OF REVIEW.

Interpleader is an equitable action. *C.F. Sales, Inc. v. Amfert, Inc.,* 344 N.W.2d 543, 550 (Iowa 1983). Both parties agree they consider the case to have been tried as an equitable action. We will review a case on appeal in the same manner it was tried in district court. *Johnson v. Kaster,* 637 N.W.2d 174, 177 (Iowa 2001). We review equity cases de novo. Iowa R.App. P. 6.4. Accordingly, we examine the facts and law and decide anew the issues properly preserved. *Johnson,* 637 N.W.2d at 177. We give weight to the fact findings of the district court, especially when considering witness credibility, but we are not bound by such findings. Iowa R.App. P. 6.14(6)(*g* ); *Orud v. Groth,* 708 N.W.2d 72, 75 (Iowa 2006).

### II. MERITS.

**\*4** Maurice first claims that the district court erred in failing to find he was the owner of the grain contract with DeBruce. As noted above, during the April 12, 2004, phone conversation between Michaelson and Marvin, Marvin did not once state he was calling on behalf of Maurice. Marvin simply called to request a bid for October delivery of 36,000 bushels of soybeans to DeBruce. Michaelson testified he had heard of Marvin and knew of his large farming operation from Marvin's dealings with DeBruce's fertilizer division, but had never heard of Maurice.

While on the telephone with Marvin, Michaelson recorded information onto a written form to set up an account for Marvin. The form, which was entered into evidence at trial, included Marvin's name, phone number, social security number, and an address given to Michaelson by Marvin. [FN2] Michaelson also assigned Marvin an account number at that time. At Marvin's request, DeBruce identified his account with DeBruce as the "Mitchell Farms Clearing Account" and that is who the contract confirmation shows the grain was bought from. The address given to Michaelson by Marvin was in fact Maurice's address, but because Michaelson did not know Maurice he was unaware of that and believed the address given was Marvin's.

> FN2. Although Marvin's social security number could not be seen on the copy of the form admitted at trial, Michaelson testified he wrote it on the original form.

Maurice does not dispute that an oral contract was in fact entered into during the telephone conversation on April 12, 2004, but only disputes who the parties to the contract were. He first argues the contract was with him because he is the owner of the "Mitchell Farms Clearing Account" and Marvin entered into the oral contract with DeBruce on Maurice's behalf as his agent. [FN3]

> FN3. Maurice does not claim on appeal the district court erred in finding Marvin was not acting as his employee.

The confirmation on its face provides that the soybeans were bought from "Mitchell Farms Clearing Account." In August 2003 Maurice did in fact open a bank account at Liberty Bank which he called the "Mitchell Farms Clearing Account," and he owned that account. Although his argument is not entirely clear Maurice appears to argue that the contract at issue was with "Mitchell Farms Clearing Account," he owned a bank account with the same name, and he is therefore the owner of the contract. However, we agree with the district court that a bank account is not a legal entity and is therefore not capable of entering into a contract. Thus, the contract cannot have been with the Liberty Bank "Mitchell Farms Clearing Account."

Furthermore, it is clear from the record that the name "Mitchell Farms Clearing Account" refers to two entirely separate and distinct things in this case. It is the name Maurice assigned to his account at Liberty Bank. It is also a name Marvin provided to be used

on the account arising from the contract he discussed with DeBruce during his April 12, 2004, telephone conversation with Michaelson. The only one of these two accounts which has any bearing on the issue at hand, who owns the grain contract with DeBruce and is thus entitled to the proceeds therefrom, is the second one. Accordingly, the fact Maurice owns a Liberty Bank account by the name "Mitchell Farms Clearing Account" does not mean he owns the contract DeBruce entered on April 12, 2004, an account to which Marvin assigned an identical name.

 **5** Maurice also argues the DeBruce contract was with him because Marvin entered into the contract on his behalf as his agent. The burden of proving the existence of an agency relationship rests with the party seeking to establish its existence. *Chariton Feed & Grain, Inc. v. Harder,* 369 N.W.2d 777, 789 (Iowa 1985). Thus, the burden here lies with Maurice to prove Marvin was acting as his agent at the time he called DeBruce. The question of the existence of a principal-agent relationship is ordinarily a question of fact. *Pillsbury Co. v. Ward,* 250 N.W.2d 35, 38 (Iowa 1977). An agency relationship results from (1) a manifestation of consent by one person that another shall act on the former's behalf and subject to the former's control and (2) the consent of the latter to so act. *Id.*

 On the specific issue of an agency relationship, the district court found    "there was not sufficient evidence in the record at trial to find that Marvin Mitchell was acting at any time relevant to the issues herein as Maurice Mitchell, Sr.'s agent." More generally, the court found that Maurice's testimony on the matter was "not credible" and that

 there was no employee/employer, *or other, relationship* existing between Marvin and Maurice on April 12, 2004, which would have enabled Marvin to act on behalf of Maurice. The court finds that there is no credible evidence that Marvin was acting on behalf of Maurice at the time of his phone call to DeBruce/Michaelson on April 12, 2004.

 (Emphasis added.) We agree with the district court that Maurice failed to meet his burden to prove a principal-agent relationship existed between himself and Marvin.

 The only evidence at trial of the agency relationship Maurice alleges was his own in-court testimony, which was contradicted by his prior testimony in his answers to interrogatories regarding the relationship between himself and Marvin. Through interrogatories, Maurice was asked to identify

services that Marvin had performed on his behalf. He answered that Marvin and he had exchanged labor and Marvin had assisted him in crop inputs. Maurice did not indicate that Marvin had at any time solicited, negotiated, or entered any contract on Maurice's behalf. Through interrogatories, Maurice was asked to identify all persons who had provided him professional services. Maurice listed six individuals, but did not identify Marvin as having provided any such services. Through interrogatories, Maurice was asked to identify any contract or agreement that Marvin entered into on his behalf. He did not identify the contract with DeBruce. Through his answers to interrogatories Maurice acknowledged that no actual wages had been paid to Marvin and there was no formal documentation of the alleged agency relationship. Other than what might be implied from Maurice's testimony, the record contains no substantial evidence that Marvin consented to act on Maurice's behalf and subject to his control with respect to such things as grain sale contracts. [FN4]

> FN4. Marvin did not testify at trial even though prior to trial Maurice successfully resisted Cargill's motion in limine to exclude Marvin from testifying. Accordingly, there was no testimony from Marvin with respect to the existence of the alleged agency relationship.

 **6** The district court further found the fact that Maurice's prior testimony directly contradicted his "conclusory trial testimony significantly undercuts the credibility of his testimony, thereby reducing its evidentiary value." We give deference to the court's credibility findings and agree with the court that the inconsistencies between Maurice's answers to interrogatories and his trial testimony undermine his credibility. We conclude Maurice has not met his burden to establish the existence of a principal-agent relationship between himself and Marvin, or that Marvin acted as his agent in entering the oral contract with DeBruce. We further conclude that Maurice was not a party to the oral contract with DeBruce.

 Maurice next claims that even if we find Marvin did not enter into the oral contract on his behalf as his agent and he himself was not a party to the oral contract with DeBruce, the district court erred in failing to recognize that his changes to the contract confirmation and his act of signing it and returning it to DeBruce created a written contract between himself and DeBruce.

 As previously noted, following the telephone

conversation between Marvin and Michaelson wherein an oral contract was formed, a contract confirmation was generated by DeBruce and sent to Maurice's address. Michaelson testified he believed he was sending the confirmation to Marvin's address. On the confirmation DeBruce was listed as the "Buyer" and Marvin was listed as the "Seller." The confirmation further provided that the soybeans were "Bought From: Mitchell Farms Clearing Acct" and listed the customer identification number Michaelson had assigned to Marvin. Upon receiving the confirmation sent by DeBruce, Maurice wrote "Mitchell Farms Clearing act" above the top of the signature space, crossed out Marvin's first name and substituted his first name as "Seller," dated it April 16, 2004, and signed it as the "Seller" and person "accepting" the confirmation. In the lower left-hand corner, the contract confirmation provides:

> The above covers our understanding of the contract made with you today subject to the terms and conditions on the reverse side of this document. Please sign and return the attached duplicate copy immediately calling any errors or omissions to our attention. Failure to advise us immediately on receipt of this document will be understood by us as your acceptance of these terms.

For several reasons we find this second claim of trial court error to be without merit. First, a contract confirmation" such as the "Purchase Contract Confirmation" here is not a contract. *See* McCubbib Seed Farm, Inc. v. Tri-Mor Sales, Inc., 257 N.W.2d 55, 58 (Iowa 1977). A confirmation is an instrument which is utilized to negate the Statute of Frauds and to allow the introduction of evidence to prove the existence of the oral contract. *Id.* However, a confirmation does not prove the existence of the contract. *Id.* Accordingly, a contract exists irrespective of the existence of a confirmation, and the existence of a confirmation does not establish the existence of a contract. *Id.* at 59. Thus, Maurice's act of changing terms on the confirmation had no legal significance as it is clear that the contract in this case was the oral contract entered by Marvin and DeBruce on April 12, 2004, not the confirmation that was generated and mailed afterward.

**\*7** Second, even if we were to assume the confirmation could act as a contract, Maurice had no authority to make modifications, substitutions, or additions to the contract because only parties to a contract can make modifications or additions to the contract and we have already determined Maurice was not a party to the contract. *See* Klipp v. Iowa Grain Indem. Fund Bd., 502 N.W.2d 9, 11 (Iowa

1993) ("To establish a substitution or novation, the claimant must show (1) a previous valid obligation, (2) agreement of all partes to the new contract, (3) extinguishment of the old contract, and (4) validity of the new contract"). As a non-party he could not somehow become a party to the contract or make a new contract with DeBruce simply by scratching out Marvin's name and replacing it with his own.

Finally, Maurice argues that regardless of his status as a non-party to the "original" contract by and between DeBruce and Marvin, he was a party to a subsequent contract with DeBruce because DeBruce accepted his proposed modifications to the contract on the contract confirmation form. [FN5] In support of his argument Maurice, for the first time at trial, alleged he called DeBruce after he received the confirmation to inform DeBruce the contract should be with him and not Marvin. He testified that an unidentified DeBruce employee told him he could scratch out Marvin's name and insert his own. Thus, he contends DeBruce actually instructed him to modify the confirmation and accepted the modification by so doing.

> FN5. Because we have already determined the confirmation was not a contract, and that Maurice was not a party to the contract at issue, there is no way any amount of scratching out and adding on the confirmation form by Maurice or acceptance by DeBruce employees could have created a contract between himself and DeBruce. However, we will address this issue to the extent it inures in the other issues before us and for the sake of clarity and closure of the issue.

There is no evidence in the record to support Maurice's testimony that any such phone conversation took place or that any DeBruce employee ever told him to make such modifications. Maurice's own in-court testimony again contradicted his previous sworn statements. In interrogatories Maurice was asked to identify each person with any knowledge of the facts related to the subject of the litigation and what knowledge such persons possessed. Maurice did not identify the DeBruce employee with whom he purportedly had spoken, or state that any such conversation took place. In interrogatories he was also asked to identify "any and all alleged statements and/or admissions" by either DeBruce or Cargill which he believed to be pertinent in any respect to the lawsuit, and to provide additional information such as who made the

Slip Copy                                                                                                            Page 6
Slip Copy, 2007 WL 2118769 (Iowa App.)
**(Cite as: 2007 WL 2118769 (Iowa App.))**

statement(s) or admission(s), and the content thereof. Maurice identified only Michaelson as having made any statement or admission and did not in any manner suggest that Michaelson had made any statements or admissions such as the purported directions from the unidentified DeBruce employee first suggested at trial.

Maurice's testimony at trial again thoroughly contradicts his several answers to interrogatories and undermines his credibility. The fact that he did not at any time prior to trial mention this seemingly important telephone conversation is telling. We find there is no credible evidence in the record that the alleged conversation with the unidentified employee ever took place.

**\*8** Maurice also argues DeBruce's acceptance of his modifications is evidenced by the initials DeBruce placed on the confirmation upon receipt. The confirmation does bear the initials of a DeBruce clerical employee and the date April 20, 2004. However, Michaelson testified that the role of that clerical employee was simply to log the confirmations into the computer when they were returned to DeBruce. When she would receive the returned confirmations she would merely check "yes" or "no" in the computer system to indicate whether a signed confirmation had been returned. Maurice provided no evidence at trial that this clerical employee had any authority to accept changes to a contract for DeBruce or that the initials meant anything more than that a signed confirmation had been returned. The district court found the initials and date on the confirmation were

> nothing more than a notation showing return of the purchase contract confirmation document, which notation was made by a clerical employee of DeBruce assigned the responsibility of noting the date of receipt of such documents but having no authority reflected in this record to act on behalf of DeBruce in modifying contracts or accepting proposed modifications, if in fact this had been a proposed modification.

We fully agree with the court's findings with regard to the notation on the confirmation form. Thus, even if Maurice somehow had the authority to change the contract terms and/or add himself as a party to the contract with DeBruce, there is no evidence of any acceptance by DeBruce of such changes.

Finally, Maurice claims that even if the contract was strictly by and between Marvin and DeBruce, the district court erred in failing to find he was the owner of the soybeans delivered to DeBruce on said

contract and therefore entitled to the proceeds. The district court found

> There is no evidence in the record made at trial, other than Maurice Mitchell, Sr.'s own self-serving testimony (which the court does not find credible), as to where the beans delivered to DeBruce were raised or by whom they were raised. In any event, the court finds that the beans were clearly delivered on behalf of Marvin Mitchell pursuant to the contract between Marvin and DeBruce.

Prior to trial Maurice filed an affidavit with the court swearing he had produced in his farming operation and owned at all times all of the grain delivered pursuant to the contract at issue. During his trial testimony he admitted he did not raise all of the soybeans as earlier stated in his affidavit. Thus, the affidavit was in fact false in that regard. Maurice then claimed at trial that even though he did not raise all of the soybeans, he in fact owned all of them. His testimony on this issue was confusing and contradictory, claiming alternately that he had bought some of the soybeans from Marlene Mitchell on October 20, 2004, then that he actually bought them from her earlier and just paid for them on October 20, 2004, and then that some of the soybeans may have actually been owned by the Lucht Trust and may have been produced in 2003.

**\*9** Based on Maurice's conflicting and contradictory testimony on this issue, as well as the conflicts and contradictions in his sworn statements and testimony throughout the record, we agree with the trial court and conclude that his testimony is almost totally lacking in credibility. We conclude there is not sufficient credible evidence in the record before us to determine that Maurice owned the soybeans delivered to DeBruce. Further, regardless of who owned the soybeans we conclude they were delivered on behalf of Marvin pursuant to his contract with DeBruce and thus Marvin, or his creditors in this case, are entitled to the proceeds from the sale of the soybeans.

## IV. CONCLUSION.

Based on or de novo review, and for all of the reasons set forth above, we conclude the contract at issue here was an oral contract by and between Marvin and DeBruce, and those two parties alone. Maurice failed to prove Marvin entered this contract on behalf of Maurice as his agent. We further conclude because the contract confirmation document was not a contract and Maurice was not a party to the oral contract between Marvin and DeBruce, the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

changes Maurice made to the confirmation could not and did not modify the contract. Finally, we conclude there is not sufficient credible evidence in the record to determine that Maurice owned the soybeans delivered under the DeBruce contract, and that they were delivered in satisfaction of the contract between DeBruce and Marvin. We therefore affirm the trial court's judgment.

 **AFFIRMED.**

2012772629

 Slip Copy, 2007 WL 2118769 (Iowa App.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

C

Only the Westlaw citation is currently available.

United States District Court,
D. Connecticut.
Jane DOE, Plaintiff,
v.
CITY OF HARTFORD, et al., Defendants.
No. 3:01CV278(DJS).

Oct. 13, 2004.
Wesley S. Spears, Hartford, CT, for Plaintiff.

James J. Szerejko, Brian P. Leaming, Halloran & Sage, William J. Melley, III, Law Offices of William J. Melley, III, Hartford, CT, for Defendants.

*MEMORANDUM OF DECISION*

SQUATRITO, J.

**\*1** Plaintiff Jane Doe brings the present action against defendants City of Hartford, Joseph Croughwell, Deborah Barrows, Robert Rudewicz and Daryel McCrorey. All defendants except McCrorey have moved the court to strike portions of two affidavits submitted by plaintiff in support of her response to the pending motion for summary judgment. The motion to strike [doc. # 72] is GRANTED in part.

*DISCUSSION*

Federal Rule of Civil Procedure 56(e) governs the submission of affidavits in support of, or opposition to, a motion for summary judgment. "Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Fed.R.Civ.P. 56(e). *See also Union Ins. Soc'y of Canton, Ltd., v. William Gluckin & Co., Inc.,* 353 F.2d 946, 952 (2d Cir.1965)(holding "conclusory statements and statements not made on personal knowledge do not comply with the requirements of Fed.R.Civ.P. 56(e) and, therefore, may not be considered").

A motion to strike is appropriate if documents submitted in support of a motion for summary judgment are not made on the basis of personal knowledge or contain inadmissible hearsay or conclusory statements." *Pokorne v. Gary,* 281 F.Supp.2d 416, 418 (D.Conn.2003); *Spector v. Experian Info. Sys.,* No. 3:01-CV-1955, 2004 WL 1242978, at \*4 (D.Conn. June 2, 2004). However, the entire affidavit need not be stricken, *United States v. Alessi,* 599 F.2d 513, 514-515 (2d Cir.1979), even if a party moves to strike parts of an affidavit that do not comply with the requirements of Fed.R.Civ.P. 56(e). *Jewell-Rung Agency, Inc. v. Haddad Org., Ltd.,* 814 F.Supp. 337, 339. (S.D.N.Y.1993).

A. The Affidavit of Jane Doe II

Defendant contends that paragraphs Nos. 10, 24, 26, 46, 47, 49, 50 and 51 of the affidavit of Jane Doe II are either inadmissible hearsay or assertions not based on personal knowledge and should be stricken accordingly.

Defendants contend that paragraphs Nos. 10, 46, 47 and 49 of Jane Doe II's affidavit are inadmissible hearsay. "Hearsay is a statement, other than one made by the declarant while testifying at trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed.R.Evid. 801(c). "Hearsay testimony that would be inadmissible if testified to at trial may not properly be set forth in a Rule 56 affidavit accompanying a summary judgment motion." *Spector,* 2004 WL 124978, at \*5.

Paragraph No. 10 reads: "In subsequent conversations, many other prostitutes indicated to me that they had been forced to engage in sex, under threat of arrest." This is clearly hearsay. Jane Doe II is submitting as evidence statements made by out of court declarants to prove the truth of the assertion that other prostitutes have been sexually assaulted by the police. This paragraph is stricken.

Paragraph No. 46 reads: "During the course of the Federal Investigation, I was transported to and from the Niantic Womens Prison, with other women who claimed to have been raped by Hartford Police Officers." This is not hearsay. The statement as a whole clearly is intended only to buttress Jane Doe II's assertion that she traveled with other women claiming experiences similar to her own. The testimony is not offered to prove that the other women were raped, but instead merely to show that she was not the only woman transported from Niantic

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                 Page 2
Not Reported in F.Supp.2d, 2004 WL 2377166 (D.Conn.)
**(Cite as: 2004 WL 2377166 (D.Conn.))**

Prison to have made such claims. The statement of an out-of-court declarant may be introduced into evidence as proof that the statement was, in fact, made and that is all Jane Doe II seeks to do in paragraph No. 46. The statement is not stricken.

**\*2** Paragraph No. 47 reads: "Many of the women I knew only by street names and not their given names." There is no out-of-court declarant represented in this statement. Jane Doe II is speaking to the condition of her own knowledge regarding the women in question. There is no hearsay and the paragraph is not stricken.

Paragraph No. 49 reads: "In subsequent conversations, many of these prostitutes confided in me that they had also been sexually assaulted, under threat of arrest." This is clearly hearsay. Jane Doe II is attempting to prove that other prostitutes have actually been assaulted through the use of out-of-court statements. The paragraph is stricken.

Defendants also move to strike paragraphs Nos. 24, 26, 50 and 51 as not properly based on personal knowledge. "Generally, affiants have personal knowledge to testify about their experiences." *Larouche v. Webster,* 175 F.R.D. 452, 454 (S.D.N.Y.1996). Hearsay and secondhand information do not constitute personal knowledge. *Isaacs v. Mid Am. Body & Equip. Co.,* 720 F.Supp. 255, 256 (D.Conn.1989).

Paragraph No. 24 reads: "Apparently, Stacy Richards advised them that I had been sexually assaulted by Hartford police officers." This statement is secondhand information and also hearsay. Jane Doe II references an unknown out-of-court speaker for purposes of proving that Stacy Richards reported facts to the Hartford Police. This statement is not based on personal knowledge and is stricken.

Paragraph No. 26 reads: "I also became aware that another woman Yolando Santiago had also been assaulted by Officer Julio Camacho." Again, Jane Doe II is testifying to something that she was clearly told by someone else and not to facts or evidence that she witnessed herself or heard at trial. The paragraph is stricken.

Paragraph No. 50 reads: "Some of these same prostitutes had been transported to be interviewed with me as part of the same investigation." Jane Doe II does not establish any foundation for this knowledge other than presumed speculation and secondhand statements. The testimony is not based on personal knowledge and is stricken.

Paragraph No. 51 reads: "I saw between ten to fifteen other prostitutes who were interviewed on the same day as my interview regarding allegations of sexual assaults against prostitutes by Hartford police officers." This statement is based on personal knowledge. The affiant states that she saw a fixed number of prostitutes who were also interviewed on the day she was interviewed. Nothing in this statement is offered regarding the content of those other interviews or the testimony of the other prostitutes. The adjectival clause "regarding allegations of sexual assaults against ..." attaches, in the court's reading, to the object "my interview." Should it be the case that Jane Doe II intended to testify as to the statements made by other prostitutes during their interviews, the testimony would obviously not be based on personal knowledge and would be disregarded. A witness may always testify to her own observations, and the court considers this a statement of personal knowledge. The paragraph is not stricken.

### B. Affidavit of Yolanda Santiago

**\*3** Defendants move to strike paragraph No. 10 of the affidavit of Yolanda Santiago as either hearsay or not based on personal knowledge. The paragraph reads: "My cousin Judy Cruz was also sexually assaulted by a Hartford Police officer around the same time as the assault on me." This statement is made without any foundation for the asserted knowledge that might make it admissible. Absent some foundation, the testimony lacks a basis in personal knowledge and is stricken.

*CONCLUSION*

The court finds that paragraphs No. 10, 49, 24, 26 and 50 of Jane Doe II's affidavit arte stricken. Paragraph No. 10 of Yolanda Santiago's affidavit is also stricken. Defendants' motion to strike [doc. # 72] is GRANTED in part.

IT IS SO ORDERED.

Not Reported in F.Supp.2d, 2004 WL 2377166 (D.Conn.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

41 F.3d 1510 (Table)                                                                                          Page 1
41 F.3d 1510 (Table), 1994 WL 589450 (7th Cir.(Ill.))
**Unpublished Disposition**
**(Cite as: 41 F.3d 1510, 1994 WL 589450 (7th Cir.(Ill.)))**

C

NOTICE:  THIS IS AN UNPUBLISHED OPINION.

(The Court's decision is referenced in a "Table of Decisions Without Reported Opinions" appearing in the Federal Reporter. Use FI CTA7 Rule 53 for rules regarding the citation of unpublished opinions.)

United States Court of Appeals, Seventh Circuit.
Charles E. JONES, Plaintiff-Appellant,
v.
PEORIA COUNTY SHERIFF'S DEPARTMENT, a body politic;  and the Peoria County
Sheriff's Merit Commission, Defendants-Appellees.
**No. 94-1767.**

Submitted Oct. 12, 1994. [FN*]
Decided Oct. 25, 1994.

Appeal from the United States District Court for the Central District of Illinois, No. 91 C 2383;  Harold A. Baker, Judge.

C.D.Ill.

AFFIRMED.

Before CUMMINGS, MANION and KANNE, Circuit Judges.

### ORDER
**\*\*1** Lieutenant Charles Jones filed a complaint in federal court under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, et seq., contending that his discharge from the Peoria County Sheriff's department was racially motivated.   He appeals the district court's decision striking an affidavit submitted by his attorney to support his race discrimination claim and the court's decision to grant the defendants' motion for summary judgment on the basis of res judicata.   We find that the district court did not abuse its discretion in concluding that the affidavit was insufficient under Federal Rule of Civil Procedure 56(e).   *Unterreiner v. Volkswagen of America, Inc.,* 8 F.3d 1206, 1212 (7th Cir.1993). Moreover, we agree that the Illinois state courts issued a judgment on this matter that precludes review of Jones' Title VII claim under Illinois principles of res judicata.   Accordingly, the grant of

summary judgment was proper, *Sullivan v. Lemoncello,* No. 93- 3087, slip op. at 2 (7th Cir. Sept. 28, 1994), and we affirm the district court's decision for the reasons stated in the attached Order.

AFFIRMED.

ATTACHMENT
Filed March 4, 1994.
THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
CHARLES E. JONES
Plaintiff,
vs.
PEORIA COUNTY SHERIFF'S DEPARTMENT, a body politic;  and THE PEORIA COUNTY
SHERIFF'S MERIT COMMISSION,
Defendants.
Case No. 91-2383
### ORDER
This is a race discrimination case under Title VII of the 1964 Civil Rights Act.   The case has been periodically stayed in this court, pending the outcome of state court proceedings.   Those proceedings have concluded, bringing back to life numerous motions in this court.   The court now grants the defendants' motions for summary judgment.

### FACTUAL BACKGROUND
On September 22, 1989, the Peoria County Sheriff's Merit Commission entered an order which discharged Charles Jones from employment as a Sheriff's Deputy.   In October, 1989, Jones filed a Complaint for Administrative Review in the Circuit Court of the Tenth Judicial Circuit of Illinois seeking to reverse the decision of the Merit Commission.   In that same month, Jones filed a Charge of Discrimination with the Equal Employment Opportunity Commission (EEOC).

On March 26, 1992, the state circuit court found that the Merit Commission should not have discharged Jones and remanded the matter to the Merit Commission to enter an order imposing discipline other than discharge.   The Merit Commission determined that Jones should be demoted and suspended without pay for 180 days.   On December 2, 1992, the state court entered an order which confirmed the Merit Commission's decision. Appeals of both orders were taken, and on August 23,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

41 F.3d 1510 (Table), 1994 WL 589450 (7th Cir.(Ill.))
**Unpublished Disposition**
**(Cite as: 41 F.3d 1510, 1994 WL 589450 (7th Cir.(Ill.)))**

1993, the Appellate Court for the Third District reversed the circuit court and reinstated the Merit Commission's original order to discharge Jones. After receiving his right-to-sue letter from the EEOC, Jones challenged his dismissal in federal court.

### ANALYSIS

*Motion to Strike*

 **\*\*2** On February 1, 1994, the plaintiff filed an affidavit by the plaintiff's attorney, Donald R. Jackson. The affidavit states that during the pendency of Jones' state court proceedings, Jackson had two conversations with an unidentified member of the Peoria County Sheriff's Merit Commission who had participated in the decision to discharge Jones. According to Jackson, the commission member stated that Jones' race (he is an African-American) influenced the commission's decision to terminate Jones. Jones submits this affidavit as evidence that his case is not barred by *res judicata* because of the previous state actions, as this is new evidence which he would have been unable to raise in the state court proceedings.

 While it is not at all clear to the court that Jones could not have raised this issue in state court, his effort to raise it here is insufficient. Both of the defendants have brought motions to strike the affidavit, for different reasons. The court now grants the motions to strike for the following reason: the affidavit is entirely insufficient under F.R.Civ.P. 56(e). The only fact to which Mr. Jackson attests is that he had a conversation with an unidentified person regarding the influence Jones' race had on his dismissal. The affidavit does not document with whom Jackson spoke, when Jackson spoke with this person, or where Jackson spoke with this person. Both of the defendants have moved for summary judgment. Jackson's affidavit as part of Jones' response to the motion for summary judgment does not meet the standard of Rule 56(e):

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. (If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.)

Jackson's affidavit does not set forth any specific facts, and therefore this court will strike the affidavit

and not consider it.

*Summary Judgment*

 Each defendant has moved for summary judgment arguing that this court is precluded from hearing the present case on the grounds of *res judicata*. The defendant Peoria County Sheriff's Department filed a motion to amend their motion for summary judgment, which the court now grants to consider the summary judgment issue in its entirety.

 This court must give state court judgments "the same full faith and credit ... as they have by law or usage in the courts of such State." *Pirela v. Village of North Aurora,* 935 F.2d 909, 911 (7th Cir.) *cert. denied,* 112 S.Ct. 587 (1991) (citations omitted). Thus, if a state court judgment would preclude a later state law case, it would also preclude a Title VII case. *Kremer v. Chemical Construction Corporation,* 456 U.S. 461, 476, *reh'g denied,* 458 U.S. 1133 (1982). The two-prong test to determine whether a claim is barred by *res judicata* requires the court to ask: "(1) whether the law of the state in which the prior judgment is rendered would give that judgment preclusive effect against the claims asserted in the federal action; and (2) whether the party against whom preclusion is asserted had a full and fair opportunity in the state proceedings to litigate the claims (i.e. whether the state proceedings satisfy minimum due process requirements)." *Welch v. Johnson,* 907 F.2d 714, 719 (7th Cir.1990), citing *Kremer,* 456 U.S. at 481- 82.

 **\*\*3** The first prong of the test asks simply whether the cause of action would be precluded under Illinois principles of *res judicata*. In Illinois, the doctrine of *res judicata* will apply if there is: "(1) identity of parties or their privies in the two suits; (2) identity of causes of action in the prior and current suit; and (3) a final judgment on the merits in the prior suit." *Pirela,* 935 F.2d at 911 (citations omitted).

 The plaintiff does not contend either that the parties are not identical in the two cases, or that a final judgment was not reached in the state court proceeding. The plaintiff disagrees only with the second prong of the test, and maintains that this is not the same cause of action as was raised in the state court.

 Illinois courts have historically applied two different tests in determining whether causes of action are identical. Under the "same evidence test," a court must determine "whether the same evidence would

41 F.3d 1510 (Table)                                                                                        Page 3
41 F.3d 1510 (Table), 1994 WL 589450 (7th Cir.(Ill.))
**Unpublished Disposition**
**(Cite as: 41 F.3d 1510, 1994 WL 589450 (7th Cir.(Ill.)))**

sustain both actions." _Pirela, 935 F.2d at 912_ (citations omitted). In a similar vein, the "transactional" test requires a court to analyze whether both causes of action arose from the "same operative group of facts," in other words, from the same transaction. _Id._

Jones claims that under either test his state proceeding and this proceeding are different causes of action. He bases this claim on the fact that his state proceeding involved only the question of whether he was rightfully discharged, and thus the facts in issue were only whether or not Jones adhered to the police department's rules. He argues that in contrast, this proceeding is about whether he was treated differently from white officers.

Jones' contentions are in clear contravention of Seventh Circuit law, which shows that under both the "same evidence" test and the "transactional" test, all issues involving a termination involve one cause of action. The Seventh Circuit has relied on the reasoning of the Illinois Supreme Court in adopting a broad view of what the "same facts" and the "same transaction" mean:

> [T]he conclusiveness of the judgment in [the prior action] extends not only to matters actually determined, but also to other matters which could properly have been raised and determined therein. This rule applies to _every question relevant to and falling within the purview of the original action,_ in respect to matters of both claim or grounds of recovery, and defense, which could have been presented by the exercise of due diligence ...
>
> The principle that res judicata extends to _all matters within the purview of the original action,_ whether or not they were actually raised, is tantamount to a rule requiring parties to consolidate all closely related matters into one suit. As such, the principle serves well the interest of judicial economy and thus it is at the core of the res judicata doctrine.

_Welch, 907 F.2d at 720_ (citations omitted) (emphasis in original).

**\*\*4** The _Welch_ case is instructive. A public employee was fired. In her state cause of action, she challenged the propriety of her discharge; in her federal action she attempted to show that the basis of the discharge was sex discrimination under Title VII and 42 U.S.C. § 1983. The court applied both tests. Under the "same evidence test" the court found that any evidence Welch had regarding discrimination in her discharge could and should have been raised as a

defense at the state court level. In other words, the facts surrounding any harassment or discrimination she faced in her firing were relevant in both proceedings; thus, they were the same cause of action. The court reached the same result in applying the "transactional" test: "The single factual situation out of which both suits arise is [Welch's employer's] conduct toward Ms. Welch that eventually culminated in her discharge." _Id._ at 722. See also _Pirela, 935 F.2d at 912_ (former police officer's claim of discriminatory treatment in discharge and suspension procedures was same cause of action, for _res judicata_ purposes, as his administrative discharge hearing and subsequent judicial review proceedings under Illinois law).

Jones's case is remarkably analogous. Any facts regarding a discriminatory motive in Jones' termination could, and should have been raised at the state level. [FN1] In the absence of the struck affidavit, Jones seems to have no support for his allegation of race discrimination. Even if he did, that claim would clearly involve the same facts and arise out of the same transaction as the relevant facts in the state court proceeding.

