Westlaw.

Not Reported in A.2d                                                                                      Page 1
Not Reported in A.2d, 1996 WL 365360 (Conn.Super.), 17 Conn. L. Rptr. 37
**(Cite as: 1996 WL 365360 (Conn.Super.))**

C

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Superior Court of Connecticut.
The CONNECTICUT LIGHT and Power Company
v.
Scott CLARK et al.
**No. 319078.**

May 16, 1996.

MEMORANDUM OF DECISION

MORAGHAN.

 *1 On November 16, 1994, Connecticut Light &
Power Company (CL & P) began this action against
Scott Clark (Clark) and Thomas Quinn (Quinn)
seeking damages for unpaid electric services it
allegedly provided. The complaint is drawn in ten
(10) counts. CL & P alleges that it provided electric
services for property located at 249 Route 39,
Newtown, Connecticut, for a restaurant known as
The Corner Store (restaurant). It continues that the
defendants were partners in operating the restaurant.
CL & P seeks damages under theories of express and
implied contract, and unjust enrichment. [FN1]

> FN1. CL & P stated in count one, paragraph
> 4, that a copy of the contract between it and
> Thomas Quinn would be attached as Exhibit
> A. In fact, however, no copy is attached to
> the complaint that has been filed with the
> court.

 On May 23, 1995, Clark was defaulted for failure to
plead. On June 15, 1995, Clark filed an answer and
two counterclaims thereby opening the default
entered against him. [FN2] Practice Book Sec. 363A.
On November 28, 1995, he filed a revised answer and
counterclaims. In his first counterclaim, he alleges
that he and Quinn co-owned the premises in question,
but that Quinn was the sole owner and operator of the
restaurant. Clark denies that he had any type of
business arrangement with Quinn aside from their co-
ownership, and alleges that any express or implied
contract CL & P had to provide electrical services to
the property involved Quinn only. Moreover, Clark
avers that he advised CL & P of these facts, but that

CL & P, nevertheless, named him in this suit. Clark
claims that CL & P's conduct constitutes "an attempt
to wrongfully collect funds from ... [him] for services
not provided to him."

> FN2. On February 9, 1995, Quinn was also
> defaulted for failing to appear. To date, that
> default has not been remedied.

 In his second counterclaim, he contends that the
allegations contained in the first counterclaim
constitute a violation of the Connecticut Unfair Trade
Practices Act (CUTPA), set forth in Sec. 42-110b et
seq. of the General Statutes, in that CL & P attempted
to collect funds from him for services which were not
rendered to him even though CL & P knew, or should
have known, that Clark was not the person liable for
the services, all resulting in loss and damage to him.

 CL & P has moved to strike the two counterclaims
on the grounds that they do not state legally sufficient
causes of action. It characterizes the first
counterclaim as one for vexatious litigation, and
argues that it is improper because the underlying
litigation has not yet terminated in Clark's favor, a
prerequisite for a vexatious litigation claim.

 As to the second counterclaim, CL & P argues that it
is improper because the claim contains no allegation
that it was engaged in a "trade or business," an
essential element for a CUTPA claim. It also asserts
that it is exempt from CUTPA by the very terms of
Sec. 42-110c because it is "subject to pervasive state
or federal regulation," in accordance with the
Supreme Court's holding in Connelly v. Housing
Authority, 213 Conn. 354. [FN3] Finally, CL & P
argues that Clark's CUTPA claim is legally
insufficient because it is a "verbatim repetition of the
claims set forth in the first counterclaim." It argues
that because debt collection is only "secondary" to its
business of providing electric services to the public,
wrongfully attempting to collect a debt cannot be the
basis of a CUTPA violation.

> FN3. Notably, CL & P has not cited any
> cases in which a court has held that it-or any
> other public utility company-is exempt from
> a CUTPA claim. Nor has the court been
> able to locate any such cases.

 *2 Clark has responded by saying that his first

Not Reported in A.2d                                                           Page 2
Not Reported in A.2d, 1996 WL 365360 (Conn.Super.), 17 Conn. L. Rptr. 37
**(Cite as: 1996 WL 365360 (Conn.Super.))**

counterclaim does not attempt to state a claim for vexatious litigation. It is a claim that CL & P wrongfully attempted to collect funds from him in violation of Sec. 36a-646 of the General Statutes. Moreover, he argues, such conduct states a common law cause of action for deceptive business practice and "may constitute outright fraud." Thus, Clark argues that the first counterclaim is legally sufficient.

As to the second counterclaim, Clark claims that it, too, is legally sufficient because paragraph 10 contains an allegation that the alleged misconduct of CL & P was conducted by CL & P "in the conduct of its business as an electric [and] utility company." Clark also argues that according to the plain language of Sec. 42-110c(b), CL & P bears the burden of proving that it is entitled to an exemption. Finally, he argues that a single tortious act can give rise to a CUTPA violation and that his second counterclaim, therefore, is legally sufficient.

"The motion to strike ... admits all facts well pleaded." Ferryman v. Groton, 212 Conn. 138, 142. On a motion to strike "the trial court ... [has an] obligation to take the facts to be those alleged in the special defenses and to construe the defenses in the manner most favorable to sustaining their legal sufficiency." Connecticut National Bank v. Douglas, 221 Conn. 530, 536.

"In ruling on a motion to strike, the court is limited to the facts alleged in the ... [p]leading." Novametrix Medical Systems, Inc. v. BOC Group, Inc., 224 Conn. 210, 215. "This includes the facts necessarily implied and fairly provable under the allegations ..." (Internal quotation marks omitted.) Westport Bank & Trust Co. v. Corcoran, Mallin & Aresco, 221 Conn. 490, 495.

As to the first counterclaim, CL & P's contention that Clark has attempted to state a cause of action for vexatious litigation is not persuasive. A fair reading of the allegations of the counterclaim, read in the light most favorable to sustaining its legal sufficiency, as this court is required to do; Connecticut National Bank v. Douglas, supra, suggests that Clark has stated a legally sufficient cause of action for wrongful collection practices by CL & P in violation of Sec. 36a-646 of the General Statutes since the facts alleged by Clark, if proven, could give rise to liability by CL & P. [FN4] The motion to strike the first counterclaim is accordingly, denied.

FN4. Clark has not sufficiently pleaded a

cause of action for fraud because his counterclaim lacks the allegation that CL & P made a false or fraudulent representation to Clark as well as an allegation of fraudulent or deceptive intent on the part of CL & P, both essential elements of a fraud claim.

As to the second counterclaim, Clark has stated a legally sufficient cause of action under CUTPA. At the outset, it is noted that with few exceptions, the case law is manifest that a single act can give rise to a CUTPA violation. See, e.g., *Palmieri v. Smith,* 9 CSCR 891 (July 18, 1994) (Hennessey, J.); *Gustafson v. Young,* 12 CONN. L. RPTR. 105, 106 (July 11, 1994) (Teller, J.); *Michael J. Stula Agency, Inc. v. Wasniewski,* 9 CSCR 159 (January 26, 1994) (Austin, J.); *Yale University School of Medicine v. Wurtzel,* Superior Court, Judicial District of New Haven at New Haven, Docket No. 275314, 2 CONN. L. R PTR. 813 (November 9, 1990) (Flanagan, J.). But see *Duncan v. Burnside Motors, Inc.,* 2 CSCR 379 (February 26, 1987) (O'Neill, J.). Moreover, Clark correctly points out that paragraph 10 of the second counterclaim does contain an allegation that CL & P's alleged misconduct was committed in the context of its trade or business as an electric company.

**\*3** Assuming that CL & P believes it is entitled to an exemption from CUTPA pursuant to Sec. 42-110c, it bears the burden of proving its entitlement thereto. Simply because it may be heavily regulated by state law, does not automatically entitle it to an exemption from CUTPA. For instance, although the Supreme Court has held that municipal housing authorities are exempt from CUTPA because they are "a creature of statute ... and [are] pervasively regulated" by both the state and federal governments; *Connelly v. Housing Authority, supra,* 361; it has also held that banks-entities which are also subject to extensive federal and state regulation-are not entitled to an exemption from CUTPA. *Normand Josef Enterprises, Inc. v. Connecticut National Bank,* 230 Conn. 486, 509. As such, it cannot be said at this point that CL & P is exempt from CUTPA as a matter of law. It simply has not met its burden of demonstrating an exemption from CUTPA and, in any event, such a finding would require this court to examine documents and facts outside the current record, which it is not permitted to do on a motion to strike. *Connecticut State Oil Co. v. Carbone,* 36 Conn.Sup. 181, 182-83 ("[a] motion to strike which imparts facts from outside the pleadings is an improper 'speaking motion to strike' ").

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                          Page 3
Not Reported in A.2d, 1996 WL 365360 (Conn.Super.), 17 Conn. L. Rptr. 37
**(Cite as: 1996 WL 365360 (Conn.Super.))**

Clark has set forth a prima facie CUTPA claim sufficient to withstand a motion to strike.    The motion is, accordingly, denied in its entirety.

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.                                                                                    Page 1
Not Reported in F.Supp., 1997 WL 280496 (D.Conn.)
**(Cite as: 1997 WL 280496 (D.Conn.))**

Only the Westlaw citation is currently available.

United States District Court, D. Connecticut.
Linda CORDOVA, et al.
v.
Bradley P. LARSON
**Nos. 3:96CV2111 (AHN), 3:96CV402 (AHN).**

April 30, 1997.

*RULING ON MOTION FOR SUMMARY
JUDGMENT*

NEVAS

**\*1** The plaintiffs, Linda Cordova ("Cordova") and
Ivan Torres ("Torres"), bring this action against the
defendant, Bradley P. Larson ("Larson"), alleging
violations of the Fair Debt Collection Practices Act,
15 U.S.C. § § 1692-1692o ("FDCPA"), and the
Connecticut Creditors' Collection Practices Act,
Conn. Gen.Stat. § § 36a-645 to -654 ("CCPA").

Now pending before the court is plaintiffs' motion
for summary judgment.  For the following reasons,
this motion [doc. # 40] is DENIED.

*STANDARD*

In a motion for summary judgment, the burden is on
the moving party to establish that there are no
genuine issues of material fact in dispute and that it is
entitled to judgment as a matter of law.   See Rule
56(c), Fed.R.Civ.P.;   *Anderson v. Liberty Lobby,
Inc.,* 477 U.S. 242, 256 (1986).  A court must grant
summary judgment "if the pleadings, depositions,
answers to interrogatories, and admissions on file,
together with affidavits, if any, show that there is no
genuine issue as to any material fact."   *Miner v. City
of Glen Falls,* 999 F.2d 655, 661 (2d Cir.1993)
(citation and internal quotation marks omitted).  "A
dispute regarding a material fact is genuine 'if the
evidence is such that a reasonable jury could return a
verdict for the nonmoving party.' "   *Aldrich v.
Randolph Cent. Sch. Dist.,* 963 F.2d 520, 523 (2d
Cir) (quoting *Anderson,* 477 U.S. at 248), *cert.
denied,* 113 S.Ct. 440 (1992).   Summary judgment is
appropriate if, after discovery, the nonmoving party
"has failed to make a sufficient showing on an
essential element of [its] case with respect to which

[it] has the burden of proof."  *Celotex Corp. v. Catrett,
477 U.S. 317, 323 (1986).*   The court resolves "all
ambiguities and draw[s] all inferences in favor of the
nonmoving party in order to determine how a
reasonable jury would decide."   *Aldrich,* 963 F.2d at
523.   Thus, "[o]nly when reasonable minds could not
differ as to the import of the evidence is summary
judgment proper."   *Bryant v. Maffucci,* 923 F.2d 979,
982 (2d Cir.), *cert. denied,* 502 U.S. 849 (1991);   *see
also Suburban Propane v. Proctor Gas, Inc.,* 953
F.2d 780, 788 (2d Cir.1992).

*FACTS*

The following facts are undisputed.  In March 1995,
Cordova and Torres became members of a vacation,
travel and recreation organization.  (*See* Pls.' Stat. of
Material Facts [hereinafter "Pls.' Stat."] ¶  3.) Great
American Records ("G.A.R.") initially solicited,
financed and/or administered the membership. (*See*
Pls.' Stat. ¶  3.)

Larson, an attorney, is employed by G.A.R. as Vice-
President and General Counsel. (*See* Pls.' Stat. ¶ ¶  1,
2.) In September 1996, Larson sent a letter addressed
to Cordova and Torres which purported to attempt to
collect a debt. (*See* Pls.' Stat. ¶  8.) The letter was
signed by another G.A.R. employee, Christine
Kehayes ("Kehayes"). (*See* Pls.' Stat. ¶  9.) However,
Larson's letterhead did not indicate that he was an
employee of G.A.R., but instead, indicated that he
was an "Attorney and Counselor at Law." (*See* Pls.'
Stat. Attach.  B. (reproducing letter.))   Larson had
earlier learned both that Cordova and Torres were
represented by counsel and that Torres had filed a
truth in lending suit with regard to a transaction with
G.A.R. (*See* Pls.' Stat. ¶ ¶  4, 5;   *see also* Pls.' Stat.
Attach.  A (reproducing copy of letter sent to Larson
by plaintiffs' attorney.))

**\*2** Here, plaintiffs argue that Larson violated the
FDCPA by communicating with them about the
collection of a debt when he knew that they had
retained counsel ("Count One").   *See* 15 U.S.C. §
1692c.   In addition, based on the same conduct, they
allege a corresponding violation of the CCPA
("Count Two"). *See* Conn. Agencies Regs. §  36a-
647-4. [FN1]

*DISCUSSION*

Larson contends that there is a genuine issue of
material fact regarding whether he is a debt collector

Not Reported in F.Supp.                                                                                                   Page 2
Not Reported in F.Supp., 1997 WL 280496 (D.Conn.)
**(Cite as: 1997 WL 280496 (D.Conn.))**

for the purposes of the FDCPA.   *See* 15 U.S.C. §
1692a(6).   Alternatively, he claims that, even if he is
a debt collector, his error in contacting the plaintiffs
was not intentional, but instead, was a bona fide error
which occurred even though there were procedures in
place to prevent it.   *See* 15 U.S.C. § 1692k(c).

*I. The FDCPA Claim*

 The FDCPA is designed to eliminate abusive debt
collection practices;   to insure that debt collectors
who do not use abusive practices are not
competitively disadvantaged;   and to promote
consistent state action to protect consumers against
debt collection abuses.   *See* 15 U.S.C. § 1692(e).
The FDCPA is remedial in nature and should be
liberally construed.  *See N.C. Freed.  Co. v. Board of
Governors,* 473 F.2d 1210, 1214 (2d Cir.), *cert.
denied,* 414 U.S. 827 (1973);   *see also Pipiles v.
Credit Bureau of Lockport.  Inc.,* 886 F.2d 22, 27 (2d
Cir.1989) (noting that, in enacting FDCPA, Congress
painted with a broad brush in order to protect
consumers from abusive collection practices) Proof
of one violation is sufficient to support recovery
under the statute.   *See* 15 U.S.C. § 1692k (providing
that liability can be established for "any debt
collector who fails to comply with any provision of
[the statute]");   *Clomon v. Jackson,* 988 F.2d 1314,
1318 (2d Cir.1993).

 Under the FDCPA, a debt collector is "any person
who uses any instrumentality of interstate commerce
or the mails in any business the principle purpose of
which is the collection of any debts, or who regularly
collects or attempts to collect, directly or indirectly,
debts owed or due or asserted to be owed or due
another."   15 U.S.C. § 1692a(6).   The FDCPA
exempts from this definition "any officer or employee
of a creditor which, in the name of the creditor,
collecting debts for such creditor."   15 U.S.C. §
1692a(6)(A)

 Here, there is a genuine issue of material fact
concerning whether Larson is a debt collector within
the meaning of the FDCPA.   Plaintiffs have not
produced sufficient evidence to prove that either
Larson's firm or Larson himself is principally
engaged in the collection of debts.   Moreover, even
if Larson is a debt collector, he may be exempt from
the FDCPA in this case because he is an employee of
the creditor.   Plaintiffs admit that Larson is an
employee of G.A.R. and that the letter sent was
signed by another of G.A.R.'s employees.
Consequently, plaintiffs have not shown that Larson
was attempting to collect a debt as an attorney and

not as a G.A.R. employee.

*II. The CCPA Claim*

 **\*3** In Count Two, the plaintiffs allege that Larson
was acting as an agent of an identified principal when
he sent a demand letter to them in violation of the
CCPA. (*See* Complaint ¶ ¶ 12, 13.)   However,
because plaintiffs' Complaint appears to assert a
private cause of action under the CCPA, the court
cannot address the merits of this count.

 Under the CCPA, only the Connecticut Banking
Commissioner may initiate a cause of action against
persons engaging in collection practices prohibited
by the Act. *See* Conn. Gen.Stat. § 36a-647(c).
Other Connecticut district courts have declared that
"the CCPA does not expressly authorize private
causes of action for violations by creditors, or debt
collectors." *Little v. World Fin. Network, Inc.,* No.
N-89-346 (TFGD), 1990 WL 516554 at *6 (D.Conn.
July 26, 1990);   *see also Krutskoff v. Fleet Bank,
NA.,* No. Civ. 93-119(DJS), 1996 WL 865317 at *6-7
(D.Conn. Dec. 23, 1996).   Thus, the plaintiffs'
summary judgment motion as to Count Two is also
denied.

*CONCLUSION*
 For the reasons stated above, plaintiffs' motion for
summary judgment [doc. # 40] is DENIED.

 SO ORDERED.

> FN1. In their memorandum of law, plaintiffs
> further assert that their CCPA claim
> establishes a violation of the Connecticut
> Unfair Trade Practices Act, ("CUTPA").
> *See* Conn. Gen.Stat. 42-110(a)-(q).
> However, they fail to make such a claim in
> the Complaint.   The court cannot grant
> summary judgment regarding a CUTPA
> claim if the plaintiffs have failed to plead the
> claim in the Complaint.

 Not Reported in F.Supp., 1997 WL 280496
(D.Conn.)

 END OF DOCUMENT



Not Reported in A.2d                                                                                          Page 1
Not Reported in A.2d, 2002 WL 450534 (Conn.Super.)
**(Cite as: 2002 WL 450534 (Conn.Super.))**

H

Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Superior Court of Connecticut.
Nicole B. GRAFF et al.,
v.
Kerry O'CONNELL et al.
**No. CV010095518S.**

March 5, 2002.

 Plaintiffs brought suit against their neighbors for
slander, invasion of privacy and intentional infliction
of emotional distress. Defendant neighbors moved to
strike. The Superior Court, Judicial District of
Middlesex at Middletown, Shapiro, J., held that: (1)
alleged statements by defendants that plaintiffs were
operating an illegal boarding kennel and allowed
their dogs to bark excessively did not impute crime
so as to be slanderous per se; (2) allegations
concerning defendants' alleged videotaping of
plaintiffs and their property were insufficient to show
communication of private information so as to state
claim for invasion of privacy; and (3) plaintiffs failed
to state claim for intentional infliction of emotionally
distress without allegation that defendants intended to
inflict distress.

 Motion granted.

West Headnotes

**[1] Libel and Slander ☞7(1)**
237k7(1)  Most Cited Cases
Allegation that defendants had communicated to
others that plaintiffs were operating an illegal
boarding kennel was legally insufficient to state
claim for slander absent claim that plaintiffs had
suffered injury to their reputation.

**[2] Libel and Slander ☞7(2)**
237k7(2)  Most Cited Cases
Alleged statements by defendants that plaintiffs were
operating an illegal boarding kennel did not impute a
crime under boarding kennel statutes so as to be
slanderous per se, as any illegality attributable to
plaintiffs did not carry risk of imprisonment under

those statutes.  C.G.S.A. § § 22-344, 22- 327(3).

**[3] Libel and Slander ☞7(13)**
237k7(13)  Most Cited Cases
Defendants' alleged statements that plaintiffs were
operating an illegal boarding kennel did not imply
crime of larceny, in sense that they might be
construed to imply that plaintiffs were taking money
of customers under false pretenses, so as to be
actionable as slander per se, since allegations did not
bear reasonable relation to statutory definition of the
crime.  C.G.S.A. § 53a-119.

**[4] Libel and Slander ☞7(2)**
237k7(2)  Most Cited Cases
Defendants' statements that plaintiffs were allowing
their dogs to bark excessively did not impute a crime
so as to involve slander per se, where alleged
violation of nuisance statute involving barking dogs
could not result in term of imprisonment on first
conviction.  C.G.S.A. § 22-363.

**[5] Libel and Slander ☞7(1)**
237k7(1)  Most Cited Cases
Statements by defendants that plaintiffs were
allowing their dogs to bark excessively lacked
requisite specificity to charge a crime so as to
constitute slander per se; statements amounted to
nothing more than subjective assessments or
opinions.  C.G.S.A. § 22-363.

**[6] Torts ☞415**
379k415  Most Cited Cases
     (Formerly 379k26(1))
Allegation that defendants publicized private facts
about plaintiffs to unspecified number of unknown
third persons by making and showing videotapes of
plaintiffs and their property did not sufficiently allege
publicity to state cause of action for invasion of
privacy.

**[7] Pleading ☞365(1)**
302k365(1)  Most Cited Cases
Motion to strike claim could not be granted on
ground that was mentioned in memorandum of law
supporting motion but not in motion itself.

**[8] Torts ☞351**
379k351  Most Cited Cases
     (Formerly 379k8.5(5.1), 379k8.5(4))

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                          Page 2
Not Reported in A.2d, 2002 WL 450534 (Conn.Super.)
(Cite as: 2002 WL 450534 (Conn.Super.))

[8] Torts 🗝415

379k415 Most Cited Cases
        (Formerly 379k26(1))
Plaintiffs failed to state actionable invasion of
privacy claim against defendants by alleging that
defendants made and showed videotapes of plaintiffs
and their property, absent any indication that
videotaping involved protected, private and personal
information, such as details of plaintiffs' lives in their
home, such that defendants' conduct might be
considered highly offensive to reasonable person.

[9] Damages 🗝57.25(1)

115k57.25(1) Most Cited Cases
        (Formerly 115k50.10)
Absent any allegation that defendants intended to
inflict emotional distress or should have known that
emotional distress was likely result of their conduct,
allegations that defendants told others that plaintiffs
were operating an illegal boarding kennel and that
their dogs barked excessively, and that defendants
videotaped plaintiffs and their property, were
insufficient to state claim for intentional infliction of
emotional distress.