The second prong of the _res judicata_ test asks the court to determine whether Jones had a full and fair opportunity to litigate his claims in the state proceedings, that is, "whether the state proceedings satisf[ied] minimum due process requirements." _Welch, 907 F.2d at 719,_ citing _Kremer, 456 U.S. at 481-82._

Jones maintains that because the Merit Commission originally intended to seek his demotion, but later dismissed him, that he was denied due process by not being able to present a sufficient defense. _The charges against Jones did not change; only the punishment did._ The court does not understand how this in any way affected Jones' ability to present a defense.

Jones also claims that because he did not learn of the alleged discriminatory intent until his case was pending in the circuit court, he was prevented from raising the defense. Jones could have brought the information to the attention of the state trial court, which then would have had two options to insure that Jones' due process rights were protected: 1) hearing the claim itself, or 2) remanding his case to the Merit Commission for further proceedings. _Pirela, 935 F.2d at 915._ The _Pirela_ court found that the "failure to litigate his discrimination claims either before the

41 F.3d 1510 (Table)                                                                    Page 4
41 F.3d 1510 (Table), 1994 WL 589450 (7th Cir.(Ill.))
**Unpublished Disposition**
**(Cite as: 41 F.3d 1510,  1994 WL 589450 (7th Cir.(Ill.)))**

[administrative commission] or on administrative review in the state circuit court 'does not insulate [the plaintiff's] claims from the effects of *res judicata*.' " *Id.,* citing Welch, 907 F.2d at 725.   Consequently, Jones' failure to raise the claim in state court does not prevent his case from being barred on *res judicata* grounds now.

 **\*\*5** There is nothing to indicate that any of Jones' proceedings in state court did not meet the standards of due process.   One of the Merit Commission members submitted an affidavit as to the fairness of Jones' hearing in front of the commission.   Jones was also heard by the state circuit and appellate courts.   He has never complained about the fairness of any of these proceedings.   Thus, he meets the second prong of the *res judicata* test of having had a full and fair hearing.

 Having met both prongs of the *res judicata* test, this federal court proceeding is barred by the doctrine of *res judicata.*   Because the proceeding is barred by *res judicata,* there are no more material issues of fact for the court to consider.   In the absence of any issue of material fact, the court must grant summary judgment, in this case for the defendants.   *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).

 The remainder of the motions in the case are denied as moot.

 IT IS THEREFORE ORDERED that defendant Peoria County Sheriff's Department's motion to strike (Docket # 47) and defendant Peoria County Sheriff's Merit Commission's motion to strike (Docket # 49) are granted.

 IT IS FURTHER ORDERED that defendant Peoria County Sheriff's Department's motion to amend their motion for summary judgment (Docket # 45) is granted.

 IT IS FURTHER ORDERED that defendant Peoria County Sheriff's Merit Commission's motion for summary judgment (Docket # 28) and defendant Peoria County Sheriff's Department's motion for summary judgment (Docket # 33) are granted.

 IT IS FURTHER ORDERED that the clerk is ordered to enter judgment in favor of the defendants and against the plaintiff.   The parties shall bear their own costs.

 IT IS FURTHER ORDERED that the remainder of

the motions, defendant Peoria County Sheriff's Merit Commission's motion for the court to take judicial notice (Docket # 29), defendant Peoria County Sheriff's Merit Commission's motion to strike and to renew the motion to dismiss (Docket # 30), defendant Peoria County Sheriff's Department's motion to renew the motion to dismiss (Docket # 36), and defendant Peoria County Sheriff's Department's motion to take judicial notice (Docket # 37) are denied as moot.

    /s/ Harold A. Baker

    HAROLD A. BAKER

    United States District Judge

    FN\* After this case was set for oral argument, Plaintiff-Appellant submitted a motion to waive argument.   The court granted that motion. Accordingly, the appeal is submitted on the briefs and the record.

    FN1. Although the court has struck Mr. Jackson's affidavit and will not consider it, the court cannot resist noting that Mr. Jackson asserts that both of the alleged conversations took place during the pendency of the state proceedings, which reinforces the fact that this issue was known and should have been raised at the state court level.

 41 F.3d 1510 (Table), 1994 WL 589450 (7th Cir.(Ill.)), Unpublished Disposition

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Slip Copy                                                                                                     Page 1
Slip Copy, 2007 WL 1346913 (D.Conn.), 73 Fed. R. Evid. Serv. 536, 34 NDLR P 248
**(Cite as: 2007 WL 1346913 (D.Conn.))**

United States District Court,
D. Connecticut.
Minerva LACHIRA, Plaintiff,
v.
James SUTTON and Stanford Sutton, Defendants.
**No. 3:05cv1585 (PCD).**

May 7, 2007.

Dawne Westbrook, Middletown, CT, for Plaintiff.

*RULING ON MOTION TO STRIKE & MOTION
FOR SUMMARY JUDGMENT*

PETER C. DORSEY, U.S. District Judge.

**\*1** Plaintiff's claims are brought pursuant to the
federal Fair Housing Act of 1968, 42 U.S.C. § 3601,
et seq. ("FHA"), alleging that Defendants
discriminated against her based on her race, ethnic
origin, disability and familial status. Plaintiff also
asserts a state law claim of intentional infliction of
emotional distress. Defendants move, pursuant to
Federal Rule of Civil Procedure 56, for summary
judgment on Plaintiff's Amended Complaint, arguing
that they are entitled to judgment as a matter of law
on all claims set forth in Plaintiff's Amended
Complaint and asserting that there are no genuine
material issues of fact remaining for trial. Plaintiff
filed an opposition to Defendant's motion, and
Defendant subsequently moved to strike Plaintiff's
affidavit and the exhibits attached thereto. Plaintiff
did not file an opposition to Defendant's Motion to
Strike. For the reasons set forth herein, Defendants'
Motion for Summary Judgment [Doc. No. 32] is
**granted** and their Motion to Strike [Doc. No. 48] is
**granted in part** and **denied in part.**

**I. MOTION TO STRIKE**

Defendants move, pursuant to Federal Rule of Civil
Procedure 56(e) and Local Rule 56, to strike
materials submitted by Plaintiff in support of her
Memorandum in Opposition to Defendants' Motion
for Summary Judgment. Specifically, Defendants
move to strike Plaintiff's Affidavit and the attached
exhibits in their entirety. Alternatively, Defendants
move to strike specific statements and exhibits
referenced in Plaintiff's Affidavit prior to this Court
deciding the pending Motion for Summary Judgment.
Plaintiff has not filed an opposition to Defendants'
motion to strike. [FN1]

FN1. It is noted, in light of Plaintiff's failure
to respond to Defendants' Motion to Strike,
that the "failure to submit a memorandum in
opposition to [the] motion may be deemed
sufficient cause to grant the motion." D.
Conn. L. Civ. R. 7(a).

**A. Plaintiff's Affidavit & Exhibits**

1. *Affidavit*

Rule 56(e) of the Federal Rules of Civil Procedure
provides that "[w]hen a motion for summary
judgment is made ... an adverse party may not rest
upon the mere allegations or denials of the adverse
party's pleading, but the adverse party's response, by
affidavits or as otherwise provided in this rule, must
set forth specific facts showing that there is a genuine
issue for trial." FED. R. CIV. P. 56(e). When a
nonmovant relies on affidavits to oppose a motion for
summary judgment, those affidavits must meet the
requirements set forth in Rule 56(e):

Supporting and opposing affidavits shall be made
on personal knowledge, shall set forth such facts as
would be admissible in evidence, and shall show
affirmatively that the affiant is competent to testify
to the matters stated therein.

*Id.* The personal knowledge requirement is
mandatory. *United States v. Bosurgi,* 530 F.2d 1105,
1112 (2d Cir.1976). A court may "strike portions
of an affidavit that are not based upon the affiant's
personal knowledge, contain inadmissible hearsay or
make generalized and conclusory statements."
*Hollander v. American Cyanamid Co.,* 172 F.3d 192,
198 (2d Cir.), *cert. denied,* 528 U.S. 965, 120 S.Ct.
399, 145 L.Ed.2d 311 (1999). Moreover, "a party
may not create an issue of fact by submitting an
affidavit in opposition to a summary judgment
motion that, by omission or addition, contradicts the
affiant's previous deposition testimony." *Raskin v.
Wyatt Co.,* 125 F.3d 55, 63 (2d Cir.1997) (quoting
*Hayes v. New York City Dep't of Corrections,* 84 F.3d
614, 619 (2d Cir.1996)); *see also Perma Research &
Dev. Co. v. Singer Co.,* 410 F.2d 572, 578 (2d
Cir.1969) ("If a party who has been examined at
length on deposition could raise an issue of fact
simply by submitting an affidavit contradicting his
own prior testimony, this would greatly diminish the
utility of summary judgment as a procedure for
screening out sham issues of fact."). Finally,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                              Page 2

Slip Copy, 2007 WL 1346913 (D.Conn.), 73 Fed. R. Evid. Serv. 536, 34 NDLR P 248
**(Cite as: 2007 WL 1346913 (D.Conn.))**

conclusory allegations, examination of thoughts, opinions, argument and legal conclusions are all prohibited from affidavits submitted in support of, or opposition to, a summary judgment motion under Rule 56(e). *See Paul T. Freund Corp. v. Commonwealth Packing Co., 288 F.Supp.2d 357, 369 (W.D.N.Y.2003).*

*\*2* The court will hereby strike the following portions of the Lachira Affidavit because they contain inadmissible hearsay, generalized conclusory statements and argumentative statements, legal conclusions, information which could not be attributed to plaintiff's personal knowledge, and/or because they contradict, either by addition or omission, Plaintiff's previous deposition testimony and/or CHRO (Connecticut Commission on Human Rights and Opportunities) complaint affidavit: the statements in paragraph 5 that "there have never been tenants with children in the defendants' building" and that "[t]he defendants never wanted my child in their home"; paragraph 6; the statements in paragraph 7 that "the defendants continually abused me," that "the defendants came to my home with a screw driver to remove the lock from the front door" and the phrase "take your child away from here"; paragraph 8; the phrase in paragraph 9 "to punish me"; paragraph 11; paragraphs 16-21; the portion of paragraph 22 purporting to testify as to why Defendants decided to install the second railing in the stairwell of 1068 North Street; the statement in paragraph 28 that "[t]he defendants had a scheme to move me to another building om [sic] plaintiffs home"; and paragraphs 29-30.

2. *Exhibits*

 Defendants first argue that Plaintiff's "blanket authentication" of the exhibits in paragraph 3 of her affidavit is improper and ask the Court to strike all of Plaintiff's exhibits from the record. They contend that Plaintiff failed to provide sufficient foundation for admission of the exhibits at trial, thereby violating Federal Rule of Civil Procedure 56(e).

 The proper methods of authentication are not directly addressed in Rule 56(e), however, Federal Rule of Evidence 901(a) provides that the authentication requirement "is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Fed.R.Evid. 901(a). Therefore, to authenticate a document, a witness with personal knowledge to that effect need only testify "that the document is what it purports to be." *In re WorldCom, Inc., 357 B.R. 223, 228*

(S.D.N.Y.2006); *see also* Fed.R.Evid. 901(b)(1) (permitting authentication by testimony of a witness with knowledge "that a matter is what it is claimed to be"); 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice & Procedure* § 2722 (3d ed. 2005) ("To be admissible, documents must be authenticated by and attached to an affidavit that meets the requirements of Rule 56(e) and the affiant must be a person through whom the exhibits could be admitted into evidence."). The witness need not have "personal knowledge of the underlying events described in the document, the substance or accuracy of the document, [or] the methods of calculation." *In re WorldCom, Inc., 357 B.R. at 228.*

 With regard to the evidence that must be produced in order to authenticate a document, "[t]his threshold determination is relatively low, as evidence is admissible as authentic 'if sufficient proof has been introduced so that a reasonable juror could find in favor of authenticity or identification.' " *Bazak Int'l Corp. v. Tarrant Apparel Group, 378 F.Supp.2d 377, 391-92 (S.D.N.Y.2005)* (quoting *United States v. Ruggiero, 928 F.2d 1289, 1303 (2d Cir.1991)); see also United States v. Pluta, 176 F.3d 43, 49 (2d Cir.1999)* ( "The burden of authentication does not require the proponent of the evidence to rule out all possibilities inconsistent with authenticity, or to prove beyond any doubt that the evidence is what it purports to be. Rather, the standard for authentication, and hence for admissibility, is one of reasonable likelihood.") (citation omitted). Once this Court determines that Plaintiff has produced evidence sufficient to show by a "reasonable likelihood" that the documents "in question [are] what its proponent claims," then "the evidence may be admitted and any outstanding issues regarding its authenticity are to be resolved by the fact-finder." *Bazak Int'l Corp., 378 F.Supp.2d at 392* (citing *Raskin, 125 F.3d at 66).*

*\*3* In paragraph 3 of her affidavit, Plaintiff states: "Attached to this affidavit are Exhibits a-z. These Exhibits are true and accurate." (Lachira Aff. ¶ 3.) The documents attached as exhibits include numerous letters, a Town of Greenwich Department of Health Inspection Report, the Landlord-Tenant Agreement between the parties, a Greenwich Police Report, Norwalk Superior Court records, among many others. (*See* Exs. A-Z to Lachira Aff.) With regard to the majority of the exhibits, Defendants do not provide specific arguments as to why Plaintiff's blanket authentication is insufficient or state why she would not be competent to testify that the documents are what they are claimed to be. In addition to challenging the method of authentication of all of the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                      Page 3
Slip Copy, 2007 WL 1346913 (D.Conn.), 73 Fed. R. Evid. Serv. 536, 34 NDLR P 248
**(Cite as: 2007 WL 1346913 (D.Conn.))**

exhibits, however, Defendants also challenge the authenticity of several specific exhibits, namely, exhibits C, D and E. [FN2] Because Defendants do not challenge the actual authenticity of all of the exhibits, as opposed to the method of authentication, only those specifically addressed will be dealt with here.

> FN2. Defendants also contend that Exhibit U should be stricken, but offer no argument in support of this assertion.

*a. Exhibit C*

Exhibit C contains a typewritten, unsigned letter dated April 29, 2000, which purports to summarize a confrontation between Plaintiff and Guy Sutton that Plaintiff claims occurred on April 27, 2000. Defendants dispute the authenticity of the letter, arguing that there is no foundation that the letter was actually mailed or received by anyone.

Authentication of letters, as with other documents, requires a showing that there is a "reasonable likelihood" that the letter is what its proponent claims. A letter need not be signed nor proven to be in Plaintiff's handwriting to be authenticated, *see United States v. Thompson, 449 F.3d 267, 274 (1st Cir.2006),* however, there must be some indicia of authorship and/or authenticity. *See United States v. Bagaric, 706 F.2d 42, 67 (2d Cir.1983)* (authentication may be established entirely with circumstantial evidence, including " 'appearance, contents, substance ... and other distinctive characteristics' of the writing") (quoting Fed.R.Evid. 901(b)(4)). In *Bazak Int'l Corp.,* the Southern District of New York held that a letter was authenticated and admissible where the alleged letter writer and his assistant both attested the letter was handwritten by the alleged letter writer and subsequently typed on the computer and mailed by his assistant. 378 F.Supp.2d at 392 (noting that "[w]hether the alleged facts are credible in light of [any] evidence to the contrary is a question for the jury and inappropriate to determine on summary judgment").

Although Plaintiff, as the purported author of the letter, qualifies as a "witness with knowledge," she did not specifically reference the letter in her affidavit. Moreover, she does not state whether the letter was actually mailed and does not include a postmarked envelope or any other relevant evidence. Plaintiff also did not attest to the date on which the letter was written. Although the date typed in the upper left-hand corner of the letter is April 29, 2000,

there is no evidence to show that the letter was actually written and/or mailed on or around that date. Finally, as Defendants point out, the contents of the letter contradict Plaintiff's prior deposition testimony and her Local Rule 56(a)2 Statement, in which she attributed insulting statements to James Sutton, rather than Guy Sutton. Because of the numerous questions surrounding the authenticity of the letter, the Court finds that Plaintiff has not met her burden of authenticating the letter and establishing its credibility as required by Federal Rule of Evidence 901(a). Accordingly, Exhibit C will be stricken from the summary judgment record.

*b. Exhibit D*

**\*4** Attached as Plaintiff's Exhibit D are copies of Norwalk Superior Court records. Defendants argue that these records are inadmissible because they are incomplete, unauthenticated and contain hearsay. In order to authenticate public records, Plaintiff must produce "[e]vidence that a writing authorized by law to be recorded or filed and in fact recorded or filed in a public office, or a purported public record ... is from the public office where items of this nature are kept." Fed.R.Evid. 901(b)(7). Federal Rule of Evidence 902 provides that certain types of documents are self-authenticating, such that they do not require extrinsic evidence for authentication. *See* Fed.R.Evid. 902. A domestic public record is self-authenticating if it is submitted under seal or if it is a certified copy. Fed.R.Evid. 902(1), (4). If, as here, a public record does not fall into one of these two categories, it must comply with the requirements of Rule 901(b)(7), as set forth above. Because Plaintiff has presented no evidence that the records contained in Exhibit D are "from the public office where items of this nature are kept," they are not properly authenticated. As such, Exhibit D will be stricken from the summary judgment record.

*c. Exhibit E*

Included in Plaintiff's Exhibit E are copies of various letters purported to be written by Plaintiff to Defendants requesting that repairs be made. Defendants again argue that these documents are inadmissible because there is no foundation that the letters were mailed to or received by Defendants, and because they are unauthenticated, self-serving hearsay. The letters were purportedly written over a long period of time, dated September 10, 2003 through April 29, 2006. As with the letter contained in Exhibit C, these letters are type-written and unsigned. Plaintiff also did not specifically reference

Slip Copy, 2007 WL 1346913 (D.Conn.), 73 Fed. R. Evid. Serv. 536, 34 NDLR P 248
**(Cite as: 2007 WL 1346913 (D.Conn.))**

these letters in her affidavit and fails to state whether the letters were actually mailed. Moreover, there is no outward indicia of authenticity, as the exhibit does not, for example include a postmarked envelope or any other relevant evidence indicating that the letters were mailed by Plaintiff or received by Defendants. For the same reasons as set forth with regard to Exhibit C, the Court finds that Plaintiff has not met her burden of authenticating the letters and establishing their credibility as required by Federal Rule of Evidence 901(a), and therefore strikes the letters from the summary judgment record.

Exhibit E also contains a letter from a physician addressed to the State of Connecticut Disability Determination Services dated February 28, 2003. Again, Defendants argue that Plaintiff has failed to provide a sufficient foundation for the authenticity and admissibility of this document at trial. Plaintiff failed to provide an affidavit from the physician attesting to the letter's authenticity or any other evidence of authenticity. Accordingly, this letter will be stricken from the record.

**B. Plaintiff's Local Rule 56(a)2 Statement**

**\*5** A party opposing a motion for summary judgment in the District of Connecticut must file a Local Rule 56(a)2 Statement in response to the material facts set forth in the movant's Local Rule 56(a)1 Statement. Each denial in the opponent's Local Rule 56(a)2 Statement must be followed by a specific citation to: "(1) the affidavit of a witness competent to testify as to the facts at trial and/or (2) evidence that would be admissible at trial." D. Conn. L. Civ. R. 56(a)3. Defendants point out that Plaintiff repeatedly fails, in her Local Rule 56(a)2 Statement, to give "specific citations to evidence in the record" as required by Local Rule 56(a)3. *See* D. Conn. L. Civ. R. 56(a)3. When a party fails to appropriately deny material facts set forth in the movant's Local Rule 56(a)1 statement, those facts are deemed admitted. *See Amnesty Am. v. Town of W. Hartford, 288 F.3d 467, 470 (2d Cir.2002)* ("Fed.R.Civ.P. 56 does not impose an obligation on a district court to perform an independent review of the record to find proof of a factual dispute."); *SEC v. Global Telecom Servs. L.L.C.,* 325 F.Supp.2d 94, 109 (D.Conn.2004) (same); *Root v. Liston,* 363 F.Supp.2d 190, 191 n. 1 (D.Conn.2005); *Martin v. Town of Westport,* 329 F.Supp.2d 318, 323 n. 1 (D.Conn.2004). Moreover, as this Court recognized in *SEC v. Global Telecom Services L.L.C.,* the "failure to provide specific citations to the record ... may result in sanctions, including ... an order granting the motion" for

summary judgment." 325 F.Supp.2d 94, 108-109 (D.Conn.2004) (quoting D. Conn. L. Civ. R. 56(a)3).

In paragraphs 7, 8, 14, 21, 25, 26, 27 and 31, Plaintiff denies Defendants' assertions, but does not provide a specific citation to the record. [FN3] Because these denials fail to meet the requirements of Local Rule 56(a)2, the facts set forth in Defendants' Local Rule 56(a)(1) Statement at paragraphs 7, 8, 14, 21, 25, 26, 27 and 31 are deemed admitted.

> FN3. Plaintiff either provides no citation at all or cites generally to "plaintiff's affidavit."

**II. MOTION FOR SUMMARY JUDGMENT**

**A. Background**

Plaintiff is a residential tenant who occupies a one-bedroom apartment, Apartment Number 3-S, in a building located at 1068 North Street in Greenwich, Connecticut. Plaintiff has lived in this apartment with her sixteen-year-old son since 1999. The building located at 1068 North Street is a three-story building with two small stores on the first floor, two apartments on the second floor and two apartments on the third floor. Defendant Stanford Sutton is the owner of and landlord for the building and the apartment in question. Defendant James Sutton, Stanford Sutton's son, is the property manager and leasing agent for the property. Former defendant Guy Sutton, also Stanford Sutton's son, is an attorney who provides legal services to his father. [FN4] In October 2003, Plaintiff was granted Section 8 housing choice vouchers by the United States Department of Housing and Urban Development ("HUD"). [FN5]

> FN4. Plaintiff dismissed Guy Sutton from this lawsuit with prejudice on September 27, 2006.

> FN5. The Section 8 Program is designed "for the purpose of aiding low-income families in obtaining a decent place to live and of promoting economically mixed housing." 42 U.S.C. § 1437f(a). Participants in the Section 8 program receive vouchers from the local Housing Authority, which they may use to rent a unit on the private housing market. The program provides that the tenant will pay approximately thirty-percent of her income toward the monthly rent, with the Housing Authority paying the remainder of the monthly rent directly to the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                    Page 5
Slip Copy, 2007 WL 1346913 (D.Conn.), 73 Fed. R. Evid. Serv. 536, 34 NDLR P 248
**(Cite as: 2007 WL 1346913 (D.Conn.))**

landlord. *See* *Salute v. Stratford Greens Garden Apartments,* 136 F.3d 293, 296 (2d Cir.1998)*; see generally* 42 U.S.C. § 1437f.

Throughout Plaintiff's tenancy, Defendant Stanford Sutton owned a number of residential properties in Greenwich. A number of the tenants occupying these properties were persons of Hispanic ancestry . [FN6] Also during Plaintiff's tenancy, Stanford Sutton leased an apartment to at least one other single Hispanic woman receiving Section 8 assistance. [FN7]

> FN6. Specifically, Defendants name the following tenants: Omar Romero, Oswald Travasso, Hector Romano, Frank Rivera, Laura Solis, Jose Forlese and Emma Norvat. (*See* Defs.' Local Rule 56(a)(1) Statement ¶ 3 (citing James Sutton Decl. ¶ 7, Dec. 13, 2006, Defs.'s App. 1; Exs. A & B to James Sutton Decl.).)

> FN7. Defendants identify this tenant as Ann M. Didio, residing at 415 East Putnam Avenue, Apartment Number 2, Greenwich, Connecticut.

**\*6** According to Plaintiff, there are no other tenants with children in Defendants' building at 1068 North Street. (Lachira Aff. ¶ 5.) She contends that Defendants told her that "it has been a mistake to rent to you with a child ... for ... two years," and that they had been telling her, since 1999, that they did not want her child in the building (*Id.* ¶ ¶ 5, 10.) Plaintiff's affidavit details a contentious relationship between her and Defendants. Notably, she contends that Defendants "screamed cursed and insulted [her,] including saying 'move you stupid Spanish people,' " and screamed and cursed at her child, telling him that he and Plaintiff were "stupid Spanish people" and that there were no children allowed in the building. (*Id.* ¶ ¶ 7, 12.) James Sutton denies making these statements. (James Sutton Decl. ¶ 25.) She claims that Defendants have entered her apartment "without notice," and have looked through her child's room and his desk. (Lachira Aff. ¶ 13.) A police report dated April 27, 2000 indicates that the police were dispatched to 1068 North Street on that date for a "landlord tenant disagreement about having son in apartment." (Police Report, Apr. 27, 2000, Pl.'s Ex. C.) Plaintiff claims that Defendants refused to perform repairs in the building, despite her requests to do so, and even after the Health Department and Building Department were contacted. (Lachira Aff. ¶ ¶ 9, 14.) According to Plaintiff, as her disability worsened, she needed railings installed on the stairway in the building. (*Id.* ¶ 22 .) She requested that Defendants install the railings in 2003 and 2004, with no results. (*Id.*) Plaintiff admitted in her deposition, however, that Defendants fulfilled her reasonable accommodation request for the installation of a second railing at 1068 North Street in 2005. (Lachira Dep. 117:5-7, Aug. 10, 2006, Defs.' App. 3.)

Plaintiff claims that when she was granted Section 8 assistance in October 2003, Defendants refused to sign the application until they were forced to do so by HUD. (Lachira Aff. ¶ 23.) She claims that Defendants refused to do the necessary repairs for HUD inspections and that she had to paint the bathroom and put caulking in the bath tap while she was ill in order to ensure that the apartment passed an inspection. (*Id.* ¶ ¶ 24-25.)

According to Defendants, Plaintiff approached James Sutton in early 2004 and asked if the landlord, Stanford Sutton, would be willing to rent Plaintiff a second one-bedroom apartment on the same floor in addition to her current apartment. She wanted to combine the two apartments, giving her two bedrooms and additional space. [FN8] James Sutton signed a Request for Tenancy Approval ("RFTA") which was submitted to the Housing Authority of the Town of Greenwich. The RFTA was denied pursuant to HUD guidelines for the Section 8 program, which require that the Total Tenant Obligation for the tenant's portion of the rent and utilities not exceed forty percent of her adjusted gross income and initial lease up. (*See* Muldoon Decl. ¶ ¶ 4-5, Mar. 2, 2007, Ex. A to Defs.' Reply. [FN9]) The proposed monthly rental payment in the RFTA for the combined apartment unit was far in excess of that payment standard. (*Id.* ¶ 5.) As a result, Plaintiff's RFTA was denied. (*Id.* ¶ 6.) After learning of the RFTA denial, James Sutton offered Plaintiff the opportunity to move with her son to a two-bedroom apartment at 418 Putnam Avenue, which Plaintiff would be able to afford under existing Section 8 guidelines. Plaintiff refused the offer.

> FN8. Plaintiff claims that combining the two apartments was Defendants' idea and that they told her the rent for the two apartments would be the same amount as she had been paying for one apartment. (Lachira Aff. ¶ 27.) She claims that this was part of their "scheme" to move her to another building. (*Id.* ¶ 28.)

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                          Page 6
Slip Copy, 2007 WL 1346913 (D.Conn.), 73 Fed. R. Evid. Serv. 536, 34 NDLR P 248
(Cite as: 2007 WL 1346913 (D.Conn.))

FN9. Patricia Muldoon is the Section 8 Coordinator for the Housing Authority of the Town of Greenwich. (Muldoon Decl. ¶ 3.) She has had direct dealings with both Plaintiff and James Sutton in connection with Plaintiff's Section 8 tenancy, and was responsible for reviewing Plaintiff's RFTA.

**\*7** Subsequently, Plaintiff began badgering James Sutton with unjustified complaints about the building and called him repeatedly on the phone asking him to lower the rent for the other one-bedroom apartment at 1068 North Street. Because of this behavior, Stanford Sutton refused to renew Plaintiff's one-year lease when it expired in October 2004. On July 27, 2004, Stanford Sutton sent Plaintiff a letter confirming that he was electing not to renew Plaintiff's Section 8 lease and that he would be notifying the Housing Authority of the Town of Greenwich of that decision.

Plaintiff contends that in May 2004, Defendants locked her out of the basement where the washer and dryer for the building, as well as some of her "personal property," are located. (Lachira Aff. ¶ ¶ 31-32.) She claims that Defendants took some of her property and left it outside the building. (*Id.* ¶ 33.) Plaintiff further contends that she was denied water for twenty-eight days, and received only five to seven gallons of water during this time. (*Id.* ¶ 34.) In an October 28, 2004 Housing Court proceeding between Plaintiff and Defendants, it was revealed that the washer and dryer had been broken, but that Plaintiff had refused to stop using it while Defendants were waiting to have the repairs finished, forcing them to close off the basement. (Housing Court Trans. 6:10-10:16, Oct. 28, 2004, Pl.'s Ex. K.) The parties agreed at the hearing that Defendants would reopen the basement if Plaintiff would not use the washer and dryer until the repairs had been completed. (*Id.*) It was also revealed that Plaintiff was not denied water for twenty-eight days, but that Defendants had asked the tenants not to drink the water because it was being tested for bacteria. (*Id.* at 11:20-12:11.) Defendants had supplied Plaintiff with seven gallons of water while the testing was proceeding, and the Housing Court ordered them to supply her with "all the water she needs ... for drinking." (*Id.* at 12:25-13:22.)

On September 3, 2004, Plaintiff was served with a notice to quit notifying her that she had to move out when her lease expired in October 2004. On October 5, 2004, after Plaintiff had failed to vacate the apartment, Defendants filed a summary process action against her in the Norwalk Housing Court.

Attorney Rick Brody, from Connecticut Legal Services, appeared on Plaintiff's behalf on October 15, 2004 and has represented Plaintiff in the summary process proceedings up to the present time.

On December 21, 2004, Plaintiff filed a *pro se* discrimination complaint with the Connecticut Commission on Human Rights and Opportunities ("CHRO"). The complaint alleged discrimination based on Plaintiff's ancestry (Hispanic), her national origin (Peruvian), her lawful source of income (Section 8) and included claims of misconduct identical to those claimed here. Plaintiff contends that on February 9, 2005, Defendants came to her apartment and were angry and demanded to know why she had submitted a complaint to the Greenwich Health Department and Building Department. (Lachira Aff. ¶ 43.) She claims that Defendants "kicked [her] plants outside of [her] home," causing her to contact the police. (*Id.* ¶ ¶ 44-45.)

**\*8** On September 15, 2006, the CHRO issued its "Preliminary Draft of the Final Investigative Report," (the "CHRO Report"), which concluded that there was "no credible evidence to support [Plaintiff's] allegations that [Defendants] adversely treated her due to her protected classes." (CHRO Report 13, Sept. 15, 2006, Ex. E to James Sutton Decl.) With regard to Plaintiff, the CHRO found that she lacked credibility and that there was a "history of [her] being a problematic tenant." (*Id.* at 13-14.) Although Plaintiff did not formally raise a disability discrimination claim in her CHRO complaint, the CHRO Report also considered and disposed of any disability discrimination claim, finding that Defendants had installed railings leading to the third floor of the building, thereby complying with Plaintiff's request for reasonable accommodation. (*Id.* at 13.) Just before the fifteen-day comment period on the CHRO Report was to expire, Plaintiff withdrew her CHRO complaint in favor of filing a complaint in federal court. (James Sutton Decl. ¶ 15.)

The first eviction trial between the parties *("Sutton I")* went to trial on July 21, 2005 while the CHRO proceedings were pending. (James Sutton Decl. ¶ 16.) At trial, Plaintiff asserted various special defenses, including defenses of retaliatory eviction and discrimination, as well as a general defense based on the equitable doctrine against forfeitures. (*Id.;* Am. Ans. & Special Defense, Ex. F to James Sutton Decl.) The housing court in *Sutton I* found that the notice to quit served on Plaintiff by Defendants was valid, that Plaintiff's tenancy had expired and that Plaintiff's special defenses lacked merit. (*Sutton I*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2007 WL 1346913 (D.Conn.), 73 Fed. R. Evid. Serv. 536, 34 NDLR P 248
**(Cite as: 2007 WL 1346913 (D.Conn.))**

Trans. 9-10, July 21, 2005, Defs.' App. 4.) The housing court noted that Plaintiff did not act in good faith and that her testimony was "so exaggerated and so incredulous ... that [the court] can't give much of her testimony any credit at all." (*Id.* at 6, 10.) The court entered judgment for Plaintiff on equitable grounds, however, finding that if Plaintiff were evicted, she would lose her Section 8 status. (*Id.* at 10.)