MEMORANDUM OF DECISION RE MOTION TO
STRIKE (# 103)

ROBERT B. SHAPIRO, Judge.

 *1 This action comes before the court on the
defendants' motion to strike each of the seven counts
of the plaintiffs' complaint dated June 15, 2001. For
the reasons stated below, the defendants' motion to
strike is granted.

 I. Background

 The plaintiffs, Nicole Bartner Graff and Andrew J.
Graff, allege the following facts in their seven-count
complaint. The plaintiffs and the defendants were
neighbors in Killingworth, Connecticut. Beginning in
January of 2001, the defendants allegedly made
comments to various individuals that the plaintiffs
were operating an illegal boarding kennel on their
property (counts one and three) and that the plaintiffs
were permitting their dogs to bark excessively and
illegally (counts two, four and five). Beginning in
March of 2001, the plaintiffs claim that the
defendants began to videotape the plaintiffs and the
plaintiffs' property and did show the videotapes to
third parties (count six). Finally, the plaintiffs claim
that they have suffered severe emotional distress as a
result of the defendants' actions (count seven).

 The plaintiffs brought a seven-count complaint dated
June 15, 2001 against the defendants alleging five
counts of defamation, one count of invasion of
privacy and one count of intentional infliction of
emotional distress.

 On October 29, 2001, the defendants filed the instant
motion to strike (# 103) each of the seven counts of
the complaint. The defendants claim that the first,
second, third, fourth and fifth counts fail to allege
statements that can be considered defamatory as a
matter of law and that these counts fail to allege any
reputational or special damage. As to the sixth count,
the defendants claim that it should be stricken for
failure to allege conduct highly offensive to a
reasonable person, failure to allege appropriation of
plaintiffs' names or likenesses for defendants'
advantage and failure to allege intrusion upon the
plaintiffs' seclusion. Finally, as to count seven, the
defendants claim that the plaintiffs have failed to
allege conduct that can be considered outrageous as a
matter of law and have failed to allege that the
defendants intended or knew that emotional distress
might result from their conduct.

 On November 7, 2001, the plaintiffs filed their brief
in opposition to the motion to strike (# 104). On
November 29, 2001, the defendants filed their reply
memorandum in support of the motion to strike (#
105). The court heard oral argument at short calendar
on December 3, 2001, and after reviewing the
pleadings submitted by the parties concerning the
motion, and considering their arguments, now issues
this memorandum of decision.

 II. Standard of Review

 "The purpose of a motion to strike is to contest ... the
legal sufficiency of the allegations of any complaint
... to state a claim upon which relief can be granted.
In ruling on a motion to strike, the court is limited to
the facts alleged in the complaint." (Internal
quotation marks omitted.) *Faulkner v. United
Technologies Corp.*, 240 Conn. 576, 580, 693 A.2d
293 (1997). "The role of the trial court [in ruling on a
motion to strike is] to examine the [complaint],
construed in favor of the [plaintiff], to determine
whether the [plaintiff has] stated a legally sufficient
cause of action." (Internal quotation marks omitted.)
*Dodd v. Middlesex Mutual Assurance Co.*, 242 Conn.
375, 378, 698 A.2d 859 (1997). The court must "take
the facts to be those alleged in the complaint ..., and
... construe the complaint in the manner most
favorable to sustaining its legal sufficiency." (Internal

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2002 WL 450534 (Conn.Super.)
(Cite as: 2002 WL 450534 (Conn.Super.))

Page 3

quotation marks omitted.) *Eskin v. Castiglia,* 253 Conn. 516, 522-23, 753 A.2d 927 (2000). "[I]f facts provable in the complaint would support a cause of action, the motion to strike must be denied ... Moreover ... [w]hat is necessarily implied [in an allegation] need not be expressly alleged." (Citation omitted; internal quotation marks omitted.) *Doe v. Yale University,* 252 Conn. 641, 667, 748 A.2d 834 (2000).

III. Discussion

*2 The defendants have moved to strike the first five counts on the grounds that each of these counts fail to allege statements that can be considered defamatory as a matter of law, fail to allege that the plaintiffs' reputations have been damaged and fail to allege any special damage.

In opposition, the plaintiffs claim that those counts which allege that the defendants falsely accuse the plaintiffs of operating an illegal boarding kennel constitute libel per se because the subject allegations can be construed to imply that the plaintiffs are guilty of larceny by taking money from consumers under false pretenses. Therefore, the plaintiffs argue that allegations of special damages are not required. Further, the plaintiffs contend that by alleging that the plaintiffs suffered humiliation, embarrassment and emotional distress, and incurred economic loss, they have alleged special damages.

"Defamation is comprised of the torts of libel and slander. Defamation is that which tends to injure reputation in the popular sense; to diminish the esteem, respect, goodwill or confidence in which the plaintiff is held, or to excite adverse, derogatory, or unpleasant feelings or opinions against him ... Slander is oral defamation. [The] court has delineated specific categories of speech deemed actionable per se where the defamatory meaning of [the speech] is apparent on the face of the statement ..." (Citations omitted; internal quotation marks omitted.) *DeVito v. Schwartz,* 66 Conn.App. 228, 234, 784 A.2d 376 (2001). "A prima facie case of defamation is made when the plaintiff demonstrates that: 1.[a] defamatory statement was made by the defendant; 2. [t]he defamatory statement identifies the plaintiff to a reasonable reader; 3. [t]he defamatory statement is published to a third person; and, 4.[t]he plaintiff's reputation suffers injury ..." (Citation omitted.) *Silva v. New York Life Insurance Co.,* Superior Court, judicial district of Fairfield at Bridgeport, Docket No. 342973 (January 12, 2001) (Skolnick, J.).

A. Counts One and Three

[1] In counts one and three, the plaintiffs allege that the defendants on three occasions "falsely and maliciously stated to Cathie S. Jefferson that the plaintiffs were operating an illegal boarding Kennel." (Paragraph 3.) The plaintiffs further allege that the plaintiffs "suffered embarrassment, humiliation and emotional distress, and incurred economic loss." (Paragraph 4.)

The plaintiffs do not allege that they have suffered injury to their reputation. Since this is one of the required elements for a prima facie case of defamation, counts one and three are legally insufficient.

[2][3] Additionally, the plaintiffs have failed to plead a cause of action for slander per se. "When the defamatory words are actionable per se, the law conclusively presumes the existence of injury to the plaintiff's reputation. He is required neither to plead nor to prove it." (Internal quotation marks omitted.) *Olivas v. DeVivo Industries, Inc.,* Superior Court, judicial district of Danbury, Docket No. 335908 (February 26, 2001) (Hiller, J.). "We have recognized slander to be actionable per se where the utterance falsely charges a crime involving moral turpitude or to which an infamous penalty is attached." *Moriarty v. Lippe,* 162 Conn. 371, 383, 294 A.2d 326 (1972). "The modern view of this requirement is that the crime be a chargeable offense which is punishable by imprisonment ... The allegation that a person committed a crime need not be as specific as in an indictment, but it must bear some reasonable relation to the legislative definition of a crime." (Citations omitted.) *Olivas v. DeVivo Industries, Inc., supra.* While the statement at issue does claim some illegality, it does not specify in what way the alleged boarding kennel is illegal.

*3 Connecticut General Statutes § 22-344 provides for only a monetary penalty for any violations regarding boarding kennels, as defined by General Statutes § 22-327(3). [FN1] Since any illegality attributable to the plaintiffs by the alleged statement does not carry with it the risk of imprisonment the plaintiffs have failed to successfully allege a cause of action for slander per se. [FN2]

FN1. General Statutes § 22-327(3) defines commercial kennel as "a kennel maintained for boarding or grooming dogs or cats, and includes, but is not limited to, any veterinary hospital which boards or grooms dogs or

Not Reported in A.2d                                                                                    Page 4
Not Reported in A.2d, 2002 WL 450534 (Conn.Super.)
(Cite as: 2002 WL 450534 (Conn.Super.))

cats for nonmedical purposes."
General Statutes § 22-344(e) provides, in pertinent part, "[a]ny person maintaining any commercial kennel ... without having obtained a license for the same or after any such license has been revoked or suspended as provided herein shall be fined not more than two hundred dollars."

FN2. In their brief in opposition to the motion to strike, the plaintiffs argue that the allegation of the operation of an illegal boarding kennel implies the crime of larceny. Nevertheless, as noted, in order to constitute slander per se, the crime alleged must bear some reasonable relation to the statutory definition of the crime. See *Battista v. United Illuminating Co.,* 10 Conn.App. 486, 493, 523 A.2d 1365 (1986), cert. denied, 204 Conn. 803, 525 A.2d 1352 (1987). General Statutes § 53a-119 defines larceny as follows: "A person commits larceny when, with intent to deprive another of property or to appropriate the same to himself or a third person, he wrongfully takes, obtains or withholds such property from an owner." In this case, the statements at issue bear no reasonable relationship to the crime of larceny.

"When the defamatory words are actionable per se, the law conclusively presumes the existence of injury to the plaintiffs' reputation. He is required neither to plead nor to prove it ... The rule is different, however, when the defamation is actionable per quod. There, the law indulges in no such presumption. For this reason, injury to the reputation must be alleged and proved as an essential link between the slanderous utterances and the special damage which constitutes the basis of recovery in actions per quod." (Citations omitted.) *Urban v. Hartford Gas Co.,* 139 Conn. 301, 308, 93 A.2d 292 (1952).

Since the plaintiffs have failed to allege a cause of action for defamation per se and have failed to plead any damage to their reputation, the plaintiffs have failed to allege legally sufficient causes of action in counts one and three. The motion to strike counts one and three is granted.

B. Counts Two, Four and Five

[4] In count two, the plaintiffs allege that the defendant, Shawn O'Connell, on February 15, 2001, "falsely and maliciously stated to an officer of the Connecticut State Police, whose name is presently unknown to the plaintiffs, that the plaintiffs were permitting their dogs to bark excessively and unlawfully on that very evening." (Paragraph 3.) In count four, the plaintiffs allege that the "defendant Shawn O'Connell falsely and maliciously stated to Marianne Smith that the plaintiffs unlawfully permitted their dogs to bark outside their home at 5:00 a.m. every day for a week." (Paragraph 3.) In count five, the plaintiffs allege that "the defendant Kerry O'Connell falsely and maliciously stated to Marianne Smith, among other things, that the plaintiffs had permitted one of their dogs to bark excessively and illegally outside their home in the early morning hours of March 1, 2001." (Paragraph 3.) Additionally, the plaintiffs claim as to each of counts two, four and five that they have "suffered embarrassment, humiliation and emotional distress, and incurred economic loss." (Counts 2, 4 and 5, paragraph 4.)

Just as with counts one and three, the plaintiffs have failed to allege any injury to their reputation in counts two, four and five. Therefore, unless these counts constitute defamation per se, they too are legally insufficient.

General Statutes § 22-363 provides that "[n]o person shall own or harbor a dog or dogs which is or are a nuisance by reason of ... excessive barking ... Violation of any provision of this section shall be an infraction for the first offense and such person shall be fined not more than one hundred dollars or imprisoned not more than thirty days or both for each subsequent offense ..." Therefore, unless the defendants previously been convicted under this statute, this alleged violation cannot result in a term of imprisonment. The plaintiffs do not allege this to be the case.

*4 [5] Furthermore, "[t]o be actionable, the statement in question must convey an objective fact, as generally, a defendant cannot be held liable for expressing a mere opinion." *Daley v. Aetna Life & Casualty Co.,* 249 Conn. 766, 795, 734 A.2d 112 (1999). The statements allegedly made by the defendants of "excessive barking" certainly amount to subjective assessments, and, therefore, opinions. The statements at issue in counts two, four and five do not allege a crime with the required specificity to be considered defamation per se. [FN3] The plaintiffs have not alleged a legally sufficient cause of action for defamation per se.

FN3. In their memorandum in opposition to

Not Reported in A.2d
Not Reported in A.2d, 2002 WL 450534 (Conn.Super.)
(Cite as: 2002 WL 450534 (Conn.Super.))

Page 5

the motion to strike, the plaintiffs do not argue that the statements at issue in counts two, four and five allege the commission of any crime.

Accordingly, the causes of action for defamation alleged in each of counts two, four and five are legally insufficient. The motion to strike counts two, four and five is granted.

C. Count Six

In count six, the plaintiffs allege that from March 1, 2001 to date of the complaint, "the defendants, with malice and with the intent unreasonably to intrude upon the seclusion of the plaintiffs, to appropriate their likenesses, to unreasonably publicize the private lives of the plaintiffs, and to place the plaintiffs in a false light before third persons, have engaged in a continuous course of videotaping the plaintiffs and their property during the daily affairs of the plaintiffs' lives." (Paragraph 3.) Additionally, the plaintiffs have alleged that "[u]pon information and belief, the defendants, without permission and with malice and for the improper purposes described in Paragraph 3, have shown the aforesaid videotapes to third persons whose identities are presently unknown to the plaintiffs." (Paragraph 4.)

The defendants have moved to strike this count, arguing that this count is legally insufficient because it "fails to allege conduct that is highly offensive to a reasonable person, fails to allege the appropriation of the plaintiffs' names or likenesses for the defendants' benefit or advantage and fails to allege intrusion upon the plaintiffs' physical seclusion or solitude." (Defendants' motion to strike, p. 1.) In opposition to the motion to strike, the plaintiffs claim that their allegations in count six are identical to those in *Goodrich v. Waterbury Republican-American, Inc.,* 188 Conn. 107, 448 A.2d 1317 (1982).

"Connecticut first recognized the tort of invasion of privacy in *Goodrich v. Waterbury Republican-American, Inc.,* 188 Conn. 107, 448 A.2d 1317 (1982). In recognizing this right, the court noted that the law of privacy had not developed as a single tort, but rather as a complex of four distinct kinds of invasion of four different interests of the plaintiff which are tied together by the common name, but otherwise have almost nothing in common except that each represents an interference with the right of the plaintiff to be left alone." (Internal quotation marks omitted.) *O'Brien v. Perry,* Superior Court,

judicial district of Hartford, Docket No. 584503 (February 19, 1999) (Fineberg, J) (9 Conn. L. Rptr. 203).

*5 "Our Supreme Court has described the four types of invasion of privacy: (1) appropriation, for the defendant's benefit or advantage, of the plaintiff's name or likeness; (2) intrusion upon the plaintiff's physical solitude or seclusion; (3) publicity, of a highly objectionable kind, given to private information about the plaintiff even though it is true and no action would lie for defamation; and (4) publicity which places the plaintiff in a false light in the public eye." (Internal quotation marks omitted.) *Honan v. Dimyan,* 52 Conn.App. 123, 131, 726 A.2d 613, cert. denied 249 Conn. 909, 733 A.2d 227 (1999), quoting *Venturi v. Savitt, Inc.,* 191 Conn. 588, 591 n. 1, 468 A.2d 933 (1983). The plaintiffs herein allege that all of the foregoing have occurred, by pleading them in the conjunctive. [FN4]

> FN4. The plaintiffs have alleged all four invasion of privacy torts in the same count. Nevertheless, this is not a ground of the instant motion to strike.

[6][7] In Count six, the plaintiffs vaguely allege publicity "to third persons whose identities are presently unknown to the plaintiffs." (Paragraph four.) "[I]t is not an invasion of the right of privacy ... to communicate a fact concerning the plaintiff's private life to a single person or even to a small group of persons." *Olivas v. DeVivo Industries, Inc.,* Superior Court, judicial district of Danbury, Docket No. 335908 (February 26, 2001) (Hiller, J.). While this count does not sufficiently allege publicity in order to be a legally sufficient cause of action for invasion of privacy, the defendants do not state this as a ground for their motion to strike. The defendants do mention it in their memorandum of law in support of motion to strike complaint (# 103.50), but this is not enough to support the granting of a motion to strike this count for this reason. *Bouchard v. People's Bank,* 219 Conn. 465, 468, n. 4, 594 A.2d 1 (1991).

The defendants do argue in their motion to strike that the plaintiffs fail to allege conduct highly offensive to a reasonable person. Therefore, the court must first determine if the information allegedly publicized would be protected such that its publication would be considered highly offensive to a reasonable person. There is a "three-part test to determine whether a reasonable person would consider information to be a private fact: (1) whether the plaintiff voluntarily revealed the information or actively sought to keep it

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                      Page 6
Not Reported in A.2d, 2002 WL 450534 (Conn.Super.)
**(Cite as: 2002 WL 450534 (Conn.Super.))**

private; (2) whether the matter involves some social value, the nature of which is decided by the fact finder; and (3) whether the information is of any relevance to any ongoing public debate." *Smith v. Hartford,* Superior Court, Complex Litigation Docket at Tolland, Docket No. 70792 (July 14, 2000) (Bishop, J.).

The Connecticut Supreme Court has "listed the following as examples of personal and private information that are given protection: sexual relations; family quarrels; many unpleasant or disgraceful or humiliating illnesses, most intimate personal letters; most details of a man's life in his home; and some of his past history that he would rather forget." *Id.,* citing *Perkins v. Freedom of Information Commission,* 228 Conn. 158, 172-73, 635 A.2d 783 (1993).

*6 [8] The sixth count is vague in that this court cannot determine exactly what the defendants allegedly videotaped. The court also cannot determine from the pleadings how the plaintiffs sought to keep this information private, how it involves social value or how the information allegedly videotaped was relevant to any ongoing public debate. The plaintiffs have not alleged the videotaping of any of the aforementioned enumerated examples of protected, personal and private information. For example, the plaintiffs have alleged the "videotaping of the plaintiffs and their property," but have not alleged that the defendants videotaped any details of the plaintiffs' lives *in* their home, as specified on the list of protected information. The plaintiffs have not alleged that the defendants have publicized any protected conduct of the plaintiffs. Therefore, the defendants' alleged conduct cannot be considered highly offensive to a reasonable person. As this is a prerequisite to any invasion of privacy claim, the motion to strike count six is granted.

D. Count Seven

The defendants have moved to strike the seventh count, which purports to state a cause of action for the intentional infliction of emotional distress, on the grounds that it fails to allege conduct by the defendants that can be considered extreme and outrageous as a matter of law and that it fails to allege that the defendants intended or knew that emotional distress was the likely result. In opposition, the plaintiff's claim that whether conduct was extreme and outrageous is a question of fact for the jury.

"Our Supreme Court recently reiterated the elements which a plaintiff must prove in order to establish a claim for the intentional infliction of emotional distress. In *Appleton v. Board of Education of Stonington,* 254 Conn. 205, 210 [757 A.2d 1059] (2000), the Court restated the four necessary elements: (1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe ... Whether a defendant's conduct is sufficient to satisfy the requirement that it be extreme and outrageous is initially a question for the court to determine ... Only where reasonable minds disagree does it become an issue for the jury." (Internal quotation marks omitted.) *Rock v. Mott Metallurgical Corp.,* Superior Court, judicial district of New Britain, Docket No. 492215 (January 10, 2001) (Shapiro, J.).

[9] The plaintiffs do allege in count seven and in those allegations from earlier counts that are incorporated by reference into count seven that the alleged conduct was extreme and outrageous, that the conduct was the cause of the plaintiffs' emotional distress and that the emotional distress sustained was severe. Nevertheless, even taking the pleadings in their most favorable light, the plaintiffs have not alleged that the defendants intended to inflict emotional distress or that they knew or should have known that emotional distress was likely to result. It is this intentional element that is the linchpin of a claim for intentional infliction of emotional distress. Without this allegation of intentional behavior, this cause of action for intentional infliction of emotional distress is legally insufficient. The motion to strike the seventh count is granted. [FN5]

FN5. Under the circumstances, the court need not determine whether the alleged conduct was "extreme and outrageous."

IV. Conclusion

*7 Accordingly, for the foregoing reasons, the motion to strike each of the seven counts of the plaintiffs' complaint is hereby granted in its entirety. It is so ordered.

Not Reported in A.2d, 2002 WL 450534 (Conn.Super.)

Not Reported in A.2d
Not Reported in A.2d, 2002 WL 450534 (Conn.Super.)
**(Cite as: 2002 WL 450534 (Conn.Super.))**

END OF DOCUMENT

Westlaw.

Not Reported in F.Supp.2d                                                                 Page 1
Not Reported in F.Supp.2d, 2006 WL 1699589 (D.Conn.)
**(Cite as: 2006 WL 1699589 (D.Conn.))**

C

Only the Westlaw citation is currently available.

United States District Court,
D. Connecticut.
Donald R. HOLTMAN and Verena E. Holtman,
Plaintiffs,
v.
CITIFINANCIAL MORTGAGE COMPANY, INC.,
Defendant.
**No. Civ.A. 3:05-CV-1571(.**

June 19, 2006.

James A. Armentano, Donald R. Holtman, Katz &
Seligman, Hartford, CT, for Plaintiffs.

Donald E. Frechette, William E. Murray, Edwards &
Angell, Hartford, CT, for Defendant.

RULING ON DEFENDANTS' MOTION TO
DISMISS [DKT. NO. 15]

HALL, J.

  *1 The plaintiffs Donald R. Holtman and Verena E.
Holtman, residents of Connecticut, bring this action
for injunctive and monetary relief against the
defendant, Citifinancial Mortgage Company, Inc.
("Citifinancial"), a New York corporation with its
principal place of business in Maryland. The
Holtmans allege violations of the Creditors
Collection Practices Act, Conn. Gen.Stat. § 36a-646
*et seq.* and the Connecticut Unfair Trade Practices
Act, Conn. Gen.Stat. § 42-110a *et seq.,* defamation,
intentional infliction of emotional distress, and
negligent infliction of emotional distress. This suit
arises from a promissory note and mortgage the
Holtmans executed on their residence, which note
and mortgage are now held by Citifinancial.
Citifinancial removed this action from the
Connecticut Superior Court in Hartford pursuant to
28 U.S.C. § § 1441 and 1446. Citifinancial has
moved to dismiss certain aspects of the complaint
pursuant to Fed. R. Civ. P 12(b)(6). Jurisdiction is
allegedly based on diversity of citizenship of the
parties. 28 U.S.C § 1332.

  On the basis of the following analysis, Citifinancial's
motion is GRANTED in part and DENIED in part.