Following the conclusion of *Sutton I,* Defendants reinstated Plaintiff as a month-to-month tenant in accordance with her prior Section 8 lease. Defendants received additional complaints from tenants in the building with regard to Plaintiff after she was reinstated. Two tenants, Fiaz Arain and Tertulien Thomas, eventually sent letters to James Sutton in which they memorialized their complaints and threatened to move out if the situation was not addressed. (Arain Letter, Sept. 8, 2005, Ex. G to James Sutton Decl . [FN10]; Thomas Letter, Nov. 28, 2005, Ex. H to James Sutton Decl. [FN11])

> FN10. In his letter to James Sutton, Mr. Arain writes that he has "decided to vacate ... apartment # 2S by the end of the month," despite his initial plan to stay there long-term, due to the fact that Plaintiff "ha[d] been constantly bothering [him]." (Arain Letter.) Mr. Arain goes on to list examples of Plaintiff's conduct which prompted the letter. (*See id.*)

> FN11. In his letter to James Sutton, Mr. Thomas writes that "ever since [he] moved in the tenants upstairs have been extremely annoying." (Thomas Letter.) He lists examples of their behavior and concludes by saying that he "need[s][his] peace" and if Plaintiff's behavior continues, he "will have to move out because [he] just can't take it anymore." (*Id.*)

On October 31, 2005, Defendants provided Plaintiff with sixty-days advance notice that her Section 8 lease would not be renewed beyond the month-to-month tern expiring December 31, 2005, and advised Plaintiff that her misconduct constituted a nuisance as well as material non-compliance with the lease. (Termination Letter, Oct. 31, 2005, Ex. I to James Sutton Decl.) On December 6, 2005, Defendants served Plaintiff with another notice to quit and commenced a second eviction action against her on January 30, 2006 *("Sutton II").* Plaintiff contested Defendants' allegations and alleged special defenses

based on equity and res judicata. *Sutton II* went to trial on May 4 and May 11, 2006.

 **\*9** Plaintiff contends that on December 19, 2005, Defendant James Sutton and Defendants' handyman, Graham Leavey, came to her apartment to do repairs and as she was closing the door, James Sutton ran into the apartment, apparently hurting her "hand, arm and body" in the process. (Lachira Aff. ¶ 38.) She claims that Defendant took pictures and attempted to enter her bedroom. The police were called, and the report indicates that Plaintiff's "chief complaint was that [James] Sutton was not invited into her apartment and that her left arm and chest hurts. She also felt violated when [James] Sutton brushed into her," however, she did not want to go to the hospital when asked by the police. (Police Report, Dec. 19, 2005, Pl.'s Ex. U.) The police examined Plaintiff's left arm and found "no sign of redness, swelling, contusions, crepitus or deformity to any portion of her arm or wrist." (*Id.*) Plaintiff told the police that James Sutton had not grabbed her. The police talked with James Sutton and Leavey separately, at which point James Sutton told the police about the incident, which apparently started when Plaintiff asked James Sutton to take off his shoes before entering the apartment. James Sutton told the police that when he was in the apartment, Plaintiff threatened him by saying, "I know you have a wife and an 18 month old baby, be careful of the consequences." (*Id.*) James Sutton stated that he was becoming "increasingly alarmed at that comment and began to fear for his family's safety." (*Id.*) After finishing their investigation, the police "were unable to substantiate the injury complaints with physical evidence or observations made by the witness," and noted that "[t]he contact made between [James] Sutton and [Plaintiff] could not have been avoided in such a confined space." (*Id.*)

 During trial in *Sutton II,* Defendants presented testimony from two tenants-- Mr. Arain and Mr. Thomas--who gave testimony regarding Plaintiff's behavior which was similar to the allegations set forth in their letters. (*Sutton II* Trans. 17-50, May 11, 2006, Defs.' App. 5.) Defendants' handyman, Graham Leavey, testified that during the December 19, 2005 incident, detailed above, he heard Plaintiff tell James Sutton, "you have a wife and an eighteen month old daughter and they will have to pay the consequence." (*Id.* at 52.) Before the trial concluded, the parties entered into an agreement settling the matter.

 Plaintiff continues to occupy Apartment Number 3-S pursuant to the Stipulated Agreement between

Plaintiff and Stanford Sutton entered in *Sutton II.* The Norwalk Housing Court entered judgment in accordance with the Agreement on May 11, 2006. The Agreement provides for a judgment of possession in favor of Stanford Sutton, with a final stay of execution through June 30, 2007. (*See* Stip. Agr., Ex. K to James Sutton Decl.) Plaintiff was assisted by counsel in negotiating and entering into the Stipulated Agreement. The housing court judge canvassed Plaintiff on the Agreement before entering judgment, during which Plaintiff acknowledged that it was a "fair agreement," and that no one forced her to sign it. (*Sutton II* Trans. 88:3-19, May 11, 2006, Defs.' App. 5.)

**\*10** Plaintiff admitted in her deposition that she "didn't know" whether certain allegations in her Amended Complaint were accurate and truthful, including allegations that (1) James Sutton asked her to relocate to another building, (Am.Compl.¶ 16); (2) Plaintiff declined the request to move because the rooms were too small, (*id* . ¶ 17); and (3) James Sutton informed Plaintiff that she and her child would be moved and "put on the streets," (id.¶ 18). (*See* Lachira Dep. 174-78.) Plaintiff also admitted that she does not know whether she sustained any damages or actual harm as a result of Defendants' alleged misconduct. (*See id.* at 187:5-17.)

Plaintiff has filed, *pro se,* three new civil actions in the Connecticut Superior Court against James Sutton, Sutton Real Estate Services, Stanford Sutton, Guy Sutton, the Sutton's handyman, Graham Leavey, the Town of Greenwich and the Connecticut Department of Public Health. The complaints in the first two cases are dated September 26, 2006 and October 20, 2006. (*See* Exs. L & M to James Sutton Decl.) After Defendants filed their summary judgment motion with this Court, Plaintiff filed her third *pro se* suit against Defendants in state court *("Sutton II").* This new suit also named as defendants Attorney Frederick Brody (Plaintiff's attorney in the housing court proceedings), Statewide Legal Services and Connecticut Legal Services (Attorney Brody's affiliated legal organizations), defense counsel Robert Frost, and the law firm of Zeldes, Needle & Cooper, P.C. (the law firm that represented the Suttons in the housing court proceedings). In that suit, Plaintiff claims, *inter alia,* that Defendants, their lawyer and her lawyer made "calculated misrepresentations" and tricked Plaintiff into signing the May 11, 2006 Stipulated Agreement that mandates her eviction on June 30, 2007. (*See* Guy Sutton Decl. ¶ 13; *Sutton III* Compl., Ex. D to Guy Sutton Decl.)

## B. Standard of Review

Summary judgment is appropriate only when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). No genuine issue of material fact exists and summary judgment is therefore appropriate when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). A material fact is one which "might affect the outcome of the suit under the governing law" and an issue is genuine when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Importantly, however, "[c]onclusory allegations will not suffice to create a genuine issue." *Delaware & H.R. Co. v. Conrail,* 902 F.2d 174, 178 (2d Cir.1990).

**\*11** The moving party bears the burden of establishing that summary judgment is appropriate. *Anderson,* 477 U.S. at 255. When moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant can satisfy its burden of establishing that there is no genuine issue of material fact in dispute by pointing to an absence of evidence to support an essential element of the non-moving party's claim. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "A defendant need not prove a negative when it moves for summary judgment on an issue that the plaintiff must prove at trial. It need only point to an absence of proof on the plaintiff's part, and, at that point, plaintiff must 'designate specific facts showing that there is a genuine issue for trial.' " *Parker v. Sony Pictures Entm't, Inc.,* 260 F.3d 100, 111 (2d Cir.2001) (quoting *Celotex,* 477 U.S. at 324); *see also Gallo v. Prudential Residential Servs. Ltd. P'ship,* 22 F.3d 1219, 1223-24 (2d Cir.1994) ("The moving party may obtain summary judgment by showing that little or no evidence may be found in support of the nonmoving party's case." The nonmoving party, in order to defeat summary judgment, must then come forward with "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson,* 477 U.S. at 249. In making this determination, the court draws "all factual inferences in favor of the party against whom summary

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

judgment is sought, viewing the factual assertions in materials such as affidavits, exhibits, and depositions in the light most favorable to the party opposing the motion." *Rodriguez v. City of N.Y.,* 72 F.3d 1051, 1060 (2d Cir.1995) (citations omitted). A party opposing summary judgment, however, "may not rest upon the mere allegations or denials of the adverse party's pleading." Fed.R.Civ.P. 56(e).

Determinations of the weight to accord evidence or assessments of the credibility of witnesses are improper on a motion for summary judgment as such are within the sole province of the jury. *Hayes v. N.Y. City Dep't of Corr.,* 84 F.3d 614, 619 (2d Cir.1996). "If reasonable minds could differ as to the import of the evidence ... and if ... there is any evidence in the record from any source from which a reasonable inference in the nonmoving party's favor may be drawn, the moving party simply cannot obtain a summary judgment." *R.B. Ventures, Ltd. v. Shane,* 112 F.3d 54, 59 (2d Cir.1997) (internal citations omitted); *see also Sologub v. City of New York,* 202 F.3d 175, 178 (2d Cir.2000) ("When reasonable persons applying the proper legal standards could differ in their responses to the questions raised on the basis of the evidence presented, the question is best left to the jury.").

**C. Discussion**

Plaintiff alleges that Defendants discriminated against her based on "race, ethnic origin, disability and familial status," citing three statutory provisions: 42 U.S.C. § § 3604(f)(1), 3617 and 3604(f)(3)(B). (Am.Compl.¶ 1.) Defendants deny discriminating against Plaintiff due to her national origin, ancestry, source of income, alleged disability or any other prohibited basis in the terms and conditions of her rental or by seeking to evict her. (James Sutton Decl. ¶ ¶ 9-10; Stanford Sutton Decl. ¶ ¶ 5-6, Dec. 13, 2006, App. 2.)

*1. Judicial Estoppel*

**\*12** Defendants first argue that Plaintiff's claims are barred by judicial estoppel. Under the doctrine of judicial estoppel, "[w]here a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him." *New Hampshire v. Maine,* 532 U.S. 742, 749, 121 S.Ct. 1808, 149 L.Ed.2d 968 (2001) (quotation marks and citation omitted); *see*

*also* 18 Moore's Federal Practice § 134.30 (3d ed. 2000) ("The doctrine of judicial estoppel prevents a party from asserting a claim in a legal proceeding that is inconsistent with a claim taken by that party in a previous proceeding"); 18 Charles A. Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 4477 (2d ed. 1981) ("Absent any good explanation, a party should not be allowed to gain an advantage by litigation on one theory, and then seek an inconsistent advantage by pursuing an incompatible theory."). The Supreme Court noted that the purpose of judicial estoppel is "to protect the integrity of the judicial process" by "prohibiting parties from deliberately changing positions according to the exigencies of the moment." *New Hampshire v. Maine,* 532 U.S. at 749-50 (citations omitted); *see also Bates v. Long Island R.R. Co.,* 997 F.2d 1028, 1037 (2d Cir.) ("judicial estoppel protects the sanctity of the oath and the integrity of the judicial process"), *cert. denied,* 510 U.S. 992, 114 S.Ct. 550, 126 L.Ed.2d 452 (1993); *Scarano v. Central R.R. Co.,* 203 F.2d 510, 512-513 (3d Cir.1953) (judicial estoppel prevents parties from "playing 'fast and loose with the courts' ") (citation omitted).

Although there is no concrete formula for determining when judicial estoppel applies, factors to consider include: (1) whether a party's later position is "clearly inconsistent" with an earlier position; (2) "whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled;" and (3) "whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." *New Hampshire v. Maine,* 532 U.S. at 750-51 (internal quotations and citations omitted). The factors set forth by the Supreme Court are not exclusive; additional considerations may inform the doctrine's application in specific factual contexts.

Defendants argue that Plaintiff's current position, i.e., arguing that Defendants discriminated against her based on race, ethnicity, disability, source of income and familial status in pursuing eviction proceedings, is inconsistent with the position she took before the Housing Court to obtain the May 11, 2006 Stipulated Agreement. The Stipulated Agreement provides for a stay of execution through June 30, 2007. Plaintiff was canvassed on this agreement by the Housing Court and stated that she

Slip Copy                                                                                                    Page 10
Slip Copy, 2007 WL 1346913 (D.Conn.), 73 Fed. R. Evid. Serv. 536, 34 NDLR P 248
**(Cite as: 2007 WL 1346913 (D.Conn.))**

understood the agreement, accepted its terms, and agreed that it was fair. *(Sutton II* Trans. 88:3-19.) Plaintiff also requested, however, that the Court add a provision ordering James Sutton not to go near her son. *(Id.* at 88:20-26.) [FN12]

> FN12. The Court rejected this request. (*See Sutton II* Trans. 88-92.)

**\*13** Contrary to what Defendants argue, Plaintiff did not agree that her eviction was fair, but only that the parties' settlement agreement was fair. The agreement, as far as this Court is aware, did not speak to the issue of discrimination. Therefore, the position Plaintiff took at the conclusion of *Sutton II* does not estop Plaintiff from arguing here that Defendants discriminated against her during her tenancy. *See Simon v. Safelite Glass Corp.,* 128 F.3d 68, 72-73 (2d Cir.1997) ("There must be a true inconsistency between the statements in the two proceedings. If the statements can be reconciled there is no occasion to apply an estoppel."). Moreover, it has not been shown that the Housing Court adopted Plaintiff's earlier position. *See Mulvaney Mechanical, Inc. v. Sheet Metal Workers,* 288 F.3d 491, 504-05 (2d Cir.2002) ("Judicial estoppel is inappropriate without a showing that the prior tribunal adopted the original representations."). Although the Housing Court approved the Stipulated Agreement, it made no findings with regard to the merits of either party's arguments. Accordingly, it cannot be said that Defendants have proved judicial estoppel such that this Court should find that Plaintiff is estopped from arguing that Defendants discriminated against her in violation of the FHA.

### 2. *Collateral Estoppel*

Defendants also argue that state law principles of collateral estoppel bar Plaintiff from relitigating the issue of Defendants' motives in bringing the eviction proceedings. Under the doctrine of collateral estoppel, or issue preclusion, parties or their privies are prevented from "relitigating in a subsequent action an issue of fact or law that was fully and fairly litigated in a prior proceeding." *Marvel Characters, Inc. v. Simon,* 310 F.3d 280, 288 (2d Cir.2002); *see also Cumberland Farms, Inc. v. Groton,* 262 Conn. 45, 58 n. 17, 808 A.2d 1107 (2002) (holding that the doctrine of collateral estoppel "precludes a party from relitigating issues and facts actually and necessarily determined in an earlier proceeding between the same parties or those in privity with them upon a different claim") (citation omitted). Collateral estoppel applies, and an issue cannot be relitigated, when: "(1) the

identical issue was raised in a previous proceeding; (2) the issue was actually litigated and decided in the previous proceeding; (3) the party had a full and fair opportunity to litigate the issue; and (4) the resolution was necessary to support a valid and final judgment on the merits." *Marvel Characters,* 310 F.3d at 288-89 (quoting *Boguslavsky v. Kaplan,* 159 F.3d 715, 720 (2d Cir.1998)); *accord Delahunty v. Mass. Mut. Life Ins. Co.,* 236 Conn. 582, 600, 674 A.2d 1290 (1996). The Connecticut Supreme Court has elaborated on this test, explaining:

> 'An issue is actually litigated if it is properly raised in the pleadings or otherwise, submitted for determination, and in fact determined.... An issue is necessarily determined if, in the absence of a determination of the issue, the judgment could not have been validly rendered. If an issue has been determined, but the judgment is not dependent upon the determination of the issue, the parties may relitigate the issue in a subsequent action. Findings on nonessential issues usually have the characteristics of dicta.' ... To assert successfully the doctrine of issue preclusion, therefore, a party must establish that the issue sought to be foreclosed actually was litigated and determined in the prior action between the parties or their privies, and that the determination was essential to the decision in the prior case.

**\*14** *Delahunty,* 236 Conn. at 600-01 (quoting *Jackson v. R.G. Whipple, Inc.,* 225 Conn. 705, 714-15, 627 A.2d 374 (1993)) (internal citations omitted).

In *Sutton I,* Plaintiff's Second and Third Special Defenses stated:

> On or about July 30, 2004 and several occasions prior thereto, [defendant Stanford Sutton] and/or his agent or attorney discriminated against the defendant in the terms, conditions or privileges of rental of a dwelling or in the provision of services in connection therewith by reason of the defendant's national origin, ancestry, source of income and/or familial status.

(Am. Ans. & Special Defense, Second Special Defense ¶ 1, Third Special Defense ¶ 1, Ex. F to James Sutton Decl.) After hearing testimony regarding this allegation and Plaintiff's claim that Defendants retaliated against her for complaining to local agencies, the Housing Court stated:

> I've got a real problem. I don't think [Plaintiff is] acting in good faith.... I've heard her testimony. I don't think she's acted in good faith whatsoever with respect to the complaints. She didn't find a new place to move to. She remains in there. I've heard no evidence that in fact, the place was as bad as she said it was .... the only valid hinge that you

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2007 WL 1346913 (D.Conn.), 73 Fed. R. Evid. Serv. 536, 34 NDLR P 248
**(Cite as: 2007 WL 1346913 (D.Conn.))**

have is with respect to the equitable defenses.
(*Sutton I* Trans. 6:20-7:3.) The Housing Court later ruled from the bench, finding:

> I think that there's no good faith exhibited by [Plaintiff] with respect to the complaints that she made.... There's been no evidence satisfactory to the Court. I think her testimony is so exaggerated and so incredulous to the Court that I can't give much of her testimony any credit at all.

(*Id.* at 10:6-18.) Despite these findings, the Housing Court found that Plaintiff was entitled to judgment based on the equities. [FN13] (*See id.* at 10:18-23.)

> FN13. The Housing Court stated: "The problem is with respect to the equities. [Plaintiff] has a section 8. If she loses this section 8, she'll lose the apartment; she'll lose the section 8. And it's on that base alone that I'm going to issue judgment in favor of [Plaintiff] on that count alone." (*Sutton I* Trans. 10:18-23.)

In this case, Plaintiff brings claims of discrimination under the FHA. Contrary to Defendants' assertions, it does not appear that "the identical issue was raised" in the Housing Court proceeding, that "the issue was actually litigated and decided" in the Housing Court proceeding, that Plaintiff had "a full and fair opportunity to litigate the issue" or that "the resolution of the issue was necessary to support a valid and final judgment on the merits." *Marvel Characters,* 310 F.3d at 288-89. The Housing Court found, based on the equities, that Plaintiff was entitled to judgment. Its statements with regard to Plaintiff's good faith, credibility and complaints were not necessary to the judgment, and therefore are more akin to dicta. *See Delahunty,* 236 Conn. at 600 ("Findings on nonessential issues usually have the characteristics of dicta."). Accordingly, *Sutton I* does not collaterally estop Plaintiff from litigating her claims in the instant action.

Defendants also argue that the issue of Defendants' discriminatory motives was "necessarily determined" by agreement of the parties and the Housing Court in connection with the parties' Stipulated Agreement and the entry of judgment in *Sutton II.* Although "[i]t is clear that a dismissal, with prejudice, arising out of a settlement agreement operates as a final judgment for res judicata purposes," *Marvel Characters,* 310 F.3d at 287, this Court still has to evaluate whether the other factors set forth in *Marvel Characters* support a finding of collateral estoppel.

**\*15** In *Sutton II,* Plaintiff did not raise discrimination

as a special defense, but instead argued that she was entitled to judgment based on equity and the doctrine of res judicata, in light of the judgment reached in *Sutton I.* After two days of evidence, the parties entered into a Stipulated Agreement providing for judgment of possession in favor of Stanford Sutton with a stay of execution until June 30, 2007. The Housing Court entered judgment in accordance with the Stipulated Agreement. Defendants argue, based on the entry of judgment, that the Housing Court judge necessarily determined that the Stipulated Agreement and anticipated eviction were lawful. This finding does not preclude Plaintiff from now arguing that Defendants' discriminated against her pursuant to the FHA or that they subjected her to intentional infliction of emotional distress. Plaintiff seeks injunctive relief requiring Defendants to cease any harassment, compensatory and punitive damages, and attorneys' fees and costs. She does not seek to disturb the agreement reached in *Sutton II, i.e.,* that Stanford Sutton is entitled to possession of the apartment after June 30,2007 . [FN14] Accordingly, the doctrine of collateral estoppel does not apply. *See Carnese v. Middleton,* 27 Conn.App. 530, 535, 608 A.2d 700 (1992) ("Because this action is a claim for damages arising out of the relation of landlord and tenant that had to be and was pursued separately from the landlord's claim for possession, the doctrine of res judicata has no application.").

> FN14. Although Plaintiff does not seek, in this action, to disturb the Stipulated Agreement, she has filed a separate state court action claiming that Defendants, her lawyer and their lawyer, among others, made misrepresentations and deceived her in order to induce her to sign the Stipulated Agreement. (*See Sutton II* Compl., Ex. D to Guy Sutton Decl.) Defendants question Plaintiff's motive in filing this state court action, however, it does complicate the issues of judicial and collateral estoppel. *See Hunnicutt v. Armstrong,* 305 F.Supp.2d 175, 182 (D.Conn.2004) (relying in part on the fact that the plaintiff "has not moved to vacate the settlement" in holding that the plaintiff's claims were barred by collateral estoppel based on a prior settlement agreement).

*3. Discrimination Claims*

Plaintiff claims that Defendants discriminated against her on the basis of her race, disability and familial status, in violation of Title VIII of the Civil

Rights Act of 1968, also known as the Fair Housing Act ("FHA"), as amended by the Fair Housing Amendments Act of 1988, 42 U.S.C. § 3601 *et seq.* ("FHAA"). [FN15] The FHA forbids discrimination in housing on the basis of race, color, religion, sex, familial status, or national origin and, most recently, handicap. *See* 42 U.S.C. § 3604.

> FN15. Plaintiff attempts to add, in her opposition brief, a claim that Defendants discriminated against her based on her "source of income." (*See* Pl.'s Mem. Opp. 8.) In addition to the fact that this addition is untimely and improperly raised, the claim fails as a matter of law. The FHA does not include "source of income" or Section 8 tenants in its list of protected classes. *See* 42 U.S.C. § 3604(b). Moreover, the Second Circuit has made clear that neither economic nor Section 8 status is a basis for a discrimination claim under the FHA. *See* *Salute v. Stratford Greens Garden Apts.,* 136 F.3d 293, 301 ("Economic discrimination--such as the refusal to accept Section 8 tenants--is not cognizable as a failure to make reasonable accommodations, in violation of § 3604(f)(3)(b)."). Because the proposed amendment is futile, it is rejected.

*a. Section 3604(f)*

Section 3604(f) makes it unlawful "[t]o discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap of ... that buyer or renter," or "[t]o discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a handicap of ... that person." 42 U.S.C. § 3604(f)(1)-(2). Discrimination prohibited by the FHA includes "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling." *Id.* § 3604(f)(3)(B).

Ordinarily, a landlord's "duty to make reasonable accommodations is framed by the nature of the particular handicap." *Salute v. Stratford Greens Garden Apts.,* 136 F.3d 293, 301 (2d Cir.1998). "A defendant must incur reasonable costs and take modest, affirmative steps to accommodate the handicapped as long as the accommodations sought do not pose an undue hardship or a substantial burden." *Tsombanidis v. W. Haven Fire Dep't,* 352 F.3d 565, 578 (2d Cir.2003); *see also* *United States v. California Mobile Home Park Mgmt. Co.,* 29 F.3d 1413, 1418 (9th Cir.1994) (whether a requested accommodation is required under the FHAA is a "highly fact-specific, requiring case-by-case determination").

**\*16** To make out a claim of disability discrimination based on her landlord's duty to reasonably accommodate, Plaintiff must show that: (1) she suffers from a handicap as defined by the FHA; (2) Defendants knew or reasonably should have known of Plaintiff's handicap; (3) accommodation of the handicap "may be necessary" to afford Plaintiff an equal opportunity to use and enjoy the dwelling; and (4) Defendants refused to make such accommodation. *Bentley v. Peace & Quiet Realty 2 LLC,* 367 F.Supp.2d 341 (E.D.N.Y.2005) (citing *United States v. California Mobile Home Park Mgmt. Co.,* 107 F.3d 1374, 1380 (9th Cir.1997)).

Plaintiff's § 3604(f) claim fails because she has failed to establish that she is handicapped. To be considered "handicapped" under the FHA, Plaintiff must show that: (1) she suffers from "a physical or mental impairment which substantially limits one or more of [her] major life activities"; (2) she has "a record of having such an impairment"; or (3) she is "regarded as having such an impairment." 42 U.S.C. § 3602(h). In the first category, an individual is considered disabled if he or she: (1) suffers from a physical or mental impairment that (2) affects a major life activity, and (3) the effect is "substantial." *See* *Bragdon v. Abbott,* 524 U.S. 624, 631, 141 L.Ed.2d 540, 118 S.Ct. 2196 (1998).

Plaintiff's Amended Complaint states only that she is "disabled." (Am.Compl.¶ ¶ 5, 11.) In her deposition, Plaintiff testified that she suffers from "nerve damage" or neuropathy, which she claims causes her pain that is strongest in her legs and arms but that "jumps" around, affecting different parts of her body. (Lachira Dep. 10-12.) Plaintiff has not, however, disclosed any expert to testify concerning this medical condition, nor has she proffered any evidence to show that this condition "substantially limits" her major life activities. *See* *Toyota Motor Mfg. v. Williams,* 534 U.S. 184, 198, 122 S.Ct. 681, 151 L.Ed.2d 615 (2002) ("It is insufficient for individuals attempting to prove disability status ... to merely submit evidence of a medical diagnosis of an impairment."). Plaintiff's opposition brief discusses her allegations with regard to Defendants' behavior,

but does not discuss her alleged disability. On the record before the Court, there is no evidence showing that Plaintiff suffers from a handicap as defined by the FHA. Accordingly, her disability discrimination claim, pursuant to § 3604(f), fails.

*b. Section 3617*

Plaintiff alleges that James Sutton made insulting statements to her and her son, refused to make requested repairs, and had a "scheme" to move her into a different building. Defendants do not dispute, for purposes of this motion, that the landlord, Stanford Sutton, can be held vicariously liable for James Sutton's conduct under agency principles. *See Cabrera v. Jakabovitz, 24 F.3d 372, 385 (2d Cir.1994).*

Plaintiff's claim arises under 42 U.S.C. § 3617, which makes it unlawful to

**\*17** coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by [42 U.S.C. § § 3603, 3604, 3605, or 3606].

42 U.S.C. § 3617. Section 3617 may be read as making any violation dependent on an underlying substantive violation of § § 3603 through 3606, however, courts within this circuit have held that § 3617 can, at times, serve as a separate basis for an FHA claim even where there is no predicate for liability under any of the statute's specifically referenced enumerated substantive provisions. *See Ohana v. 180 Prospect Place Realty Corp., 996 F.Supp. 238, 240-43 (E.D.N.Y.1998); Marks v. BLDG Mgmt. Co.,* No. 99 Civ. 5733(THK), 2002 U.S. Dist. LEXIS 7506, \*32-33 (S.D.N.Y. Apr. 26, 2002); *see also Taal v. Zwirner,* No. 02-131-M, 2004 U.S. Dist. LEXIS 4546, \*22 (D.N.H. Mar. 22, 2004) ("Although there is some disagreement among courts that have considered the point, this court will assume that the provisions of 42 U.S.C. § 3617 provide a separate and substantive basis upon which to base liability under the FHA."). [FN16]

FN16. The Second Circuit found, in *Frazier v. Rominger,* that "Section 3617 prohibits the interference with the exercise of Fair Housing rights only as enumerated in [§ § 3603, 3604, 3605 or 3606], which define the substantive violations of the Act." 27 F.3d 828, 834 (2d Cir.1994). At issue in *Frazier* was the discrete question of whether a landlord's refusal to rent, which would clearly be cognizable under § 3604(a), could serve, simultaneously, as a separate § 3617 claim because it would also constitute "interference" under § 3617. As the Second Circuit pointed out, "under this theory, every allegedly discriminatory denial of housing under § 3604(a) would also constitute a violation of § 3617 in that the denial 'interfered' with the prospective tenant's Fair Housing Act rights." *Id.* Consequently, the Court "declined to believe that Congress ever intended such a statutory overlap" and concluded "that the plaintiffs' sole remedy in this case existed in their § 3604(a) cause of action." *Id.* As the *Ohana* court found, a "careful reading" of *Frazier* suggests that the Second Circuit may agree that, in certain circumstances, § 3617 can serve as a separate basis for an FHA claim even where there is no predicate for liability under § § 3603 through 3606. 996 F.Supp. at 241.

In two recent cases, the Seventh Circuit found that § 3617 provides a cause of action only for plaintiffs who complain about discrimination in acquiring, rather than simply enjoying, property. *See East-Miller v. Lake County Highway Dep't, 421 F.3d 558, 562 (7th Cir.2005); Halprin v. Prairie Single Family Homes of Dearborn Park Ass'n, 388 F.3d 327, 329-30 (7th Cir.2004).* In both cases, however, the Seventh Circuit held, based on 24 C.F.R. § 100.400(c)(2)--a regulation issued by HUD--that § 3617 could be violated even if § § 3603 through 3606 are not implicated. *See East-Miller, 421 F.3d at 562; Halprin, 388 F.3d at 330.* The *East-Miller* and *Halprin* courts both questioned the validity of 24 C.F.R. § 100.400(c)(2), but declined to rule on its validity because the parties in both cases failed to raise the issue. The HUD regulation, which interprets § 3617, provides:

Conduct made unlawful under [§ 3617] includes ... Threatening, intimidating or interfering with persons in their enjoyment of a dwelling because of the race, color, religion, sex, handicap, familial status, or national origin of such persons, or of visitors or associates of such persons.

24 C.F.R § 100.400(c)(2). Like the *Ohana* court, this Court finds that the reach of § 3617 is not "free from doubt," and therefore, 24 C.F.R. § 100.400(c)(2), which provides a "plausible construction of the statute and is compatible with Congress' expressed broad purpose in enacting the FHA," is entitled to deference. 996 F.Supp. at 242 (citing, among others, *Chevron, U.S.A., Inc. v.*

*Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842-45, 81 L.Ed.2d 694, 104 S.Ct. 2778 (1984)). [FN17]

> FN17. Aside from Defendants' cursory statement that "[t]he HUD regulation is invalid because it strays from what is expressly covered by section 3617 ... and impermissibly expands the scope of section 3617," the parties here do not attack the validity of the HUD regulation.

Following the general trend in this circuit as well as 24 C.F.R. § 100.400(c)(2), this Court finds that Plaintiff can assert a stand-alone § 3617 claim, seeking recovery not only for conduct interfering with efforts to acquire property, but also for post-acquisition interference.

**\*18** In order to prevail on her § 3617 claim, Plaintiff must show that: (1) she is a member of a protected class under the FHA, (2) she was engaged in the exercise or enjoyment of her fair housing rights, (3) Defendants were motivated in part by an intent to discriminate, and (4) Defendants coerced, threatened, intimidated or interfered with Plaintiff on account of her protected activity under the FHA. *East-Miller,* 421 F.3d at 563. [FN18] It is undisputed that Plaintiff, as a single, Hispanic woman, is a member of a protected class with regard to both race and familial status. Defendants argue that Plaintiff cannot establish the third and fourth elements of her prima facie case, i.e., that Defendants were motivated in part by an intent to discriminate, and that they coerced, threatened or interfered with Plaintiff on account of activity protected by the FHA.

> FN18. Because Plaintiff does not argue otherwise, the Court will assume, as the *East-Miller* court held, that "a showing of intentional discrimination is an essential element of a § 3617 claim ." 421 F.3d at 563.

Plaintiff may prove the third element, intentional discrimination, either directly, through direct or circumstantial evidence, or indirectly, through the burden-shifting framework established in *McDonnell-Douglas Corp. v. Green,* 411 U.S. 792, 802-03, 36 L.Ed.2d 668, 93 S.Ct. 1817 (1973). See *East-Miller,* 421 F.3d at 563; *Campbell v. Robb,* 162 Fed. Appx. 460, 473-474 (6th Cir.2006); *see also* Reg'l *Econ. Cmty. Action Program, Inc. v. City of Middletown,* 294 F.3d 35, 53-54 (2d Cir.2002) (applying the *McDonnell-Douglas* test to a claim of

retaliation under § 3617). Under the *McDonnell-Douglas* test, Plaintiff must first establish a prima facie case of discrimination. In response, Defendants must offer a legitimate nondiscriminatory reason for its conduct. Finally, Plaintiff must show that Defendants' proffered reason is pretext for unlawful discrimination.

Plaintiff alleges that Defendants told her "it has been a mistake to rent to you with a child," that James Sutton screamed, cursed and insulted her and her son by saying, *inter alia,* "move you stupid Spanish people," that they entered her apartment without notice, refused to perform repairs, refused to sign her HUD application, locked her out of the basement, refused to provide her with an adequate supply of water and retaliated against her for filing a complaint with the CHRO by kicking the plants outside of her home. Plaintiff also sets forth allegations that James Sutton injured her "hand, arm and body" her while attempting to enter her apartment to do repairs in December 2005. Defendants argue that Plaintiff was a difficult, argumentative tenant, and indeed, many of the above complaints have been found, by the state Housing Court, the CHRO, and the police who responded to a complaint, to be without merit. The admissible evidence submitted in support of these allegations consists primarily of Plaintiff's affidavit and her depositions; she offers no corroboration for her claims. The credibility of Plaintiff's allegations is thrown into question by the facts that (1) she was a tenant for more than four years, but did not formally complain about Defendants' conduct until after they filed the first eviction case, and (2) she is seeking to continue living in Defendants' building. Moreover, the record shows that Stanford Sutton had other Hispanic tenants during Plaintiff's tenancy, including another single Hispanic woman receiving Section 8 assistance. There is no evidence that Defendants initiated eviction proceedings against these tenants or had any problems whatsoever with any of these tenants.