I. FACTUAL BACKGROUND [FN1]

    FN1. The court takes the facts alleged in the
    complaint as true, as it must, and draws all
    inferences in Holtmans' favor. *See Scheuer
    v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683,
    40 L.Ed.2d 90 (1974), *overruled on other
    grounds by Davis v. Scherer,* 468 U.S. 183,
    104 S.Ct. 3012, 82 L.Ed.2d 139 (1984)

  On January 10, 2003, the Holtmans executed a
promissory note and mortgage on their residence at
12 Sage Lane, East Granby in favor of Wilmington
Savings Fund Society for $176,600. [FN2]
Citifinancial obtained that promissory note and
mortgage by assignment on March 31, 2003. The
monthly installments on the note and mortgage
became payable commencing in April of 2003.

    FN2. For the purposes of this Motion to
    Dismiss, the Holtmans' debt is consumer
    debt under Conn. Gen.Stat. § 36a-645.

  Except for three occasions, the Holtmans made
timely payment of each installment due under the
note and mortgage. However, from March 2004 until
the present, Citifinancial engaged in a number of
practices, including: a) assessing late charges against
the Holtmans for being one to three installments
behind on their payments, even though Citifinancial's
own records demonstrated that the Holtmans were
not behind on these payments; b) contacting at least
one third party regarding the Holtmans' allegedly
tardy payments; c) making hundreds of telephone
calls--as many as seven a day--to the Holtmans at
their home and to Mr. Holtman at his office,
including calling the Holtmans back immediately
after the Holtmans said that they would not speak to
Citifinancial representatives by phone; d) calling
Mrs. Holtman on at least two Fridays and claiming
that "an attorney would come out on Monday and put
a padlock on the door" if the Holtmans did not make
payments, even though such payments were not
actually due; e) refusing to determine the validity of
its claims even though Citifinancial's own records
demonstrated that the Holtmans were making timely
payments on their installments, including advising
Mr. Holtman on at least one occasion that a letter Mr.
Holtman wrote detailing Citifinancial's errors would
not be answered and had almost certainly been
thrown away; and f) threatening repeatedly to notify

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 1699589 (D.Conn.)
**(Cite as: 2006 WL 1699589 (D.Conn.))**

credit reporting agencies that the Holtmans were in default, despite the fact that Citifinancial knew, or should have known, that the Holtmans were not in default.

**\*2** The Holtmans brought the present action for injunctive relief to require the Citifinancial to correct its records, credit the Holtmans' account with all payments made by them, and notify all third parties, including but not limited to credit reporting agencies, that Citifinancial falsely reported that the Holtmans were in default. The Holtmans' request for injunctive relief is based on Citifinancial's alleged violations of Conn. Gen.Stat. § 36a-646 *et seq.* The Holtmans also assert claims for violation of Conn. Gen.Stat. § 42-110a *et seq.,* defamation, intentional infliction of emotional distress, and negligent infliction of emotional distress. Citifinancial moves pursuant to Fed.R.Civ.P. 12(b)(6) to dismiss the Holtmans' complaint, arguing that it fails to state claims upon which relief can be granted.

## II. STANDARD OF REVIEW

A motion to dismiss filed pursuant to Rule 12(b)(6) can be granted only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *see also Harris v. City of New York,* 186 F.3d 243, 250 (2d Cir.1994). In considering such a motion, the court accepts the factual allegations alleged in the complaint as true and draws all inferences in the plaintiff's favor. *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), *overruled on other grounds by Davis v. Scherer,* 468 U.S. 183, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984). In addition, Rule 8 of the Federal Rules of Civil Procedure requires only that a complaint "contain ... a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2); *see also Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 512, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002).

"In considering a motion to dismiss ... a district court must limit itself to facts stated in the complaint or in documents attached to the complaint as exhibits or incorporated in the complaint by reference ... [and review all allegations] in the light most favorable to the non-moving party." *Newman & Schwartz v. Asplundh Tree Expert Co., Inc.,* 102 F.3d 660, 662 (2d Cir.1996). "While the pleading standard is a liberal one, bald assertions and conclusions of law will not suffice." *Leeds v. Meltz,* 85 F.3d 51, 53 (2d

Cir.1996).

## III. DISCUSSION

In its motion to dismiss, Citifinancial claims that: 1) the Fair Credit Reporting Act, 15 U.S.C. § 1681 *et seq.* ("FCRA") preempts the Holtmans' defamation claim that Citifinancial falsely and maliciously reported to credit reporting agencies that the Holtmans were in default; 2) the FCRA also preempts those portions of the Holtmans' other claims that are based on Citifinancial furnishing information to credit reporting agencies; 3) the Creditors Collection Practice Act, Conn. Gen.Stat. § 36a-646 *et seq.* ("CCPA") cannot be a ground for relief because that provision does not create a private cause of action; and 4) the Holtmans' claims for intentional and negligent infliction of emotional distress do not allege sufficient facts upon which relief can be granted. The court will consider these arguments in turn.

## A. Preemption of State Law Defamation Claim

**\*3** With regard to Citifinancial's assertion that federal law preempts the Holtmans' defamation claim, section 1681t (b)(1)(F) of the FCRA provides, in pertinent part, that "[n]o requirement or prohibition may be imposed under the laws of any state with respect to any subject matter regulated under section 1681s-2 of this title, relating to the responsibilities of persons who furnish information to consumer reporting agencies." 15 U.S.C. § 1681t (b)(1)(F). As a threshold matter, this court finds that "under the laws of any state" in this section refers to the statutory and common law of a state. As the Supreme Court stated in *Erie R. Co v. Tompkins,* the laws of a state, at least for diversity purposes, include state statutes and the rulings of the highest state courts. 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). Congress may decide to limit preemption to statutes or common law, but there is no language to suggest that Congress did so in this section of the FCRA. When Congress means to limit the scope of a preemption statute, it does so in more specific terms than referencing "the laws of any state." For example, section 1681h (e) of Title 15 of the U.S.Code, a section discussed in more detail below, precludes recovery based on "defamation, invasion of privacy, or negligence," all of which are prototypical state common law claims. No designation of this sort is present in section 1681t (b)(1)(F).

Because section 1681t (b)(1)(F) operates to preempt, *inter alia,* state common law, the defamation claim

Not Reported in F.Supp.2d                                                                                           Page 3
Not Reported in F.Supp.2d, 2006 WL 1699589 (D.Conn.)
**(Cite as: 2006 WL 1699589 (D.Conn.))**

against Citifinacial cannot stand. Section 1681t (b)(1)(F) limits its preemptive effect to the conduct regulated by section 1681s-2. The statute outlines this conduct in sections 1681s-2 (a) and (b). Section 1681s-2 (a) establishes that those who furnish information to consumer reporting agencies must do so accurately. 15 U.S.C § 1681s-2(a). In the present case, the Holtmans' defamation claim asserts that Citifinancial defamed them by falsely and maliciously reporting to credit reporting agencies that the Holtmans were in default on their mortgage payments. Section 1681s- 2 (b), on the other hand, addresses the duties of those who furnish information to consumer reporting agencies once they receive notice of a dispute regarding the completeness or accuracy of the information they provide. 15 U.S.C § 1681s-2 (b)(1). Notice for the purposes of the statue may come from a credit reporting agency or a consumer. See Ryder v. Washington Mutual Bank, 371 F.Supp.2d 152, 154-55 (2005) (citing Kane v. Guaranty Residential Lending, Inc., No. 04-CV-4847 (ERK), 2005 WL 1153623, at *8 (E.D.N.Y. May 16, 2005). Here, the Holtmans claim that, despite writing Citifinancial a letter detailing its errors, Citifinancial refused to determine the validity of its claims. As such, there can be little doubt that the conduct alleged in the complaint falls squarely within the scope of section 1681s-2. Thus, § 1681t (b)(1) (F) preempts the Holtmans' recovery under state defamation law.

**\*4** The Holtmans assert that the FCRA does not preempt their state law defamation claim because section 1681h (e) of the FCRA permits recovery despite section 1681t. Section 1681h (e) states, in pertinent part, that:

No consumer may bring any action or proceeding in the nature of defamation ... with respect to the reporting of information, against any consumer reporting agency, any user of information, or any person who furnishes information to a consumer reporting agency, based on information disclosed pursuant to section 1681g, 1681h, or 1681m of this title, or based on information disclosed by a user of a consumer report to or for a consumer against whom the user has taken adverse action, based in whole or in part on the report *except as to false information furnished with malice or willful intent to injure such consumer.*

15 U.S.C § 1681h (e) (emphasis added). Relying on the emphasized portion of the language quoted above, the Holtmans argue that their state law defamation claim should survive because it alleges that Citifinancial provided false information to consumer reporting agencies in a malicious and willful attempt to injure them.

Though a federal appellate court has yet to deal with the question of how the preemptive effects of section 1681t (b) interact with section 1681h (e), a number of federal district courts have agreed in principle with the Holtmans' position. These courts take the position that, with regard to providing information to consumer reporting agencies, section 1681t (b) preempts state statutory causes of action in the areas specified, while section 1681h (e) only preempts state common law causes of action that do not involve the malicious or willful intent to injure a consumer. See, e.g., Alabran v. Capital One, No. Civ.A. 3:04CV935, 2005 WL 3338663, at *5 (E.D.Va. Dec.8, 2005); Watson v. Trans Union Credit Bureau, No. Civ. 04-205-B-C, 2005 WL 995687, at *6-8 (D.Me. Apr.28, 2005); Barnhill v. Bank of Am., 378 F.Supp.2d 696, 703-04 (D.S.C.2005).

The analysis of these courts, as well as two other groups of courts who have resolved the issue differently, [FN3] assumes that section 1681t (b)(1)(F) and section 1681h (e) govern identical subject matter. This court does not read the two statutes in this manner. As discussed above, on its face section 1681t (b)(1)(F) only applies to persons who provide information to consumer reporting agencies. The plain language, of section 1681h (e), however, applies just to consumer reporting agencies and those who take adverse actions against consumers based on consumer reports. Specifically, one portion of section 1681h (e) restricts the behavior of those who provide information to consumer reporting agencies pursuant to sections 1681g, h, and m. 15 U.S.C. § 1681h (e). Sections 1681g and 1681h only govern consumer reporting agencies. See 15 U.S.C. § § 1681g and 1681h. Section 1681m applies solely to the "duties of users taking adverse actions *on basis of information contained in consumer reports."* 15 U.S.C. § 1681m (a) (emphasis added). Likewise, the portion of section 1681h (e) following the reference to sections 1681g, h, and m only applies to persons who take adverse action against a consumer *"based in whole or in part on the* [consumer] *report."* 15 U.S.C. § 1681h (e) (emphasis added). In their complaint, the Holtmans do not allege that Citifinancial is a consumer reporting agency, or that Citifinancial took actions against them based on a consumer report. Section 1681h (e), thus, does not apply to this case. The Holtmans' defamation claim (Count Three) is therefore dismissed.

FN3. Citifinancial cites to both these groups of district courts in its Motion to Dismiss.

Not Reported in F.Supp.2d                                                                                    Page 4
Not Reported in F.Supp.2d, 2006 WL 1699589 (D.Conn.)
**(Cite as: 2006 WL 1699589 (D.Conn.))**

One group uses a temporal approach to reconcile sections 16811(b) and 1681h (e). These courts posit that section 1681t (b) operates only after a consumer or credit agency notifies a provider of information has furnished inaccurate information, while section 1681h (e) operates before said notice. *See, e.g., Ryder v. Washington Mutual Bank,* 371 F.Supp.2d 152, 154-55 (D.Conn.2005); *Woltersdorf v. Pentagon Fed. Credit Union,* 320 F.Supp.2d 1222, 1223-27 (N.D.Ala.2004). The other group of courts holds that section 1681t (b) entirely preempts 1681h (e). *Roybal v. Equifax,* No. CIV S05-1207MCEKLM, 2005 WL 3536115, at *3-4 (E.D.Cal. Oct.19, 2005); *Hasvold v. First USA Bank, N.A.,* 194 F.Supp.2d 1228, 1238-39 (D.Wyo.2002). For the reasons stated in the following analysis, this court does not adopt these formulations.

**B. Issues Based on Preempted Claims**

**\*5** For the reasons outlined in Section III. A of this decision, all aspects of the Holtmans' complaint that are based on Citifinancial's furnishing of information to consumer reporting agencies must also be dismissed. Thus, those portions of the Holtmans' complaint that are based on Citifinancial informing credit reporting agencies 1) that the Holtmans were behind on their mortgage and note payments, or 2) that Citifinancial charged the Holtmans late fees for missing these payments, Compl. at ¶ ¶ 5(a) & 5(b), are dismissed. [FN4]

> FN4. For clarity, this includes those sections of the Holtmans' claims under CUTPA (Count Two), intentional infliction of emotional distress (Count Four), and negligent infliction of emotional distress (Count Five) that incorporate these paragraphs by reference.

**C. Private Cause of Action Under the Creditor's Collection Practices Act**

Courts of this District have held for at least sixteen years that the CCPA does not create a private cause of action. *See Pabon v. Recko,* 122 F.Supp.2d 311, 314 (D.Conn.2000); *Krutchoff v. Fleet Bank, N.A.,* 960 F.Supp. 541, 548 (D.Conn.1996); *Gaetano v. Payco of Wisconsin, Inc.,* 774 F.Supp. 1404, 1414 (D.Conn.1990). The Holtmans correctly point out that the issue is still open because the Connecticut

Supreme Court has yet to rule on it. Until such a ruling, however, this court agrees with the non-binding precedent in this District.

No one disputes that the CCPA does not expressly create a private cause of action. This is critical because Connecticut law presumes that private rights of action do not exist unless expressly created by statute. *Napoletano v. CIGNA Healthcare of Connecticut, Inc.,* 238 Conn. 216, 249, 680 A.2d 127 (1997). A party attempting to invoke an implied private right of action bears the burden of overcoming this presumption and establishing that the statute creates such a right. *Asylum Hill Problem Solving Revitalization Assoc. V. King,* 277 Conn. 238, 246, 890 A.2d 522 (2006). The Holtmans cannot meet their burden unless they show that each factor in the three part test established by the Connecticut Supreme Court in *Napoletano* weighs in favor of an implied right of action. *Napoletano,* 238 Conn. at 249, 680 A.2d 127. The three part test asks if: 1) the plaintiff belongs to the class the legislature intended for the statute to benefit; 2) there is an explicit or implicit legislative intent to create or deny a private right; and 3) the implied private right of action is consistent with the legislative scheme. *Id.* Though it is clear that the Holtmans belong to the class the legislature intended the CCPA to benefit, it is equally clear that this is the only part of the *Napoletano* test they can establish.

Under the second part of the *Napoletano* test, nothing suggests that the Connecticut legislature intended to create a private cause of action in the CCPA. Section 36a-647 expressly grants the State Banking Commissioner authority to enforce the provisions of the CCPA. In section 36a-647(d), the Act provides that "(n)othing contained in sections 36a-645 to 36a-647, inclusive, shall be construed as a limitation upon the power or authority of the state, the attorney general or the commissioner to seek administrative, legal, or equitable relief." Conn.Gen.Stat. § 36a-647(d). Private citizens are conspicuously absent from the list. There are strong indications that this absence is due to the fact that the legislature viewed a private cause of action under the CCPA as unnecessary. One of these indications is a key difference between the state's CCPA and a "parallel" federal statute, the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 *et. seq.* ("FDCPA"). *See Krutchkoff,* 960 F.Supp. at 547. Both acts regulate the manner in which banks can collect consumer debt. However, though the FDCPA specifically authorizes a private cause of action for violations of its provisions, the CCPA does not.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                Page 5
Not Reported in F.Supp.2d, 2006 WL 1699589 (D.Conn.)
**(Cite as: 2006 WL 1699589 (D.Conn.))**

*Contrast* 15 U.S .C. § 1692K (authorizing private cause of action and imposing civil liability for FDCPA violations) with Conn.Gen.Stat. § 36a-647 (authorizing State Banking Commissioner to prosecute CCPA violations). Also, the legislative history of the CCPA reveals that, in drafting the original act, the Legislature removed a section that would have created a private cause of action. *See* *Connecticut National Bank v. Montanari,* 1994 WL 29929 at *3 (Conn.Super.1994). All of this suggests that the Legislature ultimately decided that the powers it granted to the Banking Commissioner and other public officials were sufficient to enforce the state's banking law.

**\*6** Looking to the third part of the *Napoletano* test, a private right of action under the CCPA appears to have no place in the legislative scheme of banking regulation given the number of alternative means of enforcement. For one, individuals like the Holtmans can use violations of the CCPA to state a claim under the Connecticut Unfair Trade Practices Act, Conn. Gen.Stat. § 42-110a *et. seq.* ("CUTPA"). To establish a CUTPA violation, a plaintiff may show that, in violating the CCPA, the defendant in question violated Connecticut public policy. *Pabon,* 122 F.Supp.2d at 314; *see also* *Tillquist v. Ford Motor Credit Co.,* 714 F.Supp. 607, 616 (D.Conn.1989) ( "Because plaintiff has sustained his burden of proof with respect to the (CCPA), the court must determine whether a violation of these regulations is also a violation of the CUTPA."). Also, as the Holtmans point out in their Response to the Motion to Dismiss, the Holtmans can use certain violations of the CCPA to support a negligence claim against Citifinancial. Considering the aforementioned powers of the Banking Commissioner, it is difficult to see what value a private right of action under the CCPA adds to the enforcement of Connecticut's banking policy.

Because the Creditor's Collection Practices Act does not create a private cause of action, the Holtmans' claims for injunctive and compensatory damages based on the CCPA (Count One) are dismissed.

D. Intentional and Negligent Infliction of Emotional Distress

Citifinancial has moved to dismiss the Holtmans' claims for intentional and negligent infliction of emotional distress. Intentional infliction of emotional distress requires that: 1) the actor intended to cause emotional distress when she knew or should have known that emotional distress likely would result; 2) the conduct was extreme and outrageous; 3) the

defendant's behavior caused the plaintiff's distress; and 4) the plaintiff's emotional distress was severe. *Carrol v. Allstate Ins. Co.,* 262 Conn. 433, 443, 815 A.2d 119 (Conn.2002). Negligent infliction of emotional distress requires that: 1) the defendant's conduct created an unreasonable risk of causing emotional distress; 2) the plaintiff's distress was foreseeable and severe enough to potentially cause illness or bodily harm; and 3) the defendant caused the plaintiff's stress. *Id.* at 446, 815 A.2d 119.

The crux of Citifinancial's argument is that the alleged conduct is not outrageous and extreme enough to sustain the Holtmans' burden under Connecticut law. Based on the allegations in the complaint, this court cannot state as a matter of law that the Holtmans could not prove these claims. The motion is therefore denied as to these two causes of action.

IV. CONCLUSION

For the foregoing reasons, Citifinancial Mortgage Company, Inc's Motion to Dismiss [Dkt. No. 15] is hereby GRANTED in part and DENIED in part. The Holtmans' CCPA claim (Count One) is dismissed. The defamation claim (Count Three) is also dismissed. Those portions of the CUTPA (Count Two), intentional infliction of emotional distress (Count Four), and negligent infliction of emotional distress (Count Five) claims based on Citifinancial informing credit reporting agencies: 1) that the Holtmans were behind on their mortgage and note installments, or 2) that Citifinancial subsequently charged the Holtmans with late fees, are also dismissed.

**\*7** SO ORDERED.

Not Reported in F.Supp.2d, 2006 WL 1699589 (D.Conn.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

41 F.3d 1510 (Table)                                                                                                  Page 1
41 F.3d 1510 (Table), 1994 WL 589450 (7th Cir.(Ill.))
**Unpublished Disposition**
**(Cite as: 41 F.3d 1510, 1994 WL 589450 (7th Cir.(Ill.)))**

C

NOTICE: THIS IS AN UNPUBLISHED OPINION.

(The Court's decision is referenced in a "Table of Decisions Without Reported Opinions" appearing in the Federal Reporter. Use FI CTA7 Rule 53 for rules regarding the citation of unpublished opinions.)

United States Court of Appeals, Seventh Circuit.
Charles E. JONES, Plaintiff-Appellant,
v.
PEORIA COUNTY SHERIFF'S DEPARTMENT, a body politic; and the Peoria County
Sheriff's Merit Commission, Defendants-Appellees.
**No. 94-1767.**

Submitted Oct. 12, 1994. [FN*]
Decided Oct. 25, 1994.

Appeal from the United States District Court for the Central District of Illinois, No. 91 C 2383; Harold A. Baker, Judge.

C.D.Ill.

AFFIRMED.

Before CUMMINGS, MANION and KANNE, Circuit Judges.

*ORDER*

**1 Lieutenant Charles Jones filed a complaint in federal court under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, et seq., contending that his discharge from the Peoria County Sheriff's department was racially motivated. He appeals the district court's decision striking an affidavit submitted by his attorney to support his race discrimination claim and the court's decision to grant the defendants' motion for summary judgment on the basis of res judicata. We find that the district court did not abuse its discretion in concluding that the affidavit was insufficient under Federal Rule of Civil Procedure 56(e). *Unterreiner v. Volkswagen of America, Inc.,* 8 F.3d 1206, 1212 (7th Cir.1993). Moreover, we agree that the Illinois state courts issued a judgment on this matter that precludes review of Jones' Title VII claim under Illinois principles of res judicata. Accordingly, the grant of

summary judgment was proper, *Sullivan v. Lemoncello,* No. 93- 3087, slip op. at 2 (7th Cir. Sept. 28, 1994), and we affirm the district court's decision for the reasons stated in the attached Order.

AFFIRMED.

ATTACHMENT
Filed March 4, 1994.
THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
CHARLES E. JONES
Plaintiff,
vs.
PEORIA COUNTY SHERIFF'S DEPARTMENT, a body politic; and THE PEORIA COUNTY
SHERIFF'S MERIT COMMISSION,
Defendants.
Case No. 91-2383
*ORDER*

This is a race discrimination case under Title VII of the 1964 Civil Rights Act. The case has been periodically stayed in this court, pending the outcome of state court proceedings. Those proceedings have concluded, bringing back to life numerous motions in this court. The court now grants the defendants' motions for summary judgment.

*FACTUAL BACKGROUND*

On September 22, 1989, the Peoria County Sheriff's Merit Commission entered an order which discharged Charles Jones from employment as a Sheriff's Deputy. In October, 1989, Jones filed a Complaint for Administrative Review in the Circuit Court of the Tenth Judicial Circuit of Illinois seeking to reverse the decision of the Merit Commission. In that same month, Jones filed a Charge of Discrimination with the Equal Employment Opportunity Commission (EEOC).