**\*19** The FHA was not intended "to convert every quarrel among neighbors in which a racial or religious slur is hurled into a federal case." *Halprin,* 388 F.3d at 330. A "pattern of harassment" which is "invidiously motivated," however, may be actionable under § 3617. *Id.; see also Ohana,* 996 F.Supp. 238 (finding that the plaintiffs had set forth a cognizable § 3617 claim with allegations that defendants engaged in a pattern of harassment and discriminatory acts which included racial and anti-Jewish slurs and epithets, threats of bodily harm, and noise disturbances). Most of the cases finding a violation of

Slip Copy                                                                                                    Page 15
Slip Copy, 2007 WL 1346913 (D.Conn.), 73 Fed. R. Evid. Serv. 536, 34 NDLR P 248
**(Cite as: 2007 WL 1346913 (D.Conn.))**

§ 3617 involve allegations of force and violence, such as the firebombing of a home or car, physical assaults, vandalism, firing weapons, or other extreme activities designed to drive a person out of his or her home. *See Halprin v. Prairie Single Family Homes of Dearborn Park Ass'n,* 208 F.Supp.2d 896, 903-904 (N.D.Ill.2002) ("Courts have applied § 3617 to threatening, intimidating, or extremely violent discriminatory conduct designed to drive an individual out of his home. These cases involve extreme and overt acts, such as cross-burning, firebombing homes or cars, shooting shotguns, physical assaults, or throwing Molotov cocktails.") (collecting cases); *see also Whisby-Myers v. Kiekenapp,* 293 F.Supp.2d 845 (N.D.Ill.2003) (denying motion to dismiss § 3617 claim because the "alleged detonation of an explosive device simulator to intimidate the husband and wife was the kind of threatening and intimidating conduct designed to drive them out of their home"); *Byrd v. Brandeburg,* 922 F.Supp. 60, 64-65 (N.D.Ohio 1996) (finding in plaintiffs' favor where plaintiffs' produced evidence of racially motivated violence, including a Molotov cocktail thrown onto the plaintiffs' porch); *Johnson v. Smith,* 810 F.Supp. 235 (N.D.Ill.1992) (cross-burning in the yard outside of the plaintiffs' residence and the related breaking of one of the windows in their home actionable under § 3617); *Stirgus v. Benoit,* 720 F.Supp. 119 (N.D.Ill.1989) (racially motivated firebombing of plaintiff's home actionable); *Seaphus v. Lilly,* 691 F.Supp. 127, 139 (N.D.Ill.1988) (finding "various acts of violence and property damage," including alleged physical assaults and attempted arson, designed "to induce plaintiffs to leave their homes because of their race" actionable under § 3617); *Stackhouse v. De Sitter,* 620 F.Supp. 208, 211 (N.D.Ill.1985) (firebombing of plaintiff's car).

In extreme instances, however, lesser conduct which serves to "coerce, intimidate, threaten, or interfere" may also be actionable. *See, e.g., Ohana,* 996 F.Supp. at 241-42. In recognition of the First Amendment rights involved, courts have found that "[s]peech can amount to a violation of § 3617 only when it is 'directed to inciting or producing imminent violence and is likely in fact to do so.' " *Taal,* 2004 U.S. Dist. LEXIS 4546 at *22-23 (quoting *White v. Lee,* 227 F.3d 1214, 1230 (9th Cir.2000)). Because "[t]hreats of violence, coercion, and intimidation directed against individuals ... do not qualify as advocacy," they "may well constitute a violation of § 3617." *Id* . at *23.

**\*20** The evidence presented here is insufficient to show intentional discrimination. The quarrels and fights described by the parties, while certainly undesirable, do not evince a discriminatory intent on the part of Defendants. Aside from allegedly calling Plaintiff a "stupid Spanish person," there is no evidence that any of James' Sutton's conduct, even if wrongful, was motivated by any discriminatory animus.

Even if Plaintiff had adequately shown a genuine issue of material fact regarding intentional race or familial status discrimination, she would have also had to show that "the conduct alleged in the complaint amounts to 'threatening, intimidating or interfering' within the meaning of the statute and the regulation." *Halprin,* 388 F.3d at 330. In *Taal,* the plaintiffs alleged "disturbing and unacceptable racial bigotry in broad and general terms" and claimed " 'hundreds' of incidents demonstrating racial animosity." 2004 U.S. Dist. LEXIS 4546 at *7, 15. The Court held that the plaintiffs failed to prove a separate § 3617 claim, finding that they "produced almost nothing by way of evidence, or even descriptions of specific events, from which a reasonable jury could find for them on any asserted federal claim." *Id.* at * 8. On the record presented, the Court held that the plaintiffs failed to make the showing necessary for their claim:

> While there can be little doubt that the [plaintiffs] and the [defendants] did not get along, and that on at least one occasion defendant's husband ... resorted to racial epithets and lewd gestures, that is not enough to establish an FHA claim under § 3617. Congress did not intend the FHA to provide a remedy for every squabble, even continuing squabbles, between neighbors of different races. Broad-form claims aside, nothing plaintiffs have presented suggests the type of conduct intended to be covered by § 3617.

*Id.* at *27; *see also Egan v. Schmock,* 93 F.Supp.2d 1090, 1093 (N.D.Cal.2000) (the FHA was not intended to "cover any discriminatory conduct which interferes with an individual's enjoyment of his or her home," but only that "which is designed to drive the individual out of his or her home").

As in *Taal,* the evidence presented in this case does not reveal conduct egregious or severe enough to give rise to a § 3617 claim. The conduct alleged and shown in this case seems more akin to a "quarrel" between a tenant and her landlord than the "pattern of harassment" found to be actionable in *Halprin* and *Ohana.* Notwithstanding the broad language used in some of Plaintiff's allegations, nothing presented here establishes the type of conduct intended to be covered by § 3617. For these reasons, the Court

Slip Copy, 2007 WL 1346913 (D.Conn.), 73 Fed. R. Evid. Serv. 536, 34 NDLR P 248
**(Cite as: 2007 WL 1346913 (D.Conn.))**

finds that Defendants are entitled to judgment on Plaintiff's § 3617 claim.

4. *Intentional Infliction of Emotional Distress*

Finally, Plaintiff sets forth a claim for intentional infliction of emotional distress under Connecticut law. The allegations that form the basis of this claim are the same as those alleged in support of Plaintiff's FHA claim. To prevail on this claim, Plaintiff must establish four elements: "(1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe." *Appleton v. Board of Educ.,* 254 Conn. 205, 210, 757 A.2d 1059 (2000) (quoting *Petyan v. Ellis,* 200 Conn. 243, 253, 510 A.2d 1337 (1986)); *see also DeLaurentis v. New Haven,* 220 Conn. 225, 597 A.2d 807 (1991) ("it is the intent to cause injury that is the gravamen of the tort").

a. *Extreme and Outrageous*

**\*21** Defendants argue that the evidence submitted by Plaintiff does not support a finding that their conduct was "extreme and outrageous." The question of whether conduct is "reasonably regarded" as extreme and outrageous is initially a question for the court; an intentional infliction of emotional distress claim should be submitted to a jury only when the court finds that "reasonable minds may differ" on this question. *Reed v. Signode Corp.,* 652 F.Supp. 129, 137 (D.Conn.1986). Connecticut state and federal courts have interpreted the extreme and outrageous qualification strictly. *See Golnik v. Amato,* 299 F.Supp.2d 8, 15-17 (D.Conn .2003) (citing cases).

An intentional infliction of emotional distress claim requires conduct that exceeds "all bounds usually tolerated by decent society...." *Petyan,* 200 Conn. 254 n. 5, quoting W. Prosser & W. Keeton, Torts (5th Ed.1984) § 12, p. 60. As discussed in the Restatement:

The cases thus far decided have found liability only where the defendant's conduct has been extreme and outrageous. It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"

Restatement (Second) of Torts § 46 cmt. d (1965). A defendant's conduct that is "merely insulting or displays bad manners or results in hurt feelings" is insufficient to form the basis of an intentional infliction of emotional distress claim. *Appleton,* 254 Conn. at 211 (quoting *Mellaly v. Eastman Kodak Co.,* 42 Conn. Supp. 17, 19, 597 A.2d 846 (1991)).

Connecticut cases involving similar--and even more severe--allegations have generally held that the conduct alleged was not extreme and outrageous. In *Burr v. Howell,* No. CV020464225S, 2003 Conn.Super. LEXIS 1857, 2003 WL 21675848 (Conn.Super. Ct. June 25, 2003), a Connecticut court found that the alleged use of the racial epithet "nigger" was not sufficiently "extreme and outrageous" to state a claim for intentional infliction of emotional distress. *Id.* at \*13-14. In *Engle v. Bosco,* No. CV054006996S, 2006 Conn.Super. LEXIS 2792, 2006 WL 2773603 (Conn.Super.Ct. Sept. 14, 2006), the plaintiff alleged that throughout his eight-year term of employment, the president of the company repeatedly "verbally belittled and abused" him and other employees. *Id.* at \* 1. Specifically, the president allegedly referred to the plaintiff and his co-workers as "dumb mother fuckers," accused them of being "brain dead" in the presence of other employees, insulted plaintiff with numerous other lewd and offensive comments, spit on plaintiff and threatened to terminate his employment. *See id.* at \*2-3. The court held that these allegations, viewed in the light most favorable to the plaintiff, were not "extreme and outrageous," and therefore were insufficient to state a claim for intentional infliction of emotional distress. *Id.* at \*6-7. In *Leone v. New Eng. Communs.,* No. CV010509752S, 2002 Conn.Super. LEXIS 1361, 2002 WL 1008470 (Conn.Super.Ct. Apr. 10, 2002), where the court denied the motion to strike the plaintiff's intentional infliction of emotional distress claim, the allegations were far more severe and specific. Specifically, the plaintiff alleged that his employers "referred to the plaintiff as 'dago, wop, Father Sarducci or Gimabroni,' ... placed sexually offensive comments and pictures on his computer, ... made comments about his penis, his sexual

performance, homosexuality and the like. Such comments were also made to him about others who were employed by his company, those with whom the company had contact or who were customers of the defendant." *Id.* at *8.

**\*22** The cases cited by Plaintiff are distinguishable. The majority of the cases cited involved a motion to strike or to dismiss, where courts apply a much lower standard of review than that at the summary judgment stage, determining only whether a plaintiff's allegations stated a claim for intentional infliction of emotional distress. [FN19] *See, e.g., Leone,* 2002 Conn.Super. LEXIS 1361, 2002 WL 1008470; *Whelan v. Whelan,* 41 Conn. Supp. 519, 588 A.2d 251 (1991); *Mellaly v. Eastman Kodak Co.,* 42 Conn. Supp. 17, 597 A.2d 846 (1991); *Centi v. Lexington Health Care* Ctr., No. CV 960383535, 1997 Conn.Super. LEXIS 1202 (Conn.Super.Ct. May 1, 1997). Indeed, as one of the courts noted, a "more appropriate manner of testing whether the conduct and emotional distress reached the threshold" required for an intentional infliction of emotional distress claim would be by a motion for summary judgment, where the court "is able to consider the *actual* facts rather than those that could be proved under the allegations of the complaint construed in a manner most favorable to the plaintiff." *Mellaly,* 42 Conn. Supp. at 19 n. 3 (emphasis added). The allegations here, although possibly sufficient to state a claim, do not appear to be "extreme and outrageous" in light of the evidence actually presented to the Court.

> FN19. Although it did not involve a motion to strike or to dismiss, the procedural posture was again different in *Berry v. Loiseau,* 223 Conn. 786, 614 A.2d 414 (1992), with the Connecticut Supreme Court reviewing for abuse of discretion the trial court's refusal to set aside a jury's finding of intentional infliction of emotional distress. Moreover, the evidence presented--i.e., that the plaintiff was subjected to physical abuse and false imprisonment--indicated much more extreme and outrageous conduct than that presented here. *See id.*

The other cases cited by Plaintiff, although numerous, do not change this Court's conclusion. First, the facts involved in those cases are very different from those presented here and thus are difficult to analogize to this case. Moreover, the failure here is not with Plaintiff's allegations, but with the evidence presented. The admissible evidence on record does not indicate that Defendants' conduct was extreme and outrageous, but only that the parties' landlord-tenant relationship has deteriorated to a point where it is routinely contentious.

The comments allegedly made here--i.e., Plaintiff's allegation that James Sutton said "move you stupid Spanish people," and her vague allegation that he screamed, cursed and insulted her and her son--do not appear to rise to the level of conduct that is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Restatement (Second) of Torts § 46 cmt. d (1965). There is no evidence to support Plaintiff's allegations that Defendants refused to perform repairs, refused to comply with HUD regulations, or otherwise engaged in conduct that threatened her Section 8 status. In light of Defendants' evidence, Plaintiff's claims regarding being locked out of the basement, deprived of water, Defendants' "scheme" to move her into another building, and her description of the December 19, 2005 incident appear to have no merit. Although "[t]here is no bright line rule to determine what constitutes extreme and outrageous conduct sufficient to maintain an action," courts must distinguish between "the slight hurts which are the price of a complex society and the severe mental disturbances inflicted by intentional acts wholly lacking in social utility." *Burr v. Howell,* 2003 Conn.Super. LEXIS 1857 at *8-9. This case seems to fall into the former category. If in fact Defendants did engage in the conduct described herein, it appears to have been isolated in the context of a heated breakdown of the parties' landlord-tenant relationship, rather than a pattern of racially-motivated conduct. *See id.* at * 12. This Court certainly does not condone the behavior described by Plaintiff, however, it does not appear to be so extreme or outrageous to meet the standard of unacceptability required for the tort of intentional infliction of emotional distress.

### b. Severe Emotional Distress

**\*23** Because the Court has found that the alleged conduct was not extreme and outrageous, it is unnecessary to determine whether Plaintiff suffered severe emotional distress, although the Court notes that no evidence was provided to support such a finding. With regard to this prong, Plaintiff states only that she "suffered enormous distress at the hands of the defendants. The plaintiff is able to testify to the emotional distress experienced as medical records are not required to prove emotional distress in the state of

Slip Copy, 2007 WL 1346913 (D.Conn.), 73 Fed. R. Evid. Serv. 536, 34 NDLR P 248
**(Cite as: 2007 WL 1346913 (D.Conn.))**

Connecticut." (Pl.'s Mem. Opp. 22.) Although it is unclear in Connecticut whether a plaintiff must seek medical treatment in order to maintain a claim of intentional infliction distress under Connecticut law, *see Almonte v. Coca-Cola Bottling Co.,* 959 F.Supp. 569, 575 (D.Conn.1997) (*citing Rosenberg v. Hebrew Home and Hosp.,* No. CV 33 31 35, 1997 Conn.Super. LEXIS 168, 1997 WL 35808, *2 (Conn.Super.Ct. Jan. 23, 1997) and *Reed v. Signode Corp.,* 652 F.Supp. 129, 137 (D.Conn.1986)), Plaintiff has not shown that any emotional distress suffered was "severe," at a level which "no reasonable person could be expected to endure," or that she experienced her symptoms "to an extraordinary degree." *See Almonte,* 959 F.Supp. at 575 (granting summary judgment on the plaintiff's claim of intentional infliction of emotional distress on the ground that plaintiff failed to set forth any evidence indicating that he suffered his symptoms-- i.e., sleeplessness, depression and anxiety--"to an extraordinary degree"); *Reed,* 652 F.Supp. at 137 (granting summary judgment on the plaintiff's claim of intentional infliction of emotional distress and noting that "plaintiff was neither treated nor did he seek medical assistance for the distress he allegedly suffered"). Accordingly, Plaintiff's intentional infliction of emotional distress claim fails on this basis as well.

Because Plaintiff has not shown that Defendants' conduct was extreme and outrageous or that she suffered severe emotional distress, Defendants are entitled to judgment on Plaintiff's claim of intentional infliction of emotional distress.

## IV. CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment [Doc. No. 32] is **granted** and their Motion to Strike [Doc. No. 48] is **granted in part** and **denied in part.** The clerk may close the case.

SO ORDERED.

Slip Copy, 2007 WL 1346913 (D.Conn.), 73 Fed. R. Evid. Serv. 536, 34 NDLR P 248

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in B.R.                                                                                    Page 1
Not Reported in B.R., 1993 WL 135970 (Bankr.N.D.Ill.)
**(Cite as: 1993 WL 135970 (Bankr.N.D.Ill.))**



Only the Westlaw citation is currently available.

United States Bankruptcy Court, N.D. Illinois,
Eastern Division.
In re PLENIPOTENTIARY LIMITED, Debtor.
BARCLAYS BANK PLC, a banking corporation
organized under the laws of England,
Plaintiff,
v.
AMERICAN NATIONAL BANK AND TRUST
COMPANY OF CHICAGO, a national banking
association, not personally but as Trustee under a
Trust Agreement
December 17, 1975, and known as Trust No. 38162,
Plenipotentiary Limited, an
Illinois limited partnership, The Management Group,
Inc., an Illinois
corporation, individually and d/b/a Hostmark
Management Group, Ambassador West
(Chicago) Associates, L.P., a Delaware limited
partnership, and Stephen Mann,
Defendants.
**Nos. 92 B 12342, 92 C 2717 and 93 A 00259.**

April 15, 1993.

Matthew Botica, William J. McKenna, Jr., Hopkins
& Sutter, Chicago, IL, for Barclay Bank PLC,
plaintiff.

Marc O. Beem, Miller, Shakman, Hamilton &
Kurtzon, Chicago, IL, for Ambassador West
(Chicago) Associates, L.P., defendant.

Daniel R. Murray, Donald I. Resnick, Jenner &
Block, Chicago, IL, for The Management Group,
Inc., defendant.

MEMORANDUM OPINION

JOHN H. SQUIRES, Bankruptcy Judge.

**\*1** This matter comes before the Court on the motion
of Barclays Bank PLC ("Barclays") for summary
judgment pursuant to Federal Rule of Civil Procedure
56, incorporated by reference in Federal Rule of
Bankruptcy Procedure 7056, on Counts I and II of its
complaint for foreclosure [FN1], and on the motion
of Ambassador West (Chicago) Associates, L.P.
("AWA") to strike portions of the affidavit of

Salvatore Esposito ("Esposito") and to strike the
exhibits to this affidavit, filed by Barclays as an
exhibit to its Local Rule 12(m) statement in support
of its motion for summary judgment.    For the
reasons set forth herein, the Court having considered
the pleadings, exhibits and affidavits, grants the
motion for summary judgment.    In addition, the
Court denies the motion of AWA to strike portions of
the supplemental affidavit of Esposito and to strike
the exhibits to the affidavit.

> FN1. Barclays' motion for summary
> judgment covers the Debtor, American
> National Bank and Trust Company of
> Chicago, as trustee, The Management
> Group, Inc. and Ambassador West
> (Chicago) Associates, L.P. pursuant to
> Counts I and II of the complaint.    Barclays
> previously filed a motion for summary
> judgment against defendant Stephen Mann,
> the guarantor of the mortgage obligation.
> That motion was granted by the district
> court on March 10, 1993.    Count III has not
> been referred to this Court for disposition.
> Counts IV and V are not the subject of this
> motion.

I. JURISDICTION AND PROCEDURE
 Pursuant to an Order of the district court dated
September 23, 1992, this matter was referred to this
Court for supervision and resolution under 28 U.S.C.
§ 157(c)(2).    Thus, the Court has jurisdiction to
entertain this motion pursuant to 28 U.S.C. § 1334
and such reference from the United States District
Court for the Northern District of Illinois.    Although
this matter constitutes a non-core proceeding under
28 U.S.C. § 157(b)(3), the parties have stipulated to
the referral.    Accordingly, pursuant to 28 U.S.C. §
157(c)(2), this Court is authorized to enter judgment
on its findings of fact and conclusions of law.

II. UNDISPUTED FACTS AND BACKGROUND
 American National Bank and Trust Company of
Chicago, as Trustee under a Trust Agreement dated
December 17, 1975, and known as Trust No. 38162
(the "Trustee"), is the record owner of title to the
Ambassador West Hotel (the "Property") located at
1300 North State Parkway, Chicago, Illinois.
Plenipotentiary Limited (the "Debtor") is a limited
partnership that owns the beneficial interest of the
land trust.    The Management Group, Inc. and AWA

Not Reported in B.R.                                                                                                          Page 2
Not Reported in B.R., 1993 WL 135970 (Bankr.N.D.Ill.)
**(Cite as: 1993 WL 135970 (Bankr.N.D.Ill.))**

are the two general partners of the Debtor.

On October 19, 1989, Barclays agreed, subject to the terms and conditions set out in a written loan agreement (the "Loan Agreement"), to loan up to $20,200,000.00 to the Trustee and the Debtor. *See* Barclays Exhibit D. The Trustee and the Debtor executed a promissory note in favor of Barclays in the amount of $20,200,000.00. *See* Barclays Exhibit E. As security for that promissory note, the Trustee executed a mortgage dated October 19, 1989 (the "Mortgage"). *See* Barclays Exhibit F. As additional security for the note, the Trustee granted Barclays a security interest in certain personal property and fixtures as set forth in the mortgage. *See* Barclays Exhibit F, pp. 2-3. Further, as additional security for the note, the Trustee and the Debtor entered into a security agreement granting to Barclays a security interest in certain personal property. *See* Barclays Exhibit G. That personal property includes: (1) all furniture, furnishings and equipment located in the Property; (2) all deposits and all tangible and intangible personal property attached to or contained in and used in connection with the Property; and (3) all licenses, permits and authorizations for the operation of the Property. Barclays perfected its security interest in the collateral by filing financing statements. *See* Barclays Exhibit H.

**\*2** Pursuant to the terms of the Mortgage, it is the responsibility of the Debtor to pay the accruing real estate taxes for the Property before the due date. *See* Barclays Exhibit F, § 3(a), p. 6. The Trustee and the Debtor did not timely pay the 1990 (payable in 1991) nor the first installment of the 1991 real estate taxes on the Property in the amount of $187,082.87. *See* Barclays Exhibit J, Exhibit 1 thereto. Thereafter, on September 17, 1991, Barclays sent the Debtor a letter stating that the failure to timely pay the real estate taxes was a default under the Loan Agreement. *See* Barclays Exhibit J. The facts concerning why those and the subsequent years' real estate taxes were not timely paid are at the heart of the instant dispute. The Debtor contends that it had an oral agreement with Barclays to defer the payment of the real estate taxes until the summer when business increased and there was more money available. Barclays, on the other hand, interpreted this failure to pay the taxes as a mortgage default under Section 12 of the Mortgage, and in response thereto, accelerated the maturity date on the entire indebtedness on March 26, 1992. *See* Barclays Exhibit K.

Barclays filed a five count complaint on April 24, 1992, in the United States District Court for the Northern District of Illinois. *See* Barclays Exhibit A. Count I seeks to foreclose the real estate Mortgage and Count II seeks to foreclose the security interest on the personal property. Count IV seeks a declaration of rights and for payment of management fees under a subordination agreement. Count V also seeks a declaration of rights under a subordination agreement. On May 29, 1992, the district court entered an order granting Barclays' motion for appointment of a receiver for the Property. *See* Barclays Exhibit L. Thereafter, by order of the district court dated June 2, 1992, Lodging Unlimited, Inc. (the "Receiver") was appointed as receiver of the Property. *See* Barclays Exhibit M. Pursuant to the terms of the June 2, 1992 Order, the Receiver went into possession of the Property on June 3, 1992, and took control of the Property and the collateral. *Id.*

Subsequently, on June 3, 1992, an involuntary Chapter 11 petition was filed against the Debtor by AWA. *See* Barclays Exhibit N. On June 4, 1992, Barclays filed a motion in the bankruptcy court to excuse the Receiver from complying with the turnover provisions of 11 U.S.C. § 543. After a hearing, Barclays' motion was granted and an order was entered authorizing the Receiver to remain in possession of and manage the Property and collateral. *See* Barclays Exhibits O and P.

Thereafter, on June 9, 1992, the district court dismissed the complaint, without prejudice, as to the Trustee and the Debtor. *See* Barclays Exhibit Q. The Debtor did not contest the involuntary petition, nor did it consent to an order for relief. On June 24, 1992, an Order for Relief was thereafter entered. *See* Barclays Exhibit R. On September 23, 1992, with the consent of the parties and pursuant to 28 U.S.C. § 157(c)(2), the district court referred the proceeding under Barclays' complaint to the bankruptcy court for supervision and resolution, with the exception of the guaranty claim against defendant Stephen Mann in Count III of the complaint. *See* Barclays Exhibit S.

**\*3** On October 8, 1992, this Court held a hearing on Barclays' motion for dismissal of the case, or alternatively, for termination of the automatic stay. The Court found that cause existed to lift the stay and entered an order on October 15, 1992, granting Barclays motion to modify the automatic stay effective December 31, 1992, for cause shown pursuant to 11 U.S.C. § 362(d)(1). The Order provided that "[a]s of December 31, 1992, Barclays may take any and all actions it deems appropriate or necessary with respect to the Complaint for

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.                                                                                                    Page 3
Not Reported in B.R., 1993 WL 135970 (Bankr.N.D.Ill.)
**(Cite as: 1993 WL 135970 (Bankr.N.D.Ill.))**

Foreclosure...." *See* Barclays Exhibit T.   Pursuant to that Order, on January 6, 1993, Barclays filed a motion to reinstate its complaint against the Debtor and the Trustee, which was allowed on February 11, 1993. *See* Barclays Exhibit U.

 The instant motion for summary judgment was filed on January 21, 1993.   AWA, the Debtor and The Management Group, Inc. filed their responses thereto on March 3, 1993.   Barclays filed its reply on March 10, 1993.   The matter was thereafter taken under advisement.   On March 9, 1993, AWA filed its motion to strike portions of the supplemental affidavit of Esposito and to strike the exhibits to the affidavit.   A response was filed by Barclays Bank on March 17, 1993.

 On March 2, 1993, Barclays filed a renewed motion to dismiss the core bankruptcy case.   That motion was granted on April 5, 1993, pursuant to the provisions of 11 U.S.C. § 1112(b)(1) and (b)(2).   On April 5, 1993, the Court allowed the Debtor and The Management Group, Inc. to file a counterclaim against Barclays.   Barclays filed its answer thereto on April 6, 1993.

### III. APPLICABLE STANDARDS

 In order to prevail on a motion for summary judgment, the movant must meet the statutory criteria set forth in Rule 56 of the Federal Rules of Civil Procedure, made applicable to adversary proceedings by Federal Rule of Bankruptcy Procedure 7056.   Rule 56(c) reads in part:

 [T]he judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

 Fed.R.Civ.P. 56(c);   *see also Donald v. Polk County,* 836 F.2d 376, 378- 379 (7th Cir.1988).

 In 1986, the United States Supreme Court decided a trilogy of cases which encourage the use of summary judgment as a means to dispose of factually unsupported claims.   *Farries v. Standyne/Chicago Div.,* 832 F.2d 374, 378 (7th Cir.1987) (quoting *Wainwright Bank & Trust Co. v.*

*Railroadmens Federal Sav. & Loan Asso.,* 806 F.2d 146, 149 (7th Cir.1986)).   The burden is on the moving party to show that no genuine issue of material fact is in dispute.   *Anderson,* 477 U.S. at 256;   *Celotex,* 477 U.S. at 322;   *Matsushita,* 475 U.S. at 585-586.   There is no genuine issue for trial if the record, taken as a whole, does not lead a rational trier of fact to find for the non-moving party.   *Matsushita,* 475 U.S. at 587.   "If the evidence is merely colorable or is not significantly probative, summary judgment may be granted."   *Anderson,* 477 U.S. at 249-250 (citations omitted);   *see also Valley Liquors, Inc. v. Renfield Importers, Ltd.,* 822 F.2d 656, 659 (7th Cir.1987), *cert. denied,* 484 U.S. 977 (1987). Summary judgment is appropriate in cases involving the interpretation of contractual documents.   *Ryan v. Chromalloy American Corp.,* 877 F.2d 598, 602 (7th Cir.1989).

 **\*4** The party seeking summary judgment always bears the initial responsibility of informing the court of the basis for its motion, identifying those portions of the "pleadings, depositions, answers to interrogatories, and affidavits, if any," which it believes demonstrates the absence of a genuine issue of material fact.   *Celotex,* 477 U.S. at 323.   Once the motion is supported by a prima facie showing that the moving party is entitled to judgment as a matter of law, a party opposing the motion may not rest upon the mere allegations or denials in its pleadings, rather its response must show that there is a genuine issue for trial.   *Anderson,* 477 U.S. at 248;   *Celotex,* 477 U.S. at 323;   *Matsushita,* 475 U.S. at 587;   *Patrick v. Jasper County,* 901 F.2d 561, 564-566 (7th Cir.1990).   The manner in which this showing can be made depends upon which party will bear the burden of persuasion at trial.   If the burden of persuasion at trial would be on the non-moving party, the party moving for summary judgment may satisfy the burden of production under Rule 56 by either submitting affirmative evidence that negates an essential element of the non-moving party's claim, or by demonstrating that the non-moving party's claim is insufficient to establish an essential element of the non-moving party's claim.   *See* 10A Wright, Miller & Kane, § 2727, pp. 130-131.

 Moreover, all reasonable inferences to be drawn from the underlying facts must be viewed in a light most favorable to the party opposing the motion. *Karazanos v. Navistar International Transportation Corp.,* 948 F.2d 332, 335 (7th Cir.1991);   *Davis v. Chicago,* 841 F.2d 186, 189 (7th Cir.1988);   *Marine Bank, Nat. Asso. v. Meat Counter, Inc.,* 826 F.2d 1577, 1579 (7th Cir.1987);   *De Valk Lincoln*

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986);   *Celotex Corp. v. Catrett,* 477 U.S. 317 (1986);   *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574 (1986).   "The primary purpose for granting a summary judgment motion is to avoid unnecessary trials when there is no genuine issue of material fact in dispute."

*Mercury, Inc. v. Ford Motor Co.,* 811 F.2d 326, 329 (7th Cir.1987); *Bartman v. Allis Chalmers Corp.,* 799 F.2d 311, 312 (7th Cir.1986), *cert. denied,* 479 U.S. 1092 (1987); *In re Calisoff,* 92 B.R. 346, 350-351 (Bankr.N.D.Ill.1988). Furthermore, the existence of a material factual dispute is sufficient only if the disputed fact is determinative of the outcome under the applicable law. *Donald v. Polk County,* 836 F.2d at 379; *Wallace v. Greer,* 821 F.2d 1274, 1276 (7th Cir.1987); *Egger v. Phillips,* 710 F.2d 292, 296 (7th Cir.1983) (en banc), *cert. denied,* 464 U.S. 918 (1983). "Summary judgment is not an appropriate occasion for weighing the evidence; rather the inquiry is limited to determining if there is a genuine issue for trial." *Lohorn v. Michal,* 913 F.2d 327, 331 (7th Cir.1990).

Rule 56(d) provides for the situation when judgment is not rendered upon the whole case, but only a portion thereof. The relief sought pursuant to subsection d is styled partial summary judgment. Partial summary judgment is available only to dispose of one or more counts of the complaint in their entirety. *Commonwealth Ins. Co. v. O. Henry Tent & Awning Co.,* 266 F.2d 200, 201 (7th Cir.1959); *Biggins v. Oltmer Iron Works,* 154 F.2d 214, 216- 217 (7th Cir.1946); *Quintana v. Byrd,* 669 F.Supp. 849, 850 (N.D.Ill.1987); *Arado v. General Fire Extinguisher Corp.,* 626 F.Supp. 506, 509 (N.D.Ill.1985); *Capitol Records, Inc. v. Progress Record Distributing, Inc.,* 106 F.R.D. 25, 28 (N.D.Ill.1985); *In re Network 90°, Inc.,* 98 B.R. 821, 823 (Bankr.N.D.Ill.1989); *Strandell v. Jackson County,* 648 F.Supp. 126, 136 (S.D.Ill.1986). Rule 56(d) provides a method whereby a court can narrow issues and facts for trial after denying in whole or in part a motion properly brought under Rule 56. *Capitol Records, Inc. v. Progress Record Distributing, Inc.,* 106 F.R.D. at 29.

**\*5** Rule 12(m) of the General Rules of the United States District Court for the Northern District of Illinois, as amended, adopted by the General Order of the Bankruptcy Court on May 6, 1986, requires that the party moving for summary judgment file a detailed statement of material facts as to which it contends there is no genuine issue. The statement must include specific references to the affidavits, parts of the record, and other supporting materials relied upon to support the summary judgment relief sought. Rule 12(n) also requires that the party opposing the motion file a statement of material facts as to which there is a genuine issue. If the opposing party's Rule 12(n) statement fails to deny the facts set forth in the movant's statement, those facts will be deemed admitted. In the present proceeding, Barclays filed its requisite Rule 12(m) statement and the Debtor, The Management Group, Inc. and AWA filed their Rule 12(n) statement.