On March 26, 1992, the state circuit court found that the Merit Commission should not have discharged Jones and remanded the matter to the Merit Commission to enter an order imposing discipline other than discharge. The Merit Commission determined that Jones should be demoted and suspended without pay for 180 days. On December 2, 1992, the state court entered an order which confirmed the Merit Commission's decision. Appeals of both orders were taken, and on August 23,

41 F.3d 1510 (Table), 1994 WL 589450 (7th Cir.(Ill.))
**Unpublished Disposition**
**(Cite as: 41 F.3d 1510, 1994 WL 589450 (7th Cir.(Ill.)))**

1993, the Appellate Court for the Third District reversed the circuit court and reinstated the Merit Commission's original order to discharge Jones. After receiving his right-to-sue letter from the EEOC, Jones challenged his dismissal in federal court.

*ANALYSIS*

*Motion to Strike*

**\*\*2** On February 1, 1994, the plaintiff filed an affidavit by the plaintiff's attorney, Donald R. Jackson. The affidavit states that during the pendency of Jones' state court proceedings, Jackson had two conversations with an unidentified member of the Peoria County Sheriff's Merit Commission who had participated in the decision to discharge Jones. According to Jackson, the commission member stated that Jones' race (he is an African-American) influenced the commission's decision to terminate Jones. Jones submits this affidavit as evidence that his case is not barred by *res judicata* because of the previous state actions, as this is new evidence which he would have been unable to raise in the state court proceedings.

While it is not at all clear to the court that Jones could not have raised this issue in state court, his effort to raise it here is insufficient. Both of the defendants have brought motions to strike the affidavit, for different reasons. The court now grants the motions to strike for the following reason: the affidavit is entirely insufficient under F.R.Civ.P. 56(e). The only fact to which Mr. Jackson attests is that he had a conversation with an unidentified person regarding the influence Jones' race had on his dismissal. The affidavit does not document with whom Jackson spoke, when Jackson spoke with this person, or where Jackson spoke with this person. Both of the defendants have moved for summary judgment. Jackson's affidavit as part of Jones' response to the motion for summary judgment does not meet the standard of Rule 56(e):

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. (If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.)

Jackson's affidavit does not set forth any specific facts, and therefore this court will strike the affidavit

and not consider it.

*Summary Judgment*

Each defendant has moved for summary judgment arguing that this court is precluded from hearing the present case on the grounds of *res judicata*. The defendant Peoria County Sheriff's Department filed a motion to amend their motion for summary judgment, which the court now grants in order to consider the summary judgment issue in its entirety.

This court must give state court judgments "the same full faith and credit ... as they have by law or usage in the courts of such State." *Pirela v. Village of North Aurora,* 935 F.2d 909, 911 (7th Cir.) *cert. denied,* 112 S.Ct. 587 (1991) (citations omitted). Thus, if a state court judgment would preclude a later state law case, it would also preclude a Title VII case. *Kremer v. Chemical Construction Corporation,* 456 U.S. 461, 476, *reh'g denied,* 458 U.S. 1133 (1982). The two-prong test to determine whether a claim is barred by *res judicata* requires the court to ask: "(1) whether the law of the state in which the prior judgment is rendered would give that judgment preclusive effect against the claims asserted in the federal action; and (2) whether the party against whom preclusion is asserted had a full and fair opportunity in the state proceedings to litigate the claims (i.e. whether the state proceedings satisfy minimum due process requirements." *Welch v. Johnson,* 907 F.2d 714, 719 (7th Cir.1990), citing *Kremer,* 456 U.S. at 481- 82.

**\*\*3** The first prong of the test asks simply whether the cause of action would be precluded under Illinois principles of *res judicata*. In Illinois, the doctrine of *res judicata* will apply if there is: "(1) identity of parties or their privies in the two suits; (2) identity of causes of action in the prior and current suit; and (3) a final judgment on the merits in the prior suit." *Pirela,* 935 F.2d at 911 (citations omitted).

The plaintiff does not contend either that the parties are not identical in the two cases, or that a final judgment was not reached in the state court proceeding. The plaintiff disagrees only with the second prong of the test, and maintains that this is not the same cause of action as was raised in the state court.

Illinois courts have historically applied two different tests in determining whether causes of action are identical. Under the "same evidence test," a court must determine "whether the same evidence would

41 F.3d 1510 (Table)                                                                                      Page 3
41 F.3d 1510 (Table), 1994 WL 589450 (7th Cir.(Ill.))
**Unpublished Disposition**
**(Cite as: 41 F.3d 1510, 1994 WL 589450 (7th Cir.(Ill.)))**

sustain both actions." *Pirela, 935 F.2d at 912* (citations omitted). In a similar vein, the "transactional" test requires a court to analyze whether both causes of action arose from the "same operative group of facts," in other words, from the same transaction. *Id.*

Jones claims that under either test his state proceeding and this proceeding are different causes of action. He bases this claim on the fact that his state proceeding involved only the question of whether he was rightfully discharged, and thus the facts in issue were only whether or not Jones adhered to the police department's rules. He argues that in contrast, this proceeding is about whether he was treated differently from white officers.

Jones' contentions are in clear contravention of Seventh Circuit law, which shows that under both the "same evidence" test and the "transactional" test, all issues involving a termination involve one cause of action. The Seventh Circuit has relied on the reasoning of the Illinois Supreme Court in adopting a broad view of what the "same facts" and the "same transaction" mean:

> [T]he conclusiveness of the judgment in [the prior action] extends not only to matters actually determined, but also to other matters which could properly have been raised and determined therein. This rule applies to *every question relevant to and falling within the purview of the original action,* in respect to matters of both claim or grounds of recovery, and defense, which could have been presented by the exercise of due diligence ...
> The principle that res judicata extends to *all matters within the purview of the original action,* whether or not they were actually raised, is tantamount to a rule requiring parties to consolidate all closely related matters into one suit. As such, the principle serves well the interest of judicial economy and thus it is at the core of the res judicata doctrine.

*Welch, 907 F.2d at 720* (citations omitted) (emphasis in original).

**\*\*4** The *Welch* case is instructive. A public employee was fired. In her state cause of action, she challenged the propriety of her discharge; in her federal action she attempted to show that the basis of the discharge was sex discrimination under Title VII and 42 U.S.C. § 1983. The court applied both tests. Under the "same evidence test" the court found that any evidence Welch had regarding discrimination in her discharge could and should have been raised as a

defense at the state court level. In other words, the facts surrounding any harassment or discrimination she faced in her firing were relevant in both proceedings; thus, they were the same cause of action. The court reached the same result in applying the "transactional" test: "The single factual situation out of which both suits arise is [Welch's employer's] conduct toward Ms. Welch that eventually culminated in her discharge." *Id.* at 722. See also *Pirela, 935 F.2d at 912* (former police officer's claim of discriminatory treatment in discharge and suspension procedures was same cause of action, for *res judicata* purposes, as his administrative discharge hearing and subsequent judicial review proceedings under Illinois law).

Jones's case is remarkably analogous. Any facts regarding a discriminatory motive in Jones' termination could, and should have been raised at the state level. [FN1] In the absence of the struck affidavit, Jones seems to have no support for his allegation of race discrimination. Even if he did, that claim would clearly involve the same facts and arise out of the same transaction as the relevant facts in the state court proceeding.

The second prong of the *res judicata* test asks the court to determine whether Jones had a full and fair opportunity to litigate his claims in the state proceedings, that is, "whether the state proceedings satisf[ied] minimum due process requirements." *Welch, 907 F.2d at 719,* citing *Kremer, 456 U.S. at 481-82.*

Jones maintains that because the Merit Commission originally intended to seek his demotion, but later dismissed him, that he was denied due process by not being able to present a sufficient defense. *The charges against Jones did not change; only the punishment did.* The court does not understand how this in any way affected Jones' ability to present a defense.

Jones also claims that because he did not learn of the alleged discriminatory intent until his case was pending in the circuit court, he was prevented from raising the defense. Jones could have brought the information to the attention of the state trial court, which then would have had two options to insure that Jones' due process rights were protected: 1) hearing the claim itself, or 2) remanding his case to the Merit Commission for further proceedings. *Pirela, 935 F.2d at 915.* The *Pirela* court found that the "failure to litigate his discrimination claims either before the

41 F.3d 1510 (Table)                                                                                       Page 4
41 F.3d 1510 (Table), 1994 WL 589450 (7th Cir.(Ill.))
**Unpublished Disposition**
**(Cite as: 41 F.3d 1510, 1994 WL 589450 (7th Cir.(Ill.)))**

[administrative commission] or on administrative review in the state circuit court 'does not insulate [the plaintiff's] claims from the effects of *res judicata.'* " *Id.,* citing Welch, 907 F.2d at 725. Consequently, Jones' failure to raise the claim in state court does not prevent his case from being barred on *res judicata* grounds now.

**\*\*5** There is nothing to indicate that any of Jones' proceedings in state court did not meet the standards of due process. One of the Merit Commission members submitted an affidavit as to the fairness of Jones' hearing in front of the commission. Jones was also heard by the state circuit and appellate courts. He has never complained about the fairness of any of these proceedings. Thus, he meets the second prong of the *res judicata* test of having had a full and fair hearing.

Having met both prongs of the *res judicata* test, this federal court proceeding is barred by the doctrine of *res judicata.* Because the proceeding is barred by *res judicata,* there are no more material issues of fact for the court to consider. In the absence of any issue of material fact, the court must grant summary judgment, in this case for the defendants. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).

The remainder of the motions in the case are denied as moot.

IT IS THEREFORE ORDERED that defendant Peoria County Sheriff's Department's motion to strike (Docket # 47) and defendant Peoria County Sheriff's Merit Commission's motion to strike (Docket # 49) are granted.

IT IS FURTHER ORDERED that defendant Peoria County Sheriff's Department's motion to amend their motion for summary judgment (Docket # 45) is granted.

IT IS FURTHER ORDERED that defendant Peoria County Sheriff's Merit Commission's motion for summary judgment (Docket # 28) and defendant Peoria County Sheriff's Department's motion for summary judgment (Docket # 33) are granted.

IT IS FURTHER ORDERED that the clerk is ordered to enter judgment in favor of the defendants and against the plaintiff. The parties shall bear their own costs.

IT IS FURTHER ORDERED that the remainder of the motions, defendant Peoria County Sheriff's Merit Commission's motion for the court to take judicial notice (Docket # 29), defendant Peoria County Sheriff's Merit Commission's motion to strike and to renew the motion to dismiss (Docket # 30), defendant Peoria County Sheriff's Department's motion to renew the motion to dismiss (Docket # 36), and defendant Peoria County Sheriff's Department's motion to take judicial notice (Docket # 37) are denied as moot.

/s/ Harold A. Baker

HAROLD A. BAKER

United States District Judge

FN* After this case was set for oral argument, Plaintiff-Appellant submitted a motion to waive argument. The court granted that motion. Accordingly, the appeal is submitted on the briefs and the record.

FN1. Although the court has struck Mr. Jackson's affidavit and will not consider it, the court cannot resist noting that Mr. Jackson asserts that both of the alleged conversations took place during the pendency of the state proceedings, which reinforces the fact that this issue was known and should have been raised at the state court level.

41 F.3d 1510 (Table), 1994 WL 589450 (7th Cir.(Ill.)), Unpublished Disposition

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



H

Only the Westlaw citation is currently available.

United States Bankruptcy Court, N.D. Illinois,
Eastern Division.
In re PLENIPOTENTIARY LIMITED, Debtor.
BARCLAYS BANK PLC, a banking corporation
organized under the laws of England,
Plaintiff,
v.
AMERICAN NATIONAL BANK AND TRUST
COMPANY OF CHICAGO, a national banking
association, not personally but as Trustee under a
Trust Agreement dated
December 17, 1975, and known as Trust No. 38162,
Plenipotentiary Limited, an
Illinois limited partnership, The Management Group,
Inc., an Illinois
corporation, individually and d/b/a Hostmark
Management Group, Ambassador West
(Chicago) Associates, L.P., a Delaware limited
partnership, and Stephen Mann,
Defendants.
**Nos. 92 B 12342, 92 C 2717 and 93 A 00259.**

April 15, 1993.

Matthew Botica, William J. McKenna, Jr., Hopkins
& Sutter, Chicago, IL, for Barclay Bank PLC,
plaintiff.

Marc O. Beem, Miller, Shakman, Hamilton &
Kurtzon, Chicago, IL, for Ambassador West
(Chicago) Associates, L.P., defendant.

Daniel R. Murray, Donald I. Resnick, Jenner &
Block, Chicago, IL, for The Management Group,
Inc., defendant.

MEMORANDUM OPINION

JOHN H. SQUIRES, Bankruptcy Judge.

**\*1** This matter comes before the Court on the motion
of Barclays Bank PLC ("Barclays") for summary
judgment pursuant to Federal Rule of Civil Procedure
56, incorporated by reference in Federal Rule of
Bankruptcy Procedure 7056, on Counts I and II of its
complaint for foreclosure [FN1], and on the motion
of Ambassador West (Chicago) Associates, L.P.
("AWA") to strike portions of the affidavit of

Salvatore Esposito ("Esposito") and to strike the
exhibits to this affidavit, filed by Barclays as an
exhibit to its Local Rule 12(m) statement in support
of its motion for summary judgment. For the
reasons set forth herein, the Court having considered
the pleadings, exhibits and affidavits, grants the
motion for summary judgment. In addition, the
Court denies the motion of AWA to strike portions of
the supplemental affidavit of Esposito and to strike
the exhibits to the affidavit.

> FN1. Barclays' motion for summary
> judgment covers the Debtor, American
> National Bank and Trust Company of
> Chicago, as trustee, The Management
> Group, Inc. and Ambassador West
> (Chicago) Associates, L.P. pursuant to
> Counts I and II of the complaint. Barclays
> previously filed a motion for summary
> judgment against defendant Stephen Mann,
> the guarantor of the mortgage obligation.
> That motion was granted by the district
> court on March 10, 1993. Count III has not
> been referred to this Court for disposition.
> Counts IV and V are not the subject of this
> motion.

I. JURISDICTION AND PROCEDURE

Pursuant to an Order of the district court dated
September 23, 1992, this matter was referred to this
Court for supervision and resolution under 28 U.S.C.
§ 157(c)(2). Thus, the Court has jurisdiction to
entertain this motion pursuant to 28 U.S.C. § 1334
and such reference from the United States District
Court for the Northern District of Illinois. Although
this matter constitutes a non-core proceeding under
28 U.S.C. § 157(b)(3), the parties have stipulated to
the referral. Accordingly, pursuant to 28 U.S.C. §
157(c)(2), this Court is authorized to enter judgment
on its findings of fact and conclusions of law.

II. UNDISPUTED FACTS AND BACKGROUND

American National Bank and Trust Company of
Chicago, as Trustee under a Trust Agreement dated
December 17, 1975, and known as Trust No. 38162
(the "Trustee"), is the record owner of title to the
Ambassador West Hotel (the "Property") located at
1300 North State Parkway, Chicago, Illinois.
Plenipotentiary Limited (the "Debtor") is a limited
partnership that owns the beneficial interest of the
land trust. The Management Group, Inc. and AWA

are the two general partners of the Debtor.

On October 19, 1989, Barclays agreed, subject to the terms and conditions set out in a written loan agreement (the "Loan Agreement"), to loan up to $20,200,000.00 to the Trustee and the Debtor. *See* Barclays Exhibit D. The Trustee and the Debtor executed a promissory note in favor of Barclays in the amount of $20,200,000.00. *See* Barclays Exhibit E. As security for that promissory note, the Trustee executed a mortgage dated October 19, 1989 (the "Mortgage"). *See* Barclays Exhibit F. As additional security for the note, the Trustee granted Barclays a security interest in certain personal property and fixtures as set forth in the mortgage. *See* Barclays Exhibit F, pp. 2-3. Further, as additional security for the note, the Trustee and the Debtor entered into a security agreement granting to Barclays a security interest in certain personal property. *See* Barclays Exhibit G. That personal property includes: (1) all furniture, furnishings and equipment located in the Property; (2) all deposits and all tangible and intangible personal property attached to or contained in and used in connection with the Property; and (3) all licenses, permits and authorizations for the operation of the Property. Barclays perfected its security interest in the collateral by filing financing statements. *See* Barclays Exhibit H.

**\*2** Pursuant to the terms of the Mortgage, it is the responsibility of the Debtor to pay the accruing real estate taxes for the Property before the due date. *See* Barclays Exhibit F, § 3(a), p. 6. The Trustee and the Debtor did not timely pay the 1990 (payable in 1991) nor the first installment of the 1991 real estate taxes on the Property in the amount of $187,082.87. *See* Barclays Exhibit J, Exhibit 1 thereto. Thereafter, on September 17, 1991, Barclays sent the Debtor a letter stating that the failure to timely pay the real estate taxes was a default under the Loan Agreement. *See* Barclays Exhibit J. The facts concerning why those and the subsequent years' real estate taxes were not timely paid are at the heart of the instant dispute. The Debtor contends that it had an oral agreement with Barclays to defer the payment of the real estate taxes until the summer when business increased and there was more money available. Barclays, on the other hand, interpreted this failure to pay the taxes as a mortgage default under Section 12 of the Mortgage, and in response thereto, accelerated the maturity date on the entire indebtedness on March 26, 1992. *See* Barclays Exhibit K.

Barclays filed a five count complaint on April 24, 1992, in the United States District Court for the Northern District of Illinois. *See* Barclays Exhibit A. Count I seeks to foreclose the real estate Mortgage and Count II seeks to foreclose the security interest on the personal property. Count IV seeks a declaration of rights and for payment of management fees under a subordination agreement. Count V also seeks a declaration of rights under a subordination agreement. On May 29, 1992, the district court entered an order granting Barclays' motion for appointment of a receiver for the Property. *See* Barclays Exhibit L. Thereafter, by order of the district court dated June 2, 1992, Lodging Unlimited, Inc. (the "Receiver") was appointed as receiver of the Property. *See* Barclays Exhibit M. Pursuant to the terms of the June 2, 1992 Order, the Receiver went into possession of the Property on June 3, 1992, and took control of the Property and the collateral. *Id.*

Subsequently, on June 3, 1992, an involuntary Chapter 11 petition was filed against the Debtor by AWA. *See* Barclays Exhibit N. On June 4, 1992, Barclays filed a motion in the bankruptcy court to excuse the Receiver from complying with the turnover provisions of 11 U.S.C. § 543. After a hearing, Barclays' motion was granted and an order was entered authorizing the Receiver to remain in possession of and manage the Property and collateral. *See* Barclays Exhibits O and P.

Thereafter, on June 9, 1992, the district court dismissed the complaint, without prejudice, as to the Trustee and the Debtor. *See* Barclays Exhibit Q. The Debtor did not contest the involuntary petition, nor did it consent to an order for relief. On June 24, 1992, an Order for Relief was thereafter entered. *See* Barclays Exhibit R. On September 23, 1992, with the consent of the parties and pursuant to 28 U.S.C. § 157(c)(2), the district court referred the proceeding under Barclays' complaint to the bankruptcy court for supervision and resolution, with the exception of the guaranty claim against defendant Stephen Mann in Count III of the complaint. *See* Barclays Exhibit S.

**\*3** On October 8, 1992, this Court held a hearing on Barclays' motion for dismissal of the case, or alternatively, for termination of the automatic stay. The Court found that cause existed to lift the stay and entered an order on October 15, 1992, granting Barclays motion to modify the automatic stay effective December 31, 1992, for cause shown pursuant to 11 U.S.C. § 362(d)(1). The Order provided that "[a]s of December 31, 1992, Barclays may take any and all actions it deems appropriate or necessary with respect to the Complaint for

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.                                                                                                           Page 3
Not Reported in B.R., 1993 WL 135970 (Bankr.N.D.Ill.)
**(Cite as: 1993 WL 135970 (Bankr.N.D.Ill.))**

Foreclosure...." *See* Barclays Exhibit T.  Pursuant to that Order, on January 6, 1993, Barclays filed a motion to reinstate its complaint against the Debtor and the Trustee, which was allowed on February 11, 1993. *See* Barclays Exhibit U.

The instant motion for summary judgment was filed on January 21, 1993.  AWA, the Debtor and The Management Group, Inc. filed their responses thereto on March 3, 1993.  Barclays filed its reply on March 10, 1993.  The matter was thereafter taken under advisement.  On March 9, 1993, AWA filed its motion to strike portions of the supplemental affidavit of Esposito and to strike the exhibits to the affidavit.  A response was filed by Barclays Bank on March 17, 1993.

On March 2, 1993, Barclays filed a renewed motion to dismiss the core bankruptcy case.  That motion was granted on April 5, 1993, pursuant to the provisions of 11 U.S.C. § 1112(b)(1) and (b)(2).  On April 5, 1993, the Court allowed the Debtor and The Management Group, Inc. to file a counterclaim against Barclays.  Barclays filed its answer thereto on April 6, 1993.

### III. APPLICABLE STANDARDS

In order to prevail on a motion for summary judgment, the movant must meet the statutory criteria set forth in Rule 56 of the Federal Rules of Civil Procedure, made applicable to adversary proceedings by Federal Rule of Bankruptcy Procedure 7056.  Rule 56(c) reads in part:

[T]he judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed.R.Civ.P. 56(c);  *see also Donald v. Polk County,* 836 F.2d 376, 378- 379 (7th Cir.1988).

In 1986, the United States Supreme Court decided a trilogy of cases which encourage the use of summary judgment as a means to dispose of factually unsupported claims.  *Farries v. Stanadyne/Chicago Div.,* 832 F.2d 374, 378 (7th Cir.1987) (quoting *Wainwright Bank & Trust Co. v.*

*Railroadmens Federal Sav. & Loan Asso.,* 806 F.2d 146, 149 (7th Cir.1986)).    The burden is on the moving party to show that no genuine issue of material fact is in dispute.  *Anderson,* 477 U.S. at 256;  *Celotex,* 477 U.S. at 322;  *Matsushita,* 475 U.S. at 585-586.  There is no genuine issue for trial if the record, taken as a whole, does not lead a rational trier of fact to find for the non-moving party.  *Matsushita,* 475 U.S. at 587.  "If the evidence is merely colorable or is not significantly probative, summary judgment may be granted."  *Anderson,* 477 U.S. at 249-250 (citations omitted);  *see also Valley Liquors, Inc. v. Renfield Importers, Ltd.,* 822 F.2d 656, 659 (7th Cir.1987), *cert. denied,* 484 U.S. 977 (1987).  Summary judgment is appropriate in cases involving the interpretation of contractual documents.  *Ryan v. Chromalloy American Corp.,* 877 F.2d 598, 602 (7th Cir.1989).