Pursuant to Federal Rule of Civil Procedure 56(e), "affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Fed.R.Civ.P. 56(e). Personal knowledge within the meaning of Rule 56(e) includes inferences from sense data as well as the sense data themselves (all knowledge is inferential-- including sense data). *Palucki v. Sears, Roebuck & Co.,* 879 F.2d 1568, 1572 (7th Cir.1989). Conclusory statements in affidavits opposing a motion for summary judgment are not sufficient to raise a genuine issue of material fact. *First Commodity Traders, Inc. v. Heinold Commodities, Inc.,* 766 F.2d 1007, 1011 (1985); *Hall v. Printing and Graphic Arts Union,* 696 F.2d 494, 500 (7th Cir.1982). When a party seeks to offer evidence through other exhibits, they must be identified by affidavit or otherwise made admissible in evidence. *Martz v. Union Labor Life Ins. Co.,* 757 F.2d 135, 138 (7th Cir.1985). In applying these rules, however, the Court must not lose touch with the basic principle of summary judgment: to view the evidence strictly against the movant and favorably toward the party opposing the motion. *Prudential Ins. Co. v. Curt Bullock Builders, Inc.,* 626 F.Supp. 159, 164 (N.D.Ill.1985). The goal remains the determination of whether a material issue of fact exists. *Id.* A court is allowed to disregard inadmissible argument or conclusion in an affidavit. *Id.* When admissible facts and inadmissible statements occur in the same affidavit, the Court need not strike the entire affidavit, but rather may rely on the facts and disregard the rest. *Id.*

## IV. DISCUSSION
### A. *The Motion to Strike*

The Court hereby denies the motion of AWA to strike portions of the affidavit of Esposito and the documents attached thereto as Exhibits A through K. The Court finds that many of the statements made in the affidavit are based upon Esposito's own personal knowledge as vice president of Barclays acquired by his review of the relevant documents pertaining to the transaction between Barclays and the Debtor contained in Barclays' loan file. He concludes that he found no evidence that Barclays had ever agreed that the real estate tax payments could be deferred. The exhibits to the affidavit have been identified by the affiant and are otherwise admissible in evidence

Not Reported in B.R.                                                                                              Page 5
Not Reported in B.R., 1993 WL 135970 (Bankr.N.D.Ill.)
**(Cite as: 1993 WL 135970 (Bankr.N.D.Ill.))**

under the business records exception to the hearsay rule as contained in Federal Rule of Evidence 803(6).

 **\*6** AWA's argument that the documents referenced in the affidavit constitute inadmissible hearsay is rejected. Esposito, a qualified officer of Barclays and current custodian of the subject exhibits, asserts that these documents were on file and made by other Barclays' personnel as a regular practice. The documents were made at or near the dates they bear and kept in the course of Barclays' regular business. There is no showing that the documents lack trustworthiness. Moreover, in response to the motion to strike and to buttress both the documents and Esposito's affidavit, Barclays has submitted the additional affidavit of Jane Reynolds Schaller, who was the previous responsible Barclays' loan officer on the subject loan prior to Esposito. She was the authoress of many of the letters from Barclays to the Debtor, which comprise the subject exhibits referenced in the motion to strike. She has the requisite personal firsthand knowledge with respect to such documents and the referenced events contained therein. Thus, for purposes of Rule 56(e), her affidavit satisfies the requirement of personal knowledge of the events stated and reflected therein, which Esposito lacks. Therefore, these records fall within the business records exception to hearsay contained in Federal Rule of Evidence 803(6). Hence, the motion to strike portions of Esposito's affidavit and the exhibits attached thereto is denied.

 B. *The Motion for Summary Judgment*

 The ultimate issue in this matter is whether the Debtor was in material default under the Loan Agreement for failing to pay the real estate taxes in a timely fashion. The Debtor maintains that it had a subsequent oral agreement with Barclays to defer the payment of the first installment of the 1991 real estate taxes until the summer of 1992. This allegation has its origin from the late payment of the 1990 taxes made in 1991. The Debtor asserts that in April 1991, representatives from the Debtor and Barclays met to discuss, among other things, the payment of the 1990 real estate taxes. At this meeting, the Debtor's representatives informed Barclays that, rather than paying the first installment of the Property's real estate taxes in March 1991, it had deferred the payment of the taxes until the summer. *See* Affidavit of Stephen Mann, ¶ ¶ 6, 7; Affidavit of Charles Gavzer, ¶ 4. The Debtor's representatives explained to Barclays that deferring the payment of real estate taxes would not threaten the ownership of the Property, as the Property could be redeemed by the owner until at least two years

after the non-payment of taxes. *See* Affidavit of Stephen Mann, ¶ 7; Affidavit of Charles Gavzer, ¶ 5; Affidavit of Elliot Miller, ¶ 12. Moreover, they explained that the Debtor's cash flow is greater during the summer months due to increased occupancy. *See* Affidavit of Stephen Mann, ¶ 5; Affidavit of Charles Gavzer, ¶ 5. At the conclusion of this discussion, Barclays and the Debtor's representatives allegedly agreed that, in the future, the Debtor would defer the payment of the first installment of real estate taxes until the summer. *See* Affidavit of Stephen Mann, ¶ 7; Affidavit of Elliot Miller, ¶ ¶ 11 and 12; Affidavit of Charles Gavzer, ¶ 6. Pursuant to this alleged agreement, the Debtor paid the first installment of the real estate taxes in June, 1991. This alleged agreement, however, was not reduced to writing and is denied by Barclays' representatives.

 **\*7** In the months subsequent to the meeting at which the real estate taxes were discussed, the business relationship between the parties, as well as the Debtor's financial condition, began to deteriorate. During this period, Barclays sent the Debtor numerous letters stating that the Debtor was in default under the Loan Agreement. Among these letters was a September 17, 1991 letter from Barclays stating that the deferral of the real estate taxes was a default under the Loan Agreement. *See* Barclays Exhibits J and I. Barclays and the Debtor's representatives had a series of meetings in late 1991 and early 1992. During these meetings, Barclays' representatives allegedly acknowledged that the Debtor was not in default under the loan documents. *See* Affidavit of Elliot Miller, ¶ 6. Barclays' representatives supposedly stated that although a default had not yet occurred, it believed the Debtor would be in default in the near future because it would exceed the limits on its interest reserve. *See* Affidavit of Stephen Mann, ¶ 20; Affidavit of Elliot Miller, ¶ 5.

 Barclays vehemently denies that it orally or otherwise agreed to any such deferment of the payment of the real estate taxes. In fact, Barclays points to several provisions in the Loan Agreement which prohibit the oral modification of same. Barclays contends, on the other hand, that the Debtor materially defaulted under the Loan Agreement. Barclays cites several cases for the proposition that when a mortgagor defaults under its mortgage obligations and there is no dispute as to that default or as to any other issue of material fact, the mortgagee is entitled to summary judgment as a matter of law. *See Fireman's Fund Mortg. Corp. v.*

Not Reported in B.R.                                                                              Page 6
Not Reported in B.R., 1993 WL 135970 (Bankr.N.D.Ill.)
**(Cite as: 1993 WL 135970 (Bankr.N.D.Ill.))**

*Zollicoffer,* 719 F.Supp. 650 (N.D.Ill.1989); *Chicago Title & Trust Co. v. Anderson,* 177 Ill.App.3d 615, 532 N.E.2d 595 (1st Dist.1988); *Miles Home Div. of Insilco Corp. v. Green,* 134 A.D.2d 817, 522 N.Y.S.2d 262 (1987); *Jeffery v. Seven Seventeen Corp.,* 461 A.2d 1009 (Del.1983); *Citizens Valley Bank v. Mueller,* 63 Or.App. 152, 662 P.2d 792 (1983).

 Furthermore, the Mortgage itself specifically incorporates by reference the provisions of the Loan Agreement.     The Loan Agreement provides in relevant part:
   No modification, waiver, amendment, discharge or change of this Agreement shall be valid unless the same is in writing and signed by the party against which the enforcement of such modification, waiver, amendment, discharge or change is sought.
 *See* Barclays Exhibit D.   Such a provision in a loan document is enforceable against a borrower under Illinois law.  *Delcon Group v. Northern Trust Corp.,* 187 Ill.App.3d 635, 543 N.E.2d 595 (2d Dist.1989), *appeal denied,* 548 N.E.2d 1067 (1990).   That case involved a provision similar to the one contained in the instant Loan Agreement.   The court there held that the only manner in which the terms of the loan agreement could have been waived was in writing. 187 Ill.App.3d at 645, 543 N.E.2d at 601.

 **\*8** The Debtor cites several cases for the proposition that pursuant to Illinois law, parties to a written contract may alter or modify its terms by subsequent oral agreement, even if the contract contains a provision that precludes oral modification. *Consolidated Bearings Co. v. Ehret-Krohn Corp.,* 913 F.2d 1224 (7th Cir.1990); *Falcon, Ltd. v. Corr's Natural Beverages, Inc.,* 165 Ill.App.3d 815, 520 N.E.2d 831 (1st Dist.1987); *In re ContiCommodity Services, Inc., Secur. Litigation,* 733 F.Supp. 1555 (N.D.Ill.1990).   These cases are inapposite because none of them involved a provision that modifications or waivers must be in writing.   Such provisions are clearly enforced in strict accordance with their terms. *Delcon,* 187 Ill.App.3d at 645, 543 N.E.2d at 601.

 Accordingly, based upon the pleadings, exhibits and affidavits, the evidence presented does not demonstrate a genuine issue of material fact as to whether the parties effectively modified the Loan Agreement and Mortgage so as to allow the Debtor to pay the real estate taxes on the Property at a date later than upon which same were due.   Moreover, there is no genuine issue of material fact as to whether the Debtor defaulted when it deferred the payment of the real estate taxes.   The Debtor has failed to present

affidavits based on personal knowledge, containing specific facts, not conclusions, showing that any representative of Barclays ever made any written or oral statement from which a fact finder could conclude that a modification of the Loan Agreement had been made waiving or deferring the obligation to pay real estate taxes when due.   In light of letters from Barclays declaring that failure to pay taxes was a loan default, the affidavits of Miller, Gavzer and Mann are insufficient to create a genuine issue as to any material fact.   No affidavit contains any specific statement attributed to any identified Barclays representative that would support the existence of a binding oral agreement to modify the Loan Agreement.   Moreover, even if the Debtor were right about the alleged oral agreement, same was breached because the first installment of 1991 taxes has never been paid.     Hence, there is no genuine issue of material fact, and Barclays should receive summary judgment on Counts I and II.

 In addition, Barclays cites the Illinois Credit Agreements Act (the "Act") for the proposition that the defendants' waiver and estoppel affirmative defenses are barred.   Barclays maintains that the Debtor's argument that the Loan Agreement and Mortgage were modified through a course of conduct and dealing, or that the right to call a default for non-payment of real estate taxes has been lost by Barclays' prior forbearance is expressly barred by the Act.   Specifically, Barclays cites to section 3 of the Act which provides in relevant part:  "[t]he following actions do not give rise to a claim, counter-claim, or defense by a debtor that a new credit agreement is created, unless the agreement [is in writing] ... the agreement by a creditor to modify or amend an existing credit agreement."  815 ILCS 160/3.  Hence, the statute requires that a modification must be in writing only when a party relies on a modification to claim that a new credit agreement was created.   The Act defines "credit agreement" as "an agreement or commitment by a creditor to lend money or extend credit or delay or forbear repayment of money."  815 ILCS 160/1.

 **\*9** Thus, in order for the alleged oral agreement between Barclays and the Debtor to fall within the purview of the Act, the Court must find that the alleged modification concerning the deferred payment of the real estate taxes was a new agreement or commitment by Barclays to loan funds to the Debtor or an agreement to delay the repayment of the money to Barclays.   The defendants are not suggesting that Barclays advanced additional funds to the Debtor, nor are the defendants suggesting that the

Not Reported in B.R.                                                                                                  Page 7
Not Reported in B.R., 1993 WL 135970 (Bankr.N.D.Ill.)
(Cite as: 1993 WL 135970 (Bankr.N.D.Ill.))

oral modification between the parties had the effect of extending the time for repayment of funds loaned to the Debtor by Barclays. Pursuant to the statutory definition of credit agreement, the Court finds that the alleged agreement between Barclays and the Debtor was an agreement to delay or forbear the repayment of money. Consequently, the agreement was statutorily required to be reduced to writing.

The Debtor and The Management Group, Inc. raise the argument concerning Barclays' failure to consent to a transfer of limited partnership interests in order to accomplish a tax deferred like/kind exchange under Section 1031 or to allow the Trustee to convey the Property. This issue is collateral to the motion at bar and does not provide a defense to the summary judgment motion. The Court finds that this argument which has been raised in the counterclaim by the Debtor and The Management Group, Inc. will be decided there and does not preclude granting Barclays' motion for summary judgment on Counts I and II.

AWA further argues that assuming the alleged oral agreement between the Debtor and Barclays was not enforceable, the doctrine of estoppel bars Barclays from contesting the validity of the oral agreement. AWA argues that Barclays represented to the Debtor that it would not accelerate the due date for repayment of the loan if the Debtor deferred the payment of the Property's real estate taxes until the summer. Barclays allegedly made this representation both orally, by way of the 1991 agreement between the parties, and through its conduct, by failing to raise the issue of real estate taxes in early 1992 when it knew that the Debtor did not have the funds available to make the payment in March, and that the Debtor would defer payment until the summer as it had done in 1991. AWA contends that it and the Debtor relied on this representation by deferring the payment of real estate taxes, although the Debtor and its partners could have raised the funds to pay the taxes before the foreclosure suit was filed. This reliance has allegedly cause injury to both the Debtor and AWA as the Debtor faces foreclosure.

In Illinois the elements of promissory estoppel are: (1) a promise unambiguous in its terms; (2) reliance thereon by the promisee, with such reliance being expected and foreseeable by the promisor; and (3) the promisee in fact relied on the promise to his detriment. *Geva v. Leo Burnett Co.,* 931 F.2d 1220, 1223 (7th Cir.1991) (quoting *Vincent Di Vito, Inc. v. Vollmar Clay Products Co.,* 179 Ill.App.3d 325, 327-

328, 534 N.E.2d 575, 577 (1st Dist.1989)); *see also Moore v. Illinois Bell Telephone Co.,* 155 Ill.App.3d 781, 785-786, 508 N.E.2d 519, 521 (2d Dist.1987), *appeal denied,* 515 N.E.2d 112 (1987); *Yardley v. Yardley,* 137 Ill.App.3d 747, 754, 484 N.E.2d 873, 879 (2d Dist.1985). The reasonableness of a promisee's reliance on the promise is a question of fact. *Bank Computer Network Corp. v. Continental Illinois Nat. Bank & Trust Co.,* 110 Ill.App.3d 492, 500, 442 N.E.2d 586, 592 (1st Dist.1982). Promissory estoppel requires an unambiguous promise to perform. *Simmons v. John F. Kennedy Medical Center,* 727 F.Supp. 440, 443 (N.D.Ill.1989). A plaintiff may recover on a theory of promissory estoppel despite the absence of a contract. *Bank of Marion v. Robert "Chick" Fritz, Inc.,* 57 Ill.2d 120, 124 (1974).

**\*10** It is a "well settled principle of law that where parties to a written contract mutually consent and acquiesce in the oral modifications and in the nonperformance of certain provisions thereof ... each party is estopped to deny the efficacy of the modifying agreement ... provided the proof is strong that such ... modifications have been assented to." *Nagle v. General Merchandising Corp.,* 58 Ill.App.3d 344, 348, 374 N.E.2d 1137, 1141 (3d Dist.1978) (quoting *Robar v. Isham,* 310 Ill. 585, 589 (1924)). "In order that there may be an agreement, the parties must have a distinct intention common to both and without doubt or difference.... The intention of the parties must in some way be communicated, since a person's intention can be ascertained by another only by means of outward expressions such as words and acts." *Bank of Marion v. Robert "Chick" Fritz, Inc.,* 9 Ill.App.3d 102, 108, 291 N.E.2d 836, 840 (5th Dist.1972), *aff'd,* 57 Ill.2d 120 (1974). This argument must fail as there is no demonstrated unambiguous promise of Barclays to agree to defer the payment to be made by the Debtor of the real estate taxes due.

## V. CONCLUSION

For the reasons set forth herein, the Court grants Barclays' motion for summary judgment on Counts I and II. The Court denies the motion to strike portions of Esposito's supplemental affidavit and to strike the exhibits to the affidavit. A status hearing is hereby set for May 13, 1993 at 10:00 a.m. on Counts IV and V of Barclays' complaint and on the counterclaim filed by the Debtor and The Management Group, Inc. After the Court decides Counts IV and V and the contested counterclaim, a final judgment will be entered.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.                                                                                              Page 8
Not Reported in B.R., 1993 WL 135970 (Bankr.N.D.Ill.)
**(Cite as: 1993 WL 135970 (Bankr.N.D.Ill.))**

 This Opinion constitutes the Court's findings of fact
and conclusions of law in accordance with Federal
Rule of Bankruptcy Procedure 7052.    A separate
order shall be entered pursuant to Federal Rule of
Bankruptcy Procedure 7058.

 See written Order.

 Not  Reported  in  B.R.,  1993  WL  135970
(Bankr.N.D.Ill.)

END OF DOCUMENT

©  2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                                            Page 1
Not Reported in F.Supp.2d, 2004 WL 2211691 (D.Conn.), 9 Wage & Hour Cas.2d (BNA) 1822
**(Cite as: 2004 WL 2211691 (D.Conn.))**

☞

United States District Court,
D. Connecticut.
Mario RICHARDS, Plaintiff,
v.
COMPUTER SCIENCES CORPORATION,
Defendant.
**No. 3-03-CV-00630(DJS).**

Sept. 28, 2004.

Michael J. Melly, Employment Law Group,
Woodbridge, CT, for Plaintiff.

Tasos C. Paindiris, William Joseph Anthony,
Jackson Lewis, Hartford, CT, for Defendant.

*MEMORANDUM OF DECISION*

SQUATRITO, J.

**\*1** Plaintiff Mario Richards has motioned the court
for permission to proceed as a collective action
pursuant to 29 U.S.C. § 216(b). Richards alleges that
he and other Customer Support Analysts ("CSA") are
entitled to unpaid regular and overtime wages under
the Fair Labor Standards Act. Defendant now seeks
to strike portions of the affidavit of Mario Richards
submitted in support of the motion to proceed as a
collective action. [doc. # 37] Computer Sciences
Corporation ("CSC") also moves to strike the
affidavits of various other CSC employees submitted
by Richards in a reply brief intended to support the
motion to proceed as a collective action. [doc. # 61]

*DISCUSSION*

The Federal Rules of Civil Procedure do not create a
standard for reviewing affidavits submitted in support
of motions other than a motion for summary
judgment. The court will adopt the language of Rule
56(e) as a guide for purposes of ruling on the present
motion. Rule 56(e) succinctly states the general
principles that are understood to apply to any
testimony that is proffered to this court in support of
a legal claim, although that rule explicitly applies
only to motions for summary judgment.

"Supporting and opposing affidavits shall be made
on personal knowledge, shall set forth such facts as
would be admissible in evidence, and shall show
affirmatively that the affiant is competent to testify to
the matters stated therein." Fed.R.Civ.P. 56(e). *See*

*also Union Ins. Soc'y of Canton, Ltd., v. William
Gluckin & Co., Inc.,* 353 F.2d 946, 952 (2d
Cir.1965)(holding "conclusory statements and
statements not made on personal knowledge do not
comply with the requirements of Fed.R.Civ.P. 56(e)
and, therefore, may not be considered").

A motion to strike is appropriate if documents
submitted in support of a motion for summary
judgment are not made on the basis of personal
knowledge or contain inadmissible hearsay or
conclusory statements." *Pokorne v. Gary,* 281
F.Supp.2d 416, 418 (D.Conn.2003); *Spector v.
Experian Info. Sys.,* No. 3:01- CV-1955, 2004 WL
1242978, at \*4 (D.Conn. June 2, 2004). However, the
entire affidavit need not be stricken, *United States v.
Alessi,* 599 F.2d 513, 514- 515 (2d Cir.1979), even if
a party moves to strike parts of an affidavit that do
not comply with the requirements of Fed.R.Civ.P.
56(e). *Jewell-Rung Agency, Inc. v. Haddad Org.,
Ltd.,* 814 F.Supp. 337, 339. (S.D.N.Y.1993).

A. The First Motion to Strike

Defendant contends that paragraphs 3, 15, 16 and 17
of Richards's affidavit should be stricken, as well as
portions of paragraph 4 of the affidavit. Paragraph 3
is alleged to be hearsay. The other problematic
paragraphs and statements are, CSC argues, not based
on personal knowledge. The court will address each
argument in turn.

"Hearsay is a statement, other than one made by the
declarant while testifying at trial or hearing, offered
in evidence to prove the truth of the matter asserted."
Fed.R.Evid. 801(c). "Hearsay testimony that would
be inadmissible if testified to at trial may not properly
be set forth in a Rule 56 affidavit accompanying a
summary judgment motion." *Spector,* 2004 WL
1242978, at \*5. Richards's assertion in paragraph 3
that there are many other CSAs who desire to join his
suit fits squarely within the definition of hearsay.
Richards cannot testify as to the intentions of other
employees, where those intentions were allegedly
expressed in statements made outside the presence of
the court. Richards may testify that other workers
told him they were interested in his suit, but only to
prove that such statements were made, not that they
are true. Richards offers his assertion as proof of the
intentions of his co-workers and such testimony is
inadmissible hearsay. Paragraph 3 is stricken.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                   Page 2
Not Reported in F.Supp.2d, 2004 WL 2211691 (D.Conn.), 9 Wage & Hour Cas.2d (BNA) 1822
**(Cite as: 2004 WL 2211691 (D.Conn.))**

**\*2** The remaining contested portions of the affidavit are allegedly deficient because they are not based on personal knowledge. "Generally, affiants have personal knowledge to testify about their experiences." *Larouche v. Webster,* 175 F.R.D. 452, 454 (S.D.N.Y.1996). Hearsay and secondhand information do not constitute personal knowledge. *Isaacs v. Mid Am. Body & Equip. Co.,* 720 F.Supp. 255, 256 (D.Conn.1989). Paragraph 4 is a statement regarding CSC's hiring practices as they relate to CSAs and the training and skills required to become a CSA. Paragraphs 15 and 16 assert personal knowledge of the tasks and duties of other CSAs in Norwich-specifically that the other CSAs also perform tasks that are not properly compensated with regular and overtime pay. CSC argues that Richards is not qualified to testify as to CSC's hiring practices and requirements or the job responsibilities of other CSAs.

 The court finds that the contested portions of paragraph 4 are not supported by personal knowledge and should be stricken. Richards does not establish that his own experiences with hiring, qualifications and training are reflective of other employees or that he could reasonably have knowledge of company policy in this area. It is possible that Richards is aware of the experiences of other CSAs hired with him or during his term of employment, but he does not establish the basis for his assertions or his own qualifications to address CSC hiring policies.

 Paragraphs 15 and 16 are not stricken. The statements made in paragraph 15 regarding the duties of other CSAs can obviously have a basis in the personal observations of Richards during his work day. CSC's disagreement with the statements made in the affidavit does not invalidate the testimony. The conclusory nature of paragraph 15 serves only to lessen its probative value, not to render the testimony inadmissible. Similarly, paragraph 16 is absolutely something that the plaintiff could observe-and according to his testimony, did observe-during the course of his work day. Again, disputed testimony is not necessarily improper.

 Finally, CSC is correct in arguing that paragraph 17 must be stricken. There is no basis in the plaintiff's arguments or his affidavit for his assertion that the CSAs in other parts of the country face the same conditions that allegedly exist in Norwich. The court finds there is no evidence of personal knowledge to support Richards's statement in paragraph 17.

**B. The Second Motion to Strike**

 Defendant raises two arguments in its second motion to strike affidavits. First, defendant claims that affidavits may not be included in a reply brief. Second, CSC contends that Richards's affidavit is contradicted by his deposition testimony and so should be disregarded. CSC also rehashes some of its arguments from the first motion to strike.

 The court finds that Richards's affidavit is appropriate and should not be stricken. The court does not consider the affidavit and deposition testimony to be in direct conflict. Further, even if a conflict did exist, the defendant's use of the summary judgment standard of proof is inappropriate. The standard for proceeding with discovery and notice as a collective action under the Fair Labor Standards Act is lower than the bar imposed on non-movants attempting to show a genuine issue of material fact at the summary judgment stage. Obviously, Richards cannot establish facts through affidavits that contradict his sworn testimony, but he can allege facts, which is all the burden that the law places on him at this stage of the proceedings. Richards does not need to prove anything at present but need only make a modest factual showing supported by substantial allegations and affidavits. *See, Grayson v. K-Mart Corp.,* 79 F.3d 1086, 1096 (11th Cir.1996); *Hoffman v. Sbarro, Inc.,* 982 F.Supp. 249, 261 (S.D.N.Y.1997). Thus, even if there were a clear contradiction it would not necessarily require the court to strike the affidavit, but would only be one factor in the court's assessment of Richards's success in meeting the burden of proof required to prevail on his motion.

**\*3** The court also finds the defendant's reliance on the local rules unavailing. First, the court notes that the proper local rule is D.Conn.L.Civ.R.7(e), not 9(g) as the defendant claims. The rule does not prohibit the inclusion of affidavits with a reply brief. It does limit the reply to a discussion of the matters raised by the opposition, but there is no reason for this court to hold that the discussion contemplated cannot include further evidentiary support. Indeed, the interests of justice demand that the court consider any and all appropriate materials when deciding a matter, and the affidavits submitted by Richards are appropriate. There is nothing in the local rules that prevents Richards from including an affidavit and no precedent cited to the court that interprets the rules in the manner desired by the defendant.

 Finally, the court finds that none of the arguments

Not Reported in F.Supp.2d                                                                                    Page 3
Not Reported in F.Supp.2d, 2004 WL 2211691 (D.Conn.), 9 Wage & Hour Cas.2d (BNA) 1822
**(Cite as: 2004 WL 2211691 (D.Conn.))**

raised against the supporting affidavits attached to the Richards reply brief has merit. The affidavits contain statements of personal experience and knowledge that are intended to support the plaintiff's motion and are entirely appropriate.

### *CONCLUSION*

The court finds that certain paragraphs of Mario Richards's affidavit submitted with his motion for permission to proceed as a collective action are improper hearsay and not based on personal knowledge. Paragraphs 3 and 17 and a portion of paragraph 4 are stricken accordingly. The defendant's motion to strike [doc. # 37] is GRANTED in part. The second motion to strike [doc. # 61] is DENIED.

IT IS SO ORDERED

Not Reported in F.Supp.2d, 2004 WL 2211691 (D.Conn.), 9 Wage & Hour Cas.2d (BNA) 1822

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



--- F.Supp.2d ----, 2007 WL 2071568 (S.D.N.Y.), 154 Lab.Cas. P 35,299
**(Cite as: 2007 WL 2071568 (S.D.N.Y.))**

United States District Court,
S.D. New York.
Tina ROBERTS, Plaintiff,
v.
GROUND HANDLING, INC., Defendant.
**No. 04 CIV 4955 WCC.**

March 30, 2007.

**Background:** Employee with end-stage renal disease, an Operations Manager for corporation providing various services to airlines operating out of county airport, brought action pursuant to Family and Medical Leave Act (FMLA), New York State Human Rights Law (NYSHRL), and Consolidated Omnibus Budget Reconciliation Act (COBRA) against her former employer, alleging it interfered with her rights guaranteed under FMLA, discriminated against her on basis of disability in violation of NYSHRL, failed to provide her with continuing group health plan coverage in violation of COBRA, and retaliated against her for exercising her rights guaranteed under FMLA. The District Court dismissed COBRA and FMLA retaliation claims on employer's motion. Employer moved for summary judgment on remaining claims, and employee moved to strike certain paragraphs of employer's statement and its annexed exhibits, and paragraphs of affidavit submitted in support of motion for summary judgment.

**Holdings:** The District Court, William C. Conner, Senior District Judge, held that:

(1) because employee's two periods of absences were both attributable to peritonitis, a direct side effect of her ambulatory peritoneal dialysis, they had to be considered part of a single intermittent leave under the FMLA;

(2) under all three calculation methods, employee was an "eligible employee" under FMLA as of date she requested immediate three-month medical leave of absence;

(3) under most beneficial calendar method, employee was entitled to six additional weeks of leave at time she requested medical leave and could establish interference if she properly sought reinstatement less than five weeks later;

(4) fact issue as to whether employee attempted to return to work at that time precluded summary judgment on FMLA interference claim;

(5) employee failed to establish prima facie case of

disability discrimination under NYSHRL with respect to her termination or denial of request for indefinite leave at that time, absent showing she could have performed the essential functions of her position as of date she was terminated; and

(6) paragraphs of supervisor's affidavit submitted in support of employer's summary judgment motion that contained legal conclusions or were not based on personal knowledge would be stricken from the record.

Plaintiff's motion granted in part and denied in part; defendant's motion denied.

**[1] Labor and Employment** 367(5)

231Hk367(5) Most Cited Cases
Employee has no FMLA right to be restored to her prior position if he or she is unable to perform an essential job function because of a physical or mental impairment. Family and Medical Leave Act of 1993, § 104(a)(1)(A), 29 U.S.C.A. § 2614(a)(1)(AA).

**[2] Labor and Employment** 383
231Hk383 Most Cited Cases
FMLA creates private right of action to seek both equitable relief and money damages against any employer, including a public agency, in any Federal or State court of competent jurisdiction should that employer interfere, restrain, or deny the exercise of FMLA rights. Family and Medical Leave Act of 1993, § 105(a)(1), 29 U.S.C.A. § 2615(a)(1).

**[3] Labor and Employment** 363
231Hk363 Most Cited Cases
In order to establish prima facie case for interference under the FMLA, employee must establish that (1) she is an "eligible employee" under the FMLA, (2) defendants constitute an "employer" under the FMLA, (3) she was entitled to leave under the FMLA, (4) she gave notice to defendants of her intention to take leave, and (5) defendants denied her benefits to which she was entitled by FMLA. Family and Medical Leave Act of 1993, § 105(a)(1), 29 U.S.C.A. § 2615(a)(1).

**[4] Labor and Employment** 357
231Hk357 Most Cited Cases
As first part of determination, for purposes of FMLA interference claim, of whether employee with end-stage renal disease was an "eligible employee" under the FMLA, because employee's two periods of

absences were both attributable to peritonitis, a direct side effect of her ambulatory peritoneal dialysis, they had to be considered part of a single "intermittent leave." Family and Medical Leave Act of 1993, § § 101(2), 105(a)(1), 29 U.S.C.A. § § 2611(2), 2615(a)(1); 29 C.F.R. § § 785.16(a), 825.110(c, d), 825.203(a, c).

**[5]** Labor and Employment 🗝️340
231Hk340 Most Cited Cases

**[5]** Labor and Employment 🗝️357
231Hk357 Most Cited Cases
The 1,250-hour test for FMLA eligibility is applied only once, on the commencement of a series of intermittent absences, if all involve the same FMLA-qualifying serious health condition during the same 12-month FMLA leave year. Family and Medical Leave Act of 1993, § 101(2)(A)(ii), 29 U.S.C.A. § 2611(2)(A)(ii).

**[6]** Labor and Employment 🗝️340
231Hk340 Most Cited Cases
In order to ascertain twelve-month period after which employee must reestablish eligibility for FMLA leave, three different computation methods may be employed, namely (1) calendar method, (2) fixed period, (3) "12-month period measured forward" method, and (4) "rolling backward" method. Family and Medical Leave Act of 1993, § 102(a)(1), 29 U.S.C.A. § 2612(a)(1); 29 C.F.R. § 825.200(b, e).

**[7]** Labor and Employment 🗝️340
231Hk340 Most Cited Cases
Applying any of three calculation methods, Operations Manager for corporation providing various services to airlines operating out of county airport was an "eligible employee" under FMLA as of date she requested immediate three-month medical leave of absence. Family and Medical Leave Act of 1993, § 101(2), 29 U.S.C.A. § 2611(2); 29 C.F.R. § 825.200(b, e).

**[8]** Labor and Employment 🗝️356
231Hk356 Most Cited Cases

**[8]** Labor and Employment 🗝️367(1)
231Hk367(1) Most Cited Cases
Under most beneficial calendar method for determining eligibility for FMLA leave, employee with end-stage renal disease was entitled to six additional weeks of FMLA leave at time she requested three-month medical leave and could

establish claim for FMLA interference if, as she claimed, she properly sought reinstatement within six-week period, based on her employer's failure to reinstate her to her former position or equivalent one. Family and Medical Leave Act of 1993, § § 101(2), 102(a)(1)(D),104(a)(1), 105(a)(1), 29 U.S.C.A. § § 2611(2), 2612(a)(1)(D), 2614(a)(1), 2615(a)(1); 29 C.F.R. § 825.200(b, e).

**[9]** Federal Civil Procedure 🗝️2497.1
170Ak2497.1 Most Cited Cases
Genuine issue of material fact, as to whether employee who was eligible for six weeks of FMLA leave at time she requested medical leave attempted to return to work within that time, precluded summary judgment on her FMLA interference claim based on her employer's failure to reinstate her to her former position or equivalent one; treating internist had given written clearance for employee to return to part-time work, but employee's receipt of New York State disability benefits beyond that time arguably suggested she was not sufficiently well to return to work. Family and Medical Leave Act of 1993, § § 104(a)(1), 105(a)(1), 29 U.S.C.A. § § 2614(a)(1), 2615(a)(1).