**\*4** The party seeking summary judgment always bears the initial responsibility of informing the court of the basis for its motion, identifying those portions of the "pleadings, depositions, answers to interrogatories, and affidavits, if any," which it believes demonstrates the absence of a genuine issue of material fact.  *Celotex,* 477 U.S. at 323.  Once the motion is supported by a prima facie showing that the moving party is entitled to judgment as a matter of law, a party opposing the motion may not rest upon the mere allegations or denials in its pleadings, rather its response must show that there is a genuine issue for trial.  *Anderson,* 477 U.S. at 248;  *Celotex,* 477 U.S. at 323;  *Matsushita,* 475 U.S. at 587;  *Patrick v. Jasper County,* 901 F.2d 561, 564-566 (7th Cir.1990).  The manner in which this showing can be made depends upon which party will bear the burden of persuasion at trial.  If the burden of persuasion at trial would be on the non-moving party, the party moving for summary judgment may satisfy the burden of production under Rule 56 by either submitting affirmative evidence that negates an essential element of the non-moving party's claim, or by demonstrating that the non-moving party's claim is insufficient to establish an essential element of the non-moving party's claim.  *See* 10A Wright, Miller & Kane, § 2727, pp. 130-131.

Moreover, all reasonable inferences to be drawn from the underlying facts must be viewed in a light most favorable to the party opposing the motion.  *Karazanos v. Navistar International Transportation Corp.,* 948 F.2d 332, 335 (7th Cir.1991);  *Davis v. Chicago,* 841 F.2d 186, 189 (7th Cir.1988);  *Marine Bank, Nat. Asso. v. Meat Counter, Inc.,* 826 F.2d 1577, 1579 (7th Cir.1987);  *De Valk Lincoln*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.                                                                                      Page 4
Not Reported in B.R., 1993 WL 135970 (Bankr.N.D.Ill.)
**(Cite as: 1993 WL 135970 (Bankr.N.D.Ill.))**

*Mercury, Inc. v. Ford Motor Co.,* 811 F.2d 326, 329 (7th Cir.1987); *Bartman v. Allis Chalmers Corp.,* 799 F.2d 311, 312 (7th Cir.1986), *cert. denied,* 479 U.S. 1092 (1987); *In re Calisoff,* 92 B.R. 346, 350-351 (Bankr.N.D.Ill.1988). Furthermore, the existence of a material factual dispute is sufficient only if the disputed fact is determinative of the outcome under the applicable law. *Donald v. Polk County,* 836 F.2d at 379; *Wallace v. Greer,* 821 F.2d 1274, 1276 (7th Cir.1987); *Egger v. Phillips,* 710 F.2d 292, 296 (7th Cir.1983) (en banc), *cert. denied,* 464 U.S. 918 (1983). "Summary judgment is not an appropriate occasion for weighing the evidence; rather the inquiry is limited to determining if there is a genuine issue for trial." *Lohorn v. Michal,* 913 F.2d 327, 331 (7th Cir.1990).

 Rule 56(d) provides for the situation when judgment is not rendered upon the whole case, but only a portion thereof. The relief sought pursuant to subsection d is styled partial summary judgment. Partial summary judgment is available only to dispose of one or more counts of the complaint in their entirety. *Commonwealth Ins. Co. v. O. Henry Tent & Awning Co.,* 266 F.2d 200, 201 (7th Cir.1959); *Biggins v. Oltmer Iron Works,* 154 F.2d 214, 216- 217 (7th Cir.1946); *Quintana v. Byrd,* 669 F.Supp. 849, 850 (N.D.Ill.1987); *Arado v. General Fire Extinguisher Corp.,* 626 F.Supp. 506, 509 (N.D.Ill.1985); *Capitol Records, Inc. v. Progress Record Distributing, Inc.,* 106 F.R.D. 25, 28 (N.D.Ill.1985); *In re Network 90°, Inc.,* 98 B.R. 821, 823 (Bankr.N.D.Ill.1989); *Strandell v. Jackson County,* 648 F.Supp. 126, 136 (S.D.Ill.1986). Rule 56(d) provides a method whereby a court can narrow issues and facts for trial after denying in whole or in part a motion properly brought under Rule 56. *Capitol Records, Inc. v. Progress Record Distributing, Inc.,* 106 F.R.D. at 29.

 **\*5** Rule 12(m) of the General Rules of the United States District Court for the Northern District of Illinois, as amended, adopted by the General Order of the Bankruptcy Court on May 6, 1986, requires that the party moving for summary judgment file a detailed statement of material facts as to which it contends there is no genuine issue. The statement must include specific references to the affidavits, parts of the record, and other supporting materials relied upon to support the summary judgment relief sought. Rule 12(n) also requires that the party opposing the motion file a statement of material facts as to which there is a genuine issue. If the opposing party's Rule 12(n) statement fails to deny the facts set forth in the movant's statement, those facts will be deemed admitted. In the present proceeding, Barclays filed its requisite Rule 12(m) statement and the Debtor, The Management Group, Inc. and AWA filed their Rule 12(n) statement.

 Pursuant to Federal Rule of Civil Procedure 56(e), "affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Fed.R.Civ.P. 56(e). Personal knowledge within the meaning of Rule 56(e) includes inferences from sense data as well as the sense data themselves (all knowledge is inferential-- including sense data). *Palucki v. Sears, Roebuck & Co.,* 879 F.2d 1568, 1572 (7th Cir.1989). Conclusory statements in affidavits opposing a motion for summary judgment are not sufficient to raise a genuine issue of material fact. *First Commodity Traders, Inc. v. Heinold Commodities, Inc.,* 766 F.2d 1007, 1011 (1985); *Hall v. Printing and Graphic Arts Union,* 696 F.2d 494, 500 (7th Cir.1982). When a party seeks to offer evidence through other exhibits, they must be identified by affidavit or otherwise made admissible in evidence. *Martz v. Union Labor Life Ins. Co.,* 757 F.2d 135, 138 (7th Cir.1985). In applying these rules, however, the Court must not lose touch with the basic principle of summary judgment: to view the evidence strictly against the movant and favorably toward the party opposing the motion. *Prudential Ins. Co. v. Curt Bullock Builders, Inc.,* 626 F.Supp. 159, 164 (N.D.Ill.1985). The goal remains the determination of whether a material issue of fact exists. *Id.* A court is allowed to disregard inadmissible argument or conclusion in an affidavit. *Id.* When admissible facts and inadmissible statements occur in the same affidavit, the Court need not strike the entire affidavit, but rather may rely on the facts and disregard the rest. *Id.*

## IV. DISCUSSION
### A. *The Motion to Strike*

 The Court hereby denies the motion of AWA to strike portions of the affidavit of Esposito and the documents attached thereto as Exhibits A through K. The Court finds that many of the statements made in the affidavit are based upon Esposito's own personal knowledge as vice president of Barclays acquired by his review of the relevant documents pertaining to the transaction between Barclays and the Debtor contained in Barclays' loan file. He concludes that he found no evidence that Barclays had ever agreed that the real estate tax payments could be deferred. The exhibits to the affidavit have been identified by the affiant and are otherwise admissible in evidence

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.                                                                                    Page 5
Not Reported in B.R., 1993 WL 135970 (Bankr.N.D.Ill.)
**(Cite as: 1993 WL 135970 (Bankr.N.D.Ill.))**

under the business records exception to the hearsay rule as contained in Federal Rule of Evidence 803(6).

 **\*6** AWA's argument that the documents referenced in the affidavit constitute inadmissible hearsay is rejected.   Esposito, a qualified officer of Barclays and current custodian of the subject exhibits, asserts that these documents were on file and made by other Barclays' personnel as a regular practice.    The documents were made at or near the dates they bear and kept in the course of Barclays' regular business.   There is no showing that the documents lack trustworthiness.   Moreover, in response to the motion to strike and to buttress both the documents and Esposito's affidavit, Barclays has submitted the additional affidavit of Jane Reynolds Schaller, who was the previous responsible Barclays' loan officer on the subject loan prior to Esposito.   She was the authoress of many of the letters from Barclays to the Debtor, which comprise the subject exhibits referenced in the motion to strike.   She has the requisite personal firsthand knowledge with respect to such documents and the referenced events contained therein.   Thus, for purposes of Rule 56(e), her affidavit satisfies the requirement of personal knowledge of the events stated and reflected therein, which Esposito lacks.   Therefore, these records fall within the business records exception to hearsay contained in Federal Rule of Evidence 803(6).   Hence, the motion to strike portions of Esposito's affidavit and the exhibits attached thereto is denied.

### B. *The Motion for Summary Judgment*

 The ultimate issue in this matter is whether the Debtor was in material default under the Loan Agreement for failing to pay the real estate taxes in a timely fashion.   The Debtor maintains that it had a subsequent oral agreement with Barclays to defer the payment of the first installment of the 1991 real estate taxes until the summer of 1992.   This allegation has its origin from the late payment of the 1990 taxes made in 1991.   The Debtor asserts that in April 1991, representatives from the Debtor and Barclays met to discuss, among other things, the payment of the 1990 real estate taxes.   At this meeting, the Debtor's representatives informed Barclays that, rather than paying the first installment of the Property's real estate taxes in March 1991, it had deferred the payment of the taxes until the summer.   *See* Affidavit of Stephen Mann, ¶¶ 6, 7;  Affidavit of Charles Gavzer, ¶ 4.   The Debtor's representatives explained to Barclays that deferring the payment of real estate taxes would not threaten the ownership of the Property, as the Property could be redeemed by the owner until at least two years

after the non-payment of taxes.   *See* Affidavit of Stephen Mann, ¶ 7;  Affidavit of Charles Gavzer, ¶ 5;  Affidavit of Elliot Miller, ¶ 12.   Moreover, they explained that the Debtor's cash flow is greater during the summer months due to increased occupancy.   *See* Affidavit of Stephen Mann, ¶ 5;  Affidavit of Charles Gavzer, ¶ 5.   At the conclusion of this discussion, Barclays and the Debtor's representatives allegedly agreed that, in the future, the Debtor would defer the payment of the first installment of real estate taxes until the summer.   *See* Affidavit of Stephen Mann, ¶ 7;  Affidavit of Elliot Miller, ¶¶ 11 and 12;  Affidavit of Charles Gavzer, ¶ 6.   Pursuant to this alleged agreement, the Debtor paid the first installment of the real estate taxes in June, 1991.   This alleged agreement, however, was not reduced to writing and is denied by Barclays' representatives.

 **\*7** In the months subsequent to the meeting at which the real estate taxes were discussed, the business relationship between the parties, as well as the Debtor's financial condition, began to deteriorate.   During this period, Barclays sent the Debtor numerous letters stating that the Debtor was in default under the Loan Agreement.   Among these letters was a September 17, 1991 letter from Barclays stating that the deferral of the real estate taxes was a default under the Loan Agreement.   *See* Barclays Exhibits J and I.   Barclays and the Debtor's representatives had a series of meetings in late 1991 and early 1992.   During these meetings, Barclays' representatives allegedly acknowledged that the Debtor was not in default under the loan documents.   *See* Affidavit of Elliot Miller, ¶ 6.   Barclays' representatives supposedly stated that although a default had not yet occurred, it believed the Debtor would be in default in the near future because it would exceed the limits on its interest reserve.   *See* Affidavit of Stephen Mann, ¶ 20;  Affidavit of Elliot Miller, ¶ 5.

 Barclays vehemently denies that it orally or otherwise agreed to any such deferment of the payment of the real estate taxes.   In fact, Barclays points to several provisions in the Loan Agreement which prohibit the oral modification of same.   Barclays contends, on the other hand, that the Debtor materially defaulted under the Loan Agreement.   Barclays cites several cases for the proposition that when a mortgagor defaults under its mortgage obligations and there is no dispute as to that default or as to any other issue of material fact, the mortgagee is entitled to summary judgment as a matter of law.   *See Fireman's Fund Mortg. Corp. v.*

*Zollicoffer,* 719 F.Supp. 650 (N.D.Ill.1989); *Chicago Title & Trust Co. v. Anderson,* 177 Ill.App.3d 615, 532 N.E.2d 595 (1st Dist.1988); *Miles Home Div. of Insilco Corp. v. Green,* 134 A.D.2d 817, 522 N.Y.S.2d 262 (1987); *Jeffery v. Seven Seventeen Corp.,* 461 A.2d 1009 (Del.1983); *Citizens Valley Bank v. Mueller,* 63 Or.App. 152, 662 P.2d 792 (1983).

Furthermore, the Mortgage itself specifically incorporates by reference the provisions of the Loan Agreement.    The Loan Agreement provides in relevant part:

No modification, waiver, amendment, discharge or change of this Agreement shall be valid unless the same is in writing and signed by the party against which the enforcement of such modification, waiver, amendment, discharge or change is sought.

*See* Barclays Exhibit D.   Such a provision in a loan document is enforceable against a borrower under Illinois law.   *Delcon Group v. Northern Trust Corp.,* 187 Ill.App.3d 635, 543 N.E.2d 595 (2d Dist.1989), *appeal denied,* 548 N.E.2d 1067 (1990).    That case involved a provision similar to the one contained in the instant Loan Agreement.   The court there held that the only manner in which the terms of the loan agreement could have been waived was in writing. 187 Ill.App.3d at 645, 543 N.E.2d at 601.

**\*8** The Debtor cites several cases for the proposition that pursuant to Illinois law, parties to a written contract may alter or modify its terms by subsequent oral agreement, even if the contract contains a provision that precludes oral modification. *Consolidated Bearings Co. v. Ehret-Krohn Corp.,* 913 F.2d 1224 (7th Cir.1990); *Falcon, Ltd. v. Corr's Natural Beverages, Inc.,* 165 Ill.App.3d 815, 520 N.E.2d 831 (1st Dist.1987); *In re ContiCommodity Services, Inc., Secur. Litigation,* 733 F.Supp. 1555 (N.D.Ill.1990).    These cases are inapposite because none of them involved a provision that modifications or waivers must be in writing.   Such provisions are clearly enforced in strict accordance with their terms. *Delcon,* 187 Ill.App.3d at 645, 543 N.E.2d at 601.

Accordingly, based upon the pleadings, exhibits and affidavits, the evidence presented does not demonstrate a genuine issue of material fact as to whether the parties effectively modified the Loan Agreement and Mortgage so as to allow the Debtor to pay the real estate taxes on the Property at a date later than upon which same were due.   Moreover, there is no genuine issue of material fact as to whether the Debtor defaulted when it deferred the payment of the real estate taxes.   The Debtor has failed to present

affidavits based on personal knowledge, containing specific facts, not conclusions, showing that any representative of Barclays ever made any written or oral statement from which a fact finder could conclude that a modification of the Loan Agreement had been made waiving or deferring the obligation to pay real estate taxes when due.   In light of letters from Barclays declaring that failure to pay taxes was a loan default, the affidavits of Miller, Gavzer and Mann are insufficient to create a genuine issue as to any material fact.   No affidavit contains any specific statement attributed to any identified Barclays representative that would support the existence of a binding oral agreement to modify the Loan Agreement.   Moreover, even if the Debtor were right about the alleged oral agreement, same was breached because the first installment of 1991 taxes has never been paid.    Hence, there is no genuine issue of material fact, and Barclays should receive summary judgment on Counts I and II.

In addition, Barclays cites the Illinois Credit Agreements Act (the "Act") for the proposition that the defendants' waiver and estoppel affirmative defenses are barred.    Barclays maintains that the Debtor's argument that the Loan Agreement and Mortgage were modified through a course of conduct and dealing, or that the right to call a default for non-payment of real estate taxes has been lost by Barclays' prior forbearance is expressly barred by the Act.   Specifically, Barclays cites to section 3 of the Act which provides in relevant part:   "[t]he following actions do not give rise to a claim, counter-claim, or defense by a debtor that a new credit agreement is created, unless the agreement [is in writing] ... the agreement by a creditor to modify or amend an existing credit agreement."   815 ILCS 160/3.   Hence, the statute requires that a modification must be in writing only when a party relies on a modification to claim that a new credit agreement was created.   The Act defines "credit agreement" as "an agreement or commitment by a creditor to lend money or extend credit or delay or forbear repayment of money."   815 ILCS 160/1.

**\*9** Thus, in order for the alleged oral agreement between Barclays and the Debtor to fall within the purview of the Act, the Court must find that the alleged modification concerning the deferred payment of the real estate taxes was a new agreement or commitment by Barclays to loan funds to the Debtor or an agreement to delay the repayment of the money to Barclays.    The defendants are not suggesting that Barclays advanced additional funds to the Debtor, nor are the defendants suggesting that the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.                                                                                          Page 7
Not Reported in B.R., 1993 WL 135970 (Bankr.N.D.Ill.)
**(Cite as: 1993 WL 135970 (Bankr.N.D.Ill.))**

oral modification between the parties had the effect of extending the time for repayment of funds loaned to the Debtor by Barclays. Pursuant to the statutory definition of credit agreement, the Court finds that the alleged agreement between Barclays and the Debtor was an agreement to delay or forbear the repayment of money. Consequently, the agreement was statutorily required to be reduced to writing.

The Debtor and The Management Group, Inc. raise the argument concerning Barclays' failure to consent to a transfer of limited partnership interests in order to accomplish a tax deferred like/kind exchange under Section 1031 or to allow the Trustee to convey the Property. This issue is collateral to the motion at bar and does not provide a defense to the summary judgment motion. The Court finds that this argument which has been raised in the counterclaim by the Debtor and The Management Group, Inc. will be decided there and does not preclude granting Barclays' motion for summary judgment on Counts I and II.

AWA further argues that assuming the alleged oral agreement between the Debtor and Barclays was not enforceable, the doctrine of estoppel bars Barclays from contesting the validity of the oral agreement. AWA argues that Barclays represented to the Debtor that it would not accelerate the due date for repayment of the loan if the Debtor deferred the payment of the Property's real estate taxes until the summer. Barclays allegedly made this representation both orally, by way of the 1991 agreement between the parties, and through its conduct, by failing to raise the issue of real estate taxes in early 1992 when it knew that the Debtor did not have the funds available to make the payment in March, and that the Debtor would defer payment until the summer as it had done in 1991. AWA contends that it and the Debtor relied on this representation by deferring the payment of real estate taxes, although the Debtor and its partners could have raised the funds to pay the taxes before the foreclosure suit was filed. This reliance has allegedly cause injury to both the Debtor and AWA as the Debtor faces foreclosure.

In Illinois the elements of promissory estoppel are: (1) a promise unambiguous in its terms; (2) reliance thereon by the promisee, with such reliance being expected and foreseeable by the promisor; and (3) the promisee in fact relied on the promise to his detriment. *Geva v. Leo Burnett Co.*, 931 F.2d 1220, 1223 (7th Cir.1991) (quoting *Vincent Di Vito, Inc. v. Vollmar Clay Products Co.*, 179 Ill.App.3d 325, 327-

328, 534 N.E.2d 575, 577 (1st Dist.1989)); *see also Moore v. Illinois Bell Telephone Co.*, 155 Ill.App.3d 781, 785-786, 508 N.E.2d 519, 521 (2d Dist.1987), *appeal denied*, 515 N.E.2d 112 (1987); *Yardley v. Yardley*, 137 Ill.App.3d 747, 754, 484 N.E.2d 873, 879 (2d Dist.1985). The reasonableness of a promisee's reliance on the promise is a question of fact. *Bank Computer Network Corp. v. Continental Illinois Nat. Bank & Trust Co.*, 110 Ill.App.3d 492, 500, 442 N.E.2d 586, 592 (1st Dist.1982). Promissory estoppel requires an unambiguous promise to perform. *Simmons v. John F. Kennedy Medical Center*, 727 F.Supp. 440, 443 (N.D.Ill.1989). A plaintiff may recover on a theory of promissory estoppel despite the absence of a contract. *Bank of Marion v. Robert "Chick" Fritz, Inc.*, 57 Ill.2d 120, 124 (1974).

**\*10** It is a "well settled principle of law that where parties to a written contract mutually consent and acquiesce in the oral modifications and in the nonperformance of certain provisions thereof ... each party is estopped to deny the efficacy of the modifying agreement ... provided the proof is strong that such ... modifications have been assented to." *Nagle v. General Merchandising Corp.*, 58 Ill.App.3d 344, 348, 374 N.E.2d 1137, 1141 (3d Dist.1978) (quoting *Robar v. Isham*, 310 Ill. 585, 589 (1924)). "In order that there may be an agreement, the parties must have a distinct intention common to both and without doubt or difference.... The intention of the parties must in some way be communicated, since a person's intention can be ascertained by another only by means of outward expressions such as words and acts." *Bank of Marion v. Robert "Chick" Fritz, Inc.*, 9 Ill.App.3d 102, 108, 291 N.E.2d 836, 840 (5th Dist.1972), *aff'd*, 57 Ill.2d 120 (1974). This argument must fail as there is no demonstrated unambiguous promise of Barclays to agree to defer the payment to be made by the Debtor of the real estate taxes due.

## V. CONCLUSION

For the reasons set forth herein, the Court grants Barclays' motion for summary judgment on Counts I and II. The Court denies the motion to strike portions of Esposito's supplemental affidavit and to strike the exhibits in the affidavit. A status hearing is hereby set for May 13, 1993 at 10:00 a.m. on Counts IV and V of Barclays' complaint and on the counterclaim filed by the Debtor and The Management Group, Inc. After the Court decides Counts IV and V and the contested counterclaim, a final judgment will be entered.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.                                                                                           Page 8
Not Reported in B.R., 1993 WL 135970 (Bankr.N.D.Ill.)
**(Cite as: 1993 WL 135970 (Bankr.N.D.Ill.))**

 This Opinion constitutes the Court's findings of fact
and conclusions of law in accordance with Federal
Rule of Bankruptcy Procedure 7052.    A separate
order shall be entered pursuant to Federal Rule of
Bankruptcy Procedure 7058.

 See written Order.

 Not  Reported  in  B.R.,  1993  WL  135970
(Bankr.N.D.Ill.)

END OF DOCUMENT

©  2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw

Not Reported in A.2d                                                                              Page 1

Not Reported in A.2d, 1993 WL 265529 (Conn.Super.)