**[10]** Civil Rights 🗝️1743
78k1743 Most Cited Cases
*McDonnell Douglas* burden-shifting framework applies in discrimination claims brought under New York State Human Rights Law (NYSHRL). N.Y.McKinney's Executive Law, § 296.

**[11]** Civil Rights 🗝️1536
78k1536 Most Cited Cases
*McDonnell Douglas* framework requires employee in disability discrimination case to establish prima facie case of discrimination, after which burden shifts to employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action in question; once employer provides such a reason, employee shoulders burden of showing sufficient potential proof for a reasonable jury to find the proffered legitimate reason merely a pretext for discrimination.

**[12]** Civil Rights 🗝️1217
78k1217 Most Cited Cases
Elements of prima facie case of disability discrimination prohibited by the New York State Human Rights Law (NYSHRL) are the same for a claim under the ADA; specifically, employee must show that (1) her employer was subject to the NYSHRL, (2) she was disabled within the meaning

of the NYSHRL, (3) she was otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation, and (4) she suffered adverse employment action because of her disability. Americans with Disabilities Act of 1990, § 2 et seq., 42 U.S.C.A. § 12101 et seq.; N.Y.McKinney's Executive Law § 290 et seq.

**[13] Civil Rights** 🔑1218(4)

78k1218(4) Most Cited Cases

Employee failed to establish prima facie case of disability discrimination under New York State Human Rights Law (NYSHRL) with respect to her termination or denial of request for indefinite leave at that time, absent showing she could have performed the essential functions of her position as of date she was terminated. N.Y.McKinney's Executive Law § 290 et seq.

**[14] Federal Civil Procedure** 🔑2539

170Ak2539 Most Cited Cases

In FMLA interference case, paragraphs of supervisor's affidavit submitted in support of employer's summary judgment motion that stated employee was not entitled to leave pursuant to FMLA on date she requested medical leave contained legal conclusion and would be stricken from the record. Fed.Rules Civ.Proc.Rule 56(e), 28 U.S.C.A.; Family and Medical Leave Act of 1993, § 105(a)(1), 29 U.S.C.A. § 2615(a)(1).

**[15] Federal Civil Procedure** 🔑2539

170Ak2539 Most Cited Cases

In FMLA interference case, paragraphs of supervisor's affidavit submitted in support of employer's summary judgment motion that concerned events that occurred prior to supervisor's employment with defendant were not based on personal knowledge and would be stricken from the record. Fed.Rules Civ.Proc.Rule 56(e), 28 U.S.C.A.; Family and Medical Leave Act of 1993, § 105(a)(1), 29 U.S.C.A. § 2615(a)(1).

 Zabell & Associates, P.C., Bohemia, Saul D. Zabell, Esq., R. Elizabeth Ureña, Esq., Of Counsel, for Plaintiff.

 Greenwald Doherty, LLP, New City, Kevin M. Doherty, Esq., Of Counsel, for Defendant.

OPINION AND ORDER

CONNER, Sr. D.J.

**\*1**  Plaintiff Tina Roberts brought this action

pursuant to the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § § 2601 et. seq., the New York State Human Rights Law, EXEC. LAW § § 296, et seq. ("NYSHRL") and the Consolidated Omnibus Budget Reconciliation Act of 1985, 29 U.S.C. § § 1161, et seq. ("COBRA") against her former employer, defendant Group Handling, Inc. ("GHI"). Plaintiff alleged that defendant: (1) interfered with her rights guaranteed under the FMLA; (2) discriminated against her on the basis of her disability in violation of NYSHRL; (3) failed to provide her with continuing group health plan coverage in violation of COBRA; and (4) retaliated against her for exercising her rights guaranteed under the FMLA. Defendant moved to dismiss plaintiff's first, third and fourth claims pursuant to FED. R. CIV. P. 12(b)(6), and in an Opinion and Order dated March 11, 2005, we granted defendant's motion with respect to plaintiff's third and fourth causes of action. Defendant now moves for summary judgment on plaintiff's remaining two claims, namely: (1) the first cause of action for interference with plaintiff's rights guaranteed under the FMLA; and (2) the second cause of action for disability discrimination in violation of NYSHRL. In addition, plaintiff moves to strike certain paragraphs of defendant's Rule 56.1 Statement and its annexed exhibits, as well as certain paragraphs of the affidavit of John Barrella ("Barrella"), all of which defendant submitted in support of its motion for summary judgment. For the following reasons, defendant's motion for summary judgment is denied and plaintiff's motion to strike is granted in part and denied in part.

BACKGROUND

 Viewed in the light most favorable to plaintiff, the record reveals the following relevant facts. [FN1] GHI is a New York corporation that provides various services to airlines that operate out of Westchester County Airport, including catering and cleaning services, ground crew assistance and gate boarding and bag loading services. (See Pl. Aff. ¶ 2.) On April 21, 1986, GHI hired plaintiff as a customer service agent and promoted her to Operations Manager in January 1996. (See id. ¶ 1; Barrella Aff. ¶ 6.) As an Operations Manager, plaintiff was one of four individuals responsible for the timely and effective operations of the aircraft operating out of Westchester County Airport. (See Barrella Aff. ¶ 6.) Prior to 2000, plaintiff was supervised by Barrella and, thereafter, by Edward Thorton ("Thorton"), who was himself supervised by Barrella. (See id. ¶ 8; Pl. Rule 56.1 Stmt. ¶ 5.)

 In 1987, plaintiff was diagnosed with chronic renal

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2007 WL 2071568                                                                                      Page 4
--- F.Supp.2d ----, 2007 WL 2071568 (S.D.N.Y.), 154 Lab.Cas. P 35,299
**(Cite as: 2007 WL 2071568 (S.D.N.Y.))**

failure which ultimately developed into end-stage renal disease. [FN2] (*See* Def. Rule 56.1 Stmt. ¶ 6, Ex. D (Pl. Dep. at 36); Pl. Rule 56.1 Stmt. ¶ 6.) From 1987 through the end of 2002, plaintiff received continuous ambulatory peritoneal dialysis. [FN3] (*See* Def. Rule 56.1 Stmt., Ex. D (Pl. Dep. at 37); Urena Decl., Ex. S (Saitta Dep. at 13-15).) During this period, GHI provided her work breaks four times a week, twice a day during which she would administer the dialysis in either Barrella or Thorton's office. (*See* Def. Rule 56.1 Stmt. ¶ 6, Ex. D (Pl. Dep. at 45, 48); Pl. Rule 56.1 Stmt. ¶ 6; Urena Decl., Ex. Q (Thorton Dep. at 27-28).)

**\*2** GHI also allowed plaintiff multiple leaves of absences as a result of her kidney condition. (*See* Def. Rule 56.1 Stmt. ¶ 7; Pl. Rule 56.1 Stmt. ¶ 7.) Specifically, plaintiff took leave from December 6, 1989 to January 14, 1990, June 1990 to September 1990 [FN4] and February 8, 2002 to March 11, 2002. (*See* Def. Rule 56.1 Stmt. ¶¶ 7, 8, 12; Pl. Rule 56.1 Stmt. ¶¶ 7, 8, 12; Barrella Aff. ¶ 9.) In addition, between 1990 and 2000, plaintiff was hospitalized on approximately ten occasions for reasons attributable to her kidney condition [FN5] and, on each occasion, GHI allowed plaintiff medical leave and granted her immediate reinstatement upon completion of her treatment and medical clearance for her to resume work. (*See* Def. Rule 56.1 Stmt. ¶ 9, Ex. D (Pl. Dep. at 41-42); Pl. Rule 56.1 Stmt. ¶ 10.) At all relevant times, Barrella was responsible for handling plaintiff's requests for medical leave and other medical accommodations. (*See* Barrella Aff. ¶ 8.)

On September 22, 2002, plaintiff was hospitalized due to an infection surrounding the catheter [FN6] and the onset of peritonitis, [FN7] both of which were attributable to her kidney condition. (*See* Complt. ¶ 39; Def. Rule 56.1 Stmt., Ex. D (Pl. Dep. at 43), Ex. F (Saitta Dep. 17), Ex. G (Pisano Dep. at 16-18).) On September 24, 2002, she called Barrella and advised him of the situation and indicated that she was going to miss work that day. (*See* Pl. Aff. ¶ 5.) The next day, plaintiff called Barrella and advised him that she was still in the hospital and was going to be absent from work again. (*See id.* ¶ 6.) Then, on September 26, 2002, plaintiff's sister called Barrella and informed him that plaintiff was extremely ill and could not return to work at that time. (*See id.* ¶ 7; Barrella Aff. ¶ 11.)

On September 26, 2002, Barrella sent plaintiff a letter stating:

I would like to thank you for the call I received

from your sister on your behalf updating your status. I am very sorry to hear about your situation. The Company realizes you are going through a very difficult time and does not want your work responsibilities to divert your attention from focusing on your health and recovery. Therefore, at this time I am relieving you of all your Operation Manager responsibilities.

Once you are feeling better and are cleared to work, it will be necessary for you to contact me before returning. As always if you have any questions please do not hesitate to contact me.

(*See* Def. Rule 56.1 Stmt., Ex. I.) On October 3, 2002, Barrella sent plaintiff a second letter stating:

This letter is to provide you with an update on the status of your health benefits and information so you can make decisions concerning your condition.... Per our conversation today you informed me you do not wish to use any more vacation time and instead wish to seek disability. Enclosed is a disability form for your completion.

...

**\*3** The Family and Medical Leave Act (FMLA) provides certain employees with up to 12 workweeks of unpaid, job-protected leave a year and requires group health benefits to be maintained during the leave as if employees continued to work instead of taking leave. I also have enclosed an informational brief explaining the purpose and eligibility requirements for both the employer and employee under the FMLA.

Effective October 1, 2002 the Company is designating your medical absence as FMLA leave. During this time the Company will continue to maintain group health insurance, including dependent coverage on the same terms as if you continued to work.

...

As always if you have questions please do not hesitate to contact me.

(*See* Def. Rule 56.1 Stmt., Ex. C; Pl. Aff., Ex. B; Barrella Aff. ¶ 12.) Defendant enclosed a twelve-page explanation of the FMLA entitled "Compliance Guide to the Family and Medical Leave Act ." [FN8] (*See id.*) It also enclosed an application for New York State Disability benefits for which plaintiff applied and ultimately received through the end of the year. (*See* Pl. Aff., Ex. B.; Def. Rule 56.1 Stmt. ¶ 19; Pl. Rule 56.1 Stmt. ¶ 19; Barrella Aff. ¶¶ 12-13.)

Plaintiff remained on leave until January 6, 2003 at which time she provided defendant with medical clearance from her two treating doctors, Dr. Richard Pisano ("Pisano"), her internist, and Dr. Richard Saitta ("Saitta"), her nephrologist. (*See* Def. Rule 56

--- F.Supp.2d ----, 2007 WL 2071568 (S.D.N.Y.), 154 Lab.Cas. P 35,299
**(Cite as: 2007 WL 2071568 (S.D.N.Y.))**

.1 Stmt. ¶¶ 22, 23, 26, Exs. D (Pl. Dep. at 74), L, M, F (Saitta Dep. at 4), G (Pisano Dep. at 4, 10; Pl. Rule 56.1 Stmt. ¶¶ 22, 23, 26; Barrella Aff. ¶¶ 14-15.) Although plaintiff did not actually return to work until February 19, 2003, plaintiff used FMLA time only to January 6, 2003. [FN9] (*See* Barrella Aff. ¶ 16; Pl. Mem. Opp. Summ. J. at 4; Pl. Aff. ¶ 8; Def. Rule 56.1 Stmt. ¶ 25, 26; Pl. Rule 56.1 Stmt. ¶ 24, 25, 26; Urena Decl., Exs. P (Barrella Dep. at 60), I, J; Def. Rule 56.1 Stmt., Ex. D (Pl. Dep. at 74).) During this time, the three other Operation Managers were required to work overtime in order to cover plaintiff's responsibilities. (*See* Def. Rule 56.1 Stmt. ¶ 27; Pl. Rule 56.1 Stmt. ¶ 27.)

Upon plaintiff's return to work on February 19, 2003, plaintiff provided Barrella a memorandum requesting an accommodation to not work on Mondays, Wednesdays and Fridays between the hours of 3:30 p.m. and 7:00 p.m. so that she could receive dialysis treatments. [FN10] (*See* Barrella ¶ 17; Pl. Rule 56.1 Stmt. ¶ 28; Pl. Aff., Ex. E; Def. Rule 56.1 Stmt., Ex. N.) Defendant granted plaintiff the accommodation and plaintiff worked throughout February and the first half of March. (*See* Barrella ¶ 17; Def. Rule 56.1 Stmt. ¶ 28; Pl. Rule 56.1 Stmt. ¶ 28.)

On March 18, 2003, plaintiff requested leave for three months and submitted a letter stating:

I ... would like to request an immediate medical leave of absence effective 3/18/03. Due to circumstances out of my control, I am requesting a 2-3 month leave pending status. During my absence, I will keep my commitment to attend all prearranged classes scheduled at White Plains High School. I understand that failure on my part to attend these classes will result in termination of my employment.

**\*4** (*See* Pl. Aff., Ex. F; Def. Rule 56.1 Stmt., Ex. O; Barrella Aff. ¶ 18.) She also submitted a letter from Pisano stating:

Ms. Roberts is under my care and the care of multiple other physicians for multiple medical conditions. It is strongly recommended at this time she commence with a leave of absence as of today. I anticipate this leave to last 3 months at which time she will be reevaluated for return to employment.

(*See* Def. Rule 56.1 Stmt., Ex. P; Barrella Aff. ¶ 19.) In response, defendant sent plaintiff a letter on March 19, 2003, stating:

This letter serves to confirm our meeting yesterday. At your request I am relieving you of your responsibilities as an operations manager effective 3/18/03. I have authorized an extension of your

medical coverage through June 18, 2003. Your share of the cost was deducted from your paycheck. After June 18, 2003 you will be required to go on "COBRA" to maintain medical insurance. Therefore when you have a doctor's clearance to return, please contact me for employment consideration.

(*See* Def. Rule 56.1 Stmt., Ex. S.)

Defendant did not consider plaintiff's leave from March 18, 2003 to June 18, 2003 as FMLA leave and believed that plaintiff was not eligible or entitled to such leave at that time. (*See* Barrella Aff. ¶ 21; Def. Rule 56.1 Stmt. ¶ 32.) Barrella determined that plaintiff had not worked the required amount of hours in the preceding twelve months to be eligible for FMLA leave and had already exhausted all of her FMLA leave for that period. (*See* Barrella Aff. ¶¶ 20-22.) Unlike the October 3, 2002 letter, this letter did not enclose a FMLA notice and indicated that plaintiff would have to purchase COBRA coverage after June 18, 2003 in order to maintain medical insurance. (*See* Barrella Aff. ¶ 21; Def. Rule 56.1 Stmt., Ex. S.)

In April 2003, one of the three Operations Managers resigned, leaving only two managers to perform the responsibilities that typically required four people. (*See* Barrella Aff. ¶ 23; Def. Rule 56.1 Stmt. ¶ 33.) As a result, defendant promoted two individuals to the position of Operations Manager to fill the vacancies. (*See id.*)

In plaintiff's affidavit, she claims that on April 22, 2003, she informed Barrella that she was ready to return to work and he indicated that they " 'need[ed] to talk" ' and "there were 'other things [she] needed to do before [she] returned ....' " (*See* Pl. Aff. ¶ 9.) Plaintiff alleges that she requested a meeting to discuss her employment situation and Barrella said that he first had to talk with GHI's individual owners. (*See id.*) Plaintiff claims that Barrella never contacted her, and she called him on two occasions thereafter to follow up. [FN11] (*See id.* ¶¶ 10-11.)

According to plaintiff, Barrella requested that she submit documentation from her treating physician providing her medical clearance to return to work. (*See* Pl. Aff. ¶ 11.) She claims that Pisano sent defendant a letter, dated April 25, 2003, indicating that she was able to work part-time as of April 28, 2003. (*See* Pl. Aff. ¶ 12; Urena Decl., Ex. F.) Although it appears that Pisano wrote such a letter, (*see* Urena Decl., Ex. F; Def. Rule 56.1 Stmt., Ex. G (Pisano Dep. at 30, 38)), there is no evidence that it

2007 WL 2071568                                                                          Page 6
--- F.Supp.2d ----, 2007 WL 2071568 (S.D.N.Y.), 154 Lab.Cas. P 35,299
**(Cite as: 2007 WL 2071568 (S.D.N.Y.))**

was ever sent to defendant, except for plaintiff's unsubstantiated allegation that she called Barrella's office and was told that the office had received it. (*See id.;* Pl. Aff. ¶ 12.) Plaintiff, however, could not identify the person with whom she spoke, and neither plaintiff nor Pisano has personal knowledge that it was ever sent to defendant. [FN12] (*See id.*) The letter itself is unaddressed. (*See* Urena Decl., Ex. F.)

**\*5** According to Barrella, on April 22, 2003, plaintiff called him on her health status and indicated that she might be able to return to work in a month. (*See* Def. Rule 56.1 Stmt. ¶ 34; Doherty Aff'm, Ex. Z (Barrella Dep. at 44); Barrella Aff. ¶ 24 .) He claims that he informed her that she would need to provide medical documentation clearing her to work. (*See* Def. Rule 56.1 Stmt. ¶ 34; Doherty Aff'm, Ex. Z (Barrella Dep. at 44).) According to Barrella, plaintiff never provided him with any medical documentation and did not indicate that she would be able to return to work at any specific time. [FN13] (*See* Barrella Aff. ¶ 24; Doherty Aff'm, Ex. Z (Barrella Dep. at 47).) Barrella claims that plaintiff did not contact him again until June 30, 2003, approximately two weeks after her medical leave to June 18, 2003 had expired. [FN14] (*See* Barrella Aff. ¶ ¶ 25-26; Doherty Aff'm, Ex. Z (Barrella Dep. at 38, 48-49).)

On June 30, 2003, plaintiff informed Barrella that she had become extremely ill again and required an indefinite period of medical leave. (*See* Pl. Aff. ¶ 14, Ex. G.) Barrella instructed plaintiff to put the request in writing and, on July 1, 2003, Barrella sent plaintiff a letter stating:

> Enclosed please find the COBRA forms you requested. If you choose to use COBRA please complete the enclosed forms and return to Christa within the stated deadline. As you are aware the Company has made every effort to work with you during this difficult time. However, understanding your present condition we realize your health is your number one priority. Therefore, we wish you well in your continued efforts to regain your health. If there is anything else that we can do for you please do not hesitate to ask.

(*See* Def. Rule 56.1 Stmt., Ex. V; Barrella Aff. ¶ 26.) In response, on July 7, 2003, plaintiff sent Barrella a letter stating:

> Per our conversation on Monday[,] June 30, 2003, I am requesting an extended medical leave of absence. Unfortunately, this is due to failure to get medical clearance from my physicians.
> Your enclosed letter dated July 1, 2003 and Cobra documents were received on Saturday July 5, 2003.

This brings an enormous concern since the Cobra documents reflect an expiration date of June 30, 2003 of all medical benefits. The document entitled Notice of Rights to Continue Group Medical and/or Dental Insurance indicates no further notice will be sent and failure to make payments due will terminate insurance benefits.

> Therefore, please contact me as soon as possible in hopes to resolve this matter. And as always I appreciate your assistance.

(*See* Pl. Aff., Ex. G; Barrella Aff. ¶ 27.)

Thereafter, plaintiff called Barrella to schedule a meeting to discuss her employment status. (*See* Barrella Aff. ¶ 28.) On July 31, 2003, Barrella met with plaintiff, who was accompanied by Franklin Brown, the pastor of her church. (*See* Barrella Aff. ¶ 29; Urena Decl., Ex. U (Brown Dep. at 26, 29), Ex. P (Barrella Dep. at 50).) At this time, plaintiff did not know when she could return to work, and Barrella informed her that GHI had to terminate her employment. (*See* Barrella Aff. ¶ 29; Urena Decl., Ex. P (Barrella Dep. at 50- 51), Ex. U (Brown Dep. at 31).) At plaintiff's request, Barrella provided plaintiff with her attendance records and sent her a letter, dated August 13, 2003, regarding her employment status. (*See* Barrella Aff. ¶ ¶ 29-30; Urena Decl., Ex. P (Barrella Dep. at 51-52.) It stated:

> **\*6** This letter is to clarify any misunderstanding that may exist concerning your employment status. Our records indicate your last day worked was March 18, 2003. Your last day of employment was June 18, 2003 at the conclusion of your unpaid medical leave.

(*See* Pl. Aff., Ex. H.) Subsequent to plaintiff's request for leave in June, plaintiff never provided defendant with medical authorization indicating that she was able to resume working, and it is not clear when, if ever, plaintiff eventually received medical clearance to work. (*See* Def. Rule 56.1 Stmt. ¶ 41, Ex. E (Pl. Dep. at 217-18); Pl. Rule 56.1 Stmt. ¶ 41.) After plaintiff was discharged, plaintiff received public assistance and did not work until June 2004. (*See* Def. Rule 56.1 Stmt., Ex. E (Pl.Dep.217, 219-20).) Plaintiff brought this action on June 22, 2004, and the parties have since concluded discovery. We now turn to defendant's motion for summary judgment.

## DISCUSSION

### I. *Legal Standard*

Under FED. R. CIV. P. 56, a motion for summary judgment may be granted only "if the pleadings, depositions, answers to interrogatories, and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." It is axiomatic that " 'at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." ' *Kessler v. Westchester County Dep't of Soc. Servs.,* 461 F.3d 199, 206 (2d Cir.2006) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). The Court's role is not to decide issues of material fact, but to discern whether any exist. *See Gallo v. Prudential Residential Servs., L.P.,* 22 F.3d 1219, 1224 (2d Cir.1994). In doing so, the Court must resolve all ambiguities and draw all permissible factual inferences against the movant. *See Anderson,* 477 U.S. at 255. At all times, the burden rests on the movant to demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

" 'Once the moving party has made a properly supported showing sufficient to suggest the absence of any genuine issue as to a material fact, the nonmoving party, in order to defeat summary judgment, must come forward with evidence that would be sufficient to support a jury verdict in his favor.' " *Hill v. Rayboy-Brauestein,* No. 02-CV-3770, 2006 WL 3298383, at *5 (S.D.N.Y. Nov. 9, 2006) (quoting *Goenaga v. March of Dimes Birth Defects Found.,* 51 F.3d 14, 18 (2d Cir.1995)). The nonmovant must go beyond the pleadings and "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Bush v. Fordham Univ.,* 452 F.Supp.2d 394, 405 (S.D.N.Y.2006) ("In making its showing that a genuine issue of material fact exists, the nonmoving party may not rely on 'the mere existence of a scintilla of evidence' to support its position, but must instead proffer 'evidence on which the jury could reasonably find for the [plaintiff].' " (quoting *Dawson v. County of Westchester,* 373 F.3d 265, 272 (2d Cir.2004)). "However, summary judgment should only be granted '[i]f *after discovery,* the nonmoving party "has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof." " ' *Hellstrom v. U.S. Dep't of Veterans Affairs,* 201 F.3d 94, 97 (2d Cir.2000) (quoting *Berger v. United States,* 87 F.3d 60, 65 (2d Cir.1996) (quoting *Celotex Corp.,* 477 U.S. at 323 (1986) (emphasis in original; alterations

in original).

II. *Interference with Plaintiff's Rights Guaranteed Under the FMLA*

**\*7** Plaintiff alleges that defendant interfered with her rights guaranteed under the FMLA. [FN15] Specifically, plaintiff alleges that, on April 25, 2003, she informed Barrella that she could return to work and provided him with the required medical documentation. Nonetheless, defendant failed to reinstate plaintiff to her former position or to an equivalent position. In addition, plaintiff claims that she was terminated in June 2003 prior to the exhaustion of her FMLA leave. Defendant maintains that plaintiff was not eligible for FMLA leave as of March 18, 2003 and therefore was not entitled to reinstatement on April 28, 2003 or any time thereafter.

[1] The FMLA provides eligible employees the right to take up to twelve work weeks per year of unpaid leave due to a serious health condition that prevents the employee from performing her work function. *See* 29 U.S.C. § 2612(a)(1). At the conclusion of the leave, the employee has the right to return to the position that she held before taking leave, or to an equivalent position. *See id.* § 2614(a). However, the employee has no right to be restored to her prior position if the employee is unable to perform an essential job function because of a physical or mental impairment. *See Sarno v. Douglas Elliman-Gibbons & Ives, Inc.,* 183 F.3d 155, 161 (2d Cir.1999).

[2][3] The FMLA prohibits an "employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under" the statute. 29 U.S.C. § 2615(a)(1). To this end, "[t]he FMLA 'creates a private right of action to seek both equitable relief and money damages against any employer (including a public agency) in any Federal or State court of competent jurisdiction' should that employer 'interfere with, restrain, or deny the exercise of' FMLA rights." *Sista v. CDC Ixis N. Am., Inc.,* 445 F.3d 161, 174 (2d Cir.2006) (citing *Nevada Dep't of Human Res. v. Hibbs,* 538 U.S. 721, 724-25, 123 S.Ct. 1972, 155 L.Ed.2d 953 (2003)). In order to establish a *prima facie* case for interference under the FMLA, a plaintiff must establish: " '(1) that she is an "eligible employee" under the FMLA; (2) that defendants constitute an employer under the FMLA; (3) that she was entitled to leave under the FMLA; (4) that she gave notice to defendants of her intention to take leave; and (5) that defendants denied her benefits to which she was entitled by the FMLA ." ' "

Case 3:03-cv-00277-CFD    Document 113-4    Filed 08/17/2007    Page 51 of 68

2007 WL 2071568                                                                    Page 8
--- F.Supp.2d ----, 2007 WL 2071568 (S.D.N.Y.), 154 Lab.Cas. P 35,299
**(Cite as: 2007 WL 2071568 (S.D.N.Y.))**

*Kennebrew v. N.Y. City Hous. Auth.,* No. 01 CIV. 1654, 2002 WL 265120, at * 19 (S.D.N.Y. Feb.26, 2002) (quoting *Santos v. Knitgoods Workers' Union,* No. 99 Civ. 1499, 1999 WL 397500, at *3 (S.D.N.Y. June 15, 1999)); *see also Geromanos v. Columbia Univ.,* 322 F.Supp.2d 420, 427 (S.D.N.Y.2004); *Sabatino v. Flik Int'l Corp.,* 286 F.Supp.2d 327, 335-36 (S.D.N.Y.2003) (Conner, J.).

 Defendant first argues that plaintiff was not an eligible employee as of March 18, 2003. "The term 'eligible employee' means an employee who has been employed ... for at least 12 months by the employer ... and ... for at least 1,250 hours of service with such employer during the previous 12-month period." 29 U.S.C. § 2611. "The determining factor is the number of hours an employee has worked for the employer within the meaning of the [Fair Labor Standards Act 'FLSA'] ]." 29 C.F.R. § 825.110(c). Pursuant to the regulations of the FLSA, "[p]eriods during which an employee is completely relieved from duty and which are long enough to enable him to use the time effectively for his own purposes are not hours worked." 29 C.F.R. § 785.16(a). "The determination of whether an employee has worked for the employer for at least 1,250 hours in the past 12 months ... must be made as of the date leave commences." 29 C.F.R. § 825.110(d). "An employer must be able to clearly demonstrate that ... an employee did not work 1,250 hours during the previous 12 months in order to claim that the employee is not 'eligible' for FMLA leave." 29 C.F.R. § 825.110(c).

 **\*8** Defendant argues that plaintiff took leave commencing on March 18, 2003 but only worked 1,210.6 hours from March 19, 2002 to March 18, 2003 and consequently was not eligible for FMLA leave as of March 18, 2003. (*See* Barrella Aff. ¶ 22; Def. Rule 56.1 Stmt., Ex. T.) It contends that because plaintiff's leave from March 18, 2003 to June 18, 2003 was merely an accommodation and not granted pursuant to the FMLA, it had no obligation to reinstate plaintiff in April or any time thereafter. In response, plaintiff argues that the periods during which she was absent from October 1, 2002 to January 6, 2003 and from March 18, 2003 to June 18, 2003 constitute intermittent leave and are not separate leaves pursuant to the FMLA. She contends that, as a result, she was only required to establish eligibility under the FMLA prior to the commencement of the first absence, which was October 1, 2002, and not prior to each absence, *e.g.,* March 18, 2003. Thus, under plaintiff's theory, the determining factor is the amount of hours she worked

from October 1, 2001 to September 30, 2002, the twelve-month period immediately preceding the first absence of the intermittent leave. Under defendant's theory, the determining factor is the amount of hours plaintiff worked from March 18, 2002 to March 17, 2003, the twelve-month period immediately preceding plaintiff's second medical leave. Both defendant and plaintiff miss the mark.

 [4] First, we must determine whether plaintiff's absences commencing on October 1, 2002 and March 18, 2003 constitute intermittent leave. "Intermittent leave is FMLA leave taken in separate blocks of time due to a single qualifying reason." 29 C.F.R. § 825.203(a). "Intermittent leave may be taken for a serious health condition which requires treatment by a health care provider periodically, rather than for one continuous period of time, and may include leave of periods from an hour or more to several weeks." 29 C.F.R. § 825.203(c)(1). "Examples of intermittent leave would include leave taken on an occasional basis for medical appointments, or leave taken several days at a time spread over a period of six months, such as for chemotherapy." *Id.* In addition, "[l]eave may be taken intermittently ... when medically necessary for ... unanticipated medical treatment of a related serious health condition by or under the supervision of a health care provider, or for recovery from treatment or recovery from a serious health condition." 29 C.F.R. § 825.203(c).

 Plaintiff argues that:
> Defendant placed [p]laintiff on FMLA leave beginning on October 1, 2002, due to [p]laintiff's serious health condition, the gastrointestinal bleed and peritonitis which required [p]laintiff's hospitalization for forty-five (45) days.... On March 18, 2003, [p]laintiff requested medical leave again due to the same serious health condition which necessitated her leave in October 2002.... Thus the leave [p]laintiff took in October 2002[ ] was "intermittent FMLA leave."

 **\*9** (*See* Pl. Mem. Opp. Summ. J. at 8-9.) Although the precise reasons for plaintiff's absences commencing in October 2002 and March 2003 are somewhat unclear, the record, construed in the light most favorable to plaintiff, reveals the following facts. In October 2002, plaintiff was diagnosed with peritonitis, a common complication caused by the continuous ambulatory peritoneal dialysis that she had underwent from 1987 through 2002, and was hospitalized as a result thereof. (*See* Def. Rule 56.1 Stmt., Ex. D (Pl. Dep. at 43), Ex. F (Saitta Dep. 17), Ex. G (Pisano Dep. at 16-18).) Then, on March 18, 2003, plaintiff's peritonitis and gastrointestinal

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

problems resurfaced and caused plaintiff severe pain, rendering plaintiff incapable of working and necessitating further medical care. (*See* Def. Rule 56.1 Stmt., Ex. D (Pl. Dep. at 99-100), Ex. F (Saitta Dep. 17), Ex. G (Pisano Dep. at 17-18).) Thus, because plaintiff's two periods of absences were both attributable to the peritonitis, a direct side effect of her ambulatory peritoneal dialysis, plaintiff's absences commencing on October 1, 2002 and March 18, 2003 must be considered part of a single, intermittent leave.

[5] Next, we must determine whether plaintiff was eligible for FMLA leave as of March 18, 2003 in light of the fact that she took intermittent leave commencing on October 1, 2002. Although very little authority exists regarding the computation of hours worked for purposes of determining employee eligibility under the FMLA in the context of intermittent leave, the Department of Labor ("DOL") and two district courts have addressed this exact issue. [FN16] All three explained that "the 1,250-hour eligibility test is applied only once, on the commencement of a series of intermittent absences, if all involve the same FMLA-qualifying serious health condition *during the same 12- month FMLA leave year*." DOL Opinion Letter, 2000 WL 33157366 (Sept. 11, 2000) (emphasis added); *see also Sills v. Bendix Commercial Vehicle Sys.*, No. Civ. 1:04-CV-149, 2005 WL 2674926, at *8 (N.D.Ind. Oct.20, 2005); *Barron v. Runyon*, 11 F.Supp.2d 676, 683 (E.D.Va.1998). However, "[a]ny eligibility determination made on the date leave commences, then, can apply only to the twelve weeks the employee plans to take within the current twelve-month period ...." *Barron*, 11 F.Supp.2d at 683; *see also* DOL Opinion Letter, 2000 WL 33157366; *Sills*, 2005 WL 2674926, at *8 ("an employee [must] meet the eligibility requirements annually, even in a case of intermittent leave taken for an ongoing medical condition."). Thus, after the twelve-month period expires, the employee must reestablish eligibility in order to take FMLA leave during the subsequent twelve-month period. *See* DOL Opinion Letter, 2000 WL 33157366 ("If the employee needed leave ... again in a new 12-month period, the employee would have to re-qualify under the 1,250-hour eligibility test to be entitled to take FMLA leave for the same chronic condition in the new 12-month period."); DOL Opinion Letter, 2005 WL 3401779 (Sept. 14, 2005) ("[I]f the employee used leave in a new FMLA leave year, the employer could reassess the employee's eligibility for FMLA leave at that time."). As the DOL and the court in *Sills* explained:

    **\*10** Assume an employee is diagnosed with an FMLA-qualifying chronic condition, such as [Multiple Sclerosis (MS) ] ..., that results in an employee needing intermittent leave due to the episodic nature of the condition. For example, if an employee with MS who was eligible to take intermittent FMLA leave in April and May needed leave again when the episodes of incapacity recurred in July and again in October, the employee would be entitled to FMLA leave without having to re-qualify under the 1,250-hour eligibility test so long as the absences occurred within the same 12-month period and the employee had not exhausted the 12-week leave entitlement for this or any other FMLA-qualifying reason. If the employee needed leave for MS again in a new 12-month period, the employee would have to re-qualify under the 1,250-hour eligibility test to be entitled to take FMLA leave for the same chronic condition in the new 12-month period.