**(Cite as: Not Reported in A.2d)**

**C**

Prime Financial Corp. v. First Nat. Bank of Boston
Conn.Super.,1993.
Only the Westlaw citation is currently available.
UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Superior Court of Connecticut, Judicial District of
Hartford-New Britain, at Hartford.
PRIME FINANCIAL CORPORATION, et al.
v.
FIRST NATIONAL BANK OF BOSTON, et al.
**No. CV 90 0382929S.**

July 8, 1993.

MEMORANDUM OF DECISION ON MOTION
FOR SUMMARY JUDGMENT

MARY R. HENNESSEY, Judge.

*1 The defendants move for summary judgment on
the ground that there is no genuine issue as to any
material fact and the defendants are entitled to
judgment as a matter of law because (1) the judgment
in the Massachusetts litigation is res judicata and bars
the present action, and (2) the claims that the
defendant banks should have extended additional
credit are expressly barred by the statute of frauds,
General Statutes § 52-550(a)(6).

*Massachusetts action*

In 1989, Bank of Boston Connecticut (BOBC) filed a
complaint in Massachusetts state court against
William F. McDermott and John A. Humbert seeking
to enforce their personal guarantees of loans to
various corporate entities. In the Massachusetts
lawsuit (*Bank of Boston Connecticut v. McDermott,
et al.,* D.N. 89-8041B), Humbert and McDermott
asserted a counterclaim dated January 10, 1991. The
counterclaim sought declaratory and injunctive relief
regarding guarantees provided to the BOBC by
Humbert and McDermott. The counterclaim was
based on fraud, unfair and deceptive acts, breach of
contract, and breach of the implied covenant of good
faith and fair dealing by the BOBC in the lending
relationship. (Defendants' Memorandum of Law in
Support of Motion for Summary Judgment, Ex. B).

Humbert and McDermott, defendants in the
Massachusetts action, filed a motion to amend their

answer in order to strike the affirmative defenses
without prejudice. In their motion, they noted that a
case involving all of the parties to the Massachusetts
action was currently pending in the Connecticut
Superior Court and that the claims raised in the
affirmative defenses are more appropriately pleaded
by the corporate borrowers in the Connecticut action.
Humbert and McDermott filed a Notice of Dismissal
of their counterclaim without prejudice dated May
10, 1991. (Defendants' Memorandum of Law in
Support of Motion for Summary Judgment, Ex. C).

The parties to the Massachusetts action entered an
Agreement for Judgment, dated June 13, 1991, in
which they noted that Humbert and McDermott chose
to proceed in the Connecticut action rather than the
Massachusetts action, but nevertheless agreed to the
entry of judgment against them in the Massachusetts
action and in favor of BOBC and Humbert and
McDermott agreed that BOBC shall not make any
effort to enforce, collect or further secure the
judgment until such time as a final judgment, after
the expiration of all rights of appeal, is entered in the
Connecticut action. (Defendants' Memorandum of
Law in Support of Motion for Summary Judgment,
Ex. D).

*Connecticut action*

On November 19, 1990, the corporate plaintiffs,
Prime Financial Corporation (PFC), the parent
corporation, First Prime Mortgage Corporation of
Connecticut (FPMCC), a wholly owned subsidiary of
PFC, and First Prime Mortgage Corporation of
Massachusetts (FPMCM), a wholly owned subsidiary
of FPMCC, and the individual plaintiffs, John A.
Humbert and William F. McDermott, both principal
stockholders of the corporate plaintiffs, filed a five-
count revised complaint in Connecticut Superior
Court against the defendant banks, First National
Bank of Boston (BOB), and Bank of Boston
Connecticut (BOBC). The corporate plaintiffs were
incorporated to establish a mortgage banking
company. The subsidiary corporations would
examine the credit-worthiness of applications for
purchasing or refinancing Connecticut homes, and
the parent corporation would provide funds for the
loans. The funds were to be repaid by selling the
executed mortgages in the secondary mortgage
market. (Affidavit of John A. Humbert). The

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 1993 WL 265529 (Conn.Super.)
**(Cite as: Not Reported in A.2d)**

plaintiffs allege that the defendants reneged on an oral promise to increase the corporate plaintiffs' line of credit from $5 million to $10 million, and thereby caused the downfall of the corporate plaintiffs' businesses, which, in turn, exposed plaintiffs Humbert and McDermott to liability on their personal guarantees of the corporate plaintiffs' loans.

**\*2** In the first count of their revised complaint, the plaintiffs allege that the actions of defendants BOB and BOBC were taken in bad faith and constitute tortious interference with the business expectancy of the corporate plaintiffs and of plaintiffs Humbert and McDermott. In the second count of their revised complaint, the plaintiffs allege that by failing to honor their obligation to continue to provide a warehouse line of credit in the amount of $10 million to the corporate plaintiffs, defendants BOB and BOBC have breached their contract and their covenant of good faith and fair dealing with the corporate plaintiffs. In the third count of their revised complaint, the plaintiffs allege that the notice of termination, dated October 17, 1989, which purported to call due and terminate the $5 million warehouse line of credit of November 30, 1987, was wrongful and constitutes a breach of contract and breach of the covenant of good faith and fair dealing by defendant BOBC. In the fourth count of their revised complaint, the plaintiffs allege that the actions of BOBC constitute a violation of the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes §§ 42-110a to 42-110q. In the fifth count of their revised complaint, the plaintiffs allege that the actions of BOBC were taken in bad faith and violated its duty of good faith in dealing with its guarantors, Humbert and McDermott, and with the security pledged by plaintiff Humbert.

On February 27, 1991, the defendants filed an answer to the plaintiffs' revised complaint. The defendants deny all allegations of liability and expressly deny the existence of any obligation to extend a $10 million line of credit.

On May 6, 1992, the defendants filed a motion for summary judgment asserting that there is no genuine issue as to any material fact and that the defendants are entitled to judgment as a matter of law because (1) the " judgment entered in the Massachusetts action collaterally estops the plaintiffs from relitigating those issues in Connecticut and acts as a bar to the present action," and (2) the claims that the defendant banks should have extended additional credit are expressly barred by the statute of frauds, General Statutes § 52-550(a)(6). The defendants submitted a memorandum of law in support of the motion for summary judgment in which they correctly relied on the doctrine of res judicata, not collateral estoppel, as a basis for summary judgment. In support of the motion for summary judgment, the defendants also submitted an affidavit of the vice-president of BOBC and other supporting documents.

On June 5, 1992, the plaintiffs filed a memorandum of law in opposition to the defendants' motion for summary judgment. The plaintiffs assert that (1) the Massachusetts action does not collaterally estop the plaintiffs in the present action, (2) the statute of frauds does not bar the plaintiffs' claims that the defendants failed to advance the promised sums, and (3) the facts indicate that the defendants are liable under the theory of promissory estoppel, which requires a determination on the merits. Therefore, the plaintiffs contend that there are genuine issues of material facts and the defendants are not entitled to judgment as a matter of law. The plaintiffs also submitted affidavits of McDermott, Humbert, and the attorney who represented McDermott and Humbert in the Massachusetts litigation and other documentary evidence in opposition to the motion for summary judgment.

**\*3** On June 3, 1992, the defendants filed an amended answer and special defense. The special defense alleges that the doctrine of res judicata bars the current action since the Massachusetts judgment is binding upon the plaintiffs in the present suit as a judgment on the merits.

On January 29, 1993, the defendants filed a supplemental memorandum of law in support of the motion for summary judgment. On February 26, 1993, the defendants filed a supplemental submission in support of the motion for summary judgment and attached an affidavit of counsel for BOBC in the Massachusetts litigation.

Summary judgment " shall be rendered forthwith if the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Practice Book § 384; see *Hammer v. Lumberman's Mutual Casualty Co.*, 214 Conn. 573, 578, 573 A.2d 699 (1990). The party moving for summary judgment has the burden of showing nonexistence of any issue as to all

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 1993 WL 265529 (Conn.Super.)

**(Cite as: Not Reported in A.2d)**

material facts. *Connell v. Colwell,* 214 Conn. 242, 246, 571 A.2d 116 (1990). Questions regarding motive, intent, and good faith should not be resolved by summary judgment, *Multi-Service Contractors, Inc. v. Vernon,* 193 Conn. 446, 451, 477 A.2d 653 (1984).

In determining whether there is a material fact, the evidence is considered in the light most favorable to the nonmoving party. *Strada v. Connecticut Newspapers, Inc.,* 193 Conn. 313, 317, 477 A.2d 1005 (1984). The standard to be applied in determining whether summary judgment should be granted is whether the party would be entitled to a directed verdict on the same facts. *Connelly v. Housing Authority,* 213 Conn. 354, 364, 567 A.2d 1212 (1990).

In the present case, the defendants contend that the Massachusetts action is res judicata and bars the present suit because the issues raised in the Connecticut complaint are identical to those raised as counterclaims in the Massachusetts action. The plaintiffs contend that the doctrine of res judicata does not bar the present action because the Agreement for Judgment entered in the Massachusetts action expressly provides that the parties recognized that the guarantors, Humbert and McDermott, chose to proceed by joining the corporate plaintiffs and asserting their claims in the Connecticut action. The plaintiffs further contend that the corporate plaintiffs are not barred from asserting a claim in Connecticut because McDermott and Humbert were sued in Massachusetts as guarantors of a loan and not as agents for the corporate plaintiffs. In addition, the plaintiffs assert that the Agreement for Judgment states that defendant BOBC " shall not make any effort or attempt to enforce, collect or further secure the judgment as aforesaid, until such time as a final judgment ... is entered in the Connecticut Action."

" The doctrine of res judicata requires that a final judgment on the merits, rendered without fraud or collusion, by a court of competent jurisdiction, is conclusive, of those causes of action and of such issues or facts thereby litigated as to the parties and their privies, in all other actions in any judicial tribunal of concurrent jurisdiction." *Wade's Dairy, Inc. v. Town of Fairfield,* 181 Conn. 556, 559, 436 A.2d 24 (1980). " A judgment in favor of either the plaintiff or defendant is conclusive, in a subsequent action between them on the same or a different claim,

with respect to any issue actually litigated and determined if its determination was essential to that judgment." 1 Restatement (Second) of Judgments § 17(3) (1982).

**\*4** " When parties to a lawsuit voluntarily enter into a stipulated judgment, such judgment is as conclusive as if it had been rendered upon controverted facts." *Connecticut Water Co. v. Beausoleil,* 204 Conn. 38, 48, 526 A.2d 1329 (1987), citing *Connecticut Pharmaceutical Assn., Inc. v. Milano,* 191 Conn. 555, 558, 468 A.2d 1230 (1983). " [A] stipulated judgment may operate as res judicata to the same extent as a judgment after a contested trial." *Connecticut Water Co. v. Beausoleil,* supra, 49, citing *Gagne v. Norton,* 189 Conn. 29, 31, 453 A.2d 1162 (1983). " A final judgment rendered by agreement or after adjudication on the merits is res judicata as to any claims of the parties relating to the cause of action which were made or which might have been made...." *Van Nguyen v. DaSilva,* 10 Conn.App. 527, 532, 523 A.2d 1369, cert. denied, 204 Conn. 803, 528 A.2d 1151 (1987).

However, " [a] consent decree, [or judgment based on an agreement], although enforceable like any other judicial decree, is not a judicial determination of any litigated right." *Gagne v. Norton,* supra, 34. " It may be defined as a contract of the parties acknowledged in open court and ordered to be recorded by a court of competent jurisdiction.... The essence of any judgment is that the parties to the litigation have voluntarily entered into an agreement setting their dispute or disputes at rest and that, upon this agreement, the court has entered judgment conforming to the terms of the agreement."

Id., quoting *Bryan v. Reynolds,* 143 Conn. 456, 460, 123 A.2d 192 (1956). Although it may be presumed that the parties intended, by agreement, to settle all aspects of the controversy, evidence can be offered to show the true scope of the agreement. *Haylett v. Commission on Human Rights,* Superior Court, judicial district of Hartford-New Britain at Hartford, Docket No. 316872 (August 8, 1990), citing *Gagne v. Norton,* supra, 34-35. In the present case, the plaintiffs submitted a copy of the Agreement for Judgment itself as evidence of the true scope of the agreement. The plaintiffs expressly preserved their right to join the corporate plaintiffs and assert their rights in the Connecticut action. In addition, the defendants agreed, in the Agreement for Judgment, not to enforce the Massachusetts judgment until a

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                    Page 4

Not Reported in A.2d, 1993 WL 265529 (Conn.Super.)

**(Cite as: Not Reported in A.2d)**

final judgment is entered in the Connecticut action. The plaintiffs also submitted a copy of their motion to amend their answer to strike their affirmative defenses without prejudice in the Massachusetts action because they are more appropriately raised in the Connecticut action. A copy of the Notice of Dismissal of the counterclaim was also submitted by the plaintiffs to show that the counterclaim was dismissed in the Massachusetts litigation without prejudice. Based on the foregoing, we conclude the doctrine of res judicata does not bar the present action since the Agreement for Judgment in the Massachusetts action was not intended to dispose of or serve as a final judgment with respect to the plaintiffs' claims in this action.

**\*5** The defendants also contend that the plaintiffs' claims that the defendant banks should have extended additional credit are expressly barred by the statute of frauds, General Statutes § 52-550(a)(6), because the alleged agreement to increase the line of credit from $5 million to $10 million was not in writing. The plaintiffs contend that the statute of frauds is not a bar to this matter because (1) the conduct of defendant BOBC amounts to partial performance, and (2) the doctrine of estoppel prevents the plaintiffs' reliance on the statute of frauds.

The statute of frauds may properly be raised in a motion for summary judgment. *Smith v. Keystone Mortgage Service Corp.,* 7 CSCR 265 (March 2, 1992, Pickett, J.). General Statutes § 52-550, the statute of frauds, provides, in relevant part, that
[n]o civil action may be maintained in the following cases unless the agreement, or a memorandum of the agreement, is made in writing and signed by the party, or the agent of the party, to be charged: ... upon any agreement for a loan in amount which exceeds fifty thousand dollars ...

General Statutes § 52-550(a)(6). " The function of the statute is evidentiary, to prevent enforcement through fraud or perjury of contracts never in fact made." *Lynch v. Davis,* 181 Conn. 434, 440-41, 435 A.2d 977 (1980). " The **burden** of **proving** that a contract is outside the **statute** of **frauds** falls upon the plaintiff." *Salce v. Proto,* Superior Court, judicial district of Fairfield at Bridgeport, Docket Number 01386 (July 22, 1992), citing C. Tait and J. LaPlante, Connecticut Evidence, § 4.5.8(b) (2d ed.1988).

Acts on the part of a promisee may be sufficient to take an oral contract out of the statute of frauds,

*Ubysz v. DiPietro,* 185 Conn. 47, 54, 440 A.2d 830 (1981). As an essential element, " [t]he doctrine of part performance requires ... conduct that is ' referable to and consistent with [an] oral agreement [between the parties].' " *Dunham v. Dunham,* 204 Conn. 303, 314, 528 A.2d 1123 (1987), quoting *Andrews v. New Britain National Bank,* 113 Conn. 467, 474, 155 A. 838 (1931). The doctrine also requires the court to find that the party seeking enforcement of the agreement; (1) reasonably and substantially relied on the contract; and (2) so changed his position so that injustice can be avoided only by specific enforcement of the agreement. Id., 315.

" The ' part performance' doctrine is used by the courts in order to compel a party to perform in accordance with an oral contract that is within the provisions of the statute of frauds." Corbin on Contracts, Vol. 2, § 422A (1992 Supp.). However, [m]ost courts now have the powers of a court of equity and must apply equitable rules of law; any such court should now be ready to award damages either as supplementary to specific performance or in lieu of it." Corbin on Contracts, Vol. 2, § 422 (1950). The Connecticut Supreme Court stated that " [t]he doctrine of part performance as related to the Statute of Frauds is based on estoppel." *Galvin v. Simons,* 128 Conn. 616, 619 (1942), citing *Wolfe v. Wallingford Bank & Trust Co.,* 124 Conn. 507, 515, 1 A.2d 146 (1938). The Supreme Court found that " [t]he modern estoppel in pais although of equitable origin is of equal application in courts of law." (Citations omitted). *Wolfe v. Wallingford Bank & Trust Co.,* supra, 518. In *Wolfe v. Wallingford Bank & Trust Co.,* even though the plaintiff's complaint did not refer to " equity," the plaintiff's action for damages was sustained because the plaintiff's action in reliance on the oral promise estopped the defendant from pleading the statute of frauds as a defense. *Wolfe v. Wallingford Bank & Trust Co.,* supra, 514-17. The decision of the Supreme Court in *Wolfe* " nullifies the former decision in this case reported in 191 A. 88, 122 Conn. 507 (1937) [which is relied upon by the defendant banks in this case to show that a party cannot recover at law on the ground of part performance], and is a substantial extension of the part performance doctrine through the use of that flexible doctrine called " estoppel.' " Corbin on Contracts, Vol. 2, § 422, n. 21 (1950).

**\*6** In the present case, since the plaintiffs raised both part performance and estoppel, the court can consider

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

whether the defendant banks should be estopped from asserting the statute of frauds to defeat the oral agreement.

" When the Statute of Frauds is claimed, the doctrine of estoppel may be applied to prevent use of that statute to accomplish a fraud." *DeLuca v. C.W. Blakeslee & Sons, Inc.,* 174 Conn. 535, 544, 391 A.2d 170 (1978); see also *County Fire Door Corp. v. C.F. Wooding Co.,* 202 Conn. 277, 281 n. 2, 520 A.2d 1028 (1987). "  ' There are two essential elements to an estoppel-the party must do or say something that is intended or calculated to induce another to believe in the existence of certain facts and to act upon that belief, and the other party, influenced thereby, must actually change his position or do some act to his injury which he otherwise would not have done.' " (Citations Omitted). *First Connecticut Small Business Investment Co. v. Arba, Inc.,* 170 Conn. 168, 175, 365 A.2d 100 (1976). " [E]quitable estoppel arises when the conduct of the party estopped is fraudulent in its purpose or unjust in its results." *Field v. Miller-Davis Co.,* 14 Conn.Sup. 354 (Super.Ct.1946), quoting *Wolfe v. Wallingford Bank & Trust Co.,* supra, 517.

In their memorandum in opposition to the defendants' motion for summary judgment, the plaintiffs assert that " it would be unjust for the defendants to hide behind the statute of frauds, since, by their conduct, they waived any reliance on specific written memoranda, and encouraged the plaintiffs to assume that the increased line of credit had been established." The plaintiffs further assert that they " relied entirely on the representations of the defendants to increase the warehouse line of credit to $10 million dollars."

The plaintiffs, relying on the affidavit of BOBC vice-president John McNair, contend that the bank acknowledged that it was funding under an increased line of credit. The plaintiffs further contend that the account receivable/inventory ledger of the corporate plaintiffs indicates that the corporate plaintiffs' warehouse line of credit exceeded $5 million at various times in 1989. (Plaintiffs' Memorandum of Law in Opposition to Motion for Summary Judgment, Ex. 5). For example, the plaintiffs note that in July of 1989, the credit line indicated an outstanding balance of $5,882,850. Although BOBC claims accidental overdrafts, the plaintiffs argue that banks do not loan money that they have not agreed to lend. Furthermore, the plaintiffs assert that they built their business based on a promise of a $10 million

line of credit and that BOBC funded that line of credit. The plaintiffs contend that the affidavits of McDermott and Humbert are attached to explain that the ten million dollar credit line was needed to accommodate the enormous growth of the corporate plaintiffs, which would not have been undertaken without the defendants' commitment to have the warehouse line of credit grow with the corporate entities. In their complaint, the plaintiffs allege that they did not seek additional financing elsewhere, but instead, relied on the promises of BOBC to increase their credit line. In addition, the plaintiffs assert that BOBC viewed the alleged approval process in Boston as a mere formality and, rely on BOBC vice-president John McNair's deposition, that he expressed surprise at the ultimate failure to honor the obligation to fund. In sum, the plaintiffs contend that there are issues of material fact that must be heard on the merits.

**\*7** In their memorandum in support of the motion for summary judgment, the defendants, relying on an affidavit of John McNair, allege that, although the corporate plaintiffs undertook negotiations with BOBC and BOB in an attempt to increase their credit line, neither BOB nor BOBC supplied any type of written commitment to any of the corporate plaintiffs for the requested increase in the credit line. In their supplemental memorandum of law, the plaintiffs state that there were only brief intervals during which overadvances were permitted and the amount was never permitted to exceed $7.75 million.

The plaintiffs' conduct, undertaking enormous growth and not seeking additional financing elsewhere, is consistent with an oral agreement to increase the credit line and is sufficient to constitute partial performance. Furthermore, the plaintiffs' conduct may be the result of reliance on defendants' extension of credit above the $5 million. Genuine issues of fact remain as to whether the defendants did or said something calculated or intended to induce the plaintiffs to believe that certain facts exist, i.e., an increased credit line, and to act on that belief, and whether the plaintiffs changed their position in reliance on those facts, thereby incurring some injury. Therefore, a question exists as to whether the doctrine of " equitable estoppel" will take the oral contract out of the statute of frauds. In addition, as noted above, questions regarding motive and intent should not be resolved by summary judgment.

In their memorandum of law, the plaintiffs also

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                          Page 6
Not Reported in A.2d, 1993 WL 265529 (Conn.Super.)
**(Cite as: Not Reported in A.2d)**

contend that the defendants are liable under a theory of "promissory estoppel." The Connecticut Supreme Court has recognized the "development of liability in contract for action induced by reliance upon a promise, despite the absence of common-law consideration normally required to bind a promisor; see Restatement (Second), Contracts § 90 (1973)." *Sheets v. Teddy's Frosted Foods, Inc.,* 179 Conn. 471, 475, 427 A.2d 385 (1980). Restatement (Second) of Contracts § 139 (1981) states, in relevant part, that

[A] promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce the action or forbearance is enforceable notwithstanding the Statute of Frauds if injustice can be avoided only by enforcement of the promise. The remedy granted for breach is to be limited as justice requires.

"A fundamental element of promissory estoppel ... is the existence of a clear and definite promise which a promisor could reasonably have expected to induce reliance." *D'Ulisse-Cupo v. Board of Directors of Notre Dame High School,* 202 Conn. 206, 213, 520 A.2d 217 (1987).

The plaintiffs contend that "they relied entirely on the representations of the defendants to increase the warehouse line of credit to $10 million dollars." The defendants assert that there was not a "clear and unambiguous promise" to warrant estoppel.