*Sills*, 2005 WL 2674926, *9 (citing DOL Opinion Letter, 2000 WL 33157366).

[6] In order to ascertain the twelve-month period after which an employee must reestablish eligibility, three different computation methods may be employed, namely: (1) the calendar method; (2) the fixed period; (3) the "12- month period measured forward" method; and (4) the "rolling backward" method. *See* DOL Opinion Letter, 2000 WL 33157366. As the Department of Labor has explained:

    Where an employer has selected either the calendar year, fixed year, or the 12-month period measured forward, ... an employee's eligibility, once satisfied, for intermittent FMLA leave for a particular condition would last through the entire current 12-month period as designated by the employer for FMLA purposes. If an employer uses the rolling backward method, an employee's eligibility for absence due to a particular condition would continue for 12 months from the date of the first FMLA absence for the condition. Under all of these methods, eligibility could be recalculated at the time of the first absence for the condition after the conclusion of the 12-month period.

*See id.; see also* 29 C.F.R. § 825.200(b). However, when an employer has not designated a particular computation method, "the option that provides the most beneficial outcome for the employee will be used." 29 C.F.R. § 825.200(e).

[7] In the present case, defendant did not establish any particular method and we must apply the method that produces the best result for plaintiff. Both the application of the calendar method and the "12-month

period measured forward" or the "rolling backward" methods would allow plaintiff to establish eligibility as of March 18, 2003. First, under the calendar method, because plaintiff commenced her intermittent leave on October 1, 2002, she would be required to reestablish her eligibility upon her first absence after the conclusion of the initial twelve-month period, *i.e.*, the calendar year, which is January 1, 2003. At that time, plaintiff could have re-established eligibility for the year 2003, as she worked approximately 1,530 hours in 2002. (*See* Def. Rule 56.1 Stmt., Ex. T (2002, Week 52).) Second, applying either the "12-month period measured forward" or the "rolling back" method, plaintiff would be required to reestablish her eligibility upon taking FMLA leave after the conclusion of the twelve-month period, *i.e.*, after September 30, 2003. Because plaintiff did not take FMLA leave after September 30, 2003, she would not be required to reestablish her eligibility after being deemed an eligible employee as of October 1, 2002. Accordingly, applying any of the three methods (calendar method, "12-month period measured forward" or "rolling backward"), plaintiff was an eligible employee pursuant to the FMLA as of March 18, 2003.

**\*11** The next issue is whether plaintiff was *entitled* to FMLA leave on March 18, 2003. "[A]n eligible employee's FMLA leave entitlement is limited to a total of 12 workweeks of leave during any 12-month period ... [b]ecause of a serious health condition that makes the employee unable to perform one or more of the essential functions of his or her job." 29 C.F.R. § 825.200; 29 U.S .C. § 2612. In determining the "12-month period" in which the twelve weeks of leave entitlement occurs, an employer is permitted to choose: (1) the calendar year; (2) any fixed twelve-month "leave year"; (3) the "12-month period measured forward" from the date any employee's first FMLA leave begins; or (4) a "rolling 12-month period measured backward" from the date an employee uses any FMLA leave. *See* 29 C.F.R. § 825.200(b). As in the eligibility context, "[i]f an employer fails to select one of the[se] options ... for measuring the 12-month period, the option that provides the most beneficial outcome for the employee will be used." *Id.* at § 825.200(e).

Defendant argues:
  Plaintiff took no less than fifteen weeks of medical leave from September 24, 2002, through January 6, 2003, (the earliest point at which she provided authorization to return). Her leave from October 1, 2002 forward was designated as FMLA leave,

which would have expired on or about December 24, 2002, and definitely prior to the end of 2002. As a result, as of March 18, 2003, [p]laintiff no longer was entitled to any FMLA leave and any refusal of GHI to reinstate her from March 18, 2003 forward, if any, therefore, cannot violate the FMLA.

(*See* Def. Mem. Supp. Summ. J. at 9.) In its argument, defendant clearly uses the "rolling" twelve-month period measured backward from the date an employee uses any FMLA leave, which, under the present circumstances, is the most detrimental to plaintiff. Because defendant failed to notify plaintiff (or any other employee) of its use of the "rolling" computation method, defendant's argument fails, and we must apply the method that is most beneficial to plaintiff.

[8] In the present case, it is clear that the calendar method is the most beneficial. [FN17] Applying the calendar method, plaintiff was entitled to twelve weeks of FMLA leave as of January 1, 2003. Plaintiff took leave from January 1, 2003 to January 6, 2003 and then took leave commencing in March 18, 2003 to April 28, 2003 at which time plaintiff claims that she requested to return to work. (*See* Def. Rule. 56.1 Stmt., Exs. Q, R.) As of April 28, 2003, plaintiff took approximately six weeks of leave in 2003 and therefore was entitled to take approximately six additional weeks of FMLA leave during the remainder of the calendar year. Accordingly, in the event that plaintiff were to show that she properly sought reinstatement on April 28, 2003, she could establish a claim for FMLA interference, as it is clear that she was not reinstated to her position or to an equivalent one at that time.

**\*12** [9] The parties dispute whether plaintiff, in fact, attempted to return to work on April 28, 2003. Plaintiff alleges in her affidavit that, in April 2003, she informed Barrella that she was able to return to work and that she called Barrella on three occasions to schedule a meeting with him regarding her return. (*See* Pl. Aff. ¶ ¶ 9-11.) In addition, she alleges that Pisano sent Barrella's office a letter, dated April 25, 2003, indicating that plaintiff was medically cleared to work part-time as of April 28, 2003. (*See id.* ¶ 12.) Plaintiff produced a letter signed by Pisano's assistant, dated April 25, 2003, indicating exactly that, but it is unaddressed and does not otherwise indicate that it was actually sent to defendant. (*See* Urena Decl., Ex. F.) However, plaintiff alleges that she called "Barrella's office and was advised [that] they [had] received [ ] Pisano's note and would provide it to Barrella." (*See* Pl. Aff. ¶ 12.)

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 3:03-cv-00277-CFD    Document 113-4    Filed 08/17/2007    Page 54 of 68

2007 WL 2071568                                                                                    Page 11
--- F.Supp.2d ----, 2007 WL 2071568 (S.D.N.Y.), 154 Lab.Cas. P 35,299
**(Cite as: 2007 WL 2071568 (S.D.N.Y.))**

Conversely, defendant claims that plaintiff called Barrella on April 22, 2003 and merely indicated that "she may be able to return to work in about a month." (*See* Barrella Aff. ¶ 24.) Barrella claims that he never received correspondence from plaintiff's physician and did not hear from plaintiff again until June 30, 2003. (*See id.* ¶ ¶ 24, 26.) Moreover, at plaintiff's deposition, she was not able to recall when she contacted defendant prior to June 2003 to indicate that she could return to work, and she offers no explanation for the sudden recollection of specific dates alleged in her affidavit. (*See* Def. Rule 56.1 Stmt., Ex. D (Pl. Dep. at 106-29, 130-31, 136).) Furthermore, plaintiff received New York State disability benefits from March 19, 2003 to June 16, 2003, which arguably suggests that plaintiff was not sufficiently well to return to work in April. (*See* Def. Rule 56.1 Stmt. ¶ 35; Pl. Rule 56.1 Stmt. ¶ 35; Barrella Aff. ¶ 31.) Nevertheless, because plaintiff's allegations must be presumed true and they are in part substantiated by the letter signed by Pisano's assistant dated April 25, 2003, a genuine issue of material fact exists and summary judgment must be denied. *See Kessler,* 461 F.3d at 206 (" '[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.' ") (quoting *Anderson,* 477 U.S. at 249).

Plaintiff also claims that defendant violated the FMLA by terminating her employment on June 18, 2003 because she was entitled to additional FMLA leave at that time. Defendant contends that, by June 18, 2003, plaintiff had taken more than twelve weeks of leave during the same twelve-month period and had thus exhausted her leave under the FMLA. However, in light of plaintiff's allegation that she requested to return to work on April 28, 2003, we cannot conclude that plaintiff's leave would have been exhausted by June 18, 2003. [FN18]

### III. *NYSHRL Disability Discrimination*

**\*13** [10][11] Plaintiff also asserts a claim under the NYSHRL for disability discrimination. Specifically, she alleges that defendant discriminated against her on the basis of her disability by: (1) not reinstating her in April 2003; (2) terminating her employment on June 18, 2003; and (3) denying her request for an indefinite period of leave on June 30, 2003. "In discrimination claims brought under the New York State ... Human Rights Law, the burden-shifting framework established by the Supreme Court in

*McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), applies." *Ferraro v. Kellwood Co.,* 440 F.3d 96, 99-100 (2d Cir.2006) (citing *N. Shore Univ. Hosp. v. Rosa,* 86 N.Y.2d 413, 633 N.Y.S.2d 462, 657 N.E.2d 483, 485 (1995)). "That framework requires a plaintiff in a disability-discrimination case to establish a *prima facie* case of discrimination, after which the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action in question." *Id.* at 100. "Once the defendant provides such a reason, the plaintiff shoulders the burden of showing 'sufficient potential proof for a reasonable jury to find the proffered legitimate reason merely a pretext' for discrimination." *Id.* (quoting *Richardson v. N.Y. State Dep't of Corr. Servs.,* 180 F.3d 426, 443 (2d Cir.1999)).

[12] The elements of a *prima facie* case for discrimination prohibited by the NYSHRL are the same for a claim under the Americans with Disabilities Act ("ADA"). *See Graves v. Finch Pruyn & Co.,* 457 F.3d 181, 184 n. 3 (2d Cir.2006) ("A claim of disability discrimination under the New York State Human Rights Law, N.Y. Exec. Law § 290-301 ... is governed by the same legal standards as govern federal ADA claims.")(citing *Parker v. Columbia Pictures Indus.,* 204 F.3d 326, 332 n. 1 (2d Cir.2000). Specifically, plaintiff must show that: (1) her employer was subject to the NYSHRL; (2) she was disabled within the meaning of the NYSHRL; [FN19] (3) she was otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation; and (4) she suffered adverse employment action because of her disability. *See Sista,* 445 F.3d at 169 (citing *Giordano,* 274 F.3d at 747); *Micari v. Trans World Airlines, Inc.;* 205 F.3d 1323, 1323 (2d Cir.1999); *Mitchell v. Washingtonville Cent. Sch. Dist.,* 190 F.3d 1, 6 (2d Cir.1999). The parties do not dispute that defendant is subject to the NYSHRL or that plaintiff is disabled for purposes of the statute. Defendant argues, however, that plaintiff could not have performed the essential duties of her position, with or without a reasonable accommodation, in either April or June of 2003.

Plaintiff alleges that, in April 2003, she informed defendant that she was able to return to work. She further alleges that Pisano sent Barrella's office the proper medical clearance but, nevertheless, she was not reinstated and remained on unpaid medical leave. Defendant, in its defense, primarily argues that plaintiff never attempted to return to work in April,

Case 3:03-cv-00277-CFD        Document 113-4        Filed 08/17/2007        Page 55 of 68

2007 WL 2071568                                                                          Page 12
--- F.Supp.2d ----, 2007 WL 2071568 (S.D.N.Y.), 154 Lab.Cas. P 35,299
**(Cite as: 2007 WL 2071568 (S.D.N.Y.))**

but rather, informed Barrella on April 22, 2005 that she might be able to return to work in a month. Accordingly, as explained *supra* pp. 21-22, a genuine issue of material fact exists as to whether plaintiff, in April 2003, requested to return to work and was medically cleared to do so.

**\*14** Defendant argues, however, that even if plaintiff did, in fact, properly request reinstatement in April 2003, she only could have worked part-time. Defendant relies on the letter that was purportedly sent to defendant by Pisano which states: "The above patient may now return to *part time work* as of April 28, 2003 from the medical leave of absence commenced March 18, 2003." (*See* Urena Decl., Ex. F. (emphasis supplied).) No evidence in the record, however, suggests that defendant failed to reinstate plaintiff because she requested to return to a part-time position. This is merely counsel's *ex post facto* argument to obviate defendant's obligation to reinstate plaintiff. Indeed, defendant unequivocally claims that plaintiff did not request to return to work *at all* in April and that it never received Pisano's letter prior to this litigation. Although defendant may not have an obligation to reinstate plaintiff to a part-time position under certain circumstances, [FN20] it is unclear whether plaintiff made such a request. Indeed, plaintiff alleges that she requested to be restored to the position that she had prior to her leave, and any inconsistent indication in Pisano's letter may merely be reflective of plaintiff's usual four-day-a-week work schedule. (*See* Def. Rule 56.1 Stmt., Exs. Q, R.) According to plaintiff, defendant made no effort to ascertain the nature of plaintiff's request to return to work and, in fact, ignored her request almost completely. *See* N.Y. COMP. CODES R. & REGS., tit. 9, § 466.11(j), (k) (2007) ("The employer has a duty to move forward to consider accommodation once the need for accommodation is known or requested. The employer has the duty to clearly request from the applicant or employee any documentation that is needed."); *cf. Jackan v. N.Y. State Dep't of Labor*, 205 F.3d 562, 568 (2d Cir.2000) (noting that the ADA imposes an obligation upon an employer to take affirmative steps to assist an employee in identifying potential accommodations); *Mengine v. Runyon*, 114 F.3d 415, 419 (3d Cir.1997) ("To determine the appropriate reasonable accommodation it may be necessary for the [employer] to initiate an informal, interactive process with the qualified individual with a disability in need of the accommodation. This process should identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations."). It remains

consequential whether plaintiff requested reinstatement in April 2003, and Pisano's written clearance for only "part time work" does not render this disputed issue of fact immaterial. Accordingly, defendant's motion for summary judgment with respect to plaintiff's claim for disability discrimination under the NYSHRL is denied.

[13] However, with respect to defendant's termination of plaintiff's employment on June 18, 2003, plaintiff has offered no evidence that she could have performed the essential duties of her position as of that date. Certainly, the record is clear that she did not provide any such indication to defendant. Indeed, shortly thereafter, plaintiff informed defendant that she could not obtain medical clearance to return to work and requested an indefinite leave of absence. It is equally clear that defendant terminated plaintiff because her disability rendered her incapable of working at all, and the record is devoid of any discriminatory motivation for its decision.

**\*15** Similarly, we reject plaintiff's claim that defendant failed to provide her reasonable accommodation, as required by the NYSHRL, by denying her request for medical leave on June 30, 2003. N.Y. EXEC. LAW § 296(3)(a) prohibits an employer from "refus[ing] to provide reasonable accommodations to the known disabilities of an employee ... in connection with a job or occupation sought ...." Just as with her claim for discriminatory discharge, to succeed on her NYSHRL accommodation claim, plaintiff must demonstrate that she could have performed the essential duties of her position with reasonable accommodation. *See Shannon v. N.Y. City Transit Auth.*, 332 F.3d 95, 103 (2d Cir.2003) ("We have already held that § 292(21) of the NYSHRL is parallel to the 'otherwise qualified' requirement of the ADA.") (citing *DiSanto v. McGraw-Hill, Inc./ Platt's Div.*, 220 F.3d 61, 64 (2d Cir.2000); *Parker*, 204 F.3d at 332 n. 1); *see also Rodal v. Anesthesia Group of Onondaga, P.C.*, 369 F.3d 113, 118 (2d Cir.2004); N.Y. EXEC. LAW § 292(21).

In the present case, plaintiff was unable to work at all and consequently requested medical leave for an indefinite period of time. The law is clear that such an accommodation request is not reasonable. *See Parker*, 204 F.3d at 338 ("The duty to make reasonable accommodations does not, of course, require an employer to hold an injured employee's position open indefinitely while the employee attempts to recover, nor does it force an employer to investigate every aspect of an employee's condition

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2007 WL 2071568                                                                                          Page 13
--- F.Supp.2d ----, 2007 WL 2071568 (S.D.N.Y.), 154 Lab.Cas. P 35,299
**(Cite as: 2007 WL 2071568 (S.D.N.Y.))**

before terminating him based on his inability to work."); *Scott v. Mem'l Sloan-Kettering Cancer Ctr.,* 190 F.Supp.2d 590, 597 (S.D.N.Y.2002) ("Thus, plaintiff is either asking for an extended paid leave of absence or asking the hospital to hold her job open indefinitely. The ADA clearly does not require employers to hold positions open indefinitely as an accommodation to disabled employees."); *Raisley v. First Manhattan Co.,* 4 Misc.3d 1022(A), *3, 798 N.Y.S.2d 347 (N.Y.Sup.Ct.2004)* ( "[D]efendant['s] ... obligation to provide a 'reasonable accommodation' does not create a requirement that an employer hold a position open indefinitely for an injured or temporarily disabled employee."). Accordingly, defendant was not obligated by the NYSHRL to allow plaintiff to take an indefinite period of medical leave.

In conclusion, we reject plaintiff's discrimination claims that defendant violated the NYSHRL by terminating her employment in June 2003 or by denying her request for an indefinite period of leave at that time. However, because we conclude that there is a genuine issue of material fact as to whether defendant's failure to reinstate her in April 2003 was discriminatory and in violation of the statute, defendant's motion for summary judgment with respect to plaintiff's single cause of action for disability discrimination under the NYSHRL is denied.

IV. *Plaintiff's Motion to Strike*

**\*16** [14] Plaintiff cross-moves the Court to strike certain portions of defendant's submissions in support of its motion for summary judgment. First, plaintiff requests that we strike paragraphs twenty and twenty-one of Barrella's affidavit because they contain legal conclusions. (*See* Pl. Mem. Supp. Mot. To Strike at 2.) The provisions at issue state that plaintiff was not entitled to leave pursuant to the FMLA on March 18, 2003. (*See* Barrella Aff. ¶¶ 20-21.) Because this is a legal conclusion, it must be stricken from the record. [FN21] *See, e.g., Cornette v. McAllister Bros.,* No. 80 Civ. 4913, 1981 U.S. Dist. LEXIS 12938, at *1 (S.D.N .Y. May 19, 1981) (Conner, J.). Therefore, the Court has not considered these allegations in connection with defendant's motion for summary judgment.

[15] Plaintiff also requests that portions of paragraphs three through eight of Barrella's affidavit be stricken from the record because they are not based upon his personal knowledge, as the allegations concern events that occurred prior to his employment with defendant. (*See* Pl. Mem. Supp. Mot. To Strike at 3.) In response, defendant argues that Barrella, in making these allegations, relied upon plaintiff's employment records, to which, as her supervisor, he has access. (*See* Doherty Aff'm Opp. Mot. To Strike, Ex. A (Barrella Aff. ¶ 2).) Plaintiff contends, however, that because Barrella fails to cite any document upon which he relied, the allegations lack foundation and should be stricken. (*See* Pl. Reply Mem. Supp. Mot. To Strike at 3.) It is axiomatic that affidavits submitted in support of or in opposition to a summary judgment motion must "be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." FED. R. CIV. P. 56(e); *see also Patterson v. County of Oneida, N.Y.,* 375 F.3d 206, 219 (2d Cir.2004) (citing *Sarno, 183 F.3d at 160*. Accordingly, Barrella's allegations contained in paragraphs three, four, five, six and seven of his affidavit, of which he does not have personal knowledge, are stricken. The allegations contained in paragraph eight, however, are proper, as they are based on Barrella's personal knowledge. In any event, we have not relied upon any of these allegations in our decision unless they were substantiated by plaintiff's admissions, which, ironically, most of them were.

Next, plaintiff requests that this Court strike portions of paragraph twelve and thirteen of Barrella's affidavit that are based upon his "information and belief." First, she refers to the last sentence in paragraph twelve which states, "To my knowledge, this is the only copy that GHI maintained." (*See* Barrella Aff. ¶ 12.) In this context, however, the use of "[t]o my knowledge" appears to be merely a matter of phraseology and does not render the allegation improper. Nonetheless, we have not relied upon this allegation in our decision. Second, plaintiff moves to strike the first sentence in paragraph thirteen of Barrella's affidavit which states, "Upon information and belief, Ms. Roberts submitted an application for short term disability benefits which was granted by the State of New York." (*See* Barrella Aff. ¶ 13.) Plaintiff's request is baseless given that she admits the veracity of this allegation in her Rule 56.1 Statement. (*See* Pl. Rule 56.1 Stmt. ¶ 19.) Moreover, sworn allegations may be upon information and belief provided that the affiant states the sources of such information and the grounds for such belief. Here, Barrella makes clear that his belief was based on his review of plaintiff's application for New York State disability benefits, which was cited in, and attached to, his affidavit. Accordingly, plaintiff's

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2007 WL 2071568                                                                                          Page 14
--- F.Supp.2d ----, 2007 WL 2071568 (S.D.N.Y.), 154 Lab.Cas. P 35,299
(Cite as: 2007 WL 2071568 (S.D.N.Y.))

motion to strike paragraph twelve and thirteen (or any part thereof) of Barrella's affidavit is denied.

**\*17** Lastly, plaintiff moves to strike Exhibits A, B, C, G and H submitted by defendant in support of its motion for summary judgment, namely: (1) the Complaint that plaintiff filed in the instant action; (2) this Court's Opinion and Order dated March 11, 2005 dismissing plaintiff's third and fourth causes of action; (3) the October 2, 2002 letter sent by Barrella to plaintiff which plaintiff also submits in support of her opposition to defendant's motion for summary judgment; (4) the deposition transcript of Pisano (in the absence of which plaintiff's case would be dismissed); and (5) the deposition transcript of Brown (upon which plaintiff herself relies). Plaintiff's motion in this regard is utterly frivolous. [FN22] Notably, plaintiff's identification of these exhibits was not accidental, as defendant emphasized the absurdity of plaintiff's motion in its opposition and plaintiff's counsel explicitly reasserted the same objections to these exhibits in her Reply Memorandum of Law. (*See* Def. Mem. Opp. Mot. To Strike at 5; Pl. Reply Mem. Supp. Mot. To Strike at 4.) At the same time, ironically, she conceded that "there is no real dispute as to the[ir] authenticity ...." (*See* Pl. Reply Mem. Supp. Mot. To Strike at 4.) For that reason among others, plaintiff's motion to strike defendant's Exhibits A, B, C, G and H is denied. Consequently, plaintiff's motion to strike portions of paragraphs 6, 8, 10-11, 13, 16, 17 and 18 of Defendant's Rule 56.1 Statement that purportedly rely upon the aforementioned exhibits is also denied.

## CONCLUSION

For the foregoing reasons, the motion for summary judgment filed by defendant Group Handling, Inc. is denied. Plaintiff Tina Roberts's motion to strike certain portions of the affidavit of John Barrella is granted in part and denied in part in accordance with Part IV. of this Opinion and Order. Plaintiff's motion to strike defendant's Exhibits A, B, C, G and H annexed to defendant's Rule 56 .1 Statement and paragraphs 6, 8, 10-11, 13, 16, 17 and 18 of defendant's Rule 56.1 Statement is denied.

SO ORDERED.

FN1. *See Allstate Ins. Co. v. Hamilton Beach/Proctor Silex, Inc.,* No. 04-6282-CV, 2007 WL 29977, at \*5 (2d Cir. Jan.5, 2007) (" 'In assessing the record to determine whether there is [a genuine issue of material fact], the court is required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." ') (quoting *Stern v. Trs. of Columbia Univ.,* 131 F.3d 305, 312 (2d Cir.1997)); *Tocker v. Philip Morris Cos.,* 470 F.3d 481, 486 (2d Cir.2006) ("We [must] ... constru[e] the facts in the light most favorable to the non-moving party ...."); *Reading Int'l, Inc. v. Oaktree Capital Mgmt. LLC,* No. 03 Civ. 1895, 2007 WL 39301, at \*5 (S.D.N.Y. Jan. 8, 2007) ("In determining whether a genuine issue of material fact exists, the Court must examine all evidence in the light most favorable to the nonmoving party.").

FN2. Chronic renal failure is permanent damage to the kidneys that results in loss of normal kidney function. End-stage renal disease occurs when the kidneys permanently fail to work and the individual can no longer live without dialysis. (*See* Urena Decl., Ex. S (Saitta Dep. at 5).)

FN3. Ambulatory peritoneal dialysis can be performed by the patient at her home or work place. In September 2002, plaintiff began to receive hemodialysis which required her to receive treatment at a dialysis center located at Sound Shore Hospital in New Rochelle, New York. (*See* Pl. Aff. ¶ 8, Ex. E.)

FN4. In June 1990, plaintiff received a kidney transplant and took leave until September 1990. (*See* Complt. ¶ 27; Def. Rule 56.1 Stmt., Ex. D (Pl. Dep. at 39).) Plaintiff's transplanted kidney lasted approximately ten years. (*See id.*) In 2000, after the transplanted kidney had failed, plaintiff returned to dialysis treatment. (*See* Complt. ¶ 28; Def. Rule 56.1 Stmt., Ex. D (Pl. Dep. at 47-48).)

FN5. During the time plaintiff had the transplanted kidney, she experienced "rejection periods" and several infections, which required hospitalization. (*See* Def. Rule 56.1 Stmt., Ex. D (Pl. Dep. at 41).)

FN6. Ultimately, plaintiff required surgery to remove and replace her catheter. (*See* Def. Rule 56.1 Stmt., Ex. D (Pl. Dep. at 49).)

FN7. Peritonitis is inflammation of the

2007 WL 2071568                                                                                                      Page 15
--- F.Supp.2d ----, 2007 WL 2071568 (S.D.N.Y.), 154 Lab.Cas. P 35,299
**(Cite as: 2007 WL 2071568 (S.D.N.Y.))**

peritoneum (the serous membrane which lines part of the abdominal cavity and some of the viscera it contains). *See* Univ. of Md., Online Medical Database, http://www.umm.edu/altmed/ConsConditions/Peritonitiscc.html.

FN8. Plaintiff claims that she did not learn that defendant designated the leave in October 2002 as FMLA leave until defendant terminated her employment in the summer of 2003. (*See* Pl. Mem. Opp. Summ. J. at 3.) Although plaintiff testified she "never associated [her] time off [commencing on October 1, 2002 with the FMLA]," but rather thought that she was using sick time, (*see* Def. Rule 56.1 Stmt., Ex. D (Pl. Dep. at 161- 62,) she received the October 3 letter from Barrella indicating that the leave was in fact pursuant to the FMLA, considering that she produced it during discovery. (*See* Pl. Aff., Ex. A; Def. Rule 56.1 Stmt. ¶ 18; Pl. Rule 56.1 Stmt. ¶ 18.) In addition, plaintiff testified that she received the letter's attachments and it appears that, at one point, she actually testified that she received the letter itself. (*See* Def. Rule 56.1 Stmt., Ex. D (Pl. Dep. at 68-69, 162, 158-59).)

FN9. Plaintiff was required to complete "an action plan" prior to returning to work as a result of disciplinary issues that arose before plaintiff took leave in September. (*See* Def. Rule 56.1 Stmt., Ex. D (Pl. Dep. at 77, 81); Complt. ¶ ¶ 31-38; Pl. Aff., Exs. C, D; Pl. Rule 56.1 Stmt. ¶ 24; Urena Decl., Ex. P (Barrella Dep. at 60-61), Ex. Q (Thorton Dep. at 36).) Specifically, on September 12, 2002, Thorton approached plaintiff regarding her coworkers' allegations that she had an "attitude problem." Plaintiff believed that Thorton was rehashing incidents that the two had already discussed. (*See* Complt. ¶ 32; Def. Rule 56.1 Stmt., Ex. D (Pl. Dep. at 28-29).) During their meeting, plaintiff requested to be excused several times but Thorton denied her requests and the meeting lasted over a hour-and-a-half. (*See* Complt. ¶ 34.) Plaintiff became upset and stated, "Yes Masta, What do you want me to say, I quit?" (*See id.* ¶ 35; Def. Rule 56.1 Stmt., Ex. D (Pl. Dep. at 31).) As a result, plaintiff was suspended for one week with pay for her unprofessional conduct and was required

to develop an anger management plan prior to returning to work. (*See* Complt. ¶ ¶ 37, 38; Def. Rule 56.1 Stmt., Ex. D. (Pl. Dep. at 29-31, 49-53, 57-58).) Plaintiff had been counseled by her supervisors in the past for incidents of unprofessional conduct. (*See* Def. Rule 56.1 Stmt., Ex. D. (Pl. Dep. at 49-53).)

In connection with plaintiff and Thorton's meeting on September 12, 2002, plaintiff also testified that Thorton inappropriately commented about her disability. At the meeting, Thorton apparently suggested that her anger management problems may be attributable to her medical condition. (*See* Def. Rule 56.1 Stmt., Ex. D. (Pl. Dep. at 28-29).) However, it appears that Thorton was referring to the stress caused by her disability and not the disability itself. In any event, plaintiff does not argue in her Memorandum of Law that this evidences disability discrimination prohibited by the NYSHRL, and we can discern no reason to conclude that it does.

FN10. As noted, in February 2003, plaintiff was receiving hemodialysis which could only be administered at a dialysis center. (*See* Pl. Aff. ¶ 8, Ex. E; Complt. ¶ 42.) *See supra* n. 3.

FN11. During plaintiff's deposition, however, she merely claimed to have contacted Barrella to request to return to work at some point prior to June 30, 2003 and could not recall the specific date or month, nor could she recall any of the details alleged in her affidavit. (*See* Def. Rule 56.1 Stmt., Ex. D (Pl. Dep. at 106-29, 130-31, 136).)

FN12. In the Complaint, plaintiff alleges that she personally sent Pisano's letter to Barrella, an allegation which she subsequently recanted in her deposition and in her affidavit. (*See* Complt. ¶ 52; Def. Rule 56.1 Stmt., Ex. D (Pl. Dep. at 106-39); Pl. Aff. ¶ 12.)

FN13. Defendant submitted a memorandum written by Barrella memorializing the phone conversation between plaintiff and Barrella on April 22, 2003. (*See* Def. Rule 56.1 Stmt., Ex. U.) It indicated that plaintiff informed Barrella that "she was feeling

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 3:03-cv-00277-CFD     Document 113-4     Filed 08/17/2007     Page 59 of 68

2007 WL 2071568                                                                           Page 16
--- F.Supp.2d ----, 2007 WL 2071568 (S.D.N.Y.), 154 Lab.Cas. P 35,299
**(Cite as: 2007 WL 2071568 (S.D.N.Y.))**

better and might be able to return to work in a month." (*See id.*) It also stated that Barrella informed plaintiff that GHI had permanently promoted a new Operations Manager. (*See id.*) According to the memorandum, he then advised plaintiff that, upon her medical clearance, GHI would consider her for any open positions at that time. (*See id.*)

FN14. According to plaintiff, she made two attempts to meet with Barrella and the owners of GHI in June 2003, but was unsuccessful. (*See* Pl. Aff. ¶ 13.) However, plaintiff testified that she met with one of the individual owners in July 2003. (*See* Def. Rule 56.1 Stmt., Ex. D (Pl. Dep. at 142).)

FN15. A plaintiff may raise separate causes of action pursuant to the FMLA for "interference" and "retaliation." *See Potenza v. City of New York,* 365 F.3d 165, 167 (2d Cir.2004).

FN16. The DOL, which is responsible for promulgating regulations and providing guidance on the FMLA, issued an Opinion Letter regarding the manner in which to determine an employee's eligibility for leave taken intermittently or on a rounded leave schedule due to a qualifying serious health condition. Such opinion letters are normally accorded great deference. *See Marcella v. Capital Dist. Physicians' Health Plan, Inc.,* 293 F.3d 42, 47 & n. 1 (2d Cir.2002) ("Even though not formally promulgated as regulations, these opinion letters, as the views of the agency charged with implementing [the statute at issue], are at least " 'a body of experience and informed judgment to which courts and litigants may properly resort for guidance[.]" " ') (quoting *Bragdon v. Abbott,* 524 U.S. 624, 642, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998)); *Samson v. Apollo Resources, Inc.,* 242 F.3d 629, 638 (5th Cir.2001) ("Interpretive and opinion letters by the Department of Labor do not *per se* bind the court. Such materials, however, do 'constitute a body of experienced and informed judgment' and the court will give these materials 'substantial weight.' ") (citation omitted).

FN17. In determining the twelve-month

period, we may only choose from the calendar method or the "12-month period measured forward" or "rolling backward" methods because it is only their application that allows plaintiff to establish eligibility as of March 18, 2003. In addition, we believe that the same method must be applied in both the eligibility and entitlement contexts, and a plaintiff cannot apply a different method to determine eligibility than in determining entitlement in an effort to secure the best result for herself.