**\*8** Issues of fact exist regarding whether the defendants made a clear promise to increase the credit line which the defendants reasonably expected to induce action or forbearance on the part of the plaintiffs and which did induce action or forbearance on the part of the plaintiffs. Hence, a question exists as to whether "promissory estoppel" will take the case out of the statute of frauds and prevent the defendants from using that defense. Accordingly, the defendants' motion for summary judgment is denied.

Conn.Super.,1993.
Prime Financial Corp. v. First Nat. Bank of Boston
Not Reported in A.2d, 1993 WL 265529 (Conn.Super.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Salce v. Proto
Conn.Super.,1992.
Only the Westlaw citation is currently available.
UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.
    Superior Court of Connecticut, Housing Session,
            Judicial District of Fairfield.
            Anthony H. SALCE, Jr.
                        v.
                Louis PROTO.
            **No. CVBR 9107-01386.**

            July 22, 1992.

        MEMORANDUM OF DECISION
LEHENY, Judge.
**\*1** The plaintiff has brought this action against the defendant seeking damages for the breach of a commercial lease. The defendant has asserted eight special defenses.

The central issue in this case is whether the defendant occupied the premises under a month-to-month tenancy or whether there was a valid written lease which existed binding the defendant for a term to expire on August 14, 1994. The court finds that there is no written lease and that the tenancy was a month-to-month one. In a month-to-month tenancy the tenancy for each month is one separate from that of every other month. *Welk v. Bidwell*, 136 Conn. 603, 607.

The court finds the following facts. Louis Proto operated the Colonial Floor Covering retail store at 470 Monroe Turnpike, Monroe. At the time he first took possession of the premises the owner of the property was Arizona Lipnob Estates, Inc. In May 1989 the plaintiff, as Trustee, entered into an exchange agreement with the owner which made certain representations in anticipation of a sale of the property. Subsequently, on March 23, 1990 a closing was conducted in escrow. The corporation, by Herman Lipsitz, its President, assigned to the plaintiff its interest in the lease of " Louis Proto, under a month to month tenancy, with no security deposit, until delivery of the fully executed written lease dated August 25, 1989, and then under the written lease, with no security deposit yet posted under the lease." Exhibit A. On April 2, 1990 a warranty deed was recorded in the land records together with a

construction mortgage deed, Exhibit 4, and a Collateral Assignment of Leases and Rentals. Exhibit 5. Schedule B of the latter document, executed by the plaintiff, lists " Louis Proto, as tenant under a month to month tenancy" among the leases which Salce assigned to Lafayette Bank and Trust Company.

An original lease, Exhibit C, and a copy, Exhibit 1, were admitted into evidence and the claims of the parties rest on their respective copies. Plaintiff's Exhibit C bears the alleged signature of Mr. Lipsitz. However, it was not identified as his by any witness. It was neither witnessed nor acknowledged. The defendant claims that he never received a fully executed copy of that lease with the signature of Mr. Lipsitz and further pointed out that the copy attached to the complaint does not bear this signature. This raises the issue as to why a copy of Exhibit C was not so attached if the plaintiff had the fully executed copy all along.

In addition to this conundrum is the question as to why Lipsitz, who signed the Assignment of Leases, (Exhibit A) the Exchange Agreement, (Exhibit B) and the Warranty Deed, (Exhibit 3) as President of the corporate landlord, signed Exhibit C in his individual capacity rather than in his representative capacity. The name of the Owner or Landlord was not completed in the beginning of the lease and does not appear on either document.

Further, with regard to the execution and delivery of the lease, the evidence showed that in the summer of 1989 the parties to this action were engaged in lease negotiations. On July 21, 1989 plaintiff's attorney sent the defendant " 2 counterparts of the proposed lease" instructing him to execute and return it if satisfactory, whereupon counsel would return a fully executed original for the defendant's records. On August 22, the plaintiff's counsel wrote to George Ganim, Sr. defendant's counsel and enclosed a revised lease. Among the revisions was the inclusion of the last two sentences of paragraph 18 of the Rider. These concern the repair or replacement of the roof-top air conditioning unit by the plaintiff. On August 25, the defendant's then attorney, George Ganim, Sr. returned the leases executed by Mr. Proto and requested the return of a fully signed copy. However, he had no recollection of having received a fully executed lease and does not have one in his

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 1992 WL 209619 (Conn.Super.)
**(Cite as: Not Reported in A.2d)**

files. He believed that the lease was between Mr. Salce and Mr. Proto and had never heard Mr. Lipsitz' name. He anticipated that the space for the landlord's name would be completed with Mr. Salce's name or the corporate name he chose.

**\*2** Meanwhile, Mr. Salce instructed his property manager, Jay Malemphy, to mail a fully executed copy to Attorney Ganim. Mr. Malemphy indicated that there was no transmittal letter in his files and that he probably wrote a note by hand. There is no letter from Attorney Sobel evidencing the delivery of the fully executed lease. The court finds that neither the defendant nor his attorney received the lease.

Regardless of the August 25 lease, the defendant sent rent to Monroe Plaza and not to Mr. Salce from August 1989 to April 1990. He paid Monroe Plaza varying amounts rather than $3120 per month. By May 1, 1990 he was in arrears in the sum of $8959. Exhibit 10.

In May 1990, Jay Malemphy sent Mr. Proto a letter informing the defendant that monthly payments would be $3520.15 including base rent and 6.25% of operating costs. No mention was made of a lease in that letter. On June 29, Mr. Malemphy wrote to the defendant again modifying the monthly pro-rata share to $3483.43. There was no mention of a lease. On July 24, 1990, Mr. Malemphy again increased the monthly charge by 4.4% to $3620.71 " in accordance with paragraph 1 of the attached rider to the lease agreement." He also advised Mr. Proto that " you do not have a ' gross lease" ....."

Mr. Proto did not question the reference to a lease agreement but failed to pay the amounts specified. Mr. Malemphy did not write him again until January 14, 1991. He conceded that he did not pursue the matter " aggressively" nor take legal action.

The plaintiff argues that the lease as evidenced by Exhibit C is a valid contract through which he is entitled to obtain damages for breach. Section 52-550 of the General Statutes provides that contracts pertaining to an interest in land that are not to be performed within one year of the execution of the contract are to be in writing and signed by the party to be charged.

The **burden** of **proving** that a contract is outside the **statute** of **frauds** falls upon the plaintiff. Tait and La Plante's Handbook of Connecticut Evidence, section

4.5.8(b) 2nd ed. 1988.

" A definite contract of lease, besides the names of the parties, contains a description of the property let, the term of the lease and the amount of the rent." *Handy v. Barclay,* 98 Conn. 290, 296. The lease here lacks an essential term, namely the name of the lessor. The other memoranda furnish evidence that the terms of the lease were not in force when the lease was to have commenced. While the lease states that the " term of this demise shall be for five years beginning August 15, 1989 and ending August 14, 1994," the lease is dated August 25, 1989. In fact, the landlord's writing countermands the term of the lease by calling it a month-to-month tenancy.

The plaintiff argues that part performance can remove a contract from the purview of the statute of frauds. He claims that his replacement of the HVAC unit constituted part performance. However, that is not solely explained by the lease. Mr. Salce proposed to give the shopping center a " face-lift" , installing a canopy and changing the signage. He knew he had to either repair or replace the unit. The unit was not Mr. Proto's to remove. It was a capital improvement that would remain with the premises and benefit the property and subsequent tenants. As to the defendant, his payments of some correct rental amounts do not constitute compliance with the written lease terms. He knew he had an obligation to pay rent as a month-to-month tenant. He is not estopped to deny the existence of the lease because of rent payments. The acts of part performance are not sufficient to remove the contract from the operation of the statute of frauds. For these reasons, the Court finds judgment for the defendant. It is unnecessary to address the defendant's remaining special defenses or claims or the plaintiff's claims as the foregoing is dispositive of the matter.

Conn.Super.,1992.
Salce v. Proto
Not Reported in A.2d, 1992 WL 209619 (Conn.Super.)

END OF DOCUMENT

Westlaw.

Not Reported in A.2d                                                                                                    Page 1
Not Reported in A.2d, 1992 WL 183797 (Conn.Super.), 7 Conn. L. Rptr. 163
**(Cite as: 1992 WL 183797 (Conn.Super.))**

C

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.


Superior Court of Connecticut, Judicial District of
Hartford-New Britain, at
Hartford.
STONER GROUP, INC.
v.
FIRST BANK OF WEST HARTFORD.
**No. CV-92-0702822-S.**


July 27, 1992.

*MEMORANDUM OF DECISION*

AURIGEMMA, Judge.

 **\*1** The complaint in this action alleges that on or
about December 24, 1991 the defendant, First Bank
of West Hartford ("First Bank"), wrongfully
exercised a right of setoff against the funds of the
plaintiff, Stoner Group, Inc. ("Stoner").   It further
alleges that the wrongful setoff constituted a breach
of the defendant's fiduciary duty to the plaintiff, a
breach of the defendant's fiduciary duty to the
plaintiff, a breach of the covenant of good faith and
fair dealing and a violation of the Connecticut Unfair
Trade Practices Act (CUTPA), Connecticut General
Statutes §  42a-110a *et seq.* [FN1]   Stoner seeks an
injunction mandating the release of all of its funds on
deposit with First Bank as of December 23, 1991.

>       FN1. The plaintiff withdrew the Fifth Count
>       of the complaint at the time of trial.   That
>       count alleged a violation of 12 §  U.S.C.
>       4002, commonly referred to as the
>       Expedited Funds Act.

 Based on the evidence introduced at trial, the court
finds the following facts.   On December 23, 1991
Stoner, a real estate development company, was
indebted to First Bank in the amount of $596,830.39.
The indebtedness arose from three promissory notes.
The first, dated August 5, 1988, was in the original
principal amount of $200,000.   The second, dated
September 16, 1988, was in the original principal
amount of $100,000.   Each of the foregoing notes
was secured by mortgage on real property in
Burlington, Connecticut, and contained the following

setoff language:
>       The Maker gives the Bank a lien and right of setoff
>       for all the Maker's liabilities upon and against all
>       the deposits, credits and property of the Maker and
>       any other collateral of the Maker now or hereafter
>       in the possession or control of the Bank or in
>       transit to it.

 The third promissory note dated November 1, 1990
was in the original principal amount of $300,000, and
was secured by a mortgage on real property in West
Hartford and contained the following setoff language:
>       The holder hereof shall have a lien and a right of
>       set-off for all liabilities arising out of the loan
>       evidenced by this note, upon and against all
>       deposits, credits and property of the maker and all
>       guarantors now or hereafter in the possession or
>       control of the holder or in transit to it.   The holder
>       may at any time after default without first resort to
>       any collateral, apply all or any part of said deposits,
>       credits and property to maker's and guarantors'
>       liability hereunder.

 Prior to December, 1991, Stoner's checking account
with First Bank had been inactive for approximately
eighteen months.         However, shortly before
December 23, 1991 Stoner deposited approximately
$160,000 into its First Bank checking account and
wrote approximately $160,000 of checks on the
account.     The checks were primarily written to
Stoner's subcontractors and suppliers.   However, one
check in the amount of $24,750 was payable to
Stoner.

 Stoner reactivated its checking account with First
Bank because it owed substantial sums of money to
the banks where it maintained its regular accounts.
Stoner's obligations to those banks were in default
and it knew that those accounts were subject to
setoff.     Therefore, Stoner moved funds into First
Bank in order to avoid setoff of those funds by its
regular banks.

 **\*2** On December 19, 1991 a member of First Bank's
board of directors informed William McDougall,
First Bank's president, that he had information that
Stoner was not paying its trade creditors.      On
December 23, 1991 McDougall spoke with David
Stoner, Stoner's president, by telephone.      David
Stoner informed McDougall that Stoner was "at the
end of its line."   McDougall and Francis Wamester,

Not Reported in A.2d                                                                                           Page 2
Not Reported in A.2d, 1992 WL 183797 (Conn.Super.), 7 Conn. L. Rptr. 163
**(Cite as: 1992 WL 183797 (Conn.Super.))**

an officer of First Bank, met with David Stoner and Melvin Stoner, a principal of Stoner, on the evening of December 23rd. At this meeting the Stoners told McDougall and Wamester that Stoner was in default on other bank loans and was unable to make approximately $500,000 of payments owed to trade creditors. The plaintiff admitted that it was insolvent at that time.

Thereafter the defendant set off $119,259.16 in the plaintiff's checking account to be applied toward the amounts owed by the plaintiff under the three aforementioned promissory notes. After the setoff, the defendant returned $117,930.54 in checks which the plaintiff had written on its checking account. The defendant placed the words "refer to maker" on the returned checks rather than "insufficient funds" in an attempt to give the plaintiff an opportunity to explain to its creditors the reason for the returned checks.

The Expedited Funds Act § 12 U.S.C. 4002 required the defendant to process a check, or return it within a specified period. The defendant failed to return certain checks within the time required by the Expedited Funds Act. Therefore, the defendant ultimately paid all those checks, totalling $30,349.71. The total setoff amount was, thereby, reduced to $88,909.45 of which $59,280.24 was applied to reduce the $200,000 note, $27,175.04 was applied to reduce the $100,000 note and $2,454.17 was applied to reduce the $300,000 note.

At common law a bank has an equitable right to setoff against a debt presently due to a depositor the amount of a debt not presently due from a depositor upon the depositor's (1) confession of insolvency or (2) adjudication of insolvency in a legal proceeding. *Sullivan v. Merchants National Bank,* 108 Conn. 497, 502, 503, 114 A. 34 (1928).

The court in *Sullivan* provided the following rationale for the right of setoff:
    Where one party seeks to setoff a debt against a party who is insolvent, the case is one where "natural equity" is very strong. 108 Conn. at 501. If no rights of third parties are affected and no superior equity arises out of the contract of the parties under the particular circumstances of the transaction, the fact that both debts are subsisting debts and only by allowing their setoff can they be treated upon an even basis and the owner of debt not yet due escape an unjust loss, creates the equity upon which the allowance of the setoff rests. 108 Conn. at 502.

Courts in other jurisdictions have recognized a bank's rights to exercise a setoff in payment of an unmatured debt of an insolvent debtor. *Carr v. Hamilton,* 129 U.S. 252 (1889); *Control Leasing Partners v. Executive Service Corp.,* 688 P.2d 765, 768 (Nev.1984); *Korlam v. E.Z. Pay Plan, Inc.,* 247 Or. 170, 428 P.2d 172 (1967); *Salaman v. Bolt,* 74 Cal.Ap. 3d 907, 918 (1977); *American Surety Co. v. de Escalada,* 47 Ariz. 457, 56 P.2d 665 (1936); *Sharpe v. Metropolitan National Bank,* 503 P.2d 1043 (Colo.App.1972).

**\*3** In *Sullivan* the notes from the insolvent borrower to the bank, apparently, did not contain any language concerning setoff. In this case the promissory notes do contain setoff language. A promissory note between the original parties to the note is interpreted under the fundamental principles of contract law. *Appliances, Inc. v. Yost,* 181 Conn. 207, 211, 435 A.2d 1 (1980).

The setoff language in the $100,000 and $200,000 promissory notes gives the defendant "the right of setoff for all the maker's liabilities." Those notes contain no limitation on the right of setoff. That is, they do not specify that default, insolvency or even the bank's deeming itself insecure must exist before the bank can setoff against Stoner's funds. Therefore, under the $100,000 and the $200,000 promissory notes, the only limitation on First Bank's right of setoff is that it be exercised in good faith under Section 42a-1- 204 of the Connecticut General Statutes (Uniform Commercial Code) which provides, "every contract or duty within this title imposes an obligation of good faith in its performance or enforcement."

In the present case the defendant did not exercise its right of setoff until after it had received verbal confirmation from the plaintiff that the plaintiff was insolvent. Melvin Stoner confirmed at trial that the plaintiff was insolvent as of December 23, 1991, the setoff date. Therefore, defendant's setoff was permissible both under the common-law as recognized in *Sullivan* and under the setoff language of the $100,000 and $200,000 promissory notes.

The language of the $300,000 promissory note, arguably, provides that the defendant could exercise its right of setoff only after default. The $300,000 note was not in default on the date of setoff.

It is not clear from the evidence which setoff provision the defendant exercised in this case. However, both the $100,000 and the $200,000

promissory notes authorized the setoff "for *all* the maker's liabilities," including, presumably, the liability represented by the $300,000 note.

 The plaintiff has also claimed that the setoff was improper because the funds set off by the defendant were in a "special purpose account." In *Rosa v. Colonial Bank,* 207 Conn. 483, 495, 542 A.2d 1112 (1988) the court defined a "special purpose account" as follows:

 "A special purpose account [however] is generally one *over which the depositor has only limited dominion and control.* The deposit is usually made with special restrictions or limitations agreed upon between the bank and depositor. Accounts specially designed for the depositor's accounting purposes, such as separate 'Payroll Account,' or deposits the depositor plans to use for a special purpose will not be considered special accounts for the purposes of setoff, even if the bank knows of the intended special use, if the depositor retains unlimited dominion over the account." J. TeSelle, supra, 46; accord *In re Goodson Steel Corporation,* 488 F.2d 776 (5th Cir 1974); *Ribaudo v. Citizens National Bank,* 261 F.2d 929 (5th Cir.1958); *United States v. Tri-County Bank,* 415 F.Sup 858 (D.S.D.1976). Common examples of special purpose accounts include payroll accounts in which the bank agrees to honor only certain checks payable to the depositor's employees' *In re Goodson Steel Corporation,* supra; and trust or escrow accounts in which the bank has notice of third parties' interests in the account. *First National Bank & Trust Co. v. Osage Supply Co.,* 186 Okla. 259, 260-6;, 97 P.2d 3 (1939). (emphasis added).

 **\*4** The plaintiff's account with the defendant was not a "special purpose account" within the meaning of the *Rosa* case.

 The plaintiff has alleged that by exercising a setoff, the defendant breached a fiduciary duty which it owed to the plaintiff. The plaintiff has conceded that in the usual case, a bank does not owe its depositor a fiduciary duty. See *Frigon v. Enfield Savings and Loan Assoc.,* 195 Conn. 82, 87, 486 A.2d 630 (1985); *Monachelli v. Mechanics & Farmers Savings Bank,* 13 Conn.App. 662, 666, 538 A.2d 1089 (1988). However, the plaintiff claims that the case involves exceptional circumstances. It relies on *Dunham v. Dunham,* 294 Conn. 303, 528 A.2d 1123 (1983) wherein the court held that a fiduciary duty could arise where there is "justifiable trust" on one side and a "resulting superiority and influence" on the other.

Stoner also argues that a fiduciary relationship can exist if there are special circumstances in which there are exclusive and repeated dealings with the bank. *Pulse v. North America Land Title Co. of Montana,* 218 Mont. 275, 707 P.2d 1105 (1985).

 The evidence presented at trial was completely devoid of any facts upon which the court could find either a relationship of special trust or repeated and exclusive dealings between the parties. Stoner generally conducted its banking business wth banks other than First Bank. It had reactivated its account with First Bank after eighteen months of dormancy, to avoid setoff by its primary banks. The plaintiff claims that its "confiding" the fact that it was insolvent to First Bank officers evidences a confidential relationship. This claim overlooks the fact that the plaintiff informed the defendant of its insolvency only in response to a direct inquiry or inquiries by Frist Bank.

 Stoner has also claimed that First Bank has violated the covenant of good faith and fair dealing by exercising the setoff. First Bank had both a contractual and equitable right of setoff and it exercised that right in a reasonable manner. Therefore, it did not violate the covenant of good faith and fair dealing.

 The plaintiff claims that the defendant's wrongful exercise of its right of setoff constituted an unfair act or practice within the meaning of Connecticut General Statutes § 42-110a *et seq.,* the Connecticut Unfair Trade Practice Act (CUTPA). The parties disagree as to whether CUTPA applies to the actions of banks. This court need not reach that issue because the actions of the defendant in legally exercising a right of setoff did not constitute an unfair act or practice under CUTPA.

 For the reasons set forth above judgment may enter in favor of the defendant on the complaint. The parties have agreed that the defendant's counterclaim is stayed by virtue of § 49-28 of the Connecticut General Statutes due to the pendency of a foreclosure action on mortgages securing the promissory notes from Stoner to First Bank. Therefore, the court awards no judgment on the counterclaim.

 Not Reported in A.2d, 1992 WL 183797 (Conn.Super.), 7 Conn. L. Rptr. 163

 END OF DOCUMENT

Westlaw.

Not Reported in F.Supp.2d                                                                                   Page 1
Not Reported in F.Supp.2d, 2005 WL 544733 (D.Md.), 151 Lab.Cas. P 35,016
**(Cite as: 2005 WL 544733 (D.Md.))**

C

United States District Court,
D. Maryland.
Richard D. WHITE
v.
WASHINGTON GAS
**No. Civ.A. DKC 2003-3618.**

March 4, 2005.

Richard L. Huff, Law Office of Richard L. Huff, Olney, MD, James Lester Kestell, Kestell and Associates, Falls Church, VA, for Plaintiff.

Larry Edward Funk, Washington, DC, for Defendant.

MEMORANDUM OPINION

CHASANOW, J.

**\*1** Presently pending and ready for resolution in this age discrimination and overtime compensation case is the motion of Defendant Washington Gas for summary judgment pursuant to Fed.R.Civ.P. 56. The issues are fully briefed and the court now rules pursuant to Local Rule 105.6, no hearing being deemed necessary. For the reasons that follow, the court grants Defendant's motion.

 I. Background

 On January 16, 2003, Defendant terminated the employment of Plaintiff Richard D. White, then 61 years old. Prior to termination, Defendant employed Plaintiff as a residential gas meter reader.

 On December 22, 2003, Plaintiff filed a complaint with this court, alleging that (1) he was terminated because of his age, in violation of section 4(a)(1) of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § § 623(a)(1); and (2) he was never compensated work he performed during his breaks and lunch period, in violation of section 7(a)(1) of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 207(a)(1).

 As to the age discrimination claim, Plaintiff contends he was terminated because he was not meeting Defendant's performance standards. Plaintiff admits that on multiple occasions he did not meet the production standards set by Defendant for reading

meters, and that he was suspended for one day on November 19, 2002, for not completing his route and taking too long to perform his duties. He contends, however, that Defendant's production standards were established "arbitrarily" and without regard for the "reasonable pace and effort and age of the employee," and that he was not issued two warnings (an initial warning and a "final" warning) before his suspension, as dictated by Defendant's disciplinary rules. (Plaintiff was told by his shop steward that he could file a grievance about the suspension, but states that he declined to do so for fear of aggravating his supervisor.)