FN18. For example, if plaintiff had requested reinstatement on April 28, 2003 and then required medical leave commencing on May 1, 2003 until June, she would have exhausted her FMLA leave by June 18, 2003. (*See* Def. Rule 56.1 Stmt., Ex. R.) However, if, hypothetically, plaintiff had requested reinstatement on April 28, 2003 but did not require medical leave until June 1, 2003, she still could have been eligible for FMLA leave as of June 18, 2003.

FN19. The definition of disability under the NYSHRL is broader than the ADA's corresponding definition. *See Sista,* 445 F.3d at 169 n .2 (citing *Giordano v. City of New York,* 274 F.3d 740, 747 (2d Cir.2001)).

FN20. *See Parker,* 204 F.3d at 336 n. 5 ("Although part-time work constitutes a reasonable accommodation under the ADA, *see* 42 U.S .C. § 12111(9)(B), an employee who proposes this accommodation may only prevail in an ADA action if he can demonstrate that he could perform the essential functions of his job while working part-time.").

FN21. In paragraph twenty, Barrella also states that he reviewed plaintiff's attendance records to determine whether she was eligible for FMLA leave on March 18, 2003. (*See* Barrella Aff. ¶ 20.) In addition, in paragraph 21, Barrella states that GHI granted plaintiff a three-month leave from March 18, 2003 to June 18, 2003 and that he did not send plaintiff a "Compliance Guide to the Family and Medical Leave Act" in connection therewith. (*See* Barrella Aff. ¶ 21.) Plainly, these allegations are admissible. *See Gualandi v. Adams,* 385

--- F.Supp.2d ----, 2007 WL 2071568 (S.D.N.Y.), 154 Lab.Cas. P 35,299
**(Cite as: 2007 WL 2071568 (S.D.N.Y.))**

F.3d 236, 241 (2d Cir.2004) (finding that factual allegations of which the affiant had personal knowledge and which were separable from the inadmissible legal conclusions are admissible).

FN22. Plaintiff's additional argument that the Complaint and this Court's Opinion and Order, dated March 11, 2005, should be stricken because they contain inadmissible hearsay statements, displays a misunderstanding of the applicable rules. (*See* Pl. Mem. Supp. Mot. To Strike at 5.)

--- F.Supp.2d ----, 2007 WL 2071568 (S.D.N.Y.), 154 Lab.Cas. P 35,299

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 3:03-cv-00277-CFD    Document 113-4    Filed 08/17/2007    Page 61 of 68

Westlaw.

Not Reported in F.Supp.2d                                                                    Page 1
Not Reported in F.Supp.2d, 2005 WL 2234505 (D.Conn.)
(Cite as: 2005 WL 2234505 (D.Conn.))

C

Only the Westlaw citation is currently available.

United States District Court,
D. Connecticut.
Yolanda SANTIAGO, Plaintiff,
v.
CITY OF HARTFORD, and Officer Julio Camacho,
Defendants.
**No. 3:00 CV 2386 WIG.**

Sept. 12, 2005.

David Compagnone, Law Offices of Angelo, Stacy
L. Buden, Angelo Cicchiello, Hartford, CT, for
Plaintiff.

Brian P. Leaming, Halloran & Sage, William J.
Melley, III, Kenny, Brimmer, Melley, Mahoney,
Hartford, CT, for Defendants.

*RULING ON MOTION FOR RECONSIDERATION*
*[DOC. # 51]*

GARFINKEL, Magistrate J.

**\*1** Pending before the Court is the City of Hartford's
Motion for Reconsideration, seeking reconsideration
of this Court's denial of summary judgment on
Plaintiff's § 1983 claims against the City. (Pl.'s
Compl., Ct. V.) For the reasons discussed below, the
Court grants the City's Motion for Reconsideration
and, upon reconsideration, reverses its earlier ruling
and grants summary judgment in favor of the City on
Plaintiff's § 1983 claim.

*Discussion*

The facts giving rise to this lawsuit are set forth in
the Court's summary judgment ruling and will not be
repeated herein, except as necessary.

This case arises out of an alleged sexual assault on
Plaintiff, Yolando Santiago, by Defendant, Julio
Camacho, while Officer Camacho was working as a
police officer for the City of Hartford. Without
conceding the veracity of Plaintiff's allegations
against Officer Camacho, the City moved for
summary judgment on the ground that the
allegations, even if true, failed to state a cognizable
claim against the City under 42 U.S.C. § 1983.
[FN1] *See* Monell v. Department of Social Services,

436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).
This Court denied the City's motion for summary
judgment on Plaintiff's § 1983 cause of action, which
was premised on claims that the Hartford Police
Department's failure to train and failure to supervise
its police officers amounted to deliberate indifference
to the rights of persons with whom the police come
into contact, including Plaintiff. It is as to this portion
of the Court's ruling that the City now seeks
reconsideration.

> FN1. The City also moved for summary
> judgment on Plaintiff's fourth count, brought
> under Conn. Gen.Stat. § 7-465, which was
> granted.

As Plaintiff points out, the standard for granting
reconsideration is strict. The Second Circuit has held
that a motion for reconsideration should not be
granted where the moving party seeks solely to
relitigate an issue already decided. *Shrader v. CSX
Transportation, Inc.,* 70 F.3d 255, 257 (2d Cir.1995).
Generally, reconsideration should be denied unless
the moving party can point to controlling decisions or
data that the Court overlooked, in other words,
matters that might reasonably be expected to alter the
conclusion reached by the Court. *Id.* (finding no
abuse of discretion in the district court's granting
reconsideration in light of the moving party's
introduction of additional relevant case law and
substantial legislative history).

In the instant case, the City of Hartford has pointed
to substantial relevant case law, *Amnesty America v.
Town of West Hartford,* 361 F.3d 113 (2d Cir.
Mar.15, 2004), which this Court overlooked in its
summary judgment ruling. Judge Nevas has also
recently granted reconsideration and reversed his
prior summary judgment ruling in a case against the
City of Hartford, premised on factual allegations
strikingly similar to those in the instant case. *Jane
Doe II v. City of Hartford,* No. 3:01CV1026(AHN),
2005 WL 2009051 (D.Conn. Aug.22, 2005). These
decisions warrant the Court's reconsideration of its
earlier decision denying the City's motion for
summary judgment on Plaintiff's § 1983 claims.

**\*2** Additionally, the Court agrees with the City that,
at various points in its earlier ruling, the Court
imposed an improper burden on the City as the
moving party, requiring it to present evidence to

negate Plaintiff's claims, when the burden should have been on Plaintiff to produce evidence in support of the essential elements of her claims. That aspect of the Court's ruling will be clarified below.

*1. The Standard Governing Summary Judgment Motions*

After the close of discovery, the City moved for summary judgment on Plaintiff's § 1983 claim on the ground that Plaintiff had not, and could not, proffer evidence supporting her claim that the City's alleged failure to train and supervise its police officers constituted deliberate indifference to the constitutional rights of persons such as Plaintiff, and, therefore, that it was entitled to summary judgment as a matter of law. In support of its motion, the City produced excerpts from the Plaintiff's deposition in which she described her sexual assault by Officer Camacho, her report of the incident several months later, and her subsequent report of the incident after seeing a television report of Officer Camacho's arrest (Def.'s Ex. A); Plaintiff's responses to interrogatories and production requests (Def.'s Ex. B); the Affidavit of Neil Dryfe, Commanding Officer of the Internal Affairs Division of the Police Department, which identified fourteen complaints of sexual misconduct by Hartford police officers in the Police Department's complaint log, including a 1994 complaint against Officer Camacho, and the investigation and disposition of these charges, as more fully described below (Def.'s Ex. C); and a letter of resignation from Officer Camacho (Def.'s Ex. D). In response to the motion, the only additional evidence produced by Plaintiff was a notice of related cases filed in the criminal case against Officer Camacho, which mentioned the assembly of a task force in October 1998 to investigate allegations of corruption in the Hartford Police Department and the resulting indictments against six police officers (Pl.'s Ex. B).

In order for Plaintiff to defeat a properly supported summary judgment motion, she must come forward with affidavits, or other materials encompassed by Rule 56(e), Fed.R.Civ.P., setting forth specific facts showing that there is a genuine issue of material fact to be tried. *See Gottlieb v. County of Orange*, 84 F.3d 511, 518 (2d Cir.1996). She cannot defeat the motion by relying on the allegations of her pleadings or on mere conclusory statements. *See Gottlieb*, 84 F.3d at 518. Rather, she must set forth specific facts in support of her claims showing that there is a genuine issue for trial. Rule 56(e), Fed.R.Civ.P.; *see Watts v. City of Hartford*, No. 3:00cv0681(RNC), 2004 WL 717132, at *4 (D.Conn. Mar. 31, 2004) (granting

summary judgment on a § 1983 failure-to-supervise claim where plaintiff failed to produce evidence of the city's deliberate indifference and the causal connection between the city's failure to supervise and the unconstitutional conduct).

**\*3** As the Supreme Court held in *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986),

> the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which the party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is "entitled to a judgment as a matter of law" because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.

477 U.S. at 322-23.

While the moving party bears the initial burden of informing the Court of the basis for its motion, identifying those portions of the pleadings, depositions, answers to interrogatories, affidavits, if any, and other materials which it believes demonstrate the absence of a genuine issue of material fact, the Supreme Court held that Rule 56 does not require the moving party to "support its motion with affidavits or similar materials *negating* the opponent's claim." *Id.* at 323 (original emphasis). "Rule 56 must be construed with due regard not only for the rights of persons asserting claims and defenses that are adequately based in fact to have those claims and defenses tried to a jury, but also for the rights of persons opposing such claims and defenses to demonstrate in the manner provided by the rule, prior to trial, that the claims and defenses have no factual basis." *Id.* at 327; *see also Vann v. City of New York*, 72 F.3d 1040, 1048 (2d Cir.1995) (requiring non-movant to produce evidence establishing a genuine issue of material fact).

To the extent that the Court's prior summary judgment ruling imposed upon the City the burden of producing evidence affirmatively establishing the existence of adequate training and supervision programs within the police department--in other words, evidence negating Plaintiff's claims--that

Not Reported in F.Supp.2d                                                                                          Page 3
Not Reported in F.Supp.2d, 2005 WL 2234505 (D.Conn.)
**(Cite as: 2005 WL 2234505 (D.Conn.))**

portion of the ruling was in error. *See generally* 11 James Wm. Moore, *Moore's Federal Practice* § 56.13[1] (3d ed. 2005) ("If the movant does not bear the ultimate burden of persuasion on a particular claim at trial, it may satisfy its initial burden by pointing out that the record lacks substantial evidence to support a necessary element of the nonmovant's claim."). Once the City meets its initial burden of production, the burden shifts to Plaintiff to identify specific facts, supported by evidence, affidavits, depositions, or other materials contemplated by Rule 56(e), which show the Court that there is in fact a genuine issue for trial. *Id.* at § 56.13[2]. "[T]here can be no issue for trial unless there is sufficient evidence presented which could support a jury verdict in the nonmoving party's favor." *Id.* Applying this standard to the City's summary judgment motion, the Court now reconsiders the motion with respect to Plaintiff's inadequate training and failure-to-supervise theories of liability under § 1983.

*2. Inadequate Training*

**\*4** In *Amnesty America,* plaintiff-arrestees sued the town of West Hartford and its chief of police under § 1983, alleging that they were victims of excessive force perpetrated by the town's police officers at two anti-abortion protests. The district court granted summary judgment in favor of the town, holding that the plaintiffs had failed to show that the police officers' actions were taken pursuant to a municipal policy or custom under *Monell* and, thus, failed to establish a basis upon which the town could be held liable for the officers' actions. The plaintiffs had based their *Monell* claims on the town's failure to train its officers not to use excessive force in making arrests and the police chief's failure to supervise. The Second Circuit affirmed the grant of summary judgment in favor of the town on the plaintiffs' failure-to-train claim. The Court found that the plaintiffs had failed to offer any evidence as to the purported inadequacies in the town's training program and had failed to offer any evidence as to the causal connection between those inadequacies and the alleged constitutional violations. *Amnesty America,* 361 F.3d at 129.

 The Court acknowledged that a municipality may be liable under § 1983 for failure to train "where it acts with deliberate indifference in disregarding the risk that its employees will unconstitutionally apply its policies without more training," but emphasized that the failure to train must occur under circumstances constituting "deliberate indifference."  [FN2] *Id.* (citing *City of Canton v. Harris,* 489 U.S. 378, 387-

90, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989)). Additionally, the Court held that plaintiffs must identify a specific deficiency in a municipality's training program and establish that this deficiency was " 'closely related to the ultimate injury,' such that it 'actually caused' the constitutional deprivation." *Id.* (quoting *City of Canton,* 489 U.S. at 391). [FN3] The Court emphasized that the plaintiffs must establish that " 'the officer's shortcomings ... resulted from ... a faulty training program' rather than from the negligent administration of a sound program or other unrelated circumstances." *Id.* at 129-30 (quoting *City of Canton,* 489 U.S. at 390-91). "*City of Canton* unequivocally requires ... that the factfinder's inferences of inadequate training and causation be based on more that the mere fact that the misconduct occurred in the first place." *Id.* at 130.

 FN2. In *Walker v. City of New York,* 974 F.2d 293, 297-98 (2d Cir.1992), *cert. denied,* 507 U.S. 961, 113 S.Ct. 1387, 122 L.Ed.2d 762 (1993), in ruling on a motion to dismiss, the Second Circuit discussed the circumstances where failure to train would be sufficient to reflect a municipality's deliberate indifference and amount to a government policy or custom. The Court held that in order to establish deliberate indifference from a failure to train, a plaintiff must show (1) "that a policymaker knows 'to a moral certainty' that [his] employees will confront a given situation"; (2) "that the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation"; and (3) "that the wrong choice by the city employee will frequently cause the deprivation of a citizen's constitutional rights." *Id.* (internal citations omitted).

 FN3. *See also Collins v. City of Harker Heights,* 503 U.S. 115, 123, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992), in which the Court stressed that a showing of deliberately indifferent training does not itself provide a basis for imposing liability against a municipality under § 1983. A plaintiff must also demonstrate that the inadequate training caused the violation of the plaintiff's federally protected right.

 The Court explained that to require a plaintiff to identify a specific training deficiency and to prove a

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2005 WL 2234505 (D.Conn.)
**(Cite as: 2005 WL 2234505 (D.Conn.))**

close causal connection between that deficiency and the constitutional deprivation ensures that a failure-to-train theory does not "collapse into *respondeat superior* liability" for the misconduct of a single actor. *Id.* To adopt a lesser standard of fault and causation would create a risk that a municipality would be liable not for its own official decisions and actions but instead for the independent actions of its employees. *City of Canton,* 489 U.S. at 391.

 **\*5** In the instant case, Plaintiff Santiago, like the plaintiffs in *Amnesty America,* has failed to proffer any evidence concerning the City's training programs and has failed to identify any specific training deficiency. Other than proffering evidence that the sexual assault occurred and that, over a six-year period, there had been reports of fourteen other incidents involving Hartford police officers, which complaints were investigated with discipline imposed against certain individuals, Plaintiff has failed to offer any evidence in support of her claim that the City's training program was deficient in any manner whatsoever and that such deficiency amounted to a deliberate indifference by the City to the rights of people with whom the police would come into contact.

 Additionally, even if specific deficiencies in training had been identified by Plaintiff, she has failed to advance any theory as to how those training deficiencies, as opposed to some unrelated circumstance not implicating liability on the part of the City, caused Officer Camacho to sexually assault her. The proper conduct for a police officer, refraining from sexual assault and rape of an arrestee, is patently obvious. It is difficult to conceive of how additional training could have prevented the intentional sexual assault of Plaintiff by Officer Camacho so as to justify a finding of liability on the part of the City. As the Eighth Circuit has stated, "[i]n light of the regular law enforcement duties of a police officer, we cannot conclude that there was a patently obvious need for the city to specifically train officers not to rape young women. Moreover, even if the training was in some manner deficient, the identified deficiency in a city's training program must be closely related to the ultimate injury such that the deficiency in training actually caused the police officers' offending conduct." *Andrews v. Fowler,* 98 F.3d 1069, 1077 (8th Cir.1996) (quoting *City of Canton,* 489 U.S. at 391) (internal quotation marks omitted).

 Other courts, in ruling on summary judgment motions in similar cases, have held likewise. *See*

*generally* Martin A. Schwartz, *1A Section 1983 Litigation Clasim and Defenses* § 7.17 at 7-162 through 7-204 (4th ed.2005) (surveying inadequate training cases against municipalities under § 1983 and concluding that few § 1983 claimants are able to prevail under the rigorous *City of Canton* standards).

 For example, in *Sewell v. Town of Lake Hamilton,* 117 F.3d 488 (11th Cir.1997), *cert. denied,* 522 U.S. 1075, 118 S.Ct. 852, 139 L.Ed.2d 753 (1998), the Eleventh Circuit, relying on the Second Circuit's decision in *Walker v. City of New York,* 974 F.2d at 299-300, held that the town could not be liable under § 1983 on failure-to-train and failure-to-supervise theories for the sexual molestation of an arrestee by a town police officer. The Court held that where the proper action is obvious to all without training or supervision, then the failure to train or supervise generally is not "so likely" to produce a wrong decision by the officer as to support an inference of deliberate indifference by city policymakers of the need to train and/or supervise its police officers. *Sewell,* 117 F.3d at 490.

 **\*6** Similarly, in *Jones v. James,* No. Civ. 02-4131, 2005 WL 459652 (D.Minn. Feb.24, 2005), the district court granted the county's summary judgment motion on the plaintiff's inadequate training claim under § 1983. In that case, a county civilian transport officer had engaged in sexual relations with the plaintiff, an inmate in the county jail. The plaintiff alleged that the county had violated § 1983 by, *inter alia,* not providing the transport officer with sufficient "detention center personnel training" and by failing to instruct him on how to interact with female prisoners. The district court granted summary judgment in favor of the county on the grounds that the plaintiff had failed to offer any evidence that the county failed to properly train or that it was deliberately indifferent to the rights of people living in the county. Moreover, the court held, "no reasonable jury could find that any alleged failure on the part of [the] County to train [the defendant] proximately caused [him] to commit the crime of third degree criminal sexual conduct by having sex with a detained female in the back of a transport van." *Jones,* 2005 WL 459652, at \*5; *see also Clarke v. Sweeney,* 312 F.Supp.2d 277, 303-04 (D.Conn.2004) (granting summary judgment in favor of the City on the plaintiff's failure-to-train claim); *Perrelli v. City of East Haven,* No. 3:02CV0008, 2004 WL 1202718, at \*4 (D.Conn. May 28, 2004) (granting summary judgment for the city where the plaintiff failed to offer any evidence as to the purported inadequacies in the city's training program

and the causal relationship between those inadequacies and the alleged constitutional violation); *Barney v. Pulsipher,* 143 F.3d 1299, 1308 (10th Cir.1998) (remarking that "[s]pecific or extensive training hardly seems necessary for a jailer to know that sexually assaulting inmates is inappropriate behavior," and affirming summary judgment in favor of the county and sheriff where the plaintiff had failed to present evidence pertaining to the alleged inadequacies in the training program). [FN4]

> FN4. The case of *Harris v. City of Pagedale,* 821 F.2d 499 (8th Cir.), *cert. denied,* 484 U.S. 986, 108 S.Ct. 504, 98 L.Ed.2d 502 (1987), cited in the Court's earlier opinion, is distinguishable on its facts. There, the Eighth Circuit affirmed a jury verdict holding that the plaintiff had established a city custom of failing to investigate or act on citizen complaints of sexual misconduct by police officers and that this custom proximately caused the sexual assault. The Court noted that the plaintiff's testimony concerning the city's failure to investigate and act on citizen complaints had been corroborated by "extensive evidence of prior incidents" and also cited to the testimony of numerous witnesses concerning their complaints of sexual misconduct by police officers to which the city had failed to respond in any meaningful way. *Id.* at 501.

Most recently, in *Jane Doe II v. City of Hartford,* Judge Nevas granted summary judgment in favor of the City of Hartford on the plaintiff's § 1983 failure-to-train claim, finding that the plaintiff had failed to offer evidence that the City's failure to train caused the officer's improper conduct (sexual assault of a prostitute). *Doe II,* 2005 WL 2009051, at *6. Citing *Walker,* Judge Nevas held that the plaintiff could survive summary judgment only by producing some evidence that the policymakers were aware of this unlawful conduct and failed to institute appropriate training, such that their failure to train amounted to a conscious disregard of a risk that was likely to occur. *Id.*

As the Second Circuit held in *Amnesty America* with respect to the plaintiffs' failure-to-train theory of liability, "[i]t is impossible to prevail ... without any evidence as to ... how the training was conducted, how better or different training could have prevented the challenged conduct, or how 'a hypothetically well-trained officer would have acted under the circumstances.' " 361 F.3d at 130 (quoting *City of*

*Canton,* 489 U.S. at 391); *see also Malone v. City of New York,* No. 01CV6128, 2005 WL 1892019, at *5 (E.D.N.Y. Aug.9, 2005). "The failure to identify a specific deficiency in the city's training program and provide evidence that the deficiency caused the plaintiff's injury requires summary judgment for the City." *Esmont v. City of New York,* No. CV025560CPS, 2005 WL 1367108, at *6 (E.D.N.Y. Mar.16, 2005); *see also Callum v. Marsh,* No. 3:02CV57 (AHN), 2005 WL 752213 (D.Conn. Mar.31, 2005). Here, Plaintiff has produced no evidence of a specific training deficiency in the Hartford Police Department or evidence as to how this training deficiency was causally connected to the actions taken by Officer Camacho. Therefore, upon reconsideration of the City's motion for summary judgment, the Court concludes that summary judgment should have been granted in favor of the City on Plaintiff's § 1983 claim based upon inadequate training.

*3. Failure to Supervise*

**\*7** In *Amnesty America,* the Second Circuit also reviewed the plaintiffs' § 1983 failure-to-supervise claim against the town of West Hartford. Again, the Second Circuit held that a plaintiff asserting a failure-to-supervise claim against a municipality must establish "deliberate indifference," as opposed to negligence, by showing that a policymaking official had notice of a potentially serious problem of unconstitutional conduct, such that the need for corrective action or supervision was obvious, and that he failed to investigate or rectify the situation. *Anmesty America,* 381 F.3d at 128. The Court held that the "operative inquiry is whether the facts suggest that the policymaker's inaction was the result of a 'conscious choice' rather than mere negligence." *Id.* (citing *City of Canton,* 489 U.S. at 389). Applying these standards, the Court found that the plaintiffs had "proffered ample evidence from which a reasonable factfinder could conclude that the necessity for more supervision was glaringly obvious" at both anti-abortion demonstrations and that the police chief, who was present at the demonstrations, ignored, and even encouraged, the police officers' use of excessive force against the arrestees. 361 F.3d at 127-28. Accordingly, the Court reversed the grant of summary judgment in favor of the town.

In the instant case, unlike *Amnesty America,* there is no evidence of the Police Chief's actual presence at the scene of the constitutional violation and his subsequent failure to take corrective action. Instead,

Plaintiff has relied upon her testimony that when she telephoned the police department to report the incident in February or March of 1998, an unidentified woman told her that there was nothing that could be done and hung up on her. Additionally she relies upon the fourteen complaints of sexual assaults by Hartford police officers, including a 1994 complaint against Officer Camacho, which she maintains raise an issue of fact as to whether there was a policy or custom of the Hartford Police Department condoning such conduct.

To the extent Plaintiff relies on the lack of response by an unidentified telephone operator to her initial telephone call three months after the incident, there is no claim or evidence that a Hartford policymaker had notice of this telephone call. *See Pembauer v. City of Cincinnati, 475 U.S. 469, 480, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986); Dwares v. City of New York, 985 F.2d 94, 100 (2d Cir.1993).* To the contrary, the evidence indicates that as soon as the police chief had notice of the complaints of sexual misconduct by police officers, an investigation was immediately launched involving Internal Affairs, the Intelligence Division, the State Attorney General's Office, and the F.B.I. *See* Discussion in Ruling on Mot. for Summary Judgment at 3-5. Plaintiff was interviewed as part of this investigation, which ultimately led to the arrest and conviction of six officers, including Officer Camacho.

**\*8** To the extent that Plaintiff relies on the reported incidents of sexual assault by Hartford police officers, the undisputed facts of record, which have been acknowledged by Plaintiff, show that over a six-year period, from January 1993 to December 1998, the Hartford Police Department received fourteen complaints of sexual assaults by its police officers. Each of these complaints was investigated by either the Internal Affairs, Major Crimes, or Youth Services Divisions of the Hartford Police Department. (Local Rule 56(a)1 St. ¶ ¶ 13 & 15, admitted by Plaintiff.) Nine of the fourteen complaints involved off-duty conduct by police officers. (*Id.* ¶ 14, admitted by Plaintiff.) Six of the complaints resulted in criminal arrests.

Of the remaining eight, one from 1994 involved Officer Camacho, and was closed as unfounded after an investigation by the Internal Affairs Division. The complainant alleged that while Officer Camacho was investigating a burglary complaint, he forced himself on her, kissing her twice, and touching her breasts. Internal Affairs interviewed the complainant on several occasions. During the interviews, the

complainant appeared confused and changed her account of the incident each time she related it to the investigator. The investigator also questioned the validity of the complaint because of the complainant's apparent use of marijuana and possible impaired state, her previous admissions to a hospital for psychiatric treatment and reports of suicide attempts, her lies to her employer about the investigation, and her apparent confusion and alteration of her account each time she related it to the investigator. (Def.'s Local Rule 56(a)1 St. ¶ ¶ 16-20, admitted by Plaintiff.)

Another complainant refused to cooperate with the City's investigator and, thus, the investigation was closed. In another, the complainant could not identify the perpetrator, who was not in uniform at the time of the alleged assault, but whom she believed to be a police officer. Another complaint was investigated and closed as unfounded when the complainant changed her testimony. One investigation did not involve criminal misconduct, but the officer was charged with conduct unbecoming an officer for attempting to initiate a sexual relationship with a high school student. That officer resigned before any disciplinary action could be taken. Another investigation involved two off-duty police officers who engaged in consensual sexual activity in a public place. Both were disciplined for conduct unbecoming an officer. Of the final two investigations, one was not sustained based upon inconclusive evidence obtained during the investigation. The other was closed administratively when the alleged victim denied any sexual relationship with the officer. (Def.'s Local Rule 56(a)1 St. ¶ 21, admitted by Plaintiff.) No other evidence supporting Plaintiff's failure-to-supervise claim was presented.

The Second Circuit considered a failure-to-supervise claim in the case of *Vann v. City of New York, 72 F.3d 1040 (2d Cir.1995).* In *Vann,* the Court held that "[t]o prove such deliberate indifference, the plaintiff must show that the need for more or better supervision to protect against constitutional violations was obvious. An obvious need may be demonstrated through proof of repeated complaints of civil rights violations; *deliberate indifference may be inferred if the complaints are followed by no meaningful attempt on the part of the municipality to investigate or to forestall further incidents." Id.* at 1049 (internal citations omitted) (emphasis added).

**\*9** Here, despite Plaintiff's admission that each of the individual complaints was investigated with resulting discipline against certain individual officers, she

Not Reported in F.Supp.2d                                         Page 7
Not Reported in F.Supp.2d, 2005 WL 2234505 (D.Conn.)
(Cite as: 2005 WL 2234505 (D.Conn.))

asserts in conclusory fashion that the City took no other action to address this history of abuse or to prevent incidents of sexual misconduct and abuse of authority in the future. Plaintiff maintains that the question of whether this lack of further action by the City constitutes "deliberate indifference" remains a triable issue for the jury's determination.

In *Watts v. City of Hartford,* this Court addressed similar claims by a plaintiff that the City's failure to implement and maintain an adequate system for responding to citizen complaints of brutality by the City's police officers demonstrated a policy of negligent supervision that rose to the level of deliberate indifference. *Watts,* 2004 WL 717132, at *4. Citing *Batista v. Rodriguez,* 702 F.2d 393, 397 (2d Cir.1983), and *Fiacco v. City of Rensselaer,* 783 F.2d 319, 331 (2d Cir.1986), *cert. denied,* 480 U.S. 922, 107 S.Ct. 1384, 94 L.Ed.2d 698 (1987), the Court acknowledged that municipal inaction, such as the persistent failure to discipline subordinates who violated civil rights, could give rise to an inference of an unlawful municipal policy of ratification of unconstitutional conduct within the meaning of *Monell. Id.* Nonetheless, the Court concluded that summary judgment was warranted on the plaintiff's failure-to-supervise claim. The plaintiff in *Watts* relied upon two studies involving the Hartford police department, one of which significantly pre-dated the incident in question and the other made no reference to complaints of unconstitutional conduct or the department's handling of such complaints. The Court found that "[c]onstrued most favorably to plaintiff, the Study suggests that there were deficiencies in the citizen complaint process and a perceived lack of discipline." *Watts,* 2004 WL 717132, at *5. The Court held, however, that a "general policy of lax discipline, assuming it could be proven, does not demonstrate deliberate indifference to serious misconduct rising to the level of unconstitutional acts." *Id.* at *5 (citing *Davis v. Lynbrook Police Dept.,* 224 F.Supp.2d 463, 478-79 (E.D.N.Y.2002), *Harris v. City of Kansas City,* 703 F.Supp. 1455 1459 (D.Kan.1988), and *Poulsen v. City of North Tonawanda,* 811 F.Supp. 884, 896 (W.D.N.Y.1993)). "Plaintiff must provide evidence from which a reasonable juror could conclude that, before the [incident] at issue here, the City's response to citizen complaints of police brutality demonstrated a policy of negligent supervision that rose to the level of deliberate indifference to the officers' use of deadly force in violation of constitutional rights." *Id.* at *4 (citing *Berry v. City of Detroit,* 25 F.3d 1342, 1346 (6th Cir.1994), *cert. denied,* 513 U.S. 1111, 115 S.Ct. 902, 130 L.Ed.2d 786 (1995), and *Batista v.*

*Rodriguez,* 702 F.2d at 397). "Further, plaintiff must provide evidence that this repeated failure to discipline other officers was closely related to and actually caused [the defendant officer's] shooting of plaintiff's decedent." *Id.* This plaintiff failed to do and, thus, the Court granted summary judgment in favor of the city.

**\*10** In the instant case, Plaintiff has presented even less evidence to demonstrate a lack of response to citizens complaints that would rise to the level of deliberate indifference by the City and has produced no evidence whatsoever that the City's failure to investigate and supervise its officers was closely related to and actually caused the intentional sexual assault by Officer Camacho on Plaintiff. *See Watts,* 2004 WL717132, at *4. Although eight of the fourteen complaints of sexual misconduct by police officers occurred prior to December 1997, when Plaintiff was sexually assaulted, as discussed above, all were investigated, with two of the eight resulting in the arrest of the officer. (*See* Ex. to Pl.'s Opp'n to Mot. for Reconsideration, City's Answers to Interrog.) To the extent that Plaintiff disagrees with the level of discipline imposed or deficiencies in the citizen complaint process, that does not demonstrate deliberate indifference to serious acts of misconduct, rising to the level of unconstitutional acts. *See Watts,* 2004 WL 717132, at *5. As the Court held in *Mahan v. City of New York,* No. Civ. A.00-CV-6645, 2005 WL 1677524, at *5 (E.D.N.Y. July 19, 2005), in granting summary judgment on the plaintiffs' failure-to-discipline claim, "mere negligence or bureaucratic inaction does not rise to the level of an actionable violation.... Plaintiffs must raise an inference that the municipality or its policy-makers actually condoned such conduct and that the system is so deficient as to reflect a policy of deliberated indifference to the civil rights of the citizenry." (Internal citations and quotation marks omitted). This, Plaintiff has failed to do. [FN5]

> FN5. This case, like *Mahan,* is distinguishable from *Vann v. City of New York,* 72 F.3d at 1050-51, in which the Second Circuit reversed the grant of summary judgment for the city where there was evidence of an extensive number of complaints against the officer at issue and expert testimony regarding the deficiencies in the city's monitoring program of its police officers suggesting system-wide deficiencies. *See Mahan,* 2005 WL 1677524, at *7.

Not Reported in F.Supp.2d                                                    Page 8
Not Reported in F.Supp.2d, 2005 WL 2234505 (D.Conn.)
**(Cite as: 2005 WL 2234505 (D.Conn.))**

 Plaintiff Santiago has produced no evidence that a policymaker had notice of a potentially serious problem involving unconstitutional conduct, such that the need for additional supervision was obvious, and then made a conscious choice not to investigate or rectify the situation. *See* *Doe II, 2005 WL 2009051, at \*6*.

 The Court finds that Plaintiff has failed to present any evidence that a policymaker consciously ignored the need for additional supervision or that the lack of supervision caused her injury. Given this lack of evidence to support her claim, the City is entitled to summary judgment as a matter of law on her failure to supervise theory of liability under § 1983.

*Conclusion*

 For the reasons set forth above, the Court grants Defendant's Motion for Reconsideration [Doc. # 51]. Upon reconsideration, the Court vacates its earlier ruling [Doc. # 49] on Plaintiff's inadequate training and failure-to-supervise claims under § 1983 and grants summary judgment in favor of the City on Count Five of Plaintiff's Complaint. While this ruling disposes of all claims against the City, the claims against Officer Camacho remain pending.

 SO ORDERED.

 Not Reported in F.Supp.2d, 2005 WL 2234505 (D.Conn.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.