 Defendant, however, maintains that Plaintiff was terminated for violation of various company policies during December of 2002. On Saturday, December 21, 2002, Plaintiff did not complete some of his assigned readings. Despite knowing that he was prohibited from working on Sunday without permission from his supervisor, he completed the readings the following day, writing down the readings on a notepad, which is also prohibited by company policy. Although he took the readings on Sunday, he entered them into Defendant's computer on Monday, which Defendant characterizes as falsification of company records. Discipline swiftly followed. On January 3, 2003, Plaintiff was reassigned to work in Defendant's warehouse; on January 6, he was told he was suspended pending further investigation; and on January 16, he was terminated for falsifying company documents, failure to follow procedures, and failure to follow supervisor's direction. Plaintiff asserts that "after firing him [,][D]efendant turned over his duties to substantially younger employees;" Defendant contends that his duties were meted out to several other meter readers, including one who is 56 years of age.

 **\*2** Plaintiff asked his union to file a grievance, and filed a complaint with the Equal Employment Opportunity Commission alleging age discrimination. In a June 9 letter, Defendant offered to allow Plaintiff to return to work as a meter reader, with back pay less a 15 day suspension. Plaintiff's union sought a position for him in the warehouse rather than as a meter reader, but Defendant offered only the meter reading job. Plaintiff declined to return to work as a meter reader, citing recent blackouts induced by hypertension which he feared could recur and

Not Reported in F.Supp.2d                                                                                                    Page 2
Not Reported in F.Supp.2d, 2005 WL 544733 (D.Md.), 151 Lab.Cas. P 35,016
**(Cite as: 2005 WL 544733 (D.Md.))**

jeopardize his safety while driving his routes.

As to the FLSA claim, Plaintiff claims he worked overtime hours that do not appear on his timesheets. He admits that he neither recorded having worked during his breaks and lunch period nor ever otherwise requested payment for those hours. He contends that he failed to do so because he was instructed that he would be paid only for approved overtime, and he had not been approved for work during those periods.

Defendant now moves for summary judgment, contending that Plaintiff has not made a *prima facie* case of age discrimination, that its termination of Plaintiff was legitimate and nondiscriminatory, and that it committed no FLSA violation in failing to pay Plaintiff for the hours Plaintiff now claims he worked during breaks and lunch periods.

II. Standard of Review

It is well established that a motion for summary judgment will be granted only if there exists no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In other words, if there clearly exist factual issues "that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party," then summary judgment is inappropriate. *Anderson,* 477 U.S. at 250; *see also Pulliam Inv. Co. v. Cameo Properties,* 810 F.2d 1282, 1286 (4th Cir.1987); *Morrison v. Nissan Motor Co.,* 601 F.2d 139, 141 (4th Cir.1987). The moving party bears the burden of showing that there is no genuine issue as to any material fact and that he is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Catawba Indian Tribe of South Carolina v. State of S.C.,* 978 F.2d 1334, 1339 (4th Cir.1992), *cert. denied,* 507 U.S. 972, 113 S.Ct. 1415, 122 L.Ed.2d 785 (1993).

When ruling on a motion for summary judgment, the court must construe the facts alleged in the light most favorable to the party opposing the motion. *See United States v. Diebold,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); *Gill v. Rollins Protective Servs. Co.,* 773 F.2d 592, 595 (4th Cir.1985). A party who bears the burden of proof on a particular claim must factually support each element of his or her claim. "[A] complete failure of proof concerning an essential element ... necessarily renders all other facts immaterial." *Celotex Corp.,* 477 U.S. at 323. Thus, on those issues on which the nonmoving party will have the burden of proof, it is his or her responsibility to confront the motion for summary judgment with an affidavit or other similar evidence in order to show the existence of a genuine issue for trial. *See Anderson,* 477 U.S. at 256; *Celotex Corp.,* 477 U.S. at 324. However, "[a] mere scintilla of evidence in support of the nonmovant's position will not defeat a motion for summary judgment." *Detrick v. Panalpina, Inc.,* 108 F.3d 529, 536 (4th Cir.), *cert. denied,* 522 U.S. 810, 118 S.Ct. 52, 139 L.Ed.2d 17 (1997). There must be "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson,* 477 U.S. at 249-50 (citations omitted).

III. Analysis

A. ADEA Violation

**\*3** Section 4(a)(1) of the ADEA, 29 U.S.C. § 623(a)(1), provides, in pertinent part: "It shall be unlawful for an employer ... to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age."

"In order to establish a cause of action under the ADEA, a plaintiff must demonstrate that but for the employer's motive to discriminate against the plaintiff on the basis of age, the plaintiff would not have been discharged." *E.E.O.C. v. Clay Printing Co.,* 955 F.2d 936, 940 (4th Cir.1992). "The Fourth Circuit recognizes two avenues of proof by which an employee can prove an ADEA violation: '(1) under ordinary principles of proof using any direct or indirect evidence relevant to and sufficiently probative of the issue, or (2) under a judicially created proof scheme originally used in the Title VII context in [*McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)] and subsequently adapted for use in ADEA cases." ' *Burns v. AAF-McQuay, Inc.,* 96 F.3d 728, 731 (4th Cir.1996) (quoting *Tuck v. Henkel Corp.,* 973 F.2d 371, 374-75 (4th Cir.1992)); *Clay Printing,* 955 F.2d at 940. Under the *McDonnell Douglas* framework, the plaintiff must first establish a *prima facie* case of discrimination. *See McDonnell Douglas,* 411 U.S. at 802; *Bryant v. Bell Atl. Md., Inc.,* 288 F.3d 124, 133 (4th Cir.2002). If a plaintiff establishes a *prima facie* case of discrimination through circumstantial

Not Reported in F.Supp.2d                                                                                      Page 3
Not Reported in F.Supp.2d, 2005 WL 544733 (D.Md.), 151 Lab.Cas. P 35,016
**(Cite as: 2005 WL 544733 (D.Md.))**

evidence, the burden of production then shifts to the defendant to provide a legitimate, non-discriminatory reason for the differential treatment. *See Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 142, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000); *Tex. Dept. of Cmty. Affairs v. Burdine,* 450 U.S. 248, 252-53, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *McDonnell Douglas,* 411 U.S. at 802. The plaintiff must then " 'prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." ' *Reeves,* 530 U.S. at 142, *quoting Burdine,* 450 U.S. at 253.

Here, Plaintiff presents no direct evidence of discrimination, so the court applies the *McDonnell Douglas* test. To establish a *prima facie* case of age discrimination, Plaintiff must show that (1) he is a member of a protected class; (2) he suffered an adverse employment action; (3) he was performing his job duties at a level that met his employer's legitimate expectations at the time of the adverse employment action; and (4) the position remained open or was filled by similarly qualified applicants outside the protected class. *Hill v. Lockheed Martin Logistics Mgmt., Inc.,* 354 F.3d 277, 285 (4th Cir.2004) (citing *Brinkley v. Harbour Recreation Club,* 180 F.3d 598, 607 (4 th Cir.1999)).

Plaintiff clearly satisfies the first two criteria: At 61 years of age, he is within the protected age group, *see* 29 U.S.C. § 631(a); and he was fired. Defendant contends, however, that Plaintiff was not performing his job at a level that met Defendant's legitimate expectations at the time he was terminated because in the December 2002 incident, Plaintiff "failed to follow his supervisor's direction by reading meters without authorization on a Sunday morning; failed to follow procedures by writing meter readings on paper, instead of entering them in a computer; and falsified Company documents by entering meter readings in a computer not on the day they were read, but on another day." Defendant asserts its right to fire Plaintiff for such actions because the operative labor contract states:

**\*4** The Company may discharge an employee for any just cause including, but not limited to, the following: dishonesty; falsification of Company documents; incompetence; poor job performance ... failure to carry out instructions of supervisors to the best of the employee's ability; refusal to carry out instructions of supervisors ... or for any just cause.

Paper no. 21, Exh. 5, Attachment # 1, Art. 5(2)(a).

The court notes that Defendant's argument that Plaintiff was terminated for just cause might more properly be considered as a legitimate, non-discriminatory reason for the differential treatment, i.e., *after* Plaintiff's *prima facie* burden has been met, rather than as an argument against Plaintiff having met the *prima facie* burden itself. In this case, however, the court need not choose: Either way, Plaintiff admits Defendant's allegations that he took meter readings on Sunday without prior approval and that he took them on a notepad rather than directly into his handheld computer, both in violation of Defendant's policies. Plaintiff has introduced no evidence that these policies were illegitimate, that he had any reasonable expectation of being excused for these violations, nor that these behaviors were overlooked in other cases despite the policies. In short, Plaintiff simply cannot "demonstrate that but for the employer's motive to discriminate against the plaintiff on the basis of age, the plaintiff would not have been discharged." *Clay Printing,* 955 F.2d at 940. He is therefore unable to meet his burden, so summary judgment will be granted on the ADEA claim.

**B. FLSA Violation**

29 U.S.C. 207(a)(1) states, in pertinent part: "[N]o employer shall employ any of his employees ... for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed." Another court recently summarized the standard for determining whether a plaintiff's overtime hours are compensable under FLSA:

For compensation to be awarded, plaintiff's activities must ... be performed with the employer's knowledge. Work performed off-site must be counted as time worked only "if the employer knows or has reason to believe that work is being performed." 29 C.F.R. § 785.12 (1997); *see also* 29 C.F.R. § 785.11 (1997) ("If the employer knows or has reason to believe that [the employee] is continuing to work ... the time is working time."); *Forrester v. Roth's I.G.A. Foodliner, Inc.,* 646 F.2d 413, 414 (9th Cir.1981) ("An employer who knows or should have known that an employee is or was working overtime must comply with the provisions of [29 U.S.C.] § 207 [mandating overtime pay].").

Moreover, once an employer knows or has reason to know that an employee is working overtime, it cannot deny compensation even where the

Not Reported in F.Supp.2d                                                                         Page 4
Not Reported in F.Supp.2d, 2005 WL 544733 (D.Md.), 151 Lab.Cas. P 35,016
(Cite as: 2005 WL 544733 (D.Md.))

employee fails to claim overtime hours. *See Caserta v. Home Lines Agency, Inc.,* 273 F.2d 943, 946 (2nd Cir.1959); *Newton v. City of Henderson,* 47 F.3d 746, 748 (5th Cir.1995); *Forrester,* 646 F.2d at 414. An employer need not have actual knowledge of such off-site work; constructive knowledge will suffice. *See Reich v. Department of Conservation and Natural Resources,* 28 F.3d 1076, 1082 (11th Cir.1994).

*5 *Holzapfel v. Town of Newburgh,* 145 F.3d 516, 524 (2nd Cir.1998). Here, Plaintiff contends that he is owed money for 291 hours of breaks and lunch periods during which he worked but for which he was not compensated. *See* paper no. 21, Exh. 7. He admits, however, that he never reported those hours on his timesheets, nor did he ever ask to be paid for those hours until this lawsuit, *see* paper no. 21, Exh. 8, at 144-45. The only evidence in the record to support his contention that he worked the claimed overtime hours is his affidavit, which is directly contradicted by his signed timesheets. As such, it amounts only to a "scintilla of evidence," so summary judgment is appropriate. *See, e.g., Bill Call Ford, Inc. v. Ford Motor Co.,* 830 F.Supp. 1045, 1050 (N.D.Ohio 1993) ("Plaintiff's affidavit contradicting his own contemporaneous correspondence is, it is believed, only a scintilla of proof on this issue, rendering summary judgment appropriate."); *Prince v. Farmers Ins. Co.,* 790 F.Supp. 263, 267 (W.D.Okla.1992) (summary judgment granted where "[t]he documentary evidence in this case, ... which directly contradict[s] statements made in the affidavits, demonstrates that the affidavits are incredible and totally without merit. Plaintiff has failed to proffer even a scintilla of credible evidence raising a factual issue ...."), *rev'd on other grounds,* 982 F.2d 529 (10th Cir.1992). Plaintiff cites *Turner v. Human Genome Scis., Inc.,* 292 F.Supp.2d 738, 748 (D.Md.2003), for the proposition that in FLSA overtime cases, "[i]n the absence of an exact record of hours, ... [a] *prima facie* case can be made through an employee's testimony giving his recollection of hours worked." *Id.* Here, however, his timesheets--"an exact record of hours"--are plainly available. *Turner* is therefore inapposite. Accordingly, summary judgment will be granted on the FLSA claim.

IV. Conclusion

For the reasons stated above, the court grants Defendant's motion. A separate Order will follow.

ORDER

For the reasons stated in the foregoing Memorandum

Opinion, it is this 4th day of March, 2005, by the United States District Court for the District of Maryland, ORDERED that:

1. The motion of Defendant Washington Gas for summary judgment (paper no. 21), BE, and the same hereby IS, GRANTED;

2. Judgment BE, and the same hereby IS, ENTERED in favor of Washington Gas Light Company and against Richard D. White; and

3. The Clerk will transmit copies of the Memorandum Opinion and this Order to counsel for the parties, and CLOSE this case.

Not Reported in F.Supp.2d, 2005 WL 544733 (D.Md.), 151 Lab.Cas. P 35,016

END OF DOCUMENT

Westlaw.

Not Reported in A.2d                                                                                                      Page 1
Not Reported in A.2d, 1998 WL 563817 (Conn.Super.), 23 Conn. L. Rptr. 37
**(Cite as: 1998 WL 563817 (Conn.Super.))**

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.


Superior Court of Connecticut.
YALE NEW HAVEN HOSPITAL
v.
Thomas DeMATTEO
**No. CV 970407311S.**

Aug. 12, 1998.

MEMORANDUM OF DECISION

FRACASSE.

 *1 Presently before this court is plaintiff's motion to
strike defendant's counterclaim. The motion should
be granted.

 On December 11, 1997, Yale New Haven Hospital,
Inc., the plaintiff, filed a one count complaint against
Thomas DeMatteo, the defendant. The plaintiff
alleges that it rendered medical services to DeMatteo
with the expectation of payment, but that the
defendant "failed, refused and/or neglected to pay."
(Complaint ¶ ¶ 1, 3 & 4.) The plaintiff further alleges
that it is owed $4,292.25 for the medical services it
rendered to the defendant, as well as the costs of
bringing suit and statutory interest. (Complaint ¶ 2.)

 On February 5, 1998, DeMatteo filed an answer,
four special defenses and one counterclaim
containing two counts. The first count of the
counterclaim alleges that the plaintiff, in order to
collect the debt, employed an "abusive, deceptive and
harassing practice" in violation of General Statutes §
36a-646, the Creditors' Collection Practices Act
("CCPA"). [FN1] In the second count of the
counterclaim, the defendant alleges that the plaintiff's
behavior in collecting the debt also constituted an
"unfair, unscrupulous and deceptive business
practice" in violation of General Statutes § 42-110a
et seq., the Connecticut Unfair Trade Practices Act
("CUTPA"). [FN2]

FN1. "No creditor shall use any abusive,
harassing, fraudulent, deceptive or
misleading representation, device or practice
to collect or attempt to collect any debt."

General Statutes § 36a-646.

FN2. "No person shall engage in unfair
methods of competition and unfair or
deceptive acts or practices in the conduct of
any trade or commerce." General Statutes §
42-100b(a).

 On February 19, 1998, the plaintiff filed a motion to
strike both counts of the defendant's counterclaim.
[FN3] The plaintiff moves to strike the first and
second counts of the counterclaim on the ground that
"the facts provable under the allegations do not state
a viable cause of action in Connecticut." (Motion to
Strike, p. 1.) The defendant opposes the plaintiff's
motion, arguing that he has pleaded legally sufficient
facts in counts one and two to state claims for which
relief may be granted.

FN3. "A motion to strike may properly be
used to challenge the sufficiency of a
counterclaim." *Fairfield Lease Corp. v.
Romano's Auto Service,* 4 Conn.App. 495,
496, 495 A.2d 286 (1985).

 "The purpose of a motion to strike is to contest ... the
legal sufficiency of the allegations of [a
counterclaim] to state a claim upon which relief can
be granted." (Internal quotation marks omitted.)
*Faulkner v. United Technologies Corp.,* 240 Conn.
576, 580, 693 A.2d 293. "In ruling on a motion to
strike, the court is limited to the facts alleged in the
[counterclaim]. The court must construe the facts in
the [counterclaim] most favorably to the
[defendant]." (Internal quotation marks omitted.)
*Waters v. Autuori,* 236 Conn. 820, 825, 676 A.2d
357. "If facts provable in the [counterclaim] would
support a cause of action, the motion to strike must
be denied." *Id.,* 826, 676 A.2d 357.

 Count One--Violation of the CCPA

 The plaintiff argues that the first count, which
alleges a violation of the CCPA, should be stricken
because the CCPA does not provide for a private
cause of action. In opposition to the motion to strike,
the defendant argues that there is a private cause of
action under the CCPA pursuant to a recent Superior
Court decision, by implication in a Connecticut
Supreme Court decision, and from the statutory
language of the CCPA.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                 Page 2
Not Reported in A.2d, 1998 WL 563817 (Conn.Super.), 23 Conn. L. Rptr. 37
**(Cite as: 1998 WL 563817 (Conn.Super.))**

**\*2** The issue as to whether there exists a private cause of action pursuant to the CCPA has never been *expressly* addressed by the Connecticut Supreme Court. See *Gaynor v. Union Trust Co., 216 Conn. 458, 482, 582 A.2d 190.* No cases were uncovered which hold that there is a private cause of action under the CCPA. [FN4] There is, however, one Superior Court case which has explicitly held that there is no private cause of action under the CCPA. *Connecticut National Bank v. Montanari,* Superior Court, judicial district of Hartford-New Britain at Hartford, Docket No. 517808, 11 CONN. L. RPTR. 10 (January 26, 1994, *Aurigemma, J.*). [FN5]

> FN4. The defendant cites *Tillquist v. Ford Motor Credit Co., 714 F.Supp. 607 (D.Conn.1989),* and *Connecticut Light and Power Co. v. Clark,* Superior Court, judicial district of Danbury, Docket No. 319078, 17 C ONN.L.RPTR. 37 (May 16, 1996, *Moraghan, J.*), as authority for the proposition that both a federal court and a Connecticut Superior Court have recognized a private cause of action pursuant to the CCPA. The *Tillquist* and *Clark* decisions, however, did not expressly address the issue as to whether a private cause of action was provided for under the CCPA. Therefore, the *Tillquist* and *Clark* decisions should not be taken as authority for the proposition that a private cause of action is provided for under the CCPA.

> FN5. Compare *Krutchkoff v. Fleet Bank, N.A., 960 F.Supp. 541 (D.Conn.1996).*

In *Connecticut National Bank v. Montanari,* Judge Aurigemma presented the following analysis of the issue as to whether the CCPA provides for a private cause of action. "The [CCPA] does not explicitly provide the debtor with a private right of action. The legislative history of the [CCPA] indicates that the legislature rejected the inclusion of a private remedy in the [CCPA]. The three sections of the [CCPA] originated as Sections 1, 2, and 3 of P.A. 77-418. Early drafts of the bill included a Section 4, which provided for a private cause of action. Section 4 was removed for the reasons described by Senator Dinielli on the Senate floor: [T]he amendment removes section 4 which authorized the recovery of damages by the consumer for violations of the [CCPA]. It was felt that at the present time, the Commissioner, the Bank Commissioner, has enough powers to enforce the law and it would not be necessary for direct action by the consumer. Based on the foregoing, it appears that no private cause of action exists under the [CCPA]." *Connecticut National Bank v. Montanari, supra,* Superior Court, Docket No. 517808. This court agrees with Judge Aurigemma's analysis of the issue in *Montanari.*

This court finds that the CCPA does not provide for a private cause of action; the motion to strike is granted as to the first count for failure to state a claim upon which relief can be granted.

Count Two--CUTPA Claim Based on a Violation of the CCPA

The plaintiff argues that the second count, which alleges a CUTPA violation based upon a violation of the CCPA, should be stricken because the defendant has failed to set forth allegations sufficient to satisfy any one of the three prongs of the "cigarette rule." In opposition to the motion to strike, the defendant argues that the second count is legally and factually sufficient to support a cause of action for a CUTPA claim based upon a violation of the CCPA.

"It is well settled that in determining whether a practice violates CUTPA [the Connecticut Supreme Court has] adopted the criteria set out in the 'cigarette rule' by the federal trade commission for determining when a practice is unfair: (1) Whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise--in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers, [competitors or other business persons] ... All three criteria [of the cigarette rule] do not need to be satisfied to support a finding of unfairness. A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three." (Internal quotation marks omitted.) *Willow Springs Condominium Assn., Inc. v. Seventh BRT Development Corp., 245 Conn. 1, 43.* Under the first prong, a violation of CUTPA may be established by showing a practice which amounts to a violation of public policy as evidenced by a statute. See *id.* The defendant has attempted to state a CUTPA claim under the first prong based upon a violation of public policy as established by the CCPA. (Counterclaim, Second Count, 6 & 7.)

**\*3** Under the Second Count, the defendant

Not Reported in A.2d                                                                                        Page 3
Not Reported in A.2d, 1998 WL 563817 (Conn.Super.), 23 Conn. L. Rptr. 37
**(Cite as: 1998 WL 563817 (Conn.Super.))**

incorporates the allegations of the first count, which has now been stricken. The defendant was taken by ambulance to the plaintiff's hospital where, knowing he did not have health insurance, the plaintiff provided the defendant with excessive, unauthorized and unwanted medical treatment. (Counterclaim, Second Count, ¶ ¶ 1 & 5.) "The plaintiff then never sent the defendant an accounting as to what it did or why it charged him such excessive fees." (Counterclaim, Second Count, ¶ 2.) The defendant and his agents made legitimate inquiries to the plaintiff regarding the hospital bill and the unauthorized treatment. (Counterclaim, Second Count, ¶ ¶ 2 & 5.) The plaintiff refused to respond to these concerns, and failed to take any corrective action regarding the bill. (Counterclaim, Second Count, ¶ ¶ 2, 5 & 6.) Rather, the plaintiff "simply sued [the defendant] since he had no insurance." (Counterclaim, Second Count, ¶ 2.)

The defendant has not alleged, under the Second Count, sufficient facts to state a cause of action for a CUTPA violation. The motion to strike the second count is granted.

Not Reported in A.2d, 1998 WL 563817 (Conn.Super.), 23 Conn. L. Rptr. 37

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